ROBERT V. PRONGAY (#270796)
KARA M. WOLKE (#241521)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

-and-

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs*
*and the proposed plaintiff Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Eventbrite, Inc. Securities Litigation | Master File No. 5:19-cv-02019-EJD |
| | CLASS ACTION |
| | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| This Document Relates To: All Actions | |

1
2

# **Table of Contents**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I.      NATURE OF THE ACTION ........................................................................... 1

II.     JURISDICTION AND VENUE ..................................................................... 4

III.    PARTIES ....................................................................................................... 4

IV.     EVENTBRITE   ACQUIRES   TICKETFLY,   ATTEMPTS   TO   MIGRATE   ITS
        CUSTOMERS, AND DISCOVERS THAT EVENTBRITE'S PLATFORM CANNOT
        MEET TICKETFLY'S CUSTOMERS' NEEDS ........................................... 6

        A.      Former Employees ............................................................................ 6

        B.      Eventbrite's Business ....................................................................... 7

        C.      Ticketfly's Business ......................................................................... 7

        D.      Eventbrite Acquires Ticketfly ......................................................... 8

        E.      Eventbrite Discovers that Ticketfly Is Incompatible With Its Business ................ 8

                1.      *Eventbrite Is An Ecumenical Platform* ........................................ 8

                2.      *Ticketfly   Only   Operates   in   North   America   and   Only   Works   With
                        Independent Music Venues and Festivals* ................................... 10

                3.      *Eventbrite Discovers that Migrating Ticketfly Customers Is A Daunting
                        Task* ...................................................................................... 11

        F.      Eventbrite Botches the Migration ................................................... 14

                1.      *Eventbrite Alienates Ticketfly's Salespeople* .............................. 14

                2.      *Eventbrite Alienates Ticketfly's Customers and Ticket Purchasers* .......... 16

V.      DEFENDANTS MADE MISLEADING STATEMENTS AND OMISSIONS IN THE
        REGISTRATION STATEMENT ................................................................ 17

VI.     EVENTBRITE   REVEALS   UNEXPECTED   DELAYS,   ADDITIONAL   EXPENSES,
        AND CUSTOMER LOSSES IN THE TICKETFLY MIGRATION ............................. 18

VII.    SECURITIES ACT CLASS ACTION ALLEGATIONS ................................. 21

VIII.   SECURITIES ACT CLAIMS ...................................................................... 23

FIRST CLAIM ....................................................................................................... 23

SECOND CLAIM ..................................................................................................... 24

IX.     EXCHANGE ACT CLAIMS ....................................................................... 24

X.      SUMMARY OF THE EXCHANGE ACT CLAIMS ................................... 24

        A.     By the Summer of 2018, Eventbrite Had Taken On Financial Obligations It Could Not Discharge Without An IPO ................................................................ 25

               1.    *Eventbrite Takes On Large Loans On Onerous Terms To Finance the Ticketfly Acquisition* ............................................................. 26

               2.    *Eventbrite's Convertible Preferred Stock Threatened To Dilute Eventbrite's Shareholders* ............................................................. 27

        B.     Defendants Actually Knew Facts Showing Their Statements Were False .......... 28

               1.    *A Month Before the IPO, Defendants Amend Dreskin's Contract To Target Ticketfly Customer Retention Rather Than Migration* ................. 28

               2.    *Hartz Learned That Migration Had Failed* ............................................. 29

XI.     DEFENDANTS MAKE ADDITIONAL FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ........................................................................ 30

XII.    SECTION 10(b) CLASS ACTION ALLEGATIONS ...................................... 35

XIII.   EXCHANGE ACT CLAIMS ....................................................................... 38

THIRD CLAIM ....................................................................................................... 38

FOURTH CLAIM .................................................................................................... 41

PRAYER FOR RELIEF ............................................................................................ 42

JURY TRIAL DEMANDED ..................................................................................... 42

Plaintiffs Michael Gomes, Melvin Pastores, Mohit Uppal, and Bruce Bones ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1.    This is a class action on behalf of persons and entities that: a) purchased or otherwise acquired Eventbrite, Inc. ("Eventbrite" or the "Company") securities pursuant or traceable to Eventbrite's registration statement and prospectus ("Registration Statement") issued in connection with the Company's September 2018 initial public offering ("IPO" or the "Offering"); or b) purchased or otherwise acquired Eventbrite securities between September 20, 2018 and May 1, 2019, inclusive (the "Class Period"), seeking remedies against Defendants, under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

2.    Eventbrite hosts a platform through which live event creators ("Customers") can plan for, market, and sell tickets to their events.[1]

3.    Unlike earlier entrants in the live event planning market, Eventbrite is not geared to any particular kind of event.  Instead, Eventbrite's platform is ecumenical, designed to be used by industry conferences, music performances, endurance challenges, and any other live event, whether in the U.S. or in the 169 other countries in which Eventbrite operates, and whether the event is free or charges admission.

4.    In September 2017, approximately one year prior to the IPO, Eventbrite had acquired Ticketfly, LLC ("Ticketfly"), a competitor, from Pandora Media, Inc. ("Pandora"), for $201.1 million.  Unlike Eventbrite, intended to be used by Customers planning any event in any country, Ticketfly is narrowly focused on just one region and just one industry: independent music venues and festivals in North America.

5.    Eventbrite's principal objective in acquiring Ticketfly was to acquire Ticketfly's

---

[1] Throughout, references to "Customers" are to Eventbrite and Ticketfly's immediate customers, *i.e.*, the event creators/promoters. References to "Ticket Purchasers" are to those Customers' customers, *i.e.*, event attendees.

1    existing relationships and clients in the independent music venue market in North America.

2         6.       To reduce overhead and engineering costs, Eventbrite incorporated any new

3    platforms it acquired into its core Eventbrite platform. Eventbrite then eliminates (or "deprecates")

4    the old platform. As part of the process, Eventbrite tries to entice the old platform's customers to

5    switch (or "migrate") to Eventbrite's platform rather than to a competitor's.

6         7.       On September 20, 2018, Eventbrite filed its prospectus for its IPO.  In the IPO,

7    Eventbrite sold 11.5 million shares of Class A common shares ("common stock" or "common

8    shares") for $23.00 per share.  Eventbrite received proceeds of approximately $246.0 million from

9    the IPO, net of underwriting discounts and commissions.

10        8.       The Registration Statement which was used to sell shares in the IPO was materially

11   misleading because Defendants negligently omitted that Eventbrite was failing in migrating

12   Ticketfly customers to Eventbrite's platform.  As explained more fully herein, the migration

13   efforts suffered because Ticketfly offered its Customers various features and services which were

14   not available on, and could not easily be added to, Eventbrite.  As a result, Ticketfly Customers

15   did not migrate to Eventbrite as expected.

16        9.       Within about two months of the acquisition, Eventbrite asked all of Ticketfly's

17   salespeople to identify which of the Ticketfly features that were unavailable on Eventbrite their

18   Customers relied on.  Eventbrite also asked the salespeople to estimate how important these

19   missing features were to Customers.  Eventbrite called each such analysis a "gap analysis."

20        10.      The gap analyses identified three features that nearly all Ticketfly Customers used

21   and which they most highly valued.  These are: (a) 24-hour support for the Customers' Ticket

22   Purchasers; (b) an integrated email system that allows Customers to automatically send emails to

23   Ticket Purchasers and others; and (c) the ability to automatically break down fees for the Ticket

24   Purchasers any way the Customer wants.

25        11.      It was extremely difficult for Eventbrite to offer these features.  Ticketfly was able

26   to offer 24-7 customer support because it could piggyback off Pandora's existing customer support

27   lines.  The cost for Eventbrite to offer the same service would be astronomical.  Eventbrite does

28   not integrate email at all, and so would have to spend considerable engineering time creating not

1    just specific features Ticketfly Customers liked but the entire email infrastructure.  And the ability

2    to break down fees was such a significant engineering challenge that Eventbrite could not

3    complete it until early 2019, a year and a half after it bought Ticketfly.

4    12.    Eventbrite also mishandled the Ticketfly integration. Customers had to be

5    persuaded to switch to Eventbrite's platform.  Yet Eventbrite alienated the Ticketfly salespeople

6    who would do the persuading by convincing them that they had no future with Eventbrite.

7    Eventbrite made it these salespeople's jobs merely to retain Customers rather than pitch services to

8    new Customers.  Eventbrite abandoned valued and nearly costless Ticketfly traditions.  Believing

9    that Eventbrite would fire them after they finished migrating their Customers onto its platform,

10   many salespeople simply left, with departures reaching a "tipping point" by early 2018.

11   13.    For all these reasons, by the time of the IPO, the troubles integrating Ticketfly were

12   a known trend or uncertainty reasonably expected to have a material unfavorable impact on

13   Eventbrite's financial performance.[2]  As such, Defendants were obligated to disclose it in the

14   Registration Statement, but negligently did not.  Further, in stating in the Registration Statement

15   that "*[t]he modularity and extensibility of our platform enables us to quickly integrate and*

16   *migrate creators to the Eventbrite platform, allowing us to quickly deprecate the acquired*

17   *technology and associated costs*," Defendants misleadingly concealed that Eventbrite's platform

18   could not be extended to include the features that influenced Customers to choose Ticketfly.

19   14.    Moreover, Eventbrite's ability to integrate Ticketfly and to migrate its customers

20   onto its platform was clearly material to Eventbrite investors.  Ticketfly was Eventbrite's largest

21   ever acquisition, by far, and accounted for about one quarter of Eventbrite's revenues.

