ROBERT V. PRONGAY (#270796)
KARA M. WOLKE (#241521)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

-and-

Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs*
*and the proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Eventbrite, Inc. Securities Litigation | Master File No. 5:19-cv-02019-EJD |
| | <u>CLASS ACTION</u> |
| | **PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| | Thursday, March 26, 2020 9:00 a.m. Hon. Edward J. Davila San Jose Courthouse, Courtroom 1—5th Floor |
| This Document Relates To: All Actions | |

**<u>Table of Contents</u>**

**INTRODUCTION** ........................................................................................................... 1

**FACTUAL BACKGROUND** ......................................................................................... 2

   **A. Securities Act Allegations** ................................................................................ 3

      1. Eventbrite Acquired Ticketfly and Botched the Integration ................... 3

      2. Eventbrite's IPO Registration Statement Contained Misleading Statements and Omissions ............................................................................................ 4

   **B. Exchange Act Allegations** ................................................................................ 5

      1. Defendants Knew that the Ticketfly Integration was Failing ................... 5

      2. Defendants Made Additional False and Misleading Statements During the Class Period ................................................................................................. 6

   **C. The Truth was Revealed, Eventbrite's Stock Price Plunged** ......................... 8

**ARGUMENT** ................................................................................................................. 9

   **I. Motion to Dismiss Legal Standards** .................................................................. 9

   **II. The Complaint Adequately Alleges Violations of Securities Act §11** ............... 9

   **A. Rule 8 Applies to Plaintiffs' §11 Strict Liability and Negligence Claims** ......... 9

   **B. Plaintiffs' Allegations of Material Misstatements and Omissions in the IPO Registration Statement Meet Any Pleading Standard** ....................................... 10

      1. The Registration Statement Omitted Known Uncertainties .................... 11

      2. The Registration Statement Made Misleading Statements ..................... 12

      3. The Misstatements and Omissions Were Not Immaterial Puffery .......... 13

      4. Defendants' Throwaway Arguments Lack Merit ................................... 15

      5. The Registration Statement's Vague Risk Disclosures Are Not Exculpatory ....... 16

   **C. Defendants Fail to Prove Negative Causation** ................................................ 18

   **D. The Underwriter Defendants Are Liable For Violations Of Section 11** .......... 18

   **III. The Complaint Adequately Alleges Violations of Exchange Act §10(b)** .......... 18

   **A. Plaintiffs Adequately Allege Falsity** ................................................................ 18

      1. Defendants Made Additional Misleading Statements and Omissions ..... 18

      2. Defendants' Falsity and Materiality Arguments Fail Once Again .......... 19

   **B. Plaintiffs Adequately Allege Scienter** ............................................................. 21

      1. Former Employees Provide Reliable Information Probative of Scienter ..... 21

      2. Additional Allegations Contribute to a Strong Inference of Scienter ....... 24

   **C. Plaintiffs Allege Loss Causation** .................................................................... 28

**CONCLUSION** ............................................................................................................ 30

1

## **Table of Authorities**

2

Cases

3

*Basic Inc. v. Levinson,*
4
    485 U.S. 224 (1988) .................................................................................................... 13

5

*Berson v. Applied Signal Tech., Inc.,*
6
    527 F.3d 982 (9th Cir. 2008) ....................................................................................... 24

7

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.,*
    814 F. Supp. 2d 395 (S.D.N.Y. 2011) ........................................................................ 10

8

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford,*
9
    794 F.3d 297 (2d Cir. 2015) ....................................................................................... 22

10

*Evanston Police Pension Fund v. McKesson Corp.,*
11
    411 F. Supp. 3d 580 (N.D. Cal. 2019) ...................................................................... 13

12

*Fadia v. FireEye, Inc.,*
    No. 5:14-CV-05204-EJD, 2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ......................... 14, 28
13

*Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.,*
14
    No. 18-CV-00299 (AJN), 2019 WL 4601644 (S.D.N.Y. Sept. 23, 2019) ............................. 12, 17

15

*Herman & MacLean v. Huddleston,*
16
    459 U.S. 375 (1983) ...................................................................................................... 9

17

*Hildes v. Arthur Andersen LLP,*
    734 F.3d 854 (9th Cir. 2013) ...................................................................................... 18
18

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.,*
19
    741 F. Supp. 2d 511 (S.D.N.Y. 2010) ........................................................................ 18

20

*In re Apple Computer Sec. Litig.,*
21
    886 F.2d 1109 (9th Cir. 1989) .................................................................................... 16

22

*In re Atossa Genetics Inc Sec. Litig.,*
23
    868 F.3d 784 (9th Cir. 2017) ...................................................................................... 16

24

*In re Bofi Holding, Inc.Sec. Litig.,*
    2016 WL 5390533 n.5 (S.D. Cal. Sept. 27, 2016) ..................................................... 22
25

*In re Daou Sys., Inc., Sec. Litig.,*
26
    411 F.3d 1006 (9th Cir. 2005)................................................................................. 9, 18

27

*In re Extreme Networks, Inc. Sec. Litig.,*
28
    No. 15-CV-04883-BLF, 2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ....................... 19, 21, 28

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) ............................................................... 16, 17

*In re Facebook, Inc. Sec. Litig.*,
    405 F. Supp. 3d 809 (N.D. Cal. 2019) .................................................................. 13

*In re Finisar Corp. Sec. Litig.*,
    646 F. App'x 506 (9th Cir. 2016) ......................................................................... 26

*In re Finisar Corp. Sec. Litig.*,
    No. 5:11-CV-01252-EJD, 2017 WL 1549485 (N.D. Cal. May 1, 2017) ............................ passim

*In re HP Sec. Litig.*,
    No. C 12-05980 CRB, 2013 WL 6185529 (N.D. Cal. Nov. 26, 2013) ................................... 19

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821 (N.D. Cal. 2014) .......................................................... 13, 16, 22

*In re Intuitive Surgical Sec. Litig.*,
    No. 5:13-CV-01920-EJD, 2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ........................ 20, 26

*In re Restoration Robotics, Inc. Sec. Litig.*,
    No. 5:18-CV-03712-EJD, 2019 WL 5295059 (N.D. Cal. Oct. 18, 2019) ............... 10, 11, 12, 20

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) .................................................................................. 28

*In re Verifone Sec. Litig.*,
    No. 5:13-CV-01038-EJD, 2016 WL 1213666 (N.D. Cal. Mar. 29, 2016) ................................ 14

*Kane v. Madge Networks N.V.*,
    No. C-96-20652-RMW, 2000 WL 33208116 (N.D. Cal. May 26, 2000) ................................. 14

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ....................................................................... 1, 12, 13

*Khoja v. Orexigen Therapeutics, Inc.*,
    No. 15-CV-540 JLS (JLB), 2019 WL 4599882 (S.D. Cal. Sept. 23, 2019) .............................. 29

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) (denying motion .................................................... 24

*Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*,
    No. 2:11-CV-289, 2013 WL 6728869 (D. Vt. Dec. 20, 2013) ...................................... 22

*Mingbo Cai v. Switch, Inc.*,
    No. 218CV01471JCMVCF, 2019 WL 3065591 (D. Nev. July 12, 2019) ........................... 10, 12

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ..................................................................................... 15

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ................................................................................................... 12

*Primo v. Pac. Biosciences of California, Inc.*,
  940 F. Supp. 2d 1105 (N.D. Cal. 2013) ..................................................................... 10

*Reese v. Malone*,
  No. 12-35260, 747 F.3d 557 (9th Cir. 2014) ............................................................. 27

*Robb v. Fitbit Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016) ............................................................. passim

*Rubke v. Capitol Bancorp Ltd*,
  551 F.3d 1156 (9th Cir. 2009) ................................................................................... 10

*S. Ferry LP No. 2 v. Killinger*,
  399 F. Supp. 2d 1121 (W.D. Wash. 2005) ........................................... 13, 14, 15, 17

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ......................................................................... 15, 24, 28

*Silverstrand Investments v. AMAG Pharm., Inc.*,
  707 F.3d 95 (1st Cir. 2013) ....................................................................................... 11

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) ................................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................ 21, 27

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
  No. 15-CV-01455-VC, 2017 WL 3097184 (N.D. Cal. June 22, 2017) ............... 21, 24

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ................................................................................... 10

*Weller v. Scout Analytics, Inc.*,
  230 F. Supp. 3d 1085 (N.D. Cal. 2017) ..................................................................... 19

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..................................................................................... 22

Regulations

15 U.S.C. § 77k ...................................................................................................................... 9

Rules

Fed R. Civ. P. 9 .................................................................................................................. 10

Fed. R. Civ. P. 8 ............................................................................................................... 9, 10

Regulations

17 C.F.R. § 229.303(a)(3)(ii) .......................................................................................... 5, 11

17 C.F.R. § 240.10b-5(b) ................................................................................................... 18

Other Authorities

William O. Douglas and George E. Bates, *The Federal Securities Act of 1933*,
   43 Yale L.J. 11 (1933).................................................................................................... 9

1    Lead Plaintiff, the Eventbrite Investor Group (comprised of Michael Gomes, Melvin

2    Pastores, and Mohit Uppal) and Plaintiff Bruce Bones (collectively, "Plaintiffs"), submit the

3    following opposition to the Eventbrite Defendants' motion to dismiss (Dkt. No. 42, referred to

4    herein as "Mot."), and the Underwriter Defendants' joinder thereto (Dkt. No. 45).[1]

5                                    **<u>INTRODUCTION</u>**

6        In September 2017, the event ticket sales online platform Eventbrite, Inc. ("Eventbrite")

7    purchased its competitor Ticketfly, LLC ("Ticketfly") for over $200 million. This was by far

8    Eventbrite's largest ever acquisition, with Ticketfly accounting for one quarter of the combined

9    company's revenues. Successfully integrating Ticketfly was key to Eventbrite's prospects.