22   15.    On March 7, 2019, Defendants announced Eventbrite's full year 2018 results.  In

23   announcing the results, Defendants admitted that (a) the Ticketfly migration had taken longer than

24   Eventbrite's previous representations and would only be completed by the second half of 2019; (b)

25   Q4 2018 revenues had been lower, and Q1 2019 revenues would be lower, than previous estimates

26   because Eventbrite was spending its energy migrating Ticketfly customers rather than finding new

27   ones; and (c) Eventbrite's expenses in migrating Ticketfly customers had been and would continue

28

---

[2] 17 C.F.R. § 229.303(a)(3)(ii).

to be higher than previously stated.  The next day, the price of Eventbrite's shares fell $7.96 to close at $24.46 on unusually high trading volume. All big-name analysts following Eventbrite attributed the drop to the Ticketfly disclosures.

16.     On May 1, 2019, Defendants announced Eventbrite's Q1 2019 disappointing earnings results.  In announcing the Q1 2019 results, Defendants admitted that (a) North American music revenue grew only modestly year-over-year because Eventbrite's salespeople had focused on retaining and migrating Ticketfly Customers, and (b) because it had not been able to migrate Ticketfly Customers, Eventbrite was lowering its Q2 2019 revenue guidance. The next day, the price of Eventbrite's shares fell $6.55 to close at $17.60 on unusually high trading volumes. All big-name analysts following Eventbrite again attributed the drop to the Ticketfly disclosures.

**JURISDICTION AND VENUE**

17.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). The Company has offices in this district.

20.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

21.     Plaintiffs Michael Gomes, Melvin Pastores, and Mohit Uppal, as set forth in their certifications which they previously filed and which are incorporated by reference herein, purchased Eventbrite securities during the Class Period pursuant or traceable to the Registration

1  Statement issued in connection with the Company's IPO, and were damaged thereby.

2         22.     Plaintiff Bruce Bones, as set forth in his certification which is attached as an exhibit

3  hereto and which is incorporated by reference herein, purchased Eventbrite securities during the

4  Class Period pursuant or traceable to the Registration Statement issued in connection with the

5  Company's IPO, and was damaged thereby.

6         23.     Defendant Eventbrite is incorporated under the laws of Delaware. Its principal

7  executive offices are in San Francisco. Eventbrite's stock trades on the New York Stock Exchange

8  ("NYSE") under the symbol "EB."

9         24.     Defendant Julia Hartz ("Hartz") was, at all relevant times, the Chief Executive

10  Officer and a Director of the Company, and signed the Company's Registration Statement filed

11  with the SEC.

12         25.     Defendant Randy Befumo was, at all relevant times, the Chief Financial Officer of

13  the Company, and signed the Company's Registration Statement filed with the SEC.

14         26.     Defendant Andrew Dreskin was a director of the Company and signed the

15  Company's Registration Statement filed with the SEC. Dreskin reported directly to Julia Hartz.

16  Dreskin founded Ticketfly and ran it until Eventbrite acquired it. He then headed up Eventbrite's

17  music operations.

18         27.     Defendants Hartz, Befumo, and Dreskin are the "Individual Defendants."

19         28.     Defendant Katherine August-deWilde was a director of the Company and signed

20  the Company's Registration Statement filed with the SEC.

21         29.     Defendant Roelof Botha was a director of the Company and signed the Company's

22  Registration Statement filed with the SEC.

23         30.     Defendant Kevin Hartz ("Kevin Hartz") was a director of the Company and signed

24  the Company's Registration Statement filed with the SEC. Kevin Hartz is Hartz's husband.

25         31.     Defendant Sean P. Moriarty was a director of the Company and signed the

26  Company's Registration Statement filed with the SEC.

27         32.     Defendant Lorrie M. Norrington was a director of the Company and signed the

28  Company's Registration Statement filed with the SEC.

33.     Defendant Helen Riley was a director of the Company and signed the Company's Registration Statement filed with the SEC.

34.     Defendant Steffan C. Tomlinson was a director of the Company and signed the Company's Registration Statement filed with the SEC.

35.     Defendants Hartz, Befumo, August-deWilde, Botha, Dreskin, Kevin Hartz, Moriarty, Norrington, Riley, and Tomlinson are the "Securities Act Individual Defendants."

36.     Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") underwrote Eventbrite's IPO.

37.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") underwrote Eventbrite's IPO.

38.     Defendant Allen & Company LLC ("Allen") underwrote Eventbrite's IPO.

39.     Defendant RBC Capital Markets, LLC ("RBC") underwrote Eventbrite's IPO.

40.     Defendant SunTrust Robinson Humphrey, Inc. ("Suntrust") underwrote Eventbrite's IPO.

41.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") underwrote Eventbrite's IPO.

42.     Defendants Goldman Sachs, J.P. Morgan, Allen, RBC, SunTrust, and Stifel are the "Underwriter Defendants."

**EVENTBRITE ACQUIRES TICKETFLY, ATTEMPTS TO MIGRATE ITS CUSTOMERS, AND DISCOVERS THAT EVENTBRITE'S PLATFORM CANNOT MEET TICKETFLY'S CUSTOMERS' NEEDS**

*Former Employees*

43.     Former Employee 1 ("FE 1") was employed by Eventbrite between 2016 and June 2018, first as a Marketing Operations/Revenue Operations Analyst.  FE 1's responsibilities were monitoring Eventbrite's sales pipeline and completing analysis such as forecasting, site traffic, and deals that need to close.  FE 1's position came under the "marketing umbrella" of the Ticketing and Registration Business Unit.  FE 1 attended quarterly meetings at each of which Eventbrite's Music Business Unit, which consisted primarily of Ticketfly's legacy operations, made 15-minute presentations.  FE 1 worked in Eventbrite's San Francisco office and interacted socially with a

host of Ticketfly employees.

44.     Former Employee 2 ("FE 2") was a Ticketfly Senior Festival Success Specialist from August 2011 through to November 2018. FE 2's job was principally to sell Ticketfly's services to new and existing clients and to retain existing clients. FE 2 was familiar with Eventbrite and Ticketfly's services at all times because it was FE 2's job to sell these services.

45.     About 400 Eventbrite employees (including former Ticketfly employees) work out of the Company's San Francisco office located at 155 5th Street, 7th Floor, San Francisco, CA, 94103. Ticketfly's corporate employees, including Dreskin, worked in Eventbrite's offices. While Eventbrite leases two floors of 155 5th Street to house its San Francisco office,[3] during FE 1's tenure, Eventbrite subleased one of the floors it leased, so all Eventbrite employees worked on the same floor. Accordingly, information spread easily and quickly to all Eventbrite and Ticketfly employees like FE 1 and his colleagues.

***Eventbrite's Business***

46.     Founded in 2006, Eventbrite hosts an online platform designed to help its customers create live events. Eventbrite earns substantially all its income through its event planning platform, which provides event creators with some of the resources they need to plan, promote, and produce live events. Eventbrite's platform provides some services outright, such as printing tickets. Eventbrite's platform will also put creators in touch with third parties for other services, such as event security and email services. Eventbrite helps Customers put on live events in 170 countries.

***Ticketfly's Business***

47.     Founded in 2008, Ticketfly also assists Customers in planning and marketing live events through a platform, among other things.  Ticketfly limits its services to independent music venues and festivals in North America.

---

[3] Lease By and Between University of the Pacific, a California nonprofit corporation As Landlord and       Eventbrite,       Inc.,       a       Delaware       corporation       as       Tenant. https://www.sec.gov/Archives/edgar/data/1475115/000119312518255960/d593770dex101.htm

***Eventbrite Acquires Ticketfly***

48.     In September 2017, Eventbrite acquired Ticketfly. In a September 1, 2017 press release announcing the acquisition, Eventbrite made clear that a substantial purpose of the acquisition was to acquire Ticketfly's Customers and relationships:

> "The union of Eventbrite and Ticketfly changes the game for the music industry. Our respective customers will benefit immensely from access to the best of what each company brings to the table," said Julia Hartz, CEO and co-founder of Eventbrite. "Eventbrite's proven track record of innovation and global scale combined with Ticketfly's deep industry relationships and domain expertise is underpinned by a shared commitment to independence, and unparalleled service to our customers."
> […]
>
> Ticketfly works with over 1,800 of the top music promoters and venues across North America, and will bring iconic names such as 9:30 Club, Bowery Ballroom, Troubadour, and the Pitchfork Music Festival to Eventbrite's roster of marquee music customers including Margin Walker Presents, Mohawk, Le Poisson Rouge and Newport Folk Festival. Customers will not only benefit from the ticket-selling power of Eventbrite's distribution strategy, which includes partners such as Facebook, Spotify, and Bandsintown, but also from Ticketfly's full-service approach to digital marketing, and deep music industry experience.

49.     Eventbrite paid $201.1 million for Ticketfly. It was, by a factor of five, the largest acquisition in Eventbrite's history.

50.     Ticketfly accounted for a material portion of Eventbrite's revenues. In 2016, Ticketfly earned $40.6 million in revenues, while Eventbrite earned $133.5 million.

***Eventbrite Discovers that Ticketfly Is Incompatible With Its Business***

*Eventbrite Is An Ecumenical Platform*

51.     Eventbrite's platform is designed to serve a very large, very disaggregated market. Eventbrite seeks to sell its services to anyone planning any sort of event nearly anywhere in the world.

52.     Eventbrite has four core markets, and they are diverse: festivals, music, registration events such as conventions, and endurance events such as races. These four markets collectively accounted for about 80% of its revenues during the Class Period.[4]   In 2017, the Music market accounted for 358 million tickets, the Festivals market accounted for 437 million tickets,

---

[4] May 14, 2019 conference call organized by J.P. Morgan.