10       The acquisition, however, quickly soured.  Eventbrite faced resistance from Ticketfly

11   salespeople, who reasonably believed that they had no future at Eventbrite and from Ticketfly

12   customers, who wanted features that Eventbrite could not provide except at astronomical cost. This

13   resistance created a critical risk that Eventbrite's integration of Ticketfly, material to Eventbrite's

14   prospects, would result in substantial customer losses, distraction from Eventbrite's business, and

15   much higher than anticipated expenses.

16       Defendants knew the stark risks Eventbrite faced. Defendant Hartz is known in the

17   technology industry for her obsessive focus on what information Eventbrite can glean from its

18   customers. She holds daily and weekly meetings with employees to address current problems. She

19   also attends Eventbrite customers' events to identify customer problems. Eventbrite kept and

20   regularly updated a spreadsheet showing, for each of Ticketfly's customers, the needs that

21

22   _____

     [1] "Eventbrite Defendants" includes Eventbrite, its CEO Julia Hartz ("Hartz"), its CFO Randy
23   Befumo ("Befumo"), director Andrew Dreskin ("Dreskin"), and additional directors identified at
     ¶¶28-34 of the Amended Complaint (Dkt No. 40, the "Complaint").  The six investment banks that
24   underwrote the Eventbrite IPO (the "Underwriter Defendants") are identified at ¶¶36-41.

25   Plaintiffs do not oppose the Eventbrite Defendants' request for judicial notice (Dkt. No. 43) to the
     extent that the Court takes notice of the fact that statements contained in those documents were
26   made. To the extent that Defendants attempt to use these exhibits to defeat Plaintiffs' adequately
     pled claims, that practice is improper and highly discouraged by the Ninth Circuit.  *Khoja v.*
27   *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (recognizing a "concerning pattern
     in securities cases" where defendants attempt to exploit judicial notice "procedures improperly to
28   defeat what would otherwise constitute adequately stated claims at the pleading stage").

Ticketfly's platform had met but which Eventbrite's could not, and their importance to the customer. Though Ticketfly head Defendant Dreskin's bonus was initially based on migrating customers to Eventbrite's platform, shortly before Eventbrite's September 2018 IPO, Defendants amended the contract so that it would only call on Dreskin to retain customers – showing they understood the Ticketfly integration and migration was already at risk of failing.

Yet Defendants did not to disclose the known risks customers' and salespeople's resistance created for the Ticketfly integration in the IPO. They continued to conceal those problems from investors for six months. Then, in March 2019 Defendants partially revealed the truth about integration difficulties, causing Eventbrite's stock price to plunge nearly 30%. And in May 2019, Defendants confessed that they had to lower guidance because of the Ticketfly integration, causing Eventbrite's stock to fall another 27%.

Rather than addressing these facts *collectively*, as the law requires, Defendants instead advance explanations – often farfetched – which, they say, explains why any given *individual* fact alone is not sufficient to meet Plaintiffs' burden. Evaluated collectively, the facts Plaintiffs allege adequately plead both their claims under Sections 11 and 15 of the Securities Act of 1933 and their claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. The Court should deny the motions to dismiss.

## FACTUAL BACKGROUND

In 2017, Eventbrite's business was an online platform for event creators to plan, market, and sell tickets to their events. ¶46.[2] Eventbrite served 170 countries and four core markets: festivals, music, registration events, and endurance events. ¶¶46, 51-52, 54. Eventbrite generated its revenue by offering standardized services for paid events. ¶¶57, 59. Like Eventbrite, Ticketfly's primary business is helping event creators to plan, market, and sell tickets to their events. ¶47. That is where the similarities ended.

Eventbrite provided services for diverse events worldwide, but Ticketfly exclusively served independent music venues and festivals in North America. ¶47. Eventbrite faced little competition

---

[2] References to "¶__" are to the Amended Complaint (Dkt No. 40). Unless otherwise indicated, all emphasis is added and all internal quotation marks, footnotes, and citations are omitted.

to its one-size-fits-all services, but the independent music market is highly competitive, requiring superior, customizable solutions. ¶¶60-64. Eventbrite made small profits from hundreds of thousands of customers, but Ticketfly had only a fraction of one percent as many customers—making each relationship much more critical and valuable. ¶62 n.6. Most Eventbrite customers were amateurs who may have never created a paid event before, but most Ticketfly customers were professional event organizers or independent music venues who created them every week. ¶58, 61, 80.

### A.     Securities Act Allegations

#### 1.     Eventbrite Acquired Ticketfly and Botched the Integration

Eventbrite acquired Ticketfly from Pandora Media, Inc. in September 2017 for $201 million. ¶4. This was by far Eventbrite's largest ever acquisition, and Ticketfly accounted for a quarter of the combined company's revenue. ¶¶49-50. A main goal of the acquisition was to acquire Ticketfly's customer relationships while eliminating the Ticketfly platform. ¶¶6, 48.

Eventbrite began attempting to migrate Ticketfly customers to the Eventbrite platform immediately after the acquisition closed. ¶67. By November 2017, Eventbrite required every Ticketfly salesperson to conduct a "gap analysis" for each of their major customers. ¶68. The purpose of the analysis was to identify features of Ticketfly's platform that were important to the customers but that Eventbrite's platform did not supply (*i.e.*, gaps). ¶68. Senior Eventbrite personnel were involved, including at least one direct report of Ticketfly's founder and head, Defendant Andrew Dreskin. ¶68.

The gap analyses primarily identified three principal shortcomings. First, Ticketfly had provided 24/7 telephone support for ticket purchasers; Eventbrite did not, and the cost of providing the support would be "astronomical." ¶¶71-72. Second, Ticketfly provided free custom integrated email that automated marketing emails; Eventbrite only offered email through a third-party that could cost each customer over $10,000 per year. ¶¶77-78. Third, Ticketfly provided customizable fee schedules that separated fees and taxes incorporated into a ticket price; Eventbrite did not. ¶79. Ticketfly customers noted even more problems with Eventbrite's platform. For example, on the webpage for a given creator's event Eventbrite advertised events hosted by the creator's competitors

– not a problem for one-time event creators, but requiring music venues to tout their competitors in their own advertisements. ¶80. For these reasons and others, after the acquisition, Ticketfly salespeople made little progress in attempting to persuade their clients to migrate to the Eventbrite platform. ¶¶81-82.

Eventbrite further compounded the problems arising from its deficient platform by alienating key Ticketfly constituencies. Eventbrite sharply limited the responsibilities of Ticketfly salespeople and required them to make sales pitches that destroyed credibility with their clients. ¶87. This convinced FE 2 and other Ticketfly salespeople that Eventbrite intended to fire them after they finished migrating customers to the Eventbrite platform. ¶87. Furthermore, Eventbrite discontinued Ticketfly employee traditions and failed to deliver promised amenities they had enjoyed at Ticketfly. ¶¶89-91. Faced with plummeting morale, many Ticketfly salespeople left Eventbrite with departures reaching a "tipping point" by early 2018—months before the September 2018 IPO. ¶92. Eventbrite also alienated its customers and their ticket purchasers by under-investing in information security, which allowed hackers to steal personal data of 27 million Ticketfly ticket purchasers on May 31, 2018. ¶94.

As a result of Eventbrite's inferior product offering, and having alienated Ticketfly personnel and customers, by September 2018 the integration was floundering and had created a material uncertainty for Eventbrite's business prospects. As late as November 2018, after the IPO, very few of FE 2's Ticketfly customers had migrated to Eventbrite. ¶82.

## 2.  Eventbrite's IPO Registration Statement Contained Misleading Statements and Omissions

On or about September 20, 2018 Eventbrite completed its IPO, selling 11.5 million shares at $23.00 per share, raising net proceeds of $246 million. ¶97. Eventbrite and the Underwriter Defendants marketed the IPO under a Registration Statement, including a Form S-1/A filed with the SEC on September 18, 2018 and a prospectus filed on September 20, 2018. ¶¶96-97. The Registration Statement negligently failed to disclose material information relating to Eventbrite's botched Ticketfly integration. ¶98.