1   Registration accounted for 283 million, and Endurance accounted for 69 million.

2      53.   Yet the diversity of its core markets does not capture the reach of Eventbrite's

3   services.  Eventbrite services a diverse group of Customers using its single platform.  Eventbrite's

4   Customers include the Department of Justice, the Oregon Air Show, and the March of Dimes for

5   Babies.  Eventbrite's Customers also include restaurants, management consultants, hospitals, and

6   universities.  Customers use Eventbrite to fill classrooms, races, and conferences.

7      54.   Eventbrite provides a one-size-fits-all platform to these diverse Customers.

8   Eventbrite does not customize its offering for different regions, different events, or different

9   markets.  According to Defendant Hartz, "[w]hat's unique about Eventbrite is we have aggregated

10  a very, very fragmented market."[5]

11     55.   Further, Eventbrite's operations are spread around the world.  In 2017, Eventbrite

12  helped conduct events in 170 countries.

13     56.   Eventbrite targets its marketing principally to Customers who are not professional

14  event planners.  Eventbrite gains market share by presenting itself to potential customers in two

15  principal ways.  First, Eventbrite sells its Customers' tickets on its own website.  Thus, when

16  Ticket Purchaser purchase their tickets to attend an Eventbrite Customer's event, they are exposed

17  to Eventbrite's services – providing Eventbrite with free advertising.

18     57.   Second, Eventbrite offers a basic service for free to events that do not charge

19  admission.  If Customers want a more comprehensive suite of services, or if they want to sell

20  tickets, Eventbrite offers paid services at various tiers.

21     58.   These two forms of advertising are not designed to reach professional event

22  organizers but instead Customers who may never have created a paid event before. And indeed,

23  according to the Registration Statement, in 2017, about 95% of Eventbrite's customers, accounting

24  for about 54% of its revenues, signed themselves up on Eventbrite's platform without any targeted

25  marketing.

26     59.   Eventbrite monetizes its Customers through three pricing plans: essentials,

27  professional, and premium. While each pricing plan provides a different set of features, Eventbrite

28  ────────────────────
[5] May 14, 2019 conference call organized by J.P. Morgan.

1    does not offer custom features to its Customers.

2    *Ticketfly Only Operates in North America and Only Works With Independent Music*

3    *Venues and Festivals*

4    60.    Eventbrite faces essentially two different competitive markets.  In most of its

5    markets, it is the first truly large-scale online ticketing solution.  Defendants stated in the

6    Registration Statement and other SEC filings that Eventbrite's competition in those markets is

7    "traditional solutions to event management, such as offline, internal or ad hoc solutions."  It is so

8    bereft of existing competitors in these markets that in these SEC filings, it resorts to naming

9    potential competitors instead - "products offered by large technology companies that ***may enter***

10   the market" (emphasis added).

11   61.    But the large, lucrative independent music venue in which it operates it operates,

12   chiefly through Ticketfly, is completely different.  The first company offering online ticketing in

13   the independent music venue market, TicketWeb, was founded in 1996, and remains in business

14   today, operating under the Ticketmaster brand.  Ever since then, the market for ticketing solutions

15   for independent music venues has been cutthroat.  In addition to Ticketmaster, in the independent

16   music venue market, Eventbrite faces competition from tickets.com, StubHub, VividSeats, and

17   ShowClix, among many others.  These competitors have invested – and continue to invest –

18   heavily to entice professional event organizers to select them.  Because the independent music

19   venue market is competitive, independent music venues have many options to choose from and

20   persuading them to hire Ticketfly rather than the competition requires a much more tailored

21   products than Eventbrite offers in most of its markets.

22   62.    The independent music venue market is nonetheless highly attractive.  Eventbrite

23   as a whole earned about approximately $288 per Customer in 2017 to Ticketfly's $22,553 per

24   Customer in 2016.[6]

25   63.    To successfully compete in the music venue market, Ticketfly provides its

26   _____

27   [6] The Registration Statement reported that Eventbrite had 700,000 Customers and revenues of
     $201.6 million in 2017. The press release announcing Ticketfly's acquisition reported that
28   Ticketfly had 1,800 Customers, and the Registration Statement reported that it earned $40.6
     million in 2016.

1   Customers with individual software solutions and individual assistance.  Thus, Ticketfly's website

2   looks different and provides different features for each Customer.

3       64.    Ticketfly also provides its Customers with general features that are far superior to

4   Eventbrite's and difficult to duplicate.

5       65.    Eventbrite's salespeople were only sales representatives. But according to Hartz,

6   "Ticketfly had a different model where their sales reps were also account managers."[7]

7           *Eventbrite Discovers that Migrating Ticketfly Customers Is A Daunting Task*

8       66.    Long before the IPO, Evenbrite had discovered that migrating Ticketfly Customers

9   to Eventbrite's platform would be a monumental task.

10      67.    According to FE 2, Eventbrite began attempting to migrate customers immediately

11  after the Ticketfly acquisition closed.

12      68.    To support migration, Eventbrite attempted to determine which of Ticketfly's

13  features its Customers used.  According to FE 2, within two months of Eventbrite had *every*

14  Ticketfly salesperson conduct a "gap analysis" for each of their customers who contributed more

15  than $10,000 in gross income.  These gap analyses aimed to rank Ticketfly functions the Customer

16  used which Eventbrite could not supply (gaps).  As part of the gap analysis, Eventbrite supplied

17  Ticketfly's salespeople with a form that listed a series of gaps Eventbrite's management had

18  identified. Ticketfly salespeople were asked to check a box indicating whether the customer used

19  the feature Eventbrite could not offer.  For every gap thus identified, Ticketfly's salespeople were

20  asked to evaluate on a ranked scale how important the missing service was to the Customer. The

21  salespeople's gap analysis submissions were compiled and collated in a document FE 2 called

22  "living" which was accessible to relevant Eventbrite and Ticketfly employees. FE 2 had access to

23  the gap analysis document and thus could view all his colleagues' gap analyses.

24      69.    Ticketfly and Eventbrite took the gap analyses seriously.  The effort put into the

25  gap analysis was huge.  FE 2 spent about 5-8 hours preparing initial gap analyses.  He spent *much*

26  more time updating the analyses as new Eventbrite features were rolled out.

27      70.    Senior Ticketfly personnel were involved.  FE 2 received several emails from

28  ───────────────────

[7] May 14, 2019 conference call organized by J.P. Morgan.

Ticketfly Head of Operations Allison Brecklin checking on the status of his gap analysis. Brecklin reports directly to Defendant Dreskin.

71.   According to FE 2, the gap analysis identified glaring deficiencies in Eventbrite's services, many of which would not be easy to remedy.  First, when it was owned by Pandora, Ticketfly was able to provide its Customers a 24-7 hotline for their Ticket Purchasers to call to resolve issues.  According to FE 2, since Pandora already provided a hotline, it cost little to extend the service to Ticket Purchasers.

72.   Unlike Pandora, though, Eventbrite does not have any ongoing telephone Customer Support for Ticket Purchasers or for any purpose. Instead, it provides ad hoc customer support services when trying to land large deals.  Neither Ticketfly (because the service was provided by Pandora) nor Eventbrite have any experience providing 24-hour customer Support services. According to FE 1, the cost of providing customer support services for Ticket Purchasers would be "astronomical."

73.   Indeed, FE 1 reports that when he left in June 2018, Eventbrite was in the beginning stages of attempting to develop a Ticket Purchaser hotline.  As FE 1 learned through conversations with Ticketfly employees, Eventbrite's engineers had not even figured out how to authenticate Ticket Purchasers.

74.   In his and others' gap analyses, FE 2 noted that "[e]very customer at Ticketfly used" phone customer support and integrated email (see below).  Indeed, according to FE 2, the "customer support aspect" was "huge for our clients." Not only would Eventbrite provide information to Ticket Purchasers, sparing the Customer from hiring its own representatives, but Eventbrite would tactfully help with "difficult" Ticket Purchasers. Eventbrite did not provide any Ticket Purchaser Support Services; rather, at Eventbrite, "the venues were on their own to deal with customers."

75.   Eventbrite's principal competitor, TicketWeb, offered both a Ticket Purchaser support line and a live helpdesk at all relevant times. Eventbrite still does not offer Ticket Purchaser support to this day.

76.   According to FE 1, not only was Ticket Purchaser support provided to all Ticketfly

Customers, it was also written into most Ticketfly Customer contracts.

77.     FE 2 reports that Ticketfly also provided a custom integrated email tool. The email tool could automate marketing emails. FE 2 notes that Customers could use this tool to, for example, send an automated weekly email to potential customers about upcoming events. Ticketfly offered this tool to all Customers at no extra cost, and it was fully integrated into the Ticketfly platform.

78.     In contrast, FE 2 reports, Eventbrite provided its customers email services through a third-party vendor, Emma. Emma was not integrated into the Eventbrite platform. Thus, for email campaigns, Eventbrite Customers had to manage both an Emma and an Eventbrite account, a time-consuming process.  Moreover, Emma was expensive – according to FE 2, it could cost a Customer more than $10,000 per year.

79.     Finally, Ticketfly offered Customers customizable fee schedules, which Eventbrite did not. Ticketfly customers could break out the costs of the tickets however they wanted, including service fees, facility and maintenance fees, and various taxes. This was important for two reasons. First, while Ticketfly would separately identify federal, state, and municipal sales taxes, Eventbrite would simply have an entry for "taxes" – leaving it to the Customer to separate the check between the various government claimants.  Second, by presenting Ticket Purchasers with a detailed breakdown of what their dollars were paying for, Ticketfly's Customers could reassure Ticket Purchasers that their own fees were not extravagant.