First, Item 303 of SEC Regulation S-K requires disclosure of any known uncertainties

affecting Eventbrite's business. 17 C.F.R. § 229.303(a)(3)(ii). With Ticketfly accounting for approximately one-quarter of the combined company's total revenue, whether Eventbrite would be able to successfully migrate Ticketfly's customers to Eventbrite was a material uncertainty. And, indeed, the integration was plagued by the Eventbrite platform's shortcomings and the salesforce attrition that followed the Ticketfly acquisition. Although the failing Ticketfly integration created the precise kinds of known uncertainties intended to be disclosed under Item 303, nowhere did the Registration Statement disclose these substantial problems. ¶101.

Second, in Eventbrite's description of its business, under the heading "Our Growth Strategy," the Registration Statement claimed:

> ***Selectively Acquire Businesses Focused on Serving Creators.*** We have been successful leveraging our platform to make selective acquisitions that have contributed to creator and revenue growth. We accelerated our momentum through the acquisitions of ticketscript and Ticketfly. By finding like-minded teams who share a common ethos around serving creators, we can continue to expand and offer new capabilities to existing creators. The modularity and extensibility of our platform enables us to quickly integrate and migrate creators to the Eventbrite platform, allowing us to quickly depreciate the acquired technology and associated costs.

¶102. Yet the shortcomings of Eventbrite's platform alienated customers, delaying Eventbrite's ability to eliminate the Ticketfly platform and portending heavy customer losses. ¶103.

### B. Exchange Act Allegations

#### 1. Defendants Knew that the Ticketfly Integration was Failing

When Eventbrite acquired Ticketfly for over $200 million in September 2017, Eventbrite financed the acquisition through a mixture of debt and equity. ¶¶147-61. This financing was acquired on onerous terms, at interest rates as high as 12%, and threatened Eventbrite's stockholders with severe dilution of their ownership. *E.g.*, ¶¶153, 161. As part of this financing, Eventbrite issued a $50 million note to Pandora. ¶151.

Defendant Dreskin founded and led Ticketfly until Eventbrite acquired it, after which he ran Eventbrite's music operations. ¶26. Dreskin reported directly to Eventbrite CEO Defendant Hartz. ¶26. In April 2018 Dreskin and Eventbrite executed an Executive Bonus Plan to provide Dreskin incentive compensation relating to the Ticketfly integration. ¶163. The plan established a 2018 target bonus of $500,000, based solely on how much Ticketfly revenue ***migrated*** to the Eventbrite

platform. ¶163; Wolke Decl. Ex. A (original bonus plan) at Addendum A. The plan was to be administered by Eventbrite's Chief People Officer, CEO (Defendant Hartz), and the board's compensation committee. Wolke Decl. Ex. A. at §3. Only four months later and just one month before the IPO, in August 2018, Dreskin and Eventbrite renegotiated Dreskin's bonus contract so that his compensation depended solely on the amount of Ticketfly revenues Ticketfly *retained*. ¶¶143, 164; Wolke Decl. Ex. B. (amended bonus plan) at Addendum A; Wolke Decl. Ex. C (redline comparison). This unexplained change in Dreskin's bonus plan shows that by August, Eventbrite, Dreskin, and Hartz knew of serious problems with the migration of Ticketfly customers and had given up on migrating the customers to Eventbrite's platform. ¶165. Instead, they spent their time stanching losses of Ticketfly customers and revenues.

In addition, Defendant Hartz monitored the Ticketfly integration through several means. Hartz held regular meetings with Eventbrite employees to discuss difficult issues faced by the company. ¶169. FE 2 submitted a question for one such meeting taking place before the IPO. asking why Ticketfly customers would want to migrate to Eventbrite. ¶171. Many of FE 2's colleagues submitted similar questions. ¶171. Hartz also held bi-weekly meetings in Eventbrite's boardroom with her direct reports, including Dreskin, who was deeply involved in the Ticketfly integration as head of Ticketfly and Eventbrite's music business. ¶173. Further, the gap analyses Ticketfly employees drafted were disseminated to Eventbrite senior management, including Defendants Hartz, Befumo (CFO), and Dreskin. ¶¶70, 174.

## 2. Defendants Made Additional False and Misleading Statements During the Class Period

On November 12, 2018 Eventbrite published a letter and held a conference call to provide investors its third quarter 2018 financial results ("Q3 2018 Shareholder Letter" and "Q3 2018 Call"). ¶¶176, 183. The Q3 2018 Shareholder Letter touted a new Eventbrite initiative, Eventbrite Music, which purportedly would make Eventbrite more attractive to independent music venues. ¶178. The letter claimed:

- "This solution helps music creators stay one step ahead of the technology curve by streamlining many important marketing and operations tools into a single platform, helping to provide clarity and control of their music";

- "We also offer enhanced marketing capabilities, streamlined checkout experience and mobile box office capabilities"; and

- "We believe the people at the heart of the independent music scene partner with Eventbrite because we support them, speak their language and help grow their business."

¶179. Contrary to those assurances, Eventbrite was technologically behind Ticketfly. Eventbrite's marketing capabilities were inferior to Ticketfly's, and independent music customers only partnered with Eventbrite when required to by their legacy Ticketfly contracts. ¶180.

The Q3 2018 Shareholder Letter also misleadingly stated "Migration efforts have typically resulted in modest customer losses which tend to cluster around the time we depreciate the acquired platform." ¶181.[3] In fact, Eventbrite knew that it was suffering, and was likely to suffer further, serious customer losses in connection with the Ticketfly migration. ¶182.

On the Q3 2018 Call, in response to an analyst's question regarding Eventbrite Music and customer retention, Defendant Hartz misleadingly stated, "And so where we see the great value of Eventbrite Music is that we've been able to utilize the extensibility of our platform and the modularity really to bring together an offering, a product offering that's focused on specifically venues so giving them expanded functionality to manage their box office, to manage their checkout experience, their marketing capabilities." ¶183. In fact, deficiencies in Eventbrite's platform limited and hampered migration of Ticketfly customers. ¶184.

Also on the Q3 2018 Call, in response to an analyst's question regarding the reasons for Ticketfly customer losses, Defendant Befumo misleadingly stated in part:

> Some customers will choose to in-source, some customers actually . . . may unfortunately go out of business. Others may be acquired by companies that have competitive ticketing platforms or that already have preexisting ticketing relationships and those may actually drive the decisions, not anything about the Eventbrite platform. So far, in our migration, we've seen a mix of them. There's no one overwhelming factor. We try to take them all into account when giving you and the Street guidance in order to give you the best sense of where we believe we'll land at the end of the quarter in terms of revenue.

¶185. In fact, the *overwhelming* factor in customer losses was that Ticketfly's customers were dissatisfied with Eventbrite's platform. ¶186.

---

[3] Defendants distort this statement, replacing "typically" with "historically . . ." by improperly combining excerpts of two separate sentences and omitting intervening text. Mot. at 16. Defendants even emphasize their distortion and make it the centerpiece of an argument. *Id.*

On March 7, 2019, Eventbrite published a letter to shareholders and held a conference call to provide its fourth quarter 2018 financial results ("Q4 2018 Shareholder Letter" and "Q4 2018 Call"), and filed its 2018 annual report with the SEC ("2018 10-K"), in which it made additional false statements. ¶¶187, 188 190. On the Q4 2018 Call, Defendant Hartz misleadingly stated, "Rather than deciding to operate the Ticketfly platform on its own, we made the decision to integrate Ticketfly onto the Eventbrite platform, thus delivering the full power of both to independent music venues and promoters." ¶188. In truth, the Eventbrite platform did *not* deliver the full power of Ticketfly, and instead lacked key features that were very important to Ticketfly customers. ¶189. Finally, in the 2018 10-K, under "Our Growth Strategy," Eventbrite repeated the misleading claim made in its Registration Statement that:

> We have been successful leveraging our platform to make selective acquisitions that have contributed to creator and revenue growth. We accelerated our momentum through the acquisitions of ticketscript, Ticketfly, Ticketea and Picatic. By finding like-minded teams who share a common ethos around serving creators, we can continue to expand and offer new capabilities to existing creators. The modularity and extensibility of our platform enables us to integrate and migrate creators to the Eventbrite platform, allowing us to quickly deprecate the acquired technology and associated costs.

¶190. In fact, the Eventbrite platform's substantial shortcomings were materially preventing migration and delaying the elimination of the Ticketfly platform. ¶191.

## C.   The Truth was Revealed, Eventbrite's Stock Price Plunged

Late on March 7, 2019 Eventbrite published its Q4 2018 Shareholder Letter and held its Q4 2018 Call. ¶104. Defendants revealed that the Ticketfly sales team was still focused on migrating existing customers to Eventbrite's platform instead of seeking to grow the business, and that, as a result, Eventbrite's lackluster growth in its North American music business would continue until 2020. ¶105. Defendants further revealed that the migration was taking longer than planned and its negative effects would offset growth from other parts of Eventbrite's business. ¶¶106-08. In response, Eventbrite's stock price fell $7.96 per share (over 24%) on high volume. ¶109. The stock fell an additional $1.57, again on high volume, the next trading day. Analysts attributed the drop to the revelation of the Ticketfly integration problems. ¶110.