80.     In addition, FE 2 notes that "a lot of [Ticketfly] Customers expressed dissatisfaction with the Eventbrite platform." FE 2 notes that many of Eventbrite's features, designed for small Customers, are a poor fit for Ticketfly's business. For example, at all relevant times, there was a section in every page for every event on Eventbrite advertising other similar events (currently titled "Other Events You May Like"). These advertisements consist largely of advertisements for the Customer's competitors, as they are the ones who offer similar events. Eventbrite's Customers typically are small and individually have no impact on the market. For example, an Eventbrite Customer might be a band that puts on occasional shows. If the band puts on a show on the 5th of October, say, advertising that a different band is putting a show on

December 4th does not harm the band. But Ticketfly's Customers are professional venues - repeat players who compete directly for customers. A Ticketfly Customer with a show on October 5 very likely has a show on December 4 (or at least has shows that week). Thus, advertising a competitor's December 4 show on the Ticketfly Customer's October 5 event page conflicts with the Customer's own December 4 show. Thus, advertising for competitors on Ticketfly's Customers' page directly harms the Customers.

81.     Ticketfly's Customers met requests to migrate to Eventbrite with skepticism. Eventbrite had been Ticketfly's closest competitor. Ticketfly's salespeople, including FE 2, had geared their sales pitches to pointing out flaws in Eventbrite's platform and explaining how Ticketfly's was better. Ticketfly's Customers had chosen Ticketfly because the pitch worked. FE 2 and other Ticketfly salespeople had told Customers it was "crazy" to allow advertising for competitors on their own event pages, as Eventbrite did. Yet once Eventbrite acquired Ticketfly, these same salespeople had to return to these same Customers – often the very same employees – and tell them that advertising competitors on the Customer's own page was a good thing. According to FE 1 and FE 2, the pitch rarely worked. FE 1 stated that salespeople "had no trust with their clients" while FE 2 observed that they lost much credibility with their clients by having to make the pitch. Customers who were convinced that advertising competitors harmed their business could switch to TicketWeb, among others, as it does not advertise competitors' events on the Customer's own event page.

82.     For all these reasons, by the time FE 2 left in November 2018, very few of his customers had migrated to Eventbrite.

***Eventbrite Botches the Migration***

*Eventbrite Alienates Ticketfly's Salespeople*

83.     According to FE 1, Ticketfly's engineers received very favorable terms that left them "happy and content."   But, FE 1 said, Ticketfly's salespeople did not receive similar favorable treatment.

84.     As Eventbrite discovered, however, these salespeople were critical.

85.     Migrating Customers is not a technically difficult task. The difficult part is

convincing the Customers to migrate. Ticketfly's Customers use it because of its bespoke attention to their particular needs, while Eventbrite is one-size-fits-all. Accordingly, to migrate customers from Ticketfly to Eventbrite, Eventbrite depended critically on Ticketfly's salespeople to convince Customers that Eventbrite would address their needs.

86.     Yet Eventbrite's actions convinced Ticketfly's salespeople that they had no future at Eventbrite.

87.     First, according to FE 1 and FE 2, rather than have Ticketfly's salespeople attempt to sell Ticketfly or Eventbrite to new customers, Eventbrite limited these salespeople's jobs to retaining existing customers and migrating them to Eventbrite. As FE 2 explains, "My job [at Eventbrite] was just to retain customers." While Ticketfly salespeople's job had included retaining Customers, FE 2 explains that meeting new clients and selling services had always been part of his job. Adding to FE 2's frustration, and as set out above, FE 2's efforts strained his credibility with existing clients. Indeed, FE 1 notes that the Ticketfly salespeople "were being asked to retain customers for a platform they weren't good at." In light of their diminished responsibility and the positions Eventbrite was asking them to take with Customers, FE 2 and other Ticketfly salespeople suspected that Eventbrite intended to fire them after they had finished migrating Customers.

88.     Second, according to FE 1 and FE 2, Eventbrite refused to accommodate Ticketfly's different culture. Eventbrite is made up of tech industry professionals who may (or may not) have an interest in music or in the other types of events Eventbrite helped host. But Ticketfly's employees were music industry professionals who loved music. Many Ticketfly employees could play musical instruments.

89.     According to FE 1, one of Ticketfly's beloved traditions was a jam room in which employees could go to play musical instruments. Because Eventbrite was moving Ticketfly employees into its own offices, in or before October 2017, Defendant Hartz promised to Ticketfly employees that Eventbrite would transform a conference room into a new jam room to replace the jam room they were leaving behind. To Ticketfly employees, the ability to occasionally play musical instruments at work meant a lot. Yet by the time FE 1 left in June 2018, Eventbrite had

not even designated a conference room to serve as jam room. Further, based on conversations FE 1 had with former colleagues after he left Eventbrite's employ, it took 18 months for Eventbrite to provide the jam room. According to FE 1, Ticketfly employees frequently complained that Eventbrite had not provided them with a jam room, as promised.

90.     According to FE 1, Ticketfly employees also had a tradition of celebrating each employee's five-year work anniversary by making and hanging a velvet painting of the employee. The tradition was deeply embedded in Ticketfly, and the paintings only cost a few thousand dollars. But Eventbrite discontinued this tradition, too.  Eventbrite did not even display in its own offices those velvet paintings which had been hanging in Ticketfly's old offices.

91.     Eventbrite's discontinuing Ticketfly traditions worried Ticketfly employees, who thought that Eventbrite might not care about their morale because it intended to fire them shortly. According to FE 1, as a result of their treatment by Eventbrite, Ticketfly's salespeople became "disgruntled."

92.     By treating Ticketfly salespeople as afterthoughts, Eventbrite convinced them they had no future with Eventbrite. Accordingly, many of them left. FE 1 reports that departures reached a "tipping point" by about 6 months after the acquisition, or early 2018.

*Eventbrite Alienates Ticketfly's Customers and Ticket Purchasers*

93.     To save costs, Eventbrite did not hire additional information security employees when it acquired Ticketfly. Further, according to FE 1, Ticketfly did not have an in-house information security team. Rather, Ticketfly had relied on Pandora's security department. Thus, after the Ticketfly acquisitions, the Eventbrite information security team's workload increased significantly, but Eventbrite did not hire any more employees to help.

94.     On May 31, 2018, Ticketfly's platform was hacked. The hacker stole 27 million Ticketfly Ticket Purchasers' names, telephone numbers, addresses, username, and passwords. Because of the hack, Ticketfly Ticket Purchasers had to change their passwords. Moreover, because people often reuse usernames and passwords on the internet, the hack exposed Ticket

1    Purchasers to further hacks.[8]

2        95.     Eventbrite's negligent failure to provide security alienated many Customers, who

3    left the platform, and Ticket Purchasers.

4
     **DEFENDANTS MADE MISLEADING STATEMENTS AND OMISSIONS IN THE**
5
                        **REGISTRATION STATEMENT**
6

7        96.     On September 18, 2018, the Company filed its final amendment to the Registration

8    Statement with the SEC on Form S-1/A, which forms part of the Registration Statement. The

9    Registration Statement was declared effective on September 19, 2018.

10       97.     On September 20, 2018, the Company filed its prospectus on Form 424B4 with the

11   SEC, which forms part of the Registration Statement. In the IPO, the Company sold 11.5 million

12   shares of common stock at a price of $23.00 per share. The Company received proceeds of

13   approximately $246.0 million from the Offering, net of underwriting discounts and commissions.

14       98.     The Registration Statement was negligently prepared and, as a result, made untrue

15   statements of material facts or omitted to state other facts necessary to make the statements made

16   not misleading, and was not prepared in accordance with the rules and regulations governing its

17   preparation.

18       99.     Regulation S-K required Defendants to describe, in the Registration Statement,

19   "any known trends or uncertainties that have had or that the registrant reasonably expects will

20   have a material favorable or unfavorable impact on net sales or revenues or income from

21   continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).

22       100.    In both 2016 and 2017, Ticketfly earned revenues of roughly one third as much as

23   Eventbrite.  Eventbrite sought to migrate Ticketfly's customers onto its platform.  All other things

24   being equal, Ticketfly customers would account for about one quarter of Eventbrite and

25   Ticketfly's combined revenues.

26

27   _____

28   [8] Reusing Passwords on Multiple Sites, https://www.cisecurity.org/blog/reusing-passwords-on-multiple-sites/

101.     Whether Eventbrite would be able to migrate Ticketfly's Customers was a material uncertainty.  At the time of the IPO, Defendants were aware of facts showing that Eventbrite would not be able to successfully migrate Ticketfly Customers, but negligently prepared the Registration Statement omitting these material facts.

102.     Under "Our Growth Strategy," the Registration Statement provided in relevant part:

> ***Selectively Acquire Businesses Focused on Serving Creators. We have been successful leveraging our platform to make selective acquisitions that have contributed to creator and revenue growth. We accelerated our momentum through the acquisitions of ticketscript and Ticketfly. By finding like-minded teams who share a common ethos around serving creators, we can continue to expand and offer new capabilities to existing creators. The modularity and extensibility of our platform enables us to quickly integrate and migrate creators to the Eventbrite platform, allowing us to quickly deprecate the acquired technology and associated costs.***
> (emphasis added).

103.     Since Ticketfly was by a factor of five Eventbrite's largest acquisition, investors would have understood these statements to refer primarily to Eventbrite's integration and migration of Ticketfly's Customers onto Eventbrite's platform. Yet Eventbrite's platform's modularity and extensibility did not enable such quick integration and migration because Eventbrite's platform did not include, and could not be extended to include, sufficient features to attract Ticketfly Customers, such as 24-7 Ticket Purchaser support, email integration, and fee expensing. Accordingly, the emphasized statements gave the misleading impression that the Ticketfly migration was successful, though it was not.