Late on May 1, 2019 Eventbrite published a letter and held a conference call to provide

investors its first quarter 2019 results ("Q1 2019 Shareholder Letter" and "Q1 2019 Call"). ¶112. Defendants admitted that because of the difficulties in integrating Ticketfly, Eventbrite "will continue to face hurdles that will inhibit revenue growth, including the focus on migration efforts and the churn from venues that decide not to migrate to our platform." ¶114. Defendants attributed poor Q1 2019 results to the Ticketfly migration and guided to lower Q2 2019 revenue. ¶115-16. In response, Eventbrite's stock price fell $6.55 per share (over 27%) to close at $17.60 on high volume. ¶117. Analysts again attributed the stock drop to the Ticketfly integration. ¶118.

## ARGUMENT

## I.     Motion to Dismiss Legal Standards

"At the motion to dismiss stage, the court must read and construe the complaint in the light most favorable to the non-moving party. The court must accept as true all well-pleaded factual allegations. . . In the event that a motion to dismiss is granted, leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2017 WL 1549485, at \*5 (N.D. Cal. May 1, 2017) (Davila, J.).

## II.    The Complaint Adequately Alleges Violations of Securities Act §11

Section 11 imposes liability if a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading." 15 U.S.C. § 77k. Section 11 has no scienter requirement. It "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. . . Liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983). This strict standard reflects Congress' intent to ensure truthful and complete disclosures for IPOs. *See* William O. Douglas and George E. Bates, *The Federal Securities Act of 1933*, 43 Yale L.J. 11, 173 (1933).

### A.     Rule 8 Applies to Plaintiffs' §11 Strict Liability and Negligence Claims

Securities Act claims need only satisfy the notice pleading standards of Fed. R. Civ. P. 8. *In re Daou Sys., Inc., Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005). PSLRA pleading standards do

not apply to Securities Act claims. *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009). Rule 9(b) applies only to Securities Act claims that "sound[] in fraud," such as where "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct." *Id.* If a complaint alleges "some fraudulent and some non-fraudulent conduct," then the allegations of non-fraudulent conduct need only satisfy Rule 8. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003).

The Complaint clearly delineates Plaintiffs' Securities Act claims from the Exchange Act claims. *Compare* ¶¶119-137 (Securities Act allegations) *with* ¶¶138-197; 203-217 (Exchange Act allegations). The Securities Act claims allege that the Securities Act Defendants negligently issued the Registration Statement with material misrepresentations and omissions. ¶8; *Mingbo Cai v. Switch, Inc.*, No. 218CV01471JCMVCF, 2019 WL 3065591, at *5 (D. Nev. July 12, 2019) (Rule 8 applied to Securities Act claim alleging that "the defendants negligently signed the registration statement."). Nor do the Securities Act claims incorporate the factual allegations of fraud contained in the Exchange Act claims. Put simply, the Complaint makes it "easy to distinguish between the two [theories], and the substance of the allegations keeps the distinction as clear as does the complaint's structure." *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 425 (S.D.N.Y. 2011); *Primo v. Pac. Biosciences of California, Inc.*, 940 F. Supp. 2d 1105, 1113-14 (N.D. Cal. 2013) (Securities Act claim did not sound in fraud where separated from Exchange Act allegations). By separating the Securities Act claims from the allegations of fraud, the Complaint ensures that the Securities Act claims do not sound in fraud.

**B.      Plaintiffs' Allegations of Material Misstatements and Omissions in the IPO Registration Statement Meet Any Pleading Standard**

To support a Section 11 claim, "Plaintiff must allege sufficient facts from which this Court can infer a statement was either false or misleading (in light of omitted information), and that [the] same statement was material." *In re Restoration Robotics, Inc. Sec. Litig.*, No. 5:18-CV-03712-EJD, 2019 WL 5295059, at *10 (N.D. Cal. Oct. 18, 2019) (Davila, J.).  Here, while the more permissive pleading standard of Rule 8 applies, Plaintiffs' allegations of material misstatements and omissions suffice to allege a Section 11 violation under either the Rule 8 or the Rule 9(b) standard.

**1.   The Registration Statement Omitted Known Uncertainties**

Item 303 of SEC Regulation S-K requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management, so that they may assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future." *Silverstrand Investments v. AMAG Pharm., Inc.*, 707 F.3d 95, 102 (1st Cir. 2013). Omission of a disclosure required under Item 303 violates Section 11. *Restoration Robotics*, 2019 WL 5295059, at *14 (noting that "[t]he Ninth Circuit has held that because Section 11 imposes liability if a registrant 'omits to state a material fact required to be stated' in the registration statement, 'any omission of facts "required to be stated" under Item 303 will produce liability under Section 11.'" (quoting *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998)).

As detailed above (*see supra* Factual Background Part A.1), by the September 2018 IPO, Defendants understood that Ticketfly's customers were resisting the move to Eventbrite's platform. Eventbrite's gap analyses had revealed that Ticketfly customers needed features Eventbrite was only able to provide at astronomical cost, if at all. Further, Eventbrite's mismanagement had alienated Ticketfly sales personnel by giving them impossible tasks and ignoring their institutional culture, convincing Ticketfly's salespeople that they had no future at Eventbrite. ¶¶87-91.  Eventbrite faced a "tipping point" of Ticketfly salesforce attrition by early 2018. ¶¶68-79; ¶¶83-95

Ticketfly's salespeople failed at the task that was put to them of selling a deficient product without sufficient support. Where, as here, a witness describes a problem arising from a general practice or technology, courts will extrapolate from former employees' reports to others. ¶82; *Restoration Robotics*, 2019 WL 5295059, at *12 (inferring that other persons experienced problem caused by which a confidential witness experienced). Here, even two months ***after*** the IPO, very few of FE 2's Ticketfly customers had migrated to Eventbrite's platform because of these general deficiencies. Because FE 2's failure to convert his clients resulted from general conditions, the Court can infer the problem was widespread. Indeed, Defendants' own later admissions confirm that

1  Eventbrite was not migrating customers from Ticketfly in significant numbers.

2       By the time of the IPO, delays in migrating Ticketfly customers and foreseeable customer

3  attrition created known uncertainties likely to adversely affect Eventbrite revenues. And this impact

4  did in fact materialize. Eventbrite reported disappointing Q4 2018 and Q1 2019 on March 7, 2019

5  and May 1, 2019. Defendants and analysts alike attributed these poor results directly to the troubled

6  Ticketfly integration. ¶¶104-111; ¶¶112-118.

7       Plaintiffs thus plausibly allege that the troubled Ticketfly migration was a "known trend"

8  reasonably likely to materially impact Eventbrite's sales and revenue at the time of the IPO.

9  Defendants' failure to disclose the specific risks in the Registration Statement violates Item 303,

10  and, thereby, Section 11. *See Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't*

11  *Holdings, Inc.*, No. 18-CV-00299 (AJN), 2019 WL 4601644, at *6, 9 (S.D.N.Y. Sept. 23, 2019)

12  (Item 303 required disclosures regarding underinvestment in acquisition target and acquirer's

13  difficulty retaining target's customer loyalty program members, omission of which was actionable

14  under Section 11); *Switch*, 2019 WL 3065591, *5 (violation of Item 303, and thus Section 11, where

15  defendants failed to disclose that a new sales strategy "presented a serious risk of diminishing

16  revenue due to new complications and required engineering.").

17              **2.       The Registration Statement Made Misleading Statements**

18       "Congress adopted §11 to ensure that issuers tell[ ] the whole truth to investors. For that

19  reason, literal accuracy is not enough: An issuer must as well desist from misleading investors by

20  saying one thing and holding back another." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*

21  *Pension Fund*, 575 U.S. 175, 192 (2015)). "[O]nce defendants [choose] to tout positive information

22  to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including

23  disclosing adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1009.

24  Defendants claim certain fragments of the statements Plaintiffs identified are literally true. But "the

25  issue is not whether the statements, taken separately, were literally true. The issue is whether

26  defendants' statements taken [together] and in context, would have mislead a reasonable investor

27  about the nature of the [investment]." *Restoration Robotics*, 2019 WL 5295059, at *10.

28       In a Registration Statement paragraph addressing the Ticketfly migration, Defendants

claimed that the "modularity and extensibility" of the Eventbrite platform allows it "to quickly integrate and migrate creators to the Eventbrite platform." ¶¶102-03. Defendants thus gave investors the impression that Eventbrite could incorporate the features Ticketfly customers needed into the Eventbrite platform. Yet that impression was misleading. In fact, Defendants failed to disclose that they already knew that Eventbrite's platform could not provide the features Ticketfly customers needed and that Ticketfly customers were balking at switching to Eventbrite. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580 (N.D. Cal. 2019) ("Having touted the good news that supply disruptions were leading to increased prices and thus increased profits, McKesson had a duty to also disclose that some portion of its increased profits was actually due to far riskier and less sustainable unlawful agreements.") By omitting to disclose that Eventbrite's integration strategy was failing when Eventbrite most needed it to succeed, Defendants misled investors.