## EVENTBRITE REVEALS UNEXPECTED DELAYS, ADDITIONAL EXPENSES, AND CUSTOMER LOSSES IN THE TICKETFLY MIGRATION

104.     On March 7, 2019, post-market, the Company published a letter to shareholders and held a conference call to provide its fourth quarter 2018 financial results ("Q4 2018 Shareholder Letter" and "Q4 2019 Call").

105.     In the Q4 2019 Shareholder Letter, Defendants admitted:

> Since we last updated you, we have made substantial progress toward integration and migration of Ticketfly creators. We made a deliberate decision when we acquired the company to integrate it into the Eventbrite platform, which made for a more complex and time-consuming integration process. ***During this process, our team has been focused on migrating existing customers, which creates tremendous value for our business but does not result in near-term revenue***

***growth.*** We believe in this strategy because it will enable us to build the leading, global independent music platform.

We anticipate finishing the last integration work to support creator migration in the second quarter of 2019. In the second half of the year we aim to complete creator migration and sunset the Ticketfly platform. ***Therefore, we believe that growth rates of our North American music business will begin to accelerate by early 2020.***

(Emphasis added.)

106.   In the Q4 2018 Earnings Call, Defendants disclosed that in the North American music segment, growth was slow because "if you're timing your activities to align with the creators, it requires some patience," adding that "if you have a team that you're asking to focus on those creators first and foremost, there's growth consequences. They just aren't spending as much time growing the business."

107.   Defendants also admitted that "certainly relative to where we were talking over the summer of last year [we] have taken longer than we planned" in migrating Ticketfly Customers.

108.   The Company also stated that migration headwinds would offset "continued growth self-sign-on and international for the first quarter of 2019." The Company forecast first quarter 2019 revenue between $80.0 and $84.0 million, but in the week leading to March 7, two analysts had predicted Q1 2019 revenues of $90 million based on the Company's prior statements.

109.   On this news, the Company's share price fell $7.96, or over 24%, to close at $24.46 on March 8, 2019, on unusually high trading volume.

110.   All three big-firm analysts covering Eventbrite attributed the March 8 stock drop to the announcement of problems with the integration of Ticketfly:

    a.    A March 7, 2018 JP Morgan analyst report explained that "EB's 1Q revenue guide of $80M-84M even at the high-end was 6% / 8% below our / consensus estimates & is weighed by Ticketfly migration being pushed into 2019." The report also stated that "But slower [near-term] growth from ongoing migration should weigh on [Eventbrite] shares [near-term] & we remain Neutral rated.

    b.    A March 21, 2018 Suntrust Robinson report attributed "substantial volatility over the near-term, as the company and the stock need to sort out execution issues/risks

1               related to the on-going migration/integration of Ticketfly." Suntrust Robinson also

2               maintained its rating of Hold in light of these execution issues and risks.

3      c.     A March 22, 2018 RBC report explained that "[t]he greater than expected challenge

4               in migrating over the acquired Ticketfly customer base onto the [Eventbrite]

5               platform drove the materially weaker than expected Q1 outlook that rocked the

6               shares two weeks ago."

7      111.   On March 7, 2019, Eventbrite provided revenue guidance of $80 million to $84

8 million for Q1 2019. All three of the big firm analysts covering Eventbrite expected revenues in

9 the top half of the range Eventbrite provided. RBC estimated revenues of $82.3 million, SunTrust

10 Robinson $82.8 million, and JP Morgan estimated revenues of $82.4 million.

11      112.   On May 1, 2019, Eventbrite published its letter reporting on, and held its

12 conference call to discuss, Q1 2019 earnings ("Q1 2019 Shareholder Letter" and "Q1 2019 Call").

13      113.   In the Q1 2019 Shareholder Letter, Eventbrite announced Q1 2019 revenues of

14 $81.3 million, or in the bottom half of the range and well below analysts' estimates. Notably,

15 Eventbrite had provided the guidance more than two thirds of the way through Q1 2019.

16      114.   In the Q1 2019 Shareholder Letter, Defendants admitted that in connection with the

17 Ticketfly integration and migration, Eventbrite "will continue to face hurdles that will inhibit

18 revenue growth, including the focus on migration efforts and the churn from venues that decide

19 not to migrate to our platform."

20      115.   On the Q1 2019 Call, Defendants attributed poor Q1 2019 results to the Ticketfly

21 migration. Defendant Hartz stated:

22            We took on a substantial challenge when we acquired Ticketfly and spent time and
             resources to address the product demands and competitive landscape. This resulted
23            in a complex and consuming integration process. Internally, resources dedicated to
             Ticketfly has been primarily focused on integrating existing revenues as opposed
24            to delivering net new growth.

25      116.   Eventbrite also guided to Q2 2019 revenues of $74 million to $78 million, again

26 citing the Ticketfly integration. In the week leading up the call, all three analysts had estimated Q2

27 2019 revenues above the top of the range, with SunTrust Robinson estimating $83.1 million, JP

28

1   Morgan estimating $82.3 million, and RBC estimating $78.1 million.

2        117.   On this news, Eventbrite's share price fell $6.55 per share, or over 27%, to close at

3   $17.60 per share.

4        118.   Analysts attributed the stock drop to the Ticketfly integration:

5   a.   A May 1, 2019 RBC analyst report explained that "All in, fundamentals were

6        negative, with revenue deceleration as the company continues to face headwinds

7        from Ticketfly platform integration and migration." A later RBC April 29 report

8        explained that "We note that 1Q19 guidance on 3/7 was below consensus due to a

9        delay in migrating Ticketfly creators onto Eventbrite."

10  b.   A May 1, 2019 SunTrust Robinson analyst report titled "Poor Visibility into

11       Ticketfly Migration Keeps Us at Hold/[price target] to $20" explained that "*The*

12       *weaker guide is again largely due to a more challenging migration of Ticketfly*

13       *creators, which won't be completed until sometime in 2H19, and is likely to lead to*

14       *higher churn."*

15  c.   A May 2 JP Morgan analyst report titled "Ticketfly Migration & FX Weigh on 1Q

16       Results & 2Q Guide; Remain Neutral & [price target] to $19" explained that

17       "Ticketfly migration will remain a headwind in 2Q, but the impact appears worse

18       than what we previously expected."

19  d.   A June 17 William Blair analyst report initiating coverage on Eventbrite explained

20       that "**Tempered Expectations After Swallowing a (Ticket)fly.** Shares have sold

21       off about 60% from their highs on a lower-than-expected near-term growth

22       outlook, as resources have been diverted to ensure creator migration from the

23       Ticketfly platform onto Eventbrite's." (emphasis in original).

24  **SECURITIES ACT CLASS ACTION ALLEGATIONS**

25       119.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

26  Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that

27  purchased or otherwise acquired Eventbrite securities issued in connection with, or pursuant or

28  traceable to, the Company's IPO Registration Statement.   Excluded from the Class are

1    Defendants, the officers and directors of the Company, at all relevant times, members of their

2    immediate families and their legal representatives, heirs, successors, or assigns, and any entity in

3    which Defendants have or had a controlling interest.

4        120.    The members of the Class are so numerous that joinder of all members is

5    impracticable.  Throughout the Class Period, Eventbrite's common shares actively traded on the

6    NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can

7    only be ascertained through appropriate discovery, Plaintiffs believe that there are at least

8    hundreds or thousands of members in the proposed Class.  Hundreds of millions of Eventbrite

9    common shares were traded publicly during the Class Period on the NYSE.  Record owners and

10   other members of the Class may be identified from records maintained by Eventbrite or its transfer

11   agent and may be notified of the pendency of this action by mail, using the form of notice similar

12   to that customarily used in securities class actions.

13       121.    Plaintiffs' claims are typical of the claims of the members of the Class as all

14   members of the Class are similarly affected by Defendants' wrongful conduct in violation of

15   federal law that is complained of herein.

16       122.    Plaintiffs will fairly and adequately protect the interests of the members of the

17   Class and have retained counsel competent and experienced in class and securities litigation.

18       123.    Common questions of law and fact exist as to all members of the Class and

19   predominate over any questions solely affecting individual members of the Class.  Among the

20   questions of law and fact common to the Class are:

21       (a)     whether the federal securities laws were violated by Defendants' acts as alleged

22   herein;

23       (b)     whether statements made by Defendants to the investing public during the Class

24   Period omitted and/or misrepresented material facts about the business, operations, and prospects

25   of Eventbrite; and

26       (c)     to what extent the members of the Class have sustained damages and the proper

27   

28   measure of damages.

1       124.    A class action is superior to all other available methods for the fair and efficient

2  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

3  damages suffered by individual Class members may be relatively small, the expense and burden of

4  individual litigation makes it impossible for members of the Class to individually redress the

5  wrongs done to them.  There will be no difficulty in the management of this action as a class

6  action.

7  **SECURITIES ACT CLAIMS**

8                                    **FIRST CLAIM**
**Violation of Section 11 of the Securities Act**
9                                  **(Against All Defendants)**

10       125.    Plaintiffs repeat and re-alleges each and every allegation contained above as if fully

11  set forth herein.

12       126.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §

13  77k, on behalf of the Class, against the Defendants.

14       127.    The Registration Statement for the IPO was inaccurate and misleading, contained

15  untrue statements of material facts, omitted to state other facts necessary to make the statements

16  made not misleading, and omitted to state material facts required to be stated therein.

17       128.    Eventbrite is the registrant for the IPO.  The Defendants named herein were

18  responsible for the contents and dissemination of the Registration Statements.