### 3. The Misstatements and Omissions Were Not Immaterial Puffery

"[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Khoja*, 899 F.3d at 1009. Defendants argue that their statements and omissions were immaterial because they were puffery. Mot. at 24. To qualify as puffery a statement must be "so exaggerated or vague that no reasonable investor would rely upon it when considering the total mix of information available." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 834 (N.D. Cal. 2014) (rejecting puffery argument). "[T]he exception for puffery is narrowly drawn." *S. Ferry LP No. 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005). "To say that a statement is mere 'puffing' is, in essence, to say that it is immaterial." *South Ferry*, 399 F. Supp. 2d at 1129. Materiality, in turn, is an "inherently fact-specific finding." *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988). And "materiality arguments often are inappropriate for resolution on a motion to dismiss." *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 834 (N.D. Cal. 2019) (Davila, J.). And even puffing statements may be actionable if the speaker knows facts that seriously undermine the statement. *Intuitive Surgical*, 65 F. Supp. 3d at 834 n.3.

Defendants pick out excerpts of the statements and attack them as puffery – for example, that Eventbrite "accelerated our momentum through the acquisitions of ticketscript and Ticketfly."

Mot. at 16. Yet "the Ninth Circuit has held that [w]hat might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *See South Ferry*, 399 F. Supp. 2d at 1129. Defendants ignore the remainder of the paragraph, which explains that Eventbrite was able to accelerate its momentum because "[t]he modularity and extensibility of our platform enables us to integrate and migrate creators to the Eventbrite platform." ¶102.  Read in full, the statement makes a concrete representation that Eventbrite's ability to include the features of the companies it acquired on its platform was the secret of its success. That representation was misleading: Eventbrite was failing at incorporating Ticketfly's key features onto its platform. It was misleading to tout the success of Eventbrite's key strategy without disclosing that the strategy was flatlining when it mattered most.

Defendants' authorities are inapposite. In the context of the specific factual allegations of *Fadia v. FireEye, Inc.*, this Court held that vague statements such as "integration is progressing rapidly and smoothly" were puffery. No. 14-cv-5204, 2016 WL 6679806, at *7 (N.D. Cal. Nov. 14, 2016) (Davila, J.). There, however, the plaintiffs pointed to a generic statement about integration. Devoid of context that would give it meaning, had no factual content at all.  In *Verifone*, the defendant pointed to a vague purported benefit (specifically, "significant operating synergies"), which the plaintiff claimed implied an acquisition had gone well. But in addition to the statements' patent vagueness, in that case the issue there was not the acquisition but whether a transition to a different business model, which the particular acquisition was meant to bolster, was succeeding. 2016 WL 1213666, at *5. Defendants also cite *Kane v. Madge Networks N.V.*, No. C-96-20652-RMW, 2000 WL 33208116 (N.D. Cal. May 26, 2000), where statements that an acquisition was "fabulous", that acquiror and acquiree were "working together", that "significant progress" had been made, and that merger risks "are not as significant as one might assume" were simply too vague, and optimistic without any ***factual*** content.

Further, when the truth about the Ticketfly integration was disclosed, Eventbrite's stock price fell by 24% and 27% on the two corrective disclosure dates, to close well below its IPO price. ¶¶109, 117. These sharp share price declines upon disclosure of the truth about Eventbrite's

integration of the Ticketfly acquisition show that investors would have acted differently had Defendants told the truth about Ticketfly at the time of the IPO. *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (stock price decline following alleged corrective disclosure "supports a finding of materiality."). *See also South Ferry LP #2 v. Killinger*, 399 F. Supp. 2d 1121, 1138 (W.D. Wash. 2005) ("there is a substantial likelihood that a reasonable investor would have acted differently if [defendant] had fully and fairly disclosed its progress or lack thereof in developing and/or integrating its technology platforms" that were obtained from recent corporate acquisitions) *vacated in part on other grounds*, 542 F.3d 776 (9th Cir. 2008).

Finally, omissions logically cannot constitute puffery, and Defendants do not argue otherwise.

### 4.    Defendants' Throwaway Arguments Lack Merit

Defendants also argue that the challenged statements related to Eventbrite's acquisition of ticketscript as well as that of Ticketfly. Mot. at 24. This argument admits that the statements were made in the context of the Ticketfly acquisition, and so defeats Defendants' argument that "Plaintiffs improperly read Ticketfly into the challenged statements." Mot. at 13. Further, Ticketfly was by far Eventbrite's most important acquisition, and its largest by a factor of five. ¶¶49-50. Investors would have understood that the reference to acquisitions was principally a reference to the acquisition that mattered most, Ticketfly. *South Ferry*, 399 F. Supp. 2d at 1130 (statement that "[o]ur past systems integration experience in acquisitions will be put to good use as we tackle the complexities of this challenge" was not puffery in context "which highlighted the importance of [defendant]'s ability to integrate its acquisitions.").

Defendants claim they are entitled to dismissal because Eventbrite never promised to implement Ticketfly's 24/7 ticket purchaser support, integrated email, or custom fee details. Mot. at 24. But in truth, Plaintiffs contend that Defendants' statements were misleading not because Eventbrite promised to implement these specific features, but because the failure or inability to incorporate Ticketfly's key features, whatever they were, caused undisclosed serious problems with the Ticketfly integration. ¶103. Defendants alternatively argue that they were theoretically able to

add these Ticketfly features to the Eventbrite platform. Mot. at 24. But Plaintiffs do not necessarily

allege that it was ***impossible*** for Eventbrite to add those features. Plaintiffs allege that including the

features would cost so much time and money as to have material adverse effects on the Ticketfly

integration and Eventbrite's business. *E.g.* ¶72.

### 5.    The Registration Statement's Vague Risk Disclosures Are Not Exculpatory

To avoid liability for the alleged misstatements and omissions, Defendants must make a

"stringent showing" to show that the Registration Statement adequately disclosed problems relating

to the Ticketfly integration. *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 798 (9th Cir.

2017) ("[d]ismissal on the pleadings under the bespeaks caution doctrine . . . requires a stringent

showing: There must be sufficient cautionary language or risk disclosure such that reasonable minds

could not disagree that the challenged statements were not misleading."). Vague risk disclosures

lacking in specificity will not shield Defendants' misleading statements. *Intuitive Surgical*, 65 F.

Supp. 3d at 834 (vague risk factor disclosures regarding product liability lawsuits were insufficient

to cure omissions, "because they lacked specificity as to these lawsuits, their growing number, and

their severe nature.").

As to Plaintiffs' challenged misstatements regarding Ticketfly, Defendants argue that the

disclosure stating "Our acquisition strategy to date, and going forward, often results in the winding

down of the acquired platforms over a period of 12 to 24 months while the existing creators migrate

to our platform" is exculpatory.  Mot. at 24. "There is a difference between knowing that any

product-in-development may run into a few snags, and knowing that a particular product has already

developed problems so significant as to require months of delay". *In re Apple Computer Sec. Litig.*,

886 F.2d 1109, 1115 (9th Cir. 1989). Further, a statement in a Registration Statement that a risk

could affect a business does not excuse the failure to disclose that the risk was already affecting the

business. *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 509 (S.D.N.Y.

2013); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1035 (N.D. Cal. 2016).  Here, Defendants claimed

that the Ticketfly integration may "run into a few ***entirely theoretical and unspecified*** "snags." In

truth, the Ticketfly integration "ha[d] already developed problems so significant" – for example,

both Ticketfly's customers and salespeople hated it – that ensured the migration would be delayed by a year and would result in material customer losses.

Indeed, Defendants distort the statement's context and, thereby, its meaning. The disclosure is not about whether Eventbrite's acquisition strategy will succeed. Instead, it is about whether Eventbrite will be able to comply with privacy laws touching on data stored in the legacy platforms after their sunsetting. Speers Decl. Ex. A at 30 (prospectus p. 22).

With respect to Plaintiffs' alleged omissions under Item 303, Defendants point to the disclosure that "When we acquire companies or other businesses, we face the risk that creators of the acquired companies or businesses may not migrate to our platform or may choose to decrease their level of usage of our platform post migration." Mot. at 24-25. Again, Defendants' warning that problems ***might*** occur in the future does not absolve them because Eventbrite ***was already experiencing*** serious problems with integration, customer losses, and the ensuing revenue losses. *Facebook*, 986 F. Supp. 2d at 509; *Robb*, 216 F. Supp. 3d at 1035. Indeed, courts have held that substantially identical statements are meaningless boilerplate that do not sufficiently disclose existing problems. *Hawaii Structural Ironworkers*, 2019 WL 4601644, at *9 (generic warnings of acquisition risks including customer retention were insufficient to disclose known problems at time of offering); *South Ferry*, 399 F. Supp. 2d at 1136 (disclosure that "[i]f we experience difficulties in the integration of the technology platforms or the upgrading of software or any prolonged interruption of our service, we could experience higher than anticipated administrative costs and the loss of customers, among other things" was not meaningful or adequate to warn of specific problems arising from integrating corporate acquisitions).