19       129.    As issuer of the shares, Eventbrite is strictly liable to Plaintiffs and the Class for the

20  misstatements and omissions.

21       130.    None of the Defendants named herein made a reasonable investigation or possessed

22  reasonable grounds for the belief that the statements contained in the Registration Statements were

23  true and without omissions of any material facts and were not misleading.

24       131.    By reasons of the conduct herein alleged, each Defendant violated, and/or

25  controlled a person who violated Section 11 of the Securities Act.

26       132.    Plaintiffs acquired Eventbrite shares pursuant and/or traceable to the Registration

27  Statement for the IPO.

28       133.    Plaintiffs and the Class have sustained damages.  The value of Eventbrite common

stock has declined substantially subsequent to and due to the Defendants' violations.

<div align="center">

**SECOND CLAIM**
**Violation of Section 15 of the Securities Act**
**(Against the Securities Act Individual Defendants)**

</div>

134.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

135.    This count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act.

136.    The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Eventbrite within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause Eventbrite to engage in the acts described herein.

137.    By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

<div align="center">

**EXCHANGE ACT CLAIMS**

</div>

138.    Plaintiffs bring the Exchange Act claims on behalf of persons who purchased or otherwise acquired Eventbrite securities during the Class Period of September 20, 2018 to May 1, 2019, inclusive.

139.    By the time of the IPO, Defendants knew or were reckless in not knowing that (a) Ticketfly's Customers were delaying migration, and (b) a material number of Ticketfly Customers were likely to not migrate to Eventbrite's platform because it did not meet their needs. Defendants' false statements to the contrary, both in the Registration Statement and at other times during the Class Period, were made with scienter.

<div align="center">

**SUMMARY OF THE EXCHANGE ACT CLAIMS**

</div>

140.    In acquiring Ticketfly, Eventbrite took on financial obligations it could not hope to meet without an IPO. These obligations included a $75 million loan at an onerous interest rate and

dividend-paying convertible preferred shares which would quickly dilute existing shareholders while also making any IPO even more dilutive.

141.    A quick IPO at a sufficiently high price would solve these two problems automatically. Eventbrite was negotiating replacement loans at much lower interest rates that were contingent on its going public and the dividend-bearing convertible shares would pursuant to their terms automatically be converted to common stock in the IPO.

142.    Eventbrite's executives received extensive information through daily and weekly meetings with employees, as well as written memoranda including gap analyses. Through these contacts, Defendants learned the very facts they concealed from investors.

143.    While Defendants did not disclose to investors that the migration was going poorly, they took steps to protect their own finances. A month before the IPO, Dreskin (head of the Eventbrite business unit that included Ticketfly) renegotiated his bonus contract. Before, the modification, the bonus had depended entirely on the percentage of Ticketfly Customers Dreskin *migrated* to Eventbrite. After, it depended entirely on the percentage of Ticketfly Customers Dreskin *retained*.

144.    Defendants plainly knew, or were reckless in not knowing, that the Ticketfly migration was failing. Dreskin would keep close track of the migration process because until a month before the IPO it alone determined his bonus. By fixing Dreskin's bonus to the number of Customers migrated, Hartz and Befumo made clear that they valued and therefore closely watched migration – and by renegotiating Dreskin's bonus contract showed they knew that the migration was failing.

### By the Summer of 2018, Eventbrite Had Taken On Financial Obligations It Could Not Discharge Without An IPO

145.    Hartz, Kevin Hartz, and a third party founded Eventbrite. Before the IPO, they held almost 17% of Eventbrite's shares (chiefly through super-voting Class B common stock).

146.    Eventbrite traditionally funded itself through debt and issuing convertible preferred stock.

147.    To pay for Ticketfly, Eventbrite stretched its financial resources beyond their

breaking point. Eventbrite took on $75 million of debt at a weighted average compounding interest rate of about 11.7%. Annual interest payments reached nearly $9 million, with principal payments starting in September 2019.

148.    Eventbrite also issued more than 8 million units of a new series of convertible preferred stock, Series G, for net proceeds of $133.9 million. Series G, unlike previous series, would automatically earn annual compounding dividends at 8% beginning January 1, 2019. These compounding dividends would add more than 640,000 Series G convertible preferred shares every year until Eventbrite held its IPO, thus diluting existing shareholders. Moreover, Eventbrite was unlikely to secure financing on better terms than the Series G convertible preferred stock.

149.    The solution to both problems was an IPO. At the time of the IPO, Eventbrite was negotiating new loans of $150 million at interest rates of about 5% which would enable Eventbrite to retire its existing loans. The loans were contingent on completion of the IPO. And conducting the IPO would automatically convert the Series G convertible preferred stock, avoiding the burden of increasing dividends.

150.    Thus, Eventbrite had to complete its IPO to escape a looming death spiral.

*Eventbrite Takes On Large Loans On Onerous Terms To Finance the Ticketfly Acquisition*

151.    To finance the Ticketfly acquisition, Eventbrite borrowed $30.0 million from a secured credit facility of up to $60.0 million with Western Technology Investments ("WTI"). The loan bore interest at a rate of 11.5%, compounding. Principal payments were due to begin by September 2019. Eventbrite also issued a $50.0 million subordinated note to Ticketfly's owner, Pandora (the "Note").

152.    In March 2018, Eventbrite retired the Note for $33.0 million. Eventbrite funded the transaction by borrowing an additional $30.0 million from the WTI facility at 11.75% interest, with principal payments due to begin in March 2020. Eventbrite's borrowing maxed out the WTI facility.

153.    In May 2018, entered into an additional $15.0 million credit facility with WTI, with principal payments due to begin in May 2020. Eventbrite immediately borrowed the entire amount

1   at an interest rate of 12.0%.

2      154.   To secure the loans, Eventbrite also issued to WTI warrants to purchase 933,269

3   shares of Series G redeemable convertible preferred stock at $16.38 per share.

4      155.   The WTI facilities risked placing Eventbrite into a death spiral. Eventbrite faced

5   annual interest payments of almost $9 million. Banks would only offer loans on increasingly

6   onerous terms, as shown by the steady increase in the interest rates Eventbrite had to pay for its

7   financing. And Eventbrite would have to begin to repay the credit facilities in September 2019.

8      156.   At the time of the IPO, Eventbrite was negotiating a total of $150.0 million in new

9   loans bearing interest at roughly 5%. These loans consisted of a new syndicated $75 million term

10   ("Credit Agreement") as well as a new revolving credit facility in aggregate principal amount of

11   $75 million ("Credit Facility") ("New Loans"). Both are set out in a Credit Agreement dated

12   September 27, 2018, to replace the WTI Facility. The New Loans' issuance depended on

13   Eventbrite completing its IPO and maintaining its status as a public company.[9]

14

15   *Eventbrite's Convertible Preferred Stock Threatened To Dilute Eventbrite's Shareholders*

16      157.   Eventbrite also traditionally used convertible preferred stock to finance itself.

17   Eventbrite's Series A through F-1 convertible preferred stock did not accrue dividends.

18      158.   In August 2017, Eventbrite issued 8.2 million convertible preferred shares of its

19   new Series G. Unlike earlier issues, the Series G would accrue compounding dividends at 8%,

20   payable in additional Series G convertible preferred stock, beginning January 1, 2019. The Series

21   G convertible preferred stock would accrue additional dividends of 656,000 in 2019, rising each

22   year as the dividends compounded.

23      159.   Having already issued convertible preferred stock that accrued dividends that

24   diluted existing shareholders, Eventbrite would not obtain financing on better terms.

25      160.   All of Eventbrite's convertible preferred stock would automatically convert to

26   freely tradeable Eventbrite common stock upon an Eventbrite IPO.  Series G stock would convert

27   to stock at one common share per convertible share if the IPO price met or exceeded that $24.58.

28
_____
[9] Credit Agreement dated September 27, 2018, Section 4.01(b).

If the IPO price fell below $24.58, the Series G stock would receive compensating adjustments such that they received $24.58 worth of common stock for every Series G convertible preferred share. Thus, for example, if the IPO price were $12.29 (half of $24.58), each Series G convertible preferred share would convert into two shares of common stock.

161.   Thus, as time passed: (a) Eventbrite would dilute shareholders as it paid dividends on existing Series G convertible shares; (b) Eventbrite's financial performance would deteriorate because of its crippling interest payments; (c) Eventbrite's deteriorating financial condition would also dilute shareholders as it reduced the IPO price, thus increasing the number of common shares Eventbrite must issue to Series G convertible preferred shareholders. Moreover, all of these problems arose from Eventbrite's financing of the Ticketfly acquisition. There was thus a special connection between the facts concealed in the IPO and Defendants' false statements.

### Defendants Actually Knew Facts Showing Their Statements Were False

#### A Month Before the IPO, Defendants Amend Dreskin's Contract To Target Ticketfly Customer **Retention** Rather Than **Migration**

162.   Defendants knew or were reckless in not knowing that Eventbrite was failing at migrating Ticketfly Customers to Eventbrite and took measures to preserve their personal financial positions.

163.   In April 2018, Defendant Dreskin – the head of the Eventbrite Music Business Unit which includes Ticketfly – entered into a contract with Eventbrite setting targets he needed to reach to be entitled to a 2018 bonus.[10] The sole variable for his bonus was the percentage of revenues Dreskin was able to migrate from Ticketfly to Eventbrite. Dreskin would receive a maximum bonus of $500,000 if he migrated 90% of Ticketfly's revenues to Eventbrite. That bonus decreased by $25,000 for every percentage point short of 90%, such that if Dreskin migrated 70% or less of Ticketfly's customers, he would not be entitled to any bonus.