Understanding that Eventbrite's actual disclosures were meaningless boilerplate, Defendants try to manufacture a meaningful disclosure where none exists. Defendants claim in the Background section of their brief that the Registration Statement also disclosed words to the effect that "we believe we may see meaningful migration loss as we move to shut down the Ticketfly platform in the second half of the year." Mot. at 7. That is false. Neither this language, nor any comparable disclosure, appears anywhere in the Registration Statement. It appeared for the first time on May 1, 2019, the corrective disclosure that closes the class period. Speers Decl. Ex. E, at 9.

**C.    Defendants Fail to Prove Negative Causation**

Section 11 plaintiffs need not plead loss causation. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859-60 (9th Cir. 2013). "The defendant has the burden of proof on this defense, and bears a heavy burden." *Id.* at 860. Defendants do not advance a loss causation affirmative defense as to Plaintiffs' Section 11 claims, and thus have waived the argument. *See* Mot. at 23-25.[4]

**D.    The Underwriter Defendants Are Liable For Violations Of Section 11**

As set forth above, the Complaint adequately alleges that the Registration Statement contained materially misleading statements or omissions in violation of Section 11.  Like the Eventbrite Defendants, the Underwriter Defendants face strict liability for such material misstatements or omissions in the Registration Statement.  *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 536 (S.D.N.Y. 2010) ("With respect to any sale of a security  pursuant to a misleading registration statement, Section 11 extends potential liability to . . . underwriters . . . who provide their consent to be named as having prepared or certified any part of the registration statement or any report used in connection with the registration statement.").

**III.    The Complaint Adequately Alleges Violations of Exchange Act §10(b)**

"The basic elements of a Rule 10b-5 claim . . . are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Daou*, 411 F.3d at 1014. In their Exchange Act claims, Plaintiffs allege additional misstatements and omissions after the Registration Statement, and the complaint satisfies the other elements challenged by Defendants – scienter and loss causation.

**A.    Plaintiffs Adequately Allege Falsity**

**1.    Defendants Made Additional Misleading Statements and Omissions**

Under Rule 10b-5, it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "For an

---

[4] Even if Defendants' Exchange Act loss causation argument is considered with regard to the Securities Act claims it fails for the same reasons (*see infra* Part III.C), and all the more so due to Defendants' heavy burden to prove negative causation to defeat Section 11 claims on the pleadings.

omission to be misleading, it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.  [A] statement that is technically true, may still be misleading and actionable under securities laws where it creates such an impression." *Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1093 (N.D. Cal. 2017) (Davila, J.) (internal citation omitted).

Defendants made additional misleading statements and omissions on November 12, 2018 in the Q3 2018 Shareholder Letter and Q3 2018 Call (¶¶176-86) and on March 7, 2019 in the Q4 2018 Call and the 2018 10-K (¶¶187-91). While these misstatements differed in their precise wording, they continued to conceal the known migration delays and customer attrition, and the resulting expected financial deterioration, resulting from Eventbrite's deficient platform. *E.g.*, ¶181 ("Migration efforts have typically resulted in modest customer losses which tend to cluster around the time we depreciate the acquired platform"); ¶185 (in-sourcing, business closures and pre-existing ticket relationships "may actually drive the decisions, not anything about the Eventbrite platform. So far, in our migration, we've seen a mix of them. There's no one overwhelming factor.").

The November 12, 2018 and March 7, 2019 statements and omissions created the impression that the Ticketfly integration was going smoothly. In truth, as Defendants knew, very few Ticketfly customers had migrated to Eventbrite's platform, customers had complained that they were losing the Ticketfly features they needed, and completing the integration would lead to both substantial losses of Ticketfly customers and substantial expense to upgrade the Eventbrite platform. *E.g.*, ¶¶72, 82. Defendants' statements thus actionably overstated the Ticketfly integration's results and prospects. *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-CV-04883-BLF, 2018 WL 1411129, at *17 (N.D. Cal. Mar. 21, 2018) (following problematic corporate acquisition, "[t]he fact that executives were still trying to figure out the combined product roadmap while [the CEO] simultaneously represented that integration was 'on track,' supports an inference that the statement was false"); *In re HP Sec. Litig.*, No. C 12-05980 CRB, 2013 WL 6185529, at *9 (N.D. Cal. Nov. 26, 2013) (finding material omission regarding weak performance of acquisition target).

### 2.     Defendants' Falsity and Materiality Arguments Fail Once Again

Defendants claim that two of their misstatements are protected statements of opinion. Mot.

at 17. One of these ("we *see* the great value of Eventbrite Music . . .") is clearly not so protected because it contains no expression of opinion or belief. Mot. at 17 quoting ¶183. The other, "We believe the people at the heart of the independent music scene partner with Eventbrite because. . ." (Mot. at 17 quoting ¶179), is materially misleading because "[o]pinion statements may be actionably misleading if the speaker did not actually hold the stated belief, or if the opinion statement omitted a material fact that rendered it misleading to an ordinary investor, even if it was literally accurate." *In re Intuitive Surgical Sec. Litig.*, No. 5:13-CV-01920-EJD, 2017 WL 4355072, at *2 (N.D. Cal. Sept. 29, 2017) (Davila, J.). When stating an opinion, "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.* at 4 (finding opinion statements actionably misleading). Thus, "prefatory language like 'we think' or 'we believe,' does not alone absolve securities fraud liability because these phrases can preface statements capable of misleading investors." *Restoration Robotics*, 2019 WL 5295059, at *9). Here, Defendants knew but failed to disclose that independent music customers partnered with Eventbrite because of their legacy Ticketfly contracts, not because Eventbrite's offerings appealed to them. ¶180.

Second, Defendants point to additional purported "disclosures" they claim were sufficient to rectify their misleading statements and omissions. Mot. at 12. These disclosures only vaguely state that Eventbrite "may" face difficulties integrating acquisitions, or that Eventbrite's business could suffer "if" it was unable to deliver on its intent to enhance its platform. Speers Decl. Ex. A. at 27, 76 (prospectus pages 19, 68). These disclosures say nothing about the currently existing and known serious problems with the Ticketfly integration, and so, for the reasons discussed above, Defendants have not made the required stringent showing that they adequately disclosed those problems. *See supra* Part II.C.3.

Third, Defendants' puffery arguments (Mot. at 16) are especially weak in the context of Defendants' post-Class Period statements.  Courts find even seemingly generic responses material when they respond to analyst or investor questions to reassure the public. *Restoration Robotics*, 2019 WL 5295059, at *9 (reviewing cases in which "the courts could not conclude (on a motion to dismiss) that the statements were so vague a reasonable investor would not reasonably rely on them

because they were made in response to investor queries and addressed 'specific aspects' of the company's health"); *Union Asset Mgmt. Holding AG v. SanDisk LLC*, No. 15-CV-01455-VC, 2017 WL 3097184, at *1 (N.D. Cal. June 22, 2017) (CEO's seemingly generic statements regarding successful acquisition integration were not puffery in the context of responding to questions on an investor call and "trying to reassure the investing public."). Here, Defendants were asked detailed questions by stock analysts about Eventbrite music and what caused Ticketfly revenue losses. Defendants attempted to reassure investors by claiming that Eventbrite's platform "expanded" on Ticketfly's functionality and falsely denying that Ticketfly losing customers because of Eventbrite's platform's deficiency. Having made false claims to assuage specific investor concerns, Defendants cannot maintain that their reassurances were immaterial puffery.

### B.       Plaintiffs Adequately Allege Scienter

Scienter is established by knowledge, intent, or deliberate recklessness. *See Finisar*, 2017 WL 1549485, at *6 ("[r]ecklessly turning a blind eye to impropriety is equally culpable."). "[T]he Supreme Court instructs that courts must review all the allegations holistically. And as the Ninth Circuit explains, the relevant inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

#### 1.  Former Employees Provide Reliable Information Probative of Scienter

The Complaint cites statements from Former Employees ("FE"s) who are reliable sources of information that supports scienter.  The Complaint described the FEs with great specificity, and, based on their responsibilities, their statements, and the Complaint's mutually reinforcing allegations, shows that FE 1 and FE 2 were well informed about Eventbrite's problems with the Ticketfly integration, and the Defendants' knowledge of and recklessness regarding the same.  This Court and others in this District have repeatedly held similar confidential witness allegations to reliably contribute to a strong inference of scienter. *See Extreme Networks*, 2018 WL 1411129, at *32 ("CW2 and CW5's allegations about the persistent issues with sales force integration and

product offerings during the relevant time period, coupled with allegations of [CEO]'s direct oversight of the sales team . . . contribute to an inference that [CEO] knew or was deliberately reckless to the truth of his statements" regarding the success of acquisition integration); *Finisar*, 2017 WL 1549485, at *7 (two confidential witnesses alleging that defendant company's customers disclosed their inventory levels during annual contract negotiations, and individual defendants either knew this information or "had access to it and could have sought it out," gave rise to a strong inference of scienter); *Intuitive Surgical*, 65 F. Supp. 3d at 838 (scienter alleged where single confidential witness had access to adverse reports and stated that defendants closely monitored those reports).