164.   Four months later, on August 23, 2018, the parties amended Dreskin's bonus plan. The bonus amount remained the same. But Dreskin's amended bonus plan did not depend on how

---

[10]     Andrew     Dreskin's     Executive     Bonus     Plan,     available     at https://www.sec.gov/Archives/edgar/data/1475115/000119312518255960/d593770dex106.htm

much revenue Dreskin *migrated* to Eventbrite, but instead on how much Ticketfly revenue Dreskin *retained*.[11]

165.    Eventbrite amended Dreskin's bonus plan because it was plain in August 2018 that Dreskin would not receive any bonus under the old plan because he would not be able to migrate 70% of Ticketfly's revenues to Eventbrite.

166.    Between April and August 2018, Dreskin's bonus depended entirely on the number of customers he migrated to Eventbrite. Accordingly, Dreskin would have kept track of that number.

*Hartz Learned That Migration Had Failed*

167.    In January 2019, Hartz appeared on a well-known podcast with Reid Hoffman, Masters of Scale. In each podcast, Mr. Hoffman interviews a successful tech founder who explains the largest reason their company succeeded.

168.    Hartz's episode was titled *Let Your Customers Be Your Scouts*. As Mr. Hoffman summarized, Hartz "maintained extremely rapid feedback loops as [her] company scaled" which enmeshed Hartz in understanding and responding to Customer concerns and trends. As Mr. Hoffman summarized, Hartz "watch[ed] the influx of new customers [to] point [Eventbrite] towards their next initiative." And as Hartz stated, "simply observing your customers [] is the cornerstone of" Eventbrite. Eventbrite, and Hartz personally, even attended events to speak to event organizers, soliciting event-planning problems so they could incorporate solutions into the Eventbrite platform.

169.    To solicit information about Customer needs, Hartz personally holds several regular meetings with Eventbrite employees of various levels and specializations. Hartz's interview with Reid Hoffman mentions daily meetings with employees called Mini Hearts-to-Hartz sessions ("Daily Meetings"). In these meetings, a cross-section of 8-10 employees from different departments speak directly to Julia Hartz by videoconference for 30 minutes.   In the

---

[11]    Andrew     Dreskin's     Executive     Bonus     Plan,     available     at https://www.sec.gov/Archives/edgar/data/1475115/000119312518255960/d593770dex106.htm

1  Daily Meetings, employees are encouraged to bring forward difficult issues they are facing and to

2  have the group reflect on how to resolve them.

3      170.    But Hartz also holds weekly in-person/video town hall meetings with all

4  employees, also called Hearts-to-Hartz ("Weekly Town Halls"). Eventbrite encourages its

5  employees to anonymously submit questions for Weekly Town Halls. These questions are

6  provided to Hartz, who then answers a selection of them at the Weekly Town Halls.

7      171.    FE 2 reported that "A lot of us submitted questions essentially asking 'why would

8  our clients want to move over?'" to the Weekly Meetings. FE 2's questions pointed to the

9  difficulties he had had in persuading customers to migrate. FE 2 specifically remembers

10  submitting at least one such question before the IPO. But Hartz ignored FE 2's and his colleagues'

11  questions on this issue. Hartz never answered FE 2's or his colleague's questions.

12      172.    Hartz also kept informed of developments in the Ticketfly migration through

13  regular meetings with subordinates.

14      173.    FE 1 works on the same floor as Eventbrite's boardroom, and reports that Hartz

15  also holds bi-weekly meetings in that boardroom with her direct reports, including Dreskin.

16      174.    Further, gap analyses referenced above were disseminated to senior management,

17  including at least Eventbrite CEO Julia Hartz, CFO Randy Befumo, and head of the music

18  operations which include Ticketfly, Andrew Dreskin. These gap analyses showed that Ticketfly's

19  Customers demanded features Eventbrite's platform did not provide and could not easily be

20  amended to provide.

21

22  **DEFENDANTS MAKE ADDITIONAL FALSE AND MISLEADING STATEMENTS
   DURING THE CLASS PERIOD**

23      175.    In addition to the false and misleading statements and omissions made in the

24  Registration Statement, Defendants made additional false statements during the Class Period.

25      176.    On November 12, 2018, after markets closed, Defendants published a letter

26  addressed to shareholders concerning Eventbrite's Q3 2018 results ("Q3 2018 Shareholder

27  Letter").

28      177.    Defendants Hartz and Befumo signed the Q3 2018 Shareholder Letter.

178.    Therein, Defendants introduced a new Eventbrite program, Eventbrite Music, which purportedly would make Eventbrite more attractive to independent music venues and festivals, particularly Ticketfly's customers.

179.    In the Q3 2018 Shareholder Letter, Defendants stated:

Eventbrite Music is purpose-built with the unique challenges of the music business in mind. It's designed to give independent venues and festivals the tools and expertise they need to grow their businesses, sell out their shows, build their brands, amplify their reach and deliver a great fan and artist experience. ***This solution helps music creators stay one step ahead of the technology curve by streamlining many important marketing and operations tools into a single platform, helping to provide clarity and control of their music.***

Eventbrite Music includes a specialized event creation workflow that supports key elements of the music business, including the input of detailed artist and performance information and the ability to set up automated publishing for hundreds of events to be released on a pre-set schedule. ***We also offer enhanced marketing capabilities, streamlined checkout experience and mobile box office capabilities.*** […]

***We believe the people at the heart of the independent music scene partner with Eventbrite because we support them, speak their language and help grow their business.***

180.    Defendants' statements were misleading because: (a) Eventbrite Music's capabilities were actually a technological step back from what Ticketfly offered, in that Ticketfly provided customer support, email marketing capabilities, and fee breakdowns, among other things, which Eventbrite's platform could not offer; (b) Eventbrite Music's marketing capabilities were not an enhancement over Ticketfly's because Ticketfly provided customer support, email marketing capabilities, and fee breakdowns, among other things, which Eventbrite's platform could not offer; and (c) independent music venues partnered with Eventbrite because they had contracts with Ticketfly and sought to leave Eventbrite's platform because it did not offer provide customer support, email marketing capabilities, and fee breakdowns, among other things, that had attracted customers to Ticketfly.

181.    In the Q3 2018 Shareholder Letter, Defendants also stated, under Acquisition Strategy and Financial Impact, that:

Our strategy is to operate a single technical platform globally, which means that we work to migrate customers from acquired platforms to the Eventbrite platform. This migration process has historically taken 12 to 24 months, over which the Eventbrite team engages with customers to support this process. In general, we strive to retain the majority of net revenue while migrating customers in order to realize the important synergies of operating a single technical platform. ***Migration efforts have typically resulted in modest customer losses which tend to cluster around the time we deprecate the acquired platform.***

182.    Defendants' statements were misleading because they were aware of information showing that Eventbrite was not suffering "modest" customer losses.  Instead, the Company was experiencing material customer losses because Ticketfly Customers had hired Ticketfly for the features Ticketfly provided but Eventbrite could not, including customer support, email marketing capabilities, and fee breakdowns, among other things.

183.    That day, Eventbrite held a call to discuss its Q3 2018 earnings ("Q3 2018 Earnings Call").  On that call, Defendant Hartz stated:

**<Q >**: Okay. Thank you. Two questions, please. First, Eventbrite Music that you said that launched last week, could you talk about kind of – what kind of impact that would have? And is this something where you think this would be useful in terms of retention or new customer wins? I think you've already had a lot of offerings in this kind of venue; in music, independent music festival space, but just talk about what the implication of this is. And then secondly, with YouTube, is this already live now and then could you talk at all about the economics or the somewhat similar to some of the other deals you've had? Anything around that would be useful. Thank you.

**<A - Julia Hartz>**: Hi, Mark. Thanks so much for the questions. So, for Eventbrite Music, we have gone to market as of last week with a product that is tailor-made for independent music venues and promoters as well as festivals and this applies to not only those who are currently using Eventbrite but also, of course, those who are currently using the legacy Ticketfly platform. And so while related, they really are two different tracks of work: migration and then the Eventbrite Music product. ***And so where we see the great value of Eventbrite Music is that we've been able to utilize the extensibility of our platform and the modularity really to bring together an offering, a product offering that's focused on specifically venues so giving them expanded functionality to manage their box office, to manage their checkout experience, their marketing capabilities.***

184.    Defendants' statements were misleading because Eventbrite Music did not provide and could not be extended to offer Ticketfly Customers the features that made them hire Ticketfly, including customer support, email marketing capabilities, and fee breakdowns, among other things.

185.   In that same call, Defendant Befumo stated:

**<Q>**: Great. Thanks, Julia and Randy. Randy, the revenue that you're talking about losing is part of the re-platforming of Ticketfly. Are those customers that are going somewhere else? Is it a change in pricing? Can you just give us a sense of sort of what that means? Maybe competitively or sort of for the combined business going forward in terms of how we should think about relative growth rates on the other side of this.

**<A - Randy Befumo>**: Sure, Heath. Thank you for the question. When we think about migration loss, it comes in a variety of shapes and so the first thing to understand is unlike a SaaS contract that has a visible and stable revenue stream, our creators grow or shrink, depending on their businesses. And so when we're looking at migration and migration loss, you have to think about not just our part of it but also the creators' growing and shrinking as well.

Within that, though, there are really a few reasons that a creator will not migrate after an acquisition. The first, as you correctly inferred, is competitive activity. However, that's not the sum total. Some customers will choose to in-source, some customers actually, in the period between acquisition and migration, may unfortunately go out of business. Others may be acquired by companies that have competitive ticketing platforms or that already have preexisting ticketing relationships and those may actually drive the decisions, not anything about the Eventbrite platform.