Moreover, courts have rejected Defendants' arguments' that former employee statements are only relevant to misstatements made during their period of employment. Mot. at 8 n.2, 10. *In re Bofi Holding, Inc.Sec. Litig.*, No. 315CV02324GPCKSC, 2016 WL 5390533, at *10 n.5 (S.D. Cal. Sept. 27, 2016) (finding that case law suggests that courts will only discount witnesses who leave the company long before problems arise). Courts regularly consider allegations drawn from confidential witnesses who separated from the company before the start of the class period. For example, the court in *Louisiana Mun. Police Employees' Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, No. 2:11-CV-289, 2013 WL 6728869 (D. Vt. Dec. 20, 2013) found that it could not consider allegations drawn from a witness who had left the defendant's employ before the class period, CW 8. *Id.* at *9 n.5. The Second Circuit reversed, significantly relying on CW 8's account to establish scienter. *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 302 (2d Cir. 2015). Defendants' sole authority on this point, *Zucco Partners, LLC v. Digimarc Corp.*, says no such thing. 552 F.3d 981 (9th Cir. 2009). There, the Ninth Circuit rejected allegations for myriad fact-specific reasons including a lack of reliable details, not due to a bright line rule regarding employment periods. *Id.* at 996. Here, FE 1's and FE 2's statements are detailed, reliable, and sufficiently close in time to the challenged statements.

### (a) FE 1 Is Reliable

The Complaint describes FE 1 with sufficient specificity. FE 1 worked at Eventbrite's San Francisco office from 2016 to June 2018 as a Marketing Operations/Revenue Operations Analyst.

¶43.   Moreover, FE 1 was well informed about the Ticketfly integration. For example, "FE 1's responsibilities were monitoring Eventbrite's sales pipeline and completing analysis such as forecasting, site traffic, and deals that need to close." ¶43. FE 1 also attended quarterly meetings where Eventbrite's music unit, consisting primarily of Ticketfly's operations, made presentations. *Id.* FE 1 worked in Eventbrite's headquarters on the same floor as Eventbrite's boardroom and 400 Eventbrite and Ticketfly employees and socialized with many Ticketfly employees. ¶¶45, 173. FE 2 worked in close quarters with many Ticketfly employees, worked on projects with them, attended presentations they made, and socialized with them. *Of course* he learned quite a bit about basic problems affecting the Ticketfly integration, which is all that he reports. Indeed, FE 2 corroborated numerous observations and experiences of FE 1's, and Defendants later admitted that the Ticketfly integration had not proceeded as planned. ¶¶81, 87-88.

### (b) FE 2 Is Reliable

The Complaint also describes FE 2 with sufficient specificity. FE 2 was a Ticketfly Senior Festival Success Specialist from August 2011 to November 2018 who joined Eventbrite in the Ticketfly acquisition. ¶44. FE 2 also was well informed about the Ticketfly integration. "FE 2 was familiar with Eventbrite and Ticketfly's services at all times because it was FE 2's job *to sell these services*." ¶44. The Complaint need not show that FE 2 was actually designing Eventbrite's features. A salesperson with little knowledge of the product he or she is selling – including how the product might or will be improved – is a bad salesperson. There is no reason to infer, as Defendants suggest, that FE 2 was bad at his job.

FE 2 also spent hours conducting "gap analyses" in Eventbrite's platform to identify shortcomings in the services provided by Eventbrite compared to what Customers had previously enjoyed at Ticketfly. ¶¶68-69. FE 2 also had access to the "living" document that compiled the gap analyses of *all* Ticketfly sales personnel, which document revealed the glaring extent of the integration problems. ¶¶68-71.  FE 2 and others continuously updated the gap analyses document on a regular basis during Class Period. *Id.*  Further, as FE 2 stated, senior Eventbrite personnel were involved in the gap analyses; FE 2 received several emails regarding the gap analyses from Ticketfly's Head of Operations, who directly reported to the head of Ticketfly, Defendant Dreskin,

who in turn directly reported to Eventbrite CEO, Defendant Hartz. ¶¶70, 26.

Further, Defendants' argument that FE 2 did not directly interact with the Individual Defendants regarding the gap analyses (Mot. at 20) is groundless because that is not necessary to support scienter. *See Union Asset Mgmt.*, 2017 WL 3097184, at *2 (scienter adequately alleged "primarily because of" a single confidential witness who participated in meetings regarding sales forecasts for acquired company's products, even though officer defendants were only indirectly tied to such information via "hearsay"). Rather, the question is whether the witnesses are in a position to know the facts they report and whether those facts support scienter. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (rejecting argument that court should discount former employee reports because they were from "'engineers or technical editors' rather than management.") *see also Robb*, 216 F. Supp. 3d at 1032-33. Further, here, FE 2 reported to, and interacted with, Defendant Dreskin's direct report about the gap analyses. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (denying motion to dismiss primarily because witness reported hearsay from a third party who reported directly to the defendant).

## 2.   Additional Allegations Contribute to a Strong Inference of Scienter

In evaluating scienter, courts review all the complaint's allegations holistically. *South Ferry #2*, 542 F.3d at 784 ("The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement . . . Vague or ambiguous allegations are now properly considered as a part of a holistic review . . . the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective"). Here, the Complaint makes many additional mutually reinforcing scienter allegations.

### (a) Defendant Dreskin's Amended Bonus Plan

The significant amendment to Dreskin's bonus plan in August 2018 shows that at the time of Defendants' false and misleading statements, Defendants knew the Ticketfly migration was failing because Eventbrite's platform did not provide Ticketfly customers with the features they needed. In April 2018, Dreskin signed a contract with Eventbrite basing his 2018 bonus **solely** on the percentage of revenues he migrated from Ticketfly to Eventbrite. ¶163. Under the original bonus

plan, Dreskin would receive a maximum bonus of $500,000 if he migrated 90% of Ticketfly's revenues to Eventbrite; the bonus decreased by $25,000 for every percentage point short of 90%. *Id.* Thus, Dreskin would not receive ***any*** bonus if he migrated 70% or less of Ticketfly's customers. *Id.*

In August 2018, Eventbrite and Dreskin amended the bonus plan to change the basis of the bonus from ***migrated*** to ***retained*** Ticketfly revenues. ¶164.[5] Thus, by August 2018, it had become apparent both to Dreskin and to the senior management who approved his contract that he would not be able to migrate significant Ticketfly revenues to Eventbrite. ¶165. And Dreskin undoubtedly kept track of the number of Ticketfly customers being migrated to Eventbrite. It was his job to do so, and he had negotiated a bonus plan that hinged entirely on his success in ensuring the migration. Thus, he knew Defendants' statements were false and misleading. ¶166. By renegotiating Dreskin's bonus plan in this manner, Hartz and Befumo showed that they also knew the integration was failing. ¶144.

### (b) The Gap Analyses

The gap analyses which Eventbrite required all Ticketfly salespeople to conduct immediately after the acquisition support a strong inference of scienter. ¶68. These analyses sought to identify functions Ticketfly provided to its top customers ***that Eventbrite was unable to offer***. Part of the analysis required Ticketfly salespeople to fill out a form that listed a series of gaps identified by Eventbrite's management. *Id.* Eventbrite and Ticketfly employees put a significant amount of time and effort into the gap analyses. ¶69. Senior Ticketly personnel were involved in the process, including Ticketfly Head of Operations, Allison Brecklin, who reports directly to Dreskin. Indeed, on several occasions Brecklin emailed FE 2 regarding the analyses. ¶70. The gap analyses were disseminated to Eventbrite senior management, including CEO Julia Hartz, Befumo, and Dreskin. ¶174. The most plausible inference from these allegations is that Defendants knew the information in the gap analyses, namely that Ticketfly customers needed features Eventbrite could

---

[5] Defendants misapprehend the bonus plan allegations as bearing on Dreskin's motives. Mot. at 18. Plaintiffs allege that the plan amendment shows Defendants' knowledge that Ticketfly customers were not migrating to Eventbrite's platform. Defendants' hypothetical alternative reasons for the amendment should not be credited at this stage. *See* Mot. at 18-19.

not provide. Thus, they knew their statements were false and misleading. *See In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 (9th Cir. 2016) (Defendants' knowledge of facts making opinion false sufficiently alleged where CEO "down-played concerns of a looming inventory bubble" and complaint alleged "that inventory levels would have been disclosed to defendants during the annual contract negotiations."); *Finisar*, 2017 WL 1549485, at *7 (on remand applying the Ninth Circuit's falsity reasoning to find scienter adequately alleged). The inference Defendants suggest is implausible. It is that Eventbrite ordered Ticketfly employees to spend countless hours creating gap analyses and then ignored the results.