***So far, in our migration, we've seen a mix of them. There's no one overwhelming factor. We try to take them all into account when giving you and TheStreet guidance in order to give you the best sense of where we believe we'll land at the end of the quarter in terms of revenue.***

186.   Defendant Befumo's answer misleadingly implied that Ticketfly customers chose not to migrate to Eventbrite because of pricing, in-sourcing, and customers going out of business or being acquired by companies with pre-existing relationships, when in truth the overwhelming factor in losses is that Ticketfly's customers were dissatisfied with Eventbrite's platform.

187.   On March 7, 2019, after markets closed, Defendants publicly published a letter addressed to shareholders concerning Eventbrite's Q4 2018 results ("Q4 2018 Shareholder Letter"), which Defendants Hartz and Befumo signed, and also held a conference call to discuss Q4 2018 earnings ("Q4 2018 Earnings Call").

188.   As set out above, in the Q4 2018 Shareholder Letter and Earnings Call, Defendants revealed that the Ticketfly migration had gone much slower than planned.  But the Defendants also made false statements to reassure investors. For example, on the Q4 2018 Earnings Call, in prepared remarks, Defendant Hartz stated that:

In 2018, we saw significant progress against our strategy. In the self-sign-on acquisition channel, we took steps in the second half to drive volume growth through country launches and product capability expansion. Our two international acquisitions strengthen our focus on building global development teams and accelerate our ability to deliver product and platform solutions. Additionally, we have integrated more than 50 distribution partners that are enabled by our APIs, underscoring our focus on platform extensibility. And in music, we are migrating our global business onto one single platform. To this end, we made measurable progress on the Ticketfly integration and sunset the ticketscript platform. We also launched Eventbrite Music, a solution specifically tailored for independent music venues and promoters.

Each of these deliberate choices is about doing the hard work to grow the business in the right way. For example, our strategy is to have affordable pricing that encourages creator adoption and consumer satisfaction rather than use price to drive near-term revenue growth. Our focus remains on building a business that will serve millions of creators a decade from now. And our decisions are focused on this goalpost. Nowhere is this more evident than our Ticketfly acquisition. This was the largest acquisition we've completed to date, adding a significant amount to our revenue base. ***Rather than deciding to operate the Ticketfly platform on its own, we made the decision to integrate Ticketfly onto the Eventbrite platform, thus delivering the full power of both to independent music venues and promoters.*** This strategy also requires an intensive process where our team focuses on migrating existing customers as well as building platform enhancements.

189.    Defendants' statements were misleading because the Eventbrite platform did not extend to Ticketfly Customers the full power of Ticketfly, but instead retired the features that made them hire Eventbrite, including customer support, email marketing capabilities, and fee breakdowns, among other things.

190.    On March 7, 2019, Eventbrite filed its 10-K for the year ended December 31, 2018 ("2018 10-K"), which Hartz, Befumo, and Dreskin signed. The 2018 10-K stated under "Our Growth Strategy":

> ***Selectively Acquire Businesses Focused on Serving Creators. We have been successful leveraging our platform to make selective acquisitions that have contributed to creator and revenue growth. We accelerated our momentum through the acquisitions of ticketscript, Ticketfly, Ticketea and Picatic. By finding like-minded teams who share a common ethos around serving creators, we can continue to expand and offer new capabilities to existing creators. The modularity and extensibility of our platform enables us to integrate and migrate creators to the Eventbrite platform, allowing us to quickly deprecate the acquired technology and associated costs.***

191.   Since Ticketfly was by a factor of five Eventbrite's largest acquisition, investors would have understood these statements to refer primarily to Eventbrite's integration and migration of Ticketfly's Customers onto Eventbrite's platform. Yet Eventbrite's platform modularity and extensibility did not enable such quick integration and migration because Eventbrite's platform did not include, and could not be extended to include, sufficient features to attract Ticketfly Customers, such as 24-7 Ticket Purchaser support, email integration, and fee expensing. Accordingly, the emphasized statements gave the misleading impression that the Ticketfly migration was successful, though it was not.

**EXCHANGE ACT CLASS ACTION ALLEGATIONS**

192.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired Eventbrite securities during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

193.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Eventbrite's common shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Hundreds of millions of Eventbrite common shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Eventbrite or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

194.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

195.   Plaintiffs will fairly and adequately protect the interests of the members of the

1   Class and have retained counsel competent and experienced in class and securities litigation.

2        196.   Common questions of law and fact exist as to all members of the Class and

3   predominate over any questions solely affecting individual members of the Class.   Among the

4   questions of law and fact common to the Class are:

5        (a)   whether the federal securities laws were violated by Defendants' acts as alleged

6   herein;

7        (b)   whether statements made by Defendants to the investing public during the Class

8   Period omitted and/or misrepresented material facts about the business, operations, and prospects

9   of Eventbrite;

10

11       (c)   to what extent the members of the Class have sustained damages and the proper

12  measure of damages; and

13       (d) whether Defendants' false statements were made with scienter.

14       197.   A class action is superior to all other available methods for the fair and efficient

15  adjudication of this controversy since joinder of all members is impracticable.   Furthermore, as the

16  damages suffered by individual Class members may be relatively small, the expense and burden of

17  individual litigation makes it impossible for members of the Class to individually redress the

18  wrongs done to them.   There will be no difficulty in the management of this action as a class

19  action.

20                      **APPLICABILITY OF PRESUMPTION OF RELIANCE**

21                      **(FRAUD-ON-THE-MARKET DOCTRINE)**

22       198.   The market for Eventbrite's securities was open, well-developed and efficient at all

23  relevant times.   As a result of the materially false and misleading statements and failures to

24  disclose, Eventbrite's securities traded at artificially inflated prices during the Class Period.   On

25  September 28, 2018, the Company's share price closed at a Class Period high of $37.97 per share.

26  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's

27  securities relying upon the integrity of the market price of Eventbrite's securities and market

28  information relating to Eventbrite, and have been damaged thereby.

199.   During the Class Period, the artificial inflation of Eventbrite's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eventbrite's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Eventbrite and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

200.   At all relevant times, the market for Eventbrite's securities was an efficient market for the following reasons, among others:

(a)   Eventbrite shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   As a regulated issuer, Eventbrite filed periodic public reports with the SEC and/or the NYSE;

(c)   Eventbrite regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   Eventbrite was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

201.   As a result of the foregoing, the market for Eventbrite's securities promptly digested current information regarding Eventbrite from all publicly available sources and reflected such information in Eventbrite's share price. Under these circumstances, all purchasers of

1   Eventbrite's securities during the Class Period suffered similar injury through their purchase of
2   Eventbrite's securities at artificially inflated prices and a presumption of reliance applies.

3       202.   A Class-wide presumption of reliance is also appropriate in this action under the
4   Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),
5   because the Class's claims are, in large part, grounded on Defendants' material omissions.
6   Because this action involves Defendants' failure to disclose material adverse information
7   regarding the Company's business operations and financial prospects—information that
8   Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.
9   All that is necessary is that the facts withheld be material in the sense that a reasonable investor
10  might have considered them important in making investment decisions.  Given the importance of
11  the Class Period material misstatements and omissions set forth above, that requirement is
12  satisfied here.

13  **EXCHANGE ACT CLAIMS**

14
15  <div align="center">

**THIRD CLAIM**
**Violation of Section 10(b) of The Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
16  **<u>(Against Eventbrite and the Individual Defendants)</u>**
</div>

17      203.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully
18  set forth herein.

19      204.   During the Class Period, the Company and the Individual Defendants carried out a
20  plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:
21  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein;
22  and (ii) cause Plaintiffs and other members of the Class to purchase Eventbrite's securities at
23  artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the
24  Company and the Individual Defendants, and each of them, took the actions set forth herein.

25      205.   The Company and the Individual Defendants (i) employed devices, schemes, and
26  artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts
27  necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course
28  of business which operated as a fraud and deceit upon the purchasers of the Company's securities

in an effort to maintain artificially high market prices for Eventbrite's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The Company and the Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

206.    The Company and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Eventbrite's financial well-being and prospects, as specified herein.

207.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Eventbrite's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Eventbrite  and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

208.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were both high-level executives and directors at the Company during the Class Period and members; (ii) each of these defendants, by virtue of their responsibilities and activities as both a senior officer and a director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

209.   The Company and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing Eventbrite's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the company and the Individual Defendants' overstatements and misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, these defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

210.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Eventbrite's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Company and the Individual Defendants, or upon the integrity of the market in which the securities trades, and in the absence of material adverse information that was known to or recklessly disregarded by the Company and the Individual Defendants, but not disclosed in public statements by these defendants during the Class Period, Plaintiffs and the other members of the Class acquired Eventbrite's securities during the Class Period at artificially high prices and were damaged thereby.

211.   At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Eventbrite was experiencing, which were not disclosed by the Company and the Individual Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise

acquired their Eventbrite securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

212. By virtue of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

213. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### FOURTH CLAIM
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

214. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

215. The Individual Defendants acted as controlling persons of Eventbrite within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

216. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

217.   As set forth above, Eventbrite and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 11, 2019                    Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**


By:  *s/ Kara M. Wolke*
Robert V. Prongay
Kara M. Wolke
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne (pro hac vice)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the Class*

1  **<u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>**

2        I, the undersigned say:

3        I am not a party to the above case, and am over eighteen years old.  On October 11, 2019, I

4  served true and correct copies of the foregoing document, by posting the document electronically to

5  the ECF website of the United States District Court for the Northern District of California, for receipt

6  electronically by the parties listed on the Court's Service List.

7        I affirm under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.  Executed on October 11, 2019, at Los Angeles, California.

9

10                              *s/ Kara M. Wolke*
                                Kara M. Wolke
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28