### (c) Defendant Hartz's Frequent Employee Meetings

Defendant Hartz monitored the Ticketfly integration through regular meetings with various employees, which gave her firsthand knowledge that it was failing. Hartz held bi-weekly meetings in Eventbrite's boardroom with her direct reports, including Dreskin, who was in charge of the Ticketfly integration that was the sole factor determining his annual bonus. ¶173. Hartz *also held* regular meetings with subordinates. Harts *also held* daily meetings with 8-10 Eventbrite employees of various levels and specializations. In these meetings, Hartz encouraged employees to discuss difficult issues faced by the company. ¶¶169, 172; *see Intuitive Surgical*, 2017 WL 4355072, at *4 (allegations that "individual Defendants regularly attended internal meetings and received reports apprising them of problems" supported a strong inference of scienter). Hartz *also held* weekly town hall meetings with all employees, where she would answer a selection of anonymously submitted questions. ¶170. FE 2 noted that he and his colleagues submitted several questions about why Ticketfly customers would want to migrate to Eventbrite, and that FE 2's questions pointed to difficulties he had had in persuading such customers to migrate. ¶171. FE 2 also specifically remembers asking one such question pre-IPO. *Id.*

Indeed, Hartz even *appeared on a popular industry podcast* to explain how closely she watched Eventbrite's customers. In the podcast – aptly titled *Let Your Customers Be Your Scouts* – Hartz explained that her careful observation and understanding of customer concerns was Eventbrite's "cornerstone". ¶¶167-68. The podcast discussed that Eventbrite and Hartz personally attended customer events to speak to event organizers to understand their problems and incorporate

solutions. *Id.*   These are far from generic allegations that Hartz was a "hands-on" manager. She admits she obsessively follows the very information that showed her statements were false.

### (d)  Eventbrite's Financial Obligations

Eventbrite took on tremendous financial obligations in order to acquire Ticketfly. As such, it was imperative for the Ticketfly acquisition to be successful, and Defendants had a strong motive to hide the truth from investors. These financial obligations included taking out a $75 million loan at a 12% interest rate to pay for Ticketfly. ¶147. Pre-IPO, Eventbrite also issued more than 8 million units of a new series of convertible preferred stock, which, unlike previous series, would automatically earn annual compounding dividends at 8% beginning in January 2019. ¶148. These dividend-paying convertible preferred shares would dilute existing shares and make any IPO even more dilutive. *See* ¶¶158-161. Further, at the time of the IPO, Eventbrite was negotiating new loans which were contingent on completion of the IPO, and which would allow it to retire its existing high-interest loans. ¶149. Eventbrite's only solution to avoid an inevitable financial downward spiral was a successful IPO. Under tremendous pressure, Defendants were highly motivated to conceal the truth about the IPO from investors in order for their company to survive.

### (e)  Defendant Hartz's Personal Motive

"[P]ersonal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325; *Robb*, 216 F. Supp. 3d at 1031 (incentive to inflate company's prospects prior to IPO may be relevant to holistic scienter inquiry). Defendant Hartz had a motive to inflate Eventbrite's prospects to advance its IPO because she beneficially owned almost 17% of its stock. ¶145; Speers Decl. Ex. A. at 160-61 (prospectus pages 152-53). Eventbrite needed an IPO to avoid a looming death spiral. *See* ¶¶145-150. Without an IPO, Hartz's substantial investment, the fruit of 10 years of Hartz and her husband's lives, would become worthless, or at least worth quite a bit less.

### (f)  Defendants' Statements About the Ticketfly Acquisition Shows Their Scienter

"[T]he inference that [defendant] did not have access to the . . . data is directly contradicted by the fact that she specifically addressed it in her statement." *Reese v. Malone*, No. 12-35260, 747 F.3d 557, 572 (9th Cir. 2014)) *overruled on other grounds by City of Dearborn Heights Act 345*

*Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). A defendant's admissions, including that integration was "nearly completed", supports scienter. *Extreme Networks*, 2018 WL 1411129, at *32 (defendant's admissions, such as that integration was "nearly completed," supported scienter). Here, Defendants repeatedly spoke about Eventbrite's platform and the Ticketfly integration. *E.g.*, ¶¶183, 185. They thereby held themselves out as knowledgeable about the subject, further supporting scienter.

### (g) Plaintiffs Benefit From the Core Operations Inference

Under established Ninth Circuit law, the core operations inference allows that "it may be inferred that facts critical to a business's core operations or important transactions are known to key company officers." *South Ferry*, 542 F.3d at 781. Here, Defendants closely monitored the Ticketfly integration and migration through gap analyses and regular meetings. ¶¶169-74. Because Ticketfly represented one quarter of the combined company's revenues it was critical to Eventbrite's future prospects. ¶50. Under similar facts, both the Ninth Circuit and courts in this District have applied the core operations inference (or analogous reasoning) to find a strong inference of scienter. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012) (reversing dismissal on scienter issue where "the complaint alleges in detail that [officer defendants] were hands-on managers with respect to operational details and financial statements, and that they would have been aware of the complications associated with the . . . merger"); *Extreme Networks*, 2018 WL 1411129, at *29 (under the core operations inference allegations of executives' access to the disputed information "constitute strong evidence of scienter as to the . . . statements that integration is 'on track,' 'ahead of plan,' and sales force integration is 'complete' with integration issues 'fully behind' [the defendant company].").[6]

### C.    Plaintiffs Allege Loss Causation

"A plaintiff can plead loss causation by alleging that the share price fell significantly after the truth became known." *Finisar*, 2017 WL 1549485, at *7 (loss causation sufficiently alleged).

---

[6] Defendants' citation to *Fadia* is inapposite. There, the Court found the core operations allegations "informative" in its holistic analysis, but insufficient on their own to plead scienter. 2016 WL 6679806, at *16. Plaintiffs plead further facts here, *e.g.*, by allegations regarding the gap analyses, among others. ¶¶68-79, 174.

The Complaint alleges that the truth of Eventbrite's botched Ticketfly integration was partially revealed on March 7, 2019, resulting in a 30% cumulative stock price drop over the next two trading days ($7.96 per share on March 8, and an additional $1.57 on March 11), and then more fully revealed on May 1, 2019, resulting in a further 27% decline. ¶¶109, 117.

Defendants argue that Plaintiffs have not alleged loss causation for the May 1, 2019 price drop because the Company's disclosures that day revealed no new information as compared to the Company's March 7, 2019 disclosures. Mot. at 22-23. Any overlap between the information revealed by Defendants on March 7 and May 1 is insufficient to defeat loss causation. *Khoja v. Orexigen Therapeutics, Inc.*, No. 15-CV-540 JLS (JLB), 2019 WL 4599882, at *20 (S.D. Cal. Sept. 23, 2019) (news article contained some previously disclosed information but also, "revealed some aspect of the alleged fraud to the market and, consequently, that Lead Plaintiff adequately alleges loss causation"). On March 7, Defendants provided rosy guidance. Defendants also affirmatively misled investors by stating that the new Eventbrite platform "deliver[ed] the full power of both [Eventbrite and Ticketfly] to independent music venues and promoters." ¶188. These false statements concealed from investors the full scope of Eventbrite's problems, thus maintaining some artificial inflation in Eventbrite's stock price. But on May 1, the Defendants acknowledged that the problems they had first disclosed on March 7 were continued on May 1, were expected to continue in the foreseeable future, and were more serious than initially revealed. *E.g.*, ¶114 (Eventbrite "will continue to face hurdles that will inhibit revenue growth, including the focus on migration efforts"). Further, the May 1 news contained additional information not revealed on March 7, including that Eventbrite would be lowering its Q2 2019 guidance due in substantial part to problems with the Ticketfly migration. ¶116.

Stock analysts following Eventbrite viewed the May 1 corrective disclosures as new information. *E.g.*, ¶118c ("Ticketfly migration will remain a headwind in 2Q, but the impact appears worse than what we previously expected"). And the markets themselves clearly viewed the May 1 corrective disclosures as new information, with Eventbrite's stock price tumbling down 27%. ¶117.

In any event, "loss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage." *Id.* at *19; *Robb*, 216 F. Supp. 3d at 1033 ("Whether the stock drop was

due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage").

### CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' motions in its entirety. If the Court grants Defendants' motions to dismiss in any respect, it should grant leave to amend.

Dated: January 31, 2020                    Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:  */s/ Kara M. Wolke*
Robert V. Prongay
Kara M. Wolke
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE ROSEN LAW FIRM, P.A.**
By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE ROSEN LAW FIRM, P.A.**
Jonathan Horne (pro hac vice)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the proposed Class*

1

**PROOF OF SERVICE**

2

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

3

I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 South Grand

4

Avenue, Suite 2450, Los Angeles, CA 90071.  I am over the age of eighteen.

5

On January 31, 2020 I electronically filed the following **PLAINTIFFS' OMNIBUS**

6

**OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** with the Clerk of the Court using

7

the CM/ECF system which sent notification of such filing to counsel of record.

8

I certify under penalty of that the foregoing in true and correct.

9

Executed on January 31, 2020.

10

11

/s/ Laurence M. Rosen

12

Laurence M. Rosen

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28