COOLEY LLP
PATRICK E. GIBBS (183174) (pgibbs@cooley.com)
SHANNON M. EAGAN (212830) (seagan@cooley.com)
JEFFREY D. LOMBARD (285371) (jlombard@cooley.com)
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:   (650) 843-5000
Facsimile:   (650) 849-7400

COOLEY LLP
HEATHER SPEERS (305380) (hspeers@cooley.com)
4401 Eastgate Mall
San Diego, CA  92121
Telephone:   (858) 550-6000
Facsimile:   (858) 550-6420

Attorneys for Defendants
EVENTBRITE, INC., JULIA HARTZ, RANDY BEFUMO,
ANDREW DRESKIN, KATHERINE AUGUST-deWILDE,
ROELOF BOTHA, KEVIN HARTZ, SEAN P. MORIARTY,
LORRIE M. NORRINGTON, HELEN RILEY, and STEFFAN
C. TOMLINSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Eventbrite, Inc. Securities Litigation | Master File No. 5:19-cv-02019-EJD |
| | <u>CLASS ACTION</u> |
| | **REPLY IN SUPPORT OF EVENTBRITE DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT** |
| This Document Relates To:  All Actions | Judge:   Hon. Edward J. Davila<br>Crtm:   4, 5th Floor<br>Date:   April 9, 2020<br>Time:   9:00 a.m. |

1

**TABLE OF CONTENTS**

2
**Page**

3    I.      INTRODUCTION ..................................................................................................... 1

4    II.     PLAINTIFFS' SECTION 10(B) CLAIM SHOULD BE DISMISSED ................................. 2

            A.      Plaintiffs Fail to Plead Falsity as to *Any* of the Challenged Statements. .................... 2

5                   1.      Plaintiffs Abandon Their Core Theory of Falsity. ............................................ 2

6                   2.      Statement Nos. 1, 2, and 5 Contain Inactionable Puffery............................... 5

7                   3.      Statement No. 3 Makes No Comparison to Ticketfly, and is
                            Inactionable.................................................................................................... 6

8                   4.      Statement No. 4 Is an Accurate Historical Statement Applicable to
                            Eventbrite's Acquisitions Generally, Not Ticketfly Specifically. .................... 7

9                   5.      Plaintiffs Blatantly Mischaracterize Statement No. 6.................................... 8

10                  6.      Plaintiffs Do Not Address Any Arguments Regarding Statement No. 7......... 9

11          B.      Plaintiffs Fail to Plead a Strong Inference of Scienter................................................. 9

12                  1.      The FE's Limited Employment Duration, Lack of Direct Contact with
                            Defendants, and Nebulous Allegations All Fail to Demonstrate
                            Scienter. .......................................................................................................... 9

13                  2.      The Allegations Regarding Mr. Dreskin's Bonus Plan Are Inaccurate
                            and Premised Solely on Impermissible Speculation...................................... 11
14
                    3.      The Information Allegedly Contained in the Gap Analysis Was Not
15                          Inconsistent with any Challenged Statement. ............................................... 12

16                  4.      Plaintiffs Do Not Identify any Topic Addressed at any Meeting. ................ 13

                    5.      The Core Operations Inference Does Not Apply........................................... 14
17
                    6.      Plaintiffs Do Not Allege a Cognizable Motive............................................. 15

18                  7.      The Statements Themselves Do Not Demonstrate Scienter. ........................ 15

19                  8.      Plaintiffs' Allegations Remain Inadequate Under a Holistic Analysis.......... 16

            C.      Plaintiffs Fail to Plead Loss Causation as to the May 1 Disclosures......................... 16
20
     III.    PLAINTIFFS' SECTION 11 CLAIM SHOULD BE DISMISSED..................................... 17
21
            A.      The Entire Complaint Sounds in Fraud. ..................................................................... 17
22
            B.      Plaintiffs Fail to Identify any Misleading Statement. ................................................. 18

            C.      Plaintiffs Fail to Plead any Material Omissions Under Item 303. .............................. 18
23
     IV.     CONCLUSION..................................................................................................... 20

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alaska Elec. Pension Fund v. Adecco S.A.*,
    434 F. Supp. 2d 815 (S.D. Cal. 2006)....................................................................................13

*Anshen v. Facebook*,
    2017 WL 5635021 (C.D. Cal. Oct. 4, 2017)...........................................................................9

*Barbara v. MarineMax, Inc.*,
    2013 WL 4507068 (E.D.N.Y. Aug. 22, 2013)..........................................................................5

*In re Bofi Holding, Inc. Sec. Litig.*,
    2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) (Opp. ) ............................................................9

*Callan v. Motricity Inc.*,
    2013 WL 195194 (W.D. Wash. Jan. 17, 2013).........................................................................9

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
    2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)........................................................7, 8, 10, 12

*In re Coty Inc. Sec. Litig.*,
    2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ........................................................................14

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017) .................................................................................................14

*In re Extreme Networks, Inc. Sec. Litig.*,
    2018 WL 1411129 (N.D. Cal. Mar. 21, 2018).................................................................11, 14

*Fadia v. FireEye, Inc.*,
    2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ...................................................................5, 13

*In re Finisar Corp. Sec. Litig.*,
    2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) ...............................................................11

*Glassman v. Computervision Corp.*,
    90 F.3d 617 (1st Cir.1996)......................................................................................................20

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ..................................................................................................16

*Jui-Yang Hong v. Extreme Networks, Inc.*,
    2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) .........................................................................3

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019) ..................................................................................19

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

ii.

**REPLY ISO MOTION TO DISMISS**
**5:19-CV-02019-EJD**

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3
4

*In re Metricom Sec. Litig.,*
2004 WL 966291 (N.D. Cal. Apr. 29, 2004) ........................................................................18

5
6

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
540 F.3d 1049 (9th Cir. 2008) ...................................................................................2, 15

7

*In re Nvidia Corp. Sec. Litig.,*
2010 WL 4117561 (N.D. Cal. Oct. 19, 2010).........................................................................15

8
9

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
575 U.S. 175 (2015).........................................................................................................8

10

*Paciga v. Invuity Inc.,*
2018 WL 7286503 (N.D. Cal. Sept. 26, 2018) ...............................................................14

11
12

*Reese v. Malone,*
747 F.3d 557 (9th Cir. 2014) .......................................................................................15

13
14

*In re Restoration Robotics, Inc. Sec. Litig.,*
2019 WL 5295059 (N.D. Cal. Oct. 18, 2019).......................................................2, 11, 18, 19

15

*In re Rigel Pharm., Inc. Sec. Litig.,*
697 F.3d 869 (9th Cir. 2012) ................................................................................17, 20

16
17

*Ronconi v. Larkin,*
253 F.3d 423 (9th Cir. 2001) ........................................................................................3

18
19

*Rubke v. Capitol Bancorp Ltd.,*
551 F.3d 1156 (9th Cir. 2009) .......................................................................................19

20

*S. Ferry LP No. 2 v. Killinger,*
399 F. Supp. 2d 1121, 1136 (W.D. Wash. 2005).................................................................20

21
22

*Schneider v. Cal. Dep't of Corr.,*
151 F.3d 1194 (9th Cir. 1998) .......................................................................................13

23
24

*In re Silicon Graphics Inc. Sec. Litig.,*
183 F.3d 970 (9th Cir. 1999) ........................................................................................9

25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007).........................................................................................................16

26
27

*Union Asset Mgmt. Holding AG v. SanDisk LLC,*
2017 WL 3097184 (N.D. Cal. June 22, 2017) .....................................................................10

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iii.

REPLY ISO MOTION TO DISMISS
5:19-CV-02019-EJD

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*In re Vantive Corp. Sec. Litig.*,
 283 F.3d 1079 (9th Cir. 2002) ..................................................................4

4

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 704 F.3d 694 (9th Cir. 2012) ....................................................................14

5

6

*In re Verifone Sec. Litig.*,
 2016 WL 1213666 (N.D. Cal. Mar. 29, 2016).........................................5

7

*In re Verifone Sec. Litig.*,
 784 F. Supp. 1471 (N.D. Cal. 1992), aff'd, 11 F.3d 865 (9th Cir. 1993) .................................4

8

9

*Vess v. Ciba-Geigy Corp. USA*,
 317 F.3d 1097 (9th Cir. 2003) ..................................................................5

10

11

*Vignola v. FAT Brands, Inc.*,
 2019 WL 6138473 (C.D. Cal. June 14, 2019) .......................................20

12

13

*Webb v. Solarcity Corp.*,
 884 F.3d 844 (9th Cir. 2018) ..................................................................15

14

*Weller v. Scout Analytics, Inc.*,
 230 F. Supp. 3d 1085 (N.D. Cal. 2017) ...........................................3, 6, 18

15

16

*Wong v. Arlo Techs., Inc.*,
 2019 WL 7834762 (N.D. Cal. Dec. 19, 2019) .......................................18

17

18

*Zucco Partners, LLC v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009) ..............................................................9, 15

19

**Statutes**

20

15 U.S.C. § 77z-2(c) ..........................................................................................5

21

15 U.S.C. § 78u-5(c) ..........................................................................................5

22

15 U.S.C. § 78u-4(b)(1)(B)................................................................................2

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

iv.

**REPLY ISO MOTION TO DISMISS**
**5:19-CV-02019-EJD**

## I.   INTRODUCTION

Plaintiffs allege that Eventbrite misled investors about the likely success of the Ticketfly acquisition because (according to Plaintiffs) Eventbrite "***could not***" offer three features Ticketfly customers valued—(i) 24/7 customer support, (ii) integrated email, and (iii) customizable fee breakdowns.  (*See, e.g.*, ¶¶13, 68, 103, 180, 182, 184, 191.)[1]  But the Complaint alleges no facts in support of that theory.  Indeed, Eventbrite never told investors it would implement ***any*** specific features offered by Ticketfly.  As such, regardless of the facts alleged, Plaintiffs' core theory—that Eventbrite could not offer those three specific features—does not render any of the challenged statements false or misleading when made.

Evidently lacking any response to these arguments, the Opposition seeks to re-write Plaintiffs' Complaint.  Plaintiffs now argue that they "do not necessarily allege that it was ***impossible*** for Eventbrite to add those features," but only that it would be time-consuming and expensive to do so.  (ECF No. 50 ("Opp.") at 16:1–4.)  Plaintiffs also argue "that Defendants' statements were misleading ***not because Eventbrite promised to implement these specific features***, but because the failure or inability to incorporate Ticketfly's key features, ***whatever they were***, caused undisclosed serious problems with the Ticketfly integration."  (*Id.* at 15:25–28.)  Thus, Plaintiffs' new theory is that the challenged statements were misleading because Eventbrite lacked some unspecified "key features" which caused some unspecified "serious problems."  Even if that was alleged in the Complaint (it is not), such vague allegations are inadequate to state a claim under any applicable pleading standard.

Nor does the Opposition provide any support for Plaintiffs' argument that the Ticketfly migration was "delayed by a year."  (*Id.* at 17:1–2.)  The Registration Statement did not say anything about an expected time for completing the Ticketfly migration; rather, it said only that the process of winding down acquired platforms typically occurs "***over a period of 12 to 24 months***" after acquisition.  (Ex. A at 22.)[2]  While not specific to Ticketfly, this was the only timeframe Eventbrite disclosed, and it was thus was the only barometer against which investors could measure any alleged

---

[1] Unless otherwise noted, emphasis is added and internal quotation marks and citations are omitted.

[2] "Ex." references are to the Speers Declaration and attached exhibits.  (ECF Nos. 44, 44-1, 44-2.)

"delay."  But, even by that measure, there was no "delay."  As applied to Ticketfly, the generic timeframe, puts migration completion as far out as September 2019, which is entirely consistent with Eventbrite's disclosures in March and May 2019 (which Plaintiffs claim revealed the "truth"), both of which estimated the Ticketfly migration would be completed in the second half of 2019. (Ex. H at 2, 10; Ex. E at 9.)

Plaintiffs also fail to allege facts supporting a strong inference of scienter.  The vast majority of their allegations (and arguments) contain no specifics, and the cases upon which they rely are largely inapposite.  There are no well-pled allegations of motive.  There are no allegations of stock sales.  The allegations about Mr. Dreskin's bonus plan are pure speculation.  And, fatally, the allegations regarding the gap analysis and Ms. Hartz's meetings fail to identify a single piece of information that was inconsistent with—much less contradicted—the challenged statements.

Finally, Plaintiffs' arguments regarding loss causation for the May 1, 2019 disclosure are inconsistent with the Complaint's allegations.  No new, material information was disclosed on May 1, 2019.  Therefore, the stock drop on that date is not recoverable.

## II.    PLAINTIFFS' SECTION 10(b) CLAIM SHOULD BE DISMISSED

### A.    Plaintiffs Fail to Plead Falsity as to *Any* of the Challenged Statements.

The Opposition—which spans 30 pages—dedicates only *three paragraphs* to the purported falsity of the seven statements Plaintiffs challenge under Section 10(b).  (Opp. at 19:27–21:10; *see also* **Appendix 1A**.)[3]  To the extent Plaintiffs suggest falsity should be analyzed "collectively," (Opp. at 2:12–17), they are wrong.  *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).  For falsity, the Court must do a statement-by-statement analysis.  15 U.S.C. § 78u-4(b)(1)(B); *see In re Restoration Robotics, Inc. Sec. Litig.*, 2019 WL 5295059, at *11 (N.D. Cal. Oct. 18, 2019).  Analyzed in that manner, the Complaint fails to allege falsity.

#### 1.    Plaintiffs Abandon Their Core Theory of Falsity.

The Complaint's core theory of falsity is that Eventbrite purportedly "***could not***" offer three specific features—(i) 24/7 customer support, (ii) integrated email, and (iii) customizable fee

---

[3] Appendix 1A, attached hereto, identifies each alleged misstatement and the alleged bases for falsity.

1   breakdowns.  (*See e.g.*, ¶13 ("Eventbrite's platform *could not* be extended . . ."), ¶68 ("*could not*

2   supply"); ¶103 ("*could not* be extended"); ¶180 ("*could not* offer"); ¶182 ("features Ticketfly provided

3   but Eventbrite *could not*"); ¶¶184 & 191 ("*could not* be extended").)[4]   Accordingly, Eventbrite

4   Defendants' Opening Brief made clear that Eventbrite never claimed it would integrate these or any

5   specific Ticketfly features (ECF 42 ("Op. Br.") at 12:1–19), and that the allegations do not show that

6   Eventbrite was *unable* to offer features (*id.* at 14:8–23).

7        Rather than address these arguments, the Opposition distances Plaintiffs from this theory,

8   claiming they did "not *necessarily* allege that it was *impossible* for Eventbrite to add those features,"

9   but only that, "including the features would cost so much time and money as to have material adverse

10   effects on the Ticketfly integration and Eventbrite's business."  (Opp. at 16:1–4.)  This argument,

11   however, cannot be squared with a plain reading of the Complaint.  (¶¶103, 191, 180, 182, 184.)  None

12   of those paragraphs even mentions the time or cost it would purportedly take to integrate these features.

13   (*Id.*)  Because this theory "is not clearly alleged or supported by the Complaint," it "fails to satisfy

14   even Rule 8(a)[,] . . . much less the heightened pleading standard required by Rule 9(b) and the

15   PSLRA."[5]  *See Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1094 (N.D. Cal. 2017).

16        In any event, Plaintiffs' new theory is unsupported by any allegations of "*specific facts*"

17   demonstrating how the purported cost and time "translated into [material adverse effects on

18   Eventbrite's business]."  *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001).  As to cost, the

19   Complaint contains a single allegation regarding a single feature (24/7 customer support), which FE

20   1—a low-level marketing employee with no alleged engineering experience—believed would cost an

21   "astronomical" amount to add.  (Opp. at 3:21–23; *see also* ¶¶43, 72.)  This vague allegation, lacking

22   any factual basis to suggest that FE 1 was in a position to know what this feature would have cost (Op.

23   Br. at 8:14–19), does not show falsity.  *See Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL

24   1508991, at *16 (N.D. Cal. Apr. 27, 2017).  As to time, Plaintiffs repeatedly characterize the

---

[4] This is the *only* alleged basis for pleading falsity as to Statement Nos. 1, 2, and 5; Plaintiffs allege

that Statement Nos. 3 and 4 were misleading for this reason as well.  (*See* Appendix 1A.)

[5] For the same reasons, Statement No. 1 (¶102) cannot support a Section 11 claim.

integration and migration as "delayed," but fail to identify a single **contemporaneous** public statement setting an estimated completion date against which this purported "delay" could be measured.[6] Instead, Plaintiffs argue that the lone statement that could provide any basis for an estimated timeframe—"[Eventbrite's] acquisition strategy to date, and going forward, often results in the **winding down of the acquired platforms over a period of 12 to 24 months**" (Ex. A at 22)—is irrelevant because it relates to compliance with "privacy laws touching on data stored in the legacy platforms." (Opp. at 17:3–6.) This argument is frivolous. Irrespective of *why* it was included, it was the **only** timeframe discussed in the Registration Statement (or anywhere else prior to March 2019), so it was the **only** benchmark for measuring any alleged "delay." (Op. Br. at 13:23–14:7.) Put another way, and setting aside the Opposition's hand-waving about privacy laws, Plaintiffs allege no facts suggesting that the Ticketfly integration and migration process was "delayed" when measured against the only timeframe that Eventbrite disclosed in the Registration Statement.[7]

---

[6] On March 7, 2019 (six months *after* the IPO), Defendants disclosed for the first time that the Ticketfly migration was taking longer than Eventbrite's earlier *internal* estimates. (¶107.) Plaintiffs do not allege that Eventbrite publicly disclosed this internal estimate; thus, it has no bearing on investor expectations. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002) (rejecting "speculat[ion] in hindsight" based on a later announcement and no contemporaneous facts). Nor was Eventbrite under any obligation to disclose its internal estimate. *See In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993) (While "a corporation has sound business reasons for creating internal forecasts, there are equally sound business reasons for a corporation to keep these forecasts confidential. . . . To impose a disclosure obligation for such information simply cannot be in the best interests of investors and shareholders.").

[7] Plaintiffs' attack on Eventbrite's risk disclosures (Opp. at 16:5–17:28) should be disregarded. The Complaint does not allege that any risk disclosure is false or misleading (*see* Appendix 1A) or that Eventbrite failed to disclose any known risks (*e.g.*, alleging an omission under Item 105), and Defendants have not argued that any forward-looking statement may be "exculpated" or "safe-guarded" by adequate risk disclosures (15 U.S.C. §§ 77z-2(c), 78u-5(c)).

Plaintiffs also seek to distance themselves from their allegations that it was the three features discussed at length in the Complaint that Ticketfly customers valued, now arguing instead that, "Defendants' statements were misleading not because Eventbrite promised to implement these specific features, but because the failure or inability to incorporate Ticketfly's key features, **whatever they were**, caused undisclosed serious problems with the Ticketfly integration." (Opp. at 15:25–28 (citing ¶103).)  But the Complaint does not identify any other features that were supposedly "key," or that Eventbrite purportedly had trouble integrating.  As such, this theory is devoid of factual support and cannot satisfy Rule 9(b) or the PSLRA.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  In short, Plaintiffs pivot to a "watered-down theory" actually highlights the absence of any particularized facts pled in support of their core allegation.  *Barbara v. MarineMax, Inc.*, 2013 WL 4507068, at *18 (E.D.N.Y. Aug. 22, 2013).

Accordingly, for this reason alone, Statement Nos. 1, 2, and 5 should be dismissed.

### 2. Statement Nos. 1, 2, and 5 Contain Inactionable Puffery.

Plaintiffs argue that *FireEye* and *Verifone*—cited in the Opening Brief for the proposition that Statement Nos. 1, 2, and 5 each contain inactionable puffery (*see* Op. Br. at 17:1–3)—are inapposite because the puffing statements in those cases were "patent[ly] vague[]," "generic statement[s] about integration," "[d]evoid of context that would give it meaning," or had "no factual content at all." (Opp. at 14:12–20.) This is misleading and incorrect.  Those cases did, in fact, address statements specific to the timing and success of integration.  *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *7 (N.D. Cal. Nov. 14, 2016) ("the integration is progressing rapidly and smoothly"); *In re Verifone Sec. Litig.*, 2016 WL 1213666, at *5 (N.D. Cal. Mar. 29, 2016) ("We completed a very complicated takeover of Hypercom, and then proceeded to rapidly integrate the business, and we are already enjoying significant operating synergies").  In sharp contrast, the statements challenged in the Complaint are about general business momentum and product offerings, and do not directly address the pace or progress of the Ticketfly integration.  (¶102 ("We accelerated our momentum through the acquisitions of ticketscript and Ticketfly"); ¶190 ("We accelerated our momentum through the acquisitions of ticketscript, Ticketfly, Ticketea and Picatic"); ¶183 ("a product offering that's focused on specifically venues so giving them expanded functionality to manage their box office")).)  Accordingly, Statement

Nos 1, 2, and 5 should be dismissed for the independent reason that the statements are inactionable puffery.

### 3.   Statement No. 3 Makes No Comparison to Ticketfly, and is Inactionable.

Plaintiffs' argument that Statement No. 3 (¶179) was misleading because Eventbrite Music was purportedly inferior to Ticketfly, and that music venues only partnered with Eventbrite because it was required under their pre-existing Ticketfly contracts is meritless. (Opp. at 7:4–6; ¶180.)

First, this theory of falsity cannot be squared with the statement itself, which does not even mention Ticketfly, much less purport to tout Eventbrite Music's superiority. (¶179.) Plaintiffs offer no credible explanation as to how a reasonable investor would read this statement and be misled about Eventbrite Music's capabilities *as compared to Ticketfly*. (*See* Op. Br. at 13:6–8 (citing *Weller*, 230 F. Supp. 3d at 1094).) *Weller* is particularly instructive. There, the plaintiff challenged the statement: "With more than *$3.5 billion of recurring revenue* under management, Scout Analytics extends ServiceSource's reach into new markets." 230 F. Supp. 3d at 1093. The plaintiff alleged this statement was misleading because "[d]efendants 'have never held more than *$5 million in gross revenues*.'" *Id.* at 1094. The court rejected this argument, noting that "the [statement] does not mention '*gross revenue*'"; that "the reasons [p]laintiff offers as to why the statement is false or misleading bear no connection to the substance of the statement itself"; and that "no reasonable investor could read the Press Release the way Plaintiff suggests." *Id.* The *Weller* court concluded that "[t]he suggestion that Defendants intended to mislead investors into believing that the statements about the companies' recurring revenue management services were in reference to the companies' own gross revenue is simply not a plausible interpretation of the above statements." *Id.* That logic aptly applies to Statement No. 3, which makes no mention of Ticketfly.

Second, Plaintiffs fail entirely to address the argument (Op. Br. at 16:20–22) that Statement No. 3 consists largely of inactionable puffery (*see* Opp. at 20:24–21:10).

Third, Plaintiffs do not and cannot seriously contest that the remainder of Statement No. 3 is an inactionable statement of opinion. (Opp. at 20:2–6; *see also* ¶179 ("*We believe* the people at the heart of the independent music scene partner with Eventbrite because we support them, speak their language and help grow their business.").) The Opening Brief identified the absence of any

particularized allegations establishing that Defendants did not honestly hold these opinions.  (Op. Br. at 17:8–16.)  Rather than address that argument, Plaintiffs merely recite their conclusory allegation (¶180) that "Defendants knew but failed to disclose that independent music customers partnered with Eventbrite because of their legacy Ticketfly contracts, not because Eventbrite's offerings appealed to them."  (Opp. at 20:12–15.)  Accordingly, because conclusory allegations are inadequate to establish falsity under Rule 9(b) and the PSLRA, Statement No. 3 should be dismissed.

### 4. Statement No. 4 Is an Accurate Historical Statement Applicable to Eventbrite's Acquisitions Generally, Not Ticketfly Specifically.

Plaintiffs argue that Statement No. 4 (¶181) is misleading because Eventbrite "knew that it was suffering, and was likely to suffer further, serious customer losses in connection with the Ticketfly migration."  (Opp. at 7:9–10.)  Even if true, that allegation, does not render the challenged statement, which addresses customer loss at a single point in time—*i.e.*, "around the time we deprecate the acquired platform" (¶181)—false or misleading.  Moreover, Plaintiffs identify no facts indicating that Eventbrite was "experiencing material customer losses because Ticketfly Customers had hired Ticketfly for the features Ticketfly provided but Eventbrite could not, including customer support, email marketing capabilities, and fee breakdowns, among other things."  (¶182.)  To the contrary, as discussed in Section II.A.1, Plaintiffs concede that it was *not* "*impossible* for Eventbrite to add those features."  (Opp. at 16:1–4.)  Nor do Plaintiffs identify any facts demonstrating Ticketfly customer losses were "material."  (¶182.)  As noted in the Opening Brief (Op. Br. at 14:25–15:16)—and left unaddressed in the Opposition—even if the Court credits FE 2's allegations that "*a lot* of [Ticketfly] Customers expressed dissatisfaction with the Eventbrite platform" and that as of "November 2018, *very few of his customers* had migrated" (¶¶80, 82), these allegations provide no specific or quantifiable measures from which the Court could determine how many customers FE 2 was responsible for migrating, their overall revenue contribution, how many purportedly expressed dissatisfaction with the Eventbrite platform, whether that dissatisfaction was the reason they had not yet migrated, whether they migrated after FE 2's departure in November 2018, or whether FE 2's customers were a representative sample.  *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) (finding insufficient CW statements that

were "limited to each CW's 'team'" where the complaint "fail[ed] to otherwise allege that those 'teams' had a significant impact on Oracle's overall revenue.").

Finally, Plaintiffs argue that Eventbrite Defendants "distort" Statement No. 4 (¶181) by emphasizing the word "historically" and omitting the word "typically." (Opp. at 7 n.3.) Both terms, however, refer to past experience, and both are contained in the same paragraph of the Q3 2018 Shareholder Letter discussing Eventbrite's Acquisition Strategy and Financial Impact. (Op. Br. at 16:5–12; Ex. J at 13.) Indeed, Statement No. 4 is immediately followed in the next section of the Shareholder Letter, with the following statement that addressed the ***present*** migration loss ***specific to Ticketfly***: "We anticipate that net revenue ***in this period*** will be negatively impacted by migration activities for the ***Ticketfly*** platform consistent with the reasons outlined above in the section titled 'Acquisition Strategy and Financial Impact.'" (Ex. J at 14.) "[A]n investor reads each statement within such a document . . . in light of all its surrounding text;" therefore, to the extent Statement No. 4 created any uncertainty, the next section provided clarity with respect to Ticketfly. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). Accordingly, Statement No. 4 should be dismissed.

### 5.    Plaintiffs Blatantly Mischaracterize Statement No. 6.

The Opposition mischaracterizes Statement No. 6 (¶185), arguing that, in response to analyst questions about "what caused Ticketfly revenue losses," Defendants "falsely den[ied] that Ticketfly [was] losing customers because of Eventbrite's platform's deficiency." (Opp. at 21:5–9.) This is simply false. (*See* ¶185.) In response to analyst questions, Mr. Befumo responded: "[T]here are really a few reasons that a creator will not migrate after an acquisition. ***The first, as you correctly inferred, is competitive activity***." (¶185.) Mr. Befumo further elaborated, noting other reasons for customer loss, including loss to "***competitive ticketing platforms***," but "[s]o far, in our migration, we've seen a mix of them. ***There's no one overwhelming factor***." (*Id.*) In other words, Mr. Befumo ***admitted*** that a portion of customer loss was due to customers choosing competitor platforms over Eventbrite. *See Oracle Corp.*, 2019 WL 6877195, at *17 (finding that senior management's response that "the story is a lot bigger than the realities" when asked about whether Oracle used certain sales tactics was not a denial that the practices do happen.). Plaintiffs further argue that this statement is misleading because

"the **overwhelming factor** in customer losses was that Ticketfly's customers were dissatisfied with Eventbrite's platform." (Opp. at 7:24–26; *see also* ¶186.) But again, Plaintiffs allege no facts to support this claim. (*See* Section II.A.4.) Accordingly, Statement No. 6 should be dismissed.

### 6.     Plaintiffs Do Not Address Any Arguments Regarding Statement No. 7.

The only portion of Statement No. 7 (¶188) that Plaintiffs challenge is inactionable puffery. (*See* Op. Br. at 16:22 ("delivering the full power").) Plaintiffs, however, do not address the alleged falsity of Statement No. 7 in their Opposition. (*See* Opp. at 19:28–21:10.) Accordingly, they have abandoned any claim that Statement No. 7 was false or misleading. *See Callan v. Motricity Inc.*, 2013 WL 195194, at *9 (W.D. Wash. Jan. 17, 2013).

### B.     Plaintiffs Fail to Plead a Strong Inference of Scienter.

The Opposition fails to identify particularized allegations demonstrating that Ms. Hartz or Messrs. Befumo or Dreskin **intentionally** deceived investors, or **deliberately** disregarded information that contradicted their public statements.[8] (Opp. at 21:11–28:22.) This provides an independent basis for dismissal. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999).

### 1.     The FE's Limited Employment Duration, Lack of Direct Contact with Defendants, and Nebulous Allegations All Fail to Demonstrate Scienter.

The Opposition fails to rehabilitate the deficient FE allegations. (*See* Opp. at 21:21–24:14.) First, Plaintiffs seek to downplay Ninth Circuit precedent (*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009)), by arguing that courts "regularly consider allegations drawn from confidential witnesses who separated from the company before the start of the class period." (Opp. at 22:14–15; *see also* Op. Br. at 8:7–9, 9:9–11 (FE 1's employment ended prior to IPO; FE 2's employment ended six months prior to end of Class Period).) However, the only Ninth Circuit case Plaintiffs cite is *In re Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) (Opp. at 22:10–14), which is distinguishable. There, plaintiffs alleged "a pattern of misrepresenting and misleading investors **over a number of years**," 2016 WL 5390533 at *10, not a handful of

---

[8] The scienter of a corporate defendant generally must be derived from the individuals who made the challenged statements. *Anshen v. Facebook*, 2017 WL 5635021, at *2 (C.D. Cal. Oct. 4, 2017).

1  statements over a few months involving the status of a single acquisition.

2      Second, Plaintiffs overstate their argument that the FEs' lack of direct contact with Ms. Hartz

3  and Messrs. Befumo and Dreskin is irrelevant because direct contact is not necessary to establish

4  scienter. (Opp. at 24:2–7 (citing *Union Asset Mgmt. Holding AG v. SanDisk LLC*, 2017 WL 3097184,

5  at *2 (N.D. Cal. June 22, 2017)).) Though a lack of direct contact may not be disqualifying in limited

6  cases where the FEs have alleged other sufficient facts indicating individual defendants' knowledge,

7  a lack of direct contact remains disqualifying in all but the most unusual cases. In *Union Asset Mgmt*,

8  plaintiffs alleged that a certain confidential witness learned directly from his supervisor that the

9  supervisor discussed those reports with the individual defendants. 2017 WL 3097184, at *2. No

10 similar facts are alleged here[9].

11     Nothing in *Union Asset Mgmt.* undermines Ninth Circuit precedent rejecting allegations about

12 FE's who had no direct contact with defendants. For example, in *Oracle*, the court agreed "that

13 because the CWs did not have any direct contact with [Individual Defendants], some of their reports

14 cannot provide reliable insight into the Individual Defendants' states of mind." 2019 WL 6877195 at

15 *19. In particular, the court found inadequate allegations that "CW1 prepared presentations 'for

16 Hurd's consumption,'" "CW2 saw 'presentations going to Hurd's direct reports,'" and "CW9

17 'understood' that customer-related information 'would be summarized and presented at a higher

18 level,'" because the "CWs lack personal knowledge as to whether Catz or Hurd read or heard of the

19 internal information and presentations." *Id.* Accordingly, the court held such allegations "cannot be

20 relied upon to establish scienter." *Id.* Here, the FEs plead far fewer and far less detailed facts than

21 those found inadequate in *Oracle*. At most, FE 2 alleges that his supervisor reported to Mr. Dreskin.

22 (Opp. at 23:27–24:1 (citing ¶70).) But FE 2 does not allege that his supervisor reviewed the gap

23 analysis with Mr. Dreskin (or Ms. Hartz or Mr. Befumo). "[M]erely speculative awareness of [Ms.

24 Hartz's and Messrs. Befumo's and Dreskin's] knowledge is not enough." *Oracle*, 2019 WL 6877195,

25 at *19.

26  _____

27 [9] Moreover, even in *Union Asset Mgmt*, the court noted that because "CW5's statements are based

28 on hearsay," they "deserve less weight than if CW5 had met directly with the defendants." *Id.*

Cooley LLP
Attorneys At Law
Palo Alto
10.
REPLY ISO MOTION TO DISMISS
5:19-CV-02019-EJD

Third, Plaintiffs' reliance on *Extreme Networks* and *Finisar* (Opp. at 21:25–27) is misplaced. In *In re Extreme Networks, Inc. Sec. Litig.*, plaintiffs challenged statements that the integration was "on track," "ahead of plan," "complete," and that integration problems were "behind" the company. 2018 WL 1411129, at *11 (N.D. Cal. Mar. 21, 2018). These statements were made "shortly after [individual defendant Berger] told his global sales force . . . that the integration plan was 'TBD' [to be determined]." *Id.* at *32. Additionally, the complaint included "particularized" CW allegations "of *personal* conversations with Berger *during the relevant time period*," and "allegations about the *persistent issues* with sales force integration and product offerings *during the relevant time period*, *coupled with allegations of Berger's direct oversight* of the sales team." *Id.* Here, none of the challenged statements suggest that the Ticketfly integration was proceeding ahead of schedule or was problem-free. Nor is there any allegation that the timing or success of the Ticketfly integration was discussed at meetings, much less ones attended by Ms. Hartz or Messrs. Befumo or Dreskin.

Similarly, in *In re Finisar Corp. Sec. Litig.*, the plaintiff alleged "that material inventory-related information was disclosed to and/or discussed by Defendants during annual client negotiations," and "multiple confidential witnesses with knowledge of such negotiations corroborate[d] this claim." 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017). This information directly contradicted "specific statements in which defendants *denied* their knowledge of an inventory build-up." *Id.* at *4. Here, in contrast, neither FE alleges that Ms. Hartz or Messrs. Befumo or Dreskin even discussed the contents of the gap analysis, much less that it contradicted their public statements.

Accordingly, the FE allegations here do not support any inference of scienter.

## 2. The Allegations Regarding Mr. Dreskin's Bonus Plan Are Inaccurate and Premised Solely on Impermissible Speculation.

Plaintiffs concede that the purported amendment to Mr. Dreskin's bonus plan is not probative of motive. (Opp. at 25 n.5.) Instead, they argue that the change from "migration" to "retention" demonstrates that Ms. Hartz and Messrs. Befumo and Dreskin "knew the integration was failing." (*Id.* at 25:11–13.) This argument fails. First, Plaintiffs' argument that "[i]n April 2018, [Mr.] Dreskin signed a [bonus] contract with Eventbrite," (*Id.* at 24:27) is contradicted by Plaintiffs' own exhibits. (*See* Wolke Exs. A, C.) In fact, Mr. Dreskin never executed the April bonus plan; the only bonus plan

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

11.

REPLY ISO MOTION TO DISMISS
5:19-CV-02019-EJD

he signed was the August 2018 plan, which was based on retention.  (*See id.*)  Second, Plaintiffs'
argument only underscores their misunderstanding of the bonus calculation.  "Retention" is based
upon both (i) customers who migrated to Eventbrite's platform, and (ii) customers still using the legacy
Ticketfly platform.  A bonus based on retention would result in a higher bonus whether or not the
Ticketfly migration were ahead of schedule.  Thus, the fact that Mr. Dreskin signed the bonus plan
based on "retention" does not suggest that Ms. Hartz or Messrs. Befumo or Dreskin "knew the
integration was failing."  (*See* Opp. at 25:11–13.)  Third, Plaintiffs have alleged no facts demonstrating
that Ms. Hartz or Mr. Befumo were involved in the purported negotiation of Mr. Dreskin's bonus or
had any motive to purportedly provide him with an unduly favorable bonus.  (*Id.*; *see* Op. Br. at 18
n.7.)  Accordingly, Mr. Dreskin's bonus plan provides no support for scienter.

### 3. The Information Allegedly Contained in the Gap Analysis Was Not Inconsistent with any Challenged Statement.

Plaintiffs allege that the gap analysis was created "to support [the Ticketfly] migration" by
(i) identifying features not currently offered by Eventbrite and (ii) determining how important those
features were to Ticketfly customers.  (¶68.)  But the Complaint contains no factual allegations (from
FEs or otherwise) demonstrating that Ms. Hartz or Messrs. Befumo or Dreskin ever reviewed the gap
analysis.  (*See* Op. Br. at 20:2–11 (noting ¶174 contains only conclusory allegations).)  Plaintiffs do
not address this argument in their Opposition.  (*See* Opp. at 25:22–24 (citing ¶174).)  Nor do they
provide any clarity as to how the information purportedly contained in the gap analysis rendered any
challenged statement false or misleading when made.  (*See* Op. Br. at 20:12–26.)  In short, Plaintiffs
fail to identify how the gap analysis supports any inference of scienter.  *See Oracle*, 2019 WL 6877195,
at \*19 (finding CW allegations insufficient where they did not identify ***how*** the underlying data
revealed the purported falsity of defendants' statements).

Instead, Plaintiffs pose a strawman they can easily knock down, arguing that "the inference
Defendants suggest is . . . that Eventbrite ordered Ticketfly employees to spend countless hours
creating gap analyses and then ignored the results."  (Opp. at 26:6–8.)  But Eventbrite Defendants did
not argue that the gap analysis was ignored.  To the contrary, the Opening Brief plainly states that FE
2's allegation that he spent significant time updating the gap analysis "as new Eventbrite features were

REPLY ISO MOTION TO DISMISS
5:19-CV-02019-EJD

1   rolled out" (¶69), indicates that Eventbrite not only utilized the gap analysis to identify features it did

2   not currently have, but also to track those features as they were integrated. (*See* Op. Br. at 20:12–26.)

3   Moreover, while Plaintiffs argue that the gap analysis identified features Eventbrite was "***unable*** to

4   offer" (Opp. at 25:17), the allegation that FE 2 spent "much more time updating the [gap] analyses

5   [sic] as new Eventbrite features were rolled out" than he spent preparing the initial gap analysis (¶69),

6   makes clear that Eventbrite ***could*** and ***did*** integrate features identified therein. (*See* Op. Br. at 20:12–

7   26; *see also* ¶¶68–69 (describing gap analysis as a "living" document).) The Opposition does not

8   address this inconsistency. In short, the gap analysis does not support any inference of scienter.

9   ### 4.   Plaintiffs Do Not Identify any Topic Addressed at any Meeting.

10  Plaintiffs detail at length Ms. Hartz's purportedly hands-on management style—from attending

11  customers' events to holding weekly all-hands company meetings. (Opp. at 26:10–27:2; ¶¶168–70.)

12  Based on this, Plaintiffs argue that Ms. Hartz had "firsthand knowledge that [the Ticketfly integration]

13  was failing." (Opp. at 26:10–11.) But nowhere in the Opposition (or Complaint) do Plaintiffs identify

14  a single topic ***discussed*** at any meeting, or a single complaint voiced by a customer at an event Ms.

15  Hartz attended. (*See* Op. Br. at 19:8–15.) "At a minimum, Plaintiffs needed to have provided

16  information about precisely what was said by the parties in these meetings, which facts [Ms. Hartz

17  was] exposed to, and why this exposure supports an inference of scienter." *FireEye*, 2016 WL

18  6679806, at *16; *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 830 (S.D. Cal. 2006)

19  (holding failure to provide "insight on who attended the meeting or what was said . . . undermines a

20  strong inference of scienter"). Plaintiffs fail to do so. Instead, they point to a single question that

21  employees allegedly submitted anonymously in advance of the all-hands meeting: "why would our

22  clients want to move over?" (Opp. at 26:20–23; ¶¶170–71.) Plaintiffs argue that this question "pointed

23  to difficulties [FE 2] had had in persuading [Ticketfly] customers to migrate." (Opp. at 26:21–22.)

24  However, that is pure conjecture, is not alleged in the Complaint, and thus is "irrelevant for Rule

25  12(b)(6) purposes." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).

26  Moreover, Plaintiffs concede that Ms. Hartz never addressed these questions (¶171), and identify no

27  allegations indicating that Ms. Hartz ever even saw such questions (Opp. at 26:20–23). In sum,

28  "Plaintiffs merely allege that there were meetings and describe only in broad, conclusory terms what

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

13.

REPLY ISO MOTION TO DISMISS
5:19-CV-02019-EJD

1    was discussed at those meetings. . . As a result, Plaintiffs' allegations are '[s]ketchy at best' and 'do

2    not provide enough detail to nudge plaintiffs' claims across the line from conceivable to plausible.'"

3    *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016).

4              **5.    The Core Operations Inference Does Not Apply.**

5              Plaintiffs' reliance on the core operations inference (Opp. at 28:8–22) gets them nowhere.  The

6    inference is available "***when made in conjunction with detailed and specific allegations about***

7    ***management's exposure to factual information within the company***."  *Curry v. Yelp Inc.*, 875 F.3d

8    1219, 1227 (9th Cir. 2017).  Plaintiffs argue that they are entitled to such an inference because

9    "Ticketfly represented one quarter of the combined company's revenues," (Opp. at 28:8–22), but they

10   fail to identify any underlying information that contradicted Defendants' public statements.  *See*

11   *Paciga v. Invuity Inc.*, 2018 WL 7286503, at *6 (N.D. Cal. Sept. 26, 2018) (rejecting core operations

12   inference because "[t]he complaint does not address what ***specific*** negative information officers knew

13   about its sales data or core operations that was sufficiently troubling that the officers must have known

14   that their revenue guidance would not be met").

15             Nor do Plaintiffs' cited authorities suggest that the core operations inference is applicable here.

16   (Opp. at 28:13–22 (citing *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012)

17   and *Extreme Networks*, 2018 WL 1411129, at *29).)  In both *VeriFone* and *Extreme Networks*,

18   plaintiffs pled particularized facts regarding ***specific information*** accessible to defendants that ***directly***

19   ***contradicted defendants' public statements***.  In *Extreme Networks*, plaintiffs challenged statements

20   by the individual defendant that integration was "on track," "ahead of plan," "complete," and that

21   problems were "behind" the company.  2018 WL 1411129, at *11.  These statements were made

22   "shortly after [defendant Berger] told his global sales force . . . that the integration plan was 'TBD.'"

23   *Id.* at *32.  Similarly, in *VeriFone,* plaintiffs alleged that the company's financial reports were false.

24   704 F.3d at 701.  To support scienter, the plaintiff alleged detailed facts demonstrating that defendants

25   reviewed internal reports showing gross margins substantially lower than the company's projections,

26   emails from defendants questioning the accuracy of the reports because they did not meet projected

27   figures, and accounting adjustments with no basis that matched (almost to the dollar) the adjustments

28   needed to bring the margins to the projected figures.  *Id.* at 704–09.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

14.

1    In contrast, here, Plaintiffs have not alleged any particularized facts demonstrating that the gap

2    analysis, the employee meetings, or anything else contained specific information that contradicted

3    Defendants' public statements.  "Without sufficiently alleging **actual** falsity, the [P]laintiffs cannot

4    rely on the concept of core operations to infer scienter as to [any] of the individual defendants."  *In re*

5    *Nvidia Corp. Sec. Litig.*, 2010 WL 4117561, at *10 (N.D. Cal. Oct. 19, 2010).

6                **6.**    **Plaintiffs Do Not Allege a Cognizable Motive.**

7    Plaintiffs recite the allegations in the Complaint regarding Eventbrite's purported financial

8    obligations but do not address, much less oppose, any of the arguments raised in the Opening Brief

9    outlining their deficiencies.  (*Compare* Opp. at 27:4–15 *with* Op. Br. at 20:27–28:17.)  Instead,

10   Plaintiffs advance a new theory, arguing that Ms. Hartz "had a motive to inflate Eventbrite's prospects

11   to advance its IPO because she beneficially owned almost 17% of its stock."  (Opp. at 27:19–20.)  But

12   that would be true for every newly-public company CEO.  If "simple allegations of pecuniary motive

13   were enough to establish scienter, 'virtually every company in the United States that experiences a

14   downturn in stock price could be forced to defend securities fraud actions.'"  *Zucco*, 552 F.3d at 1005.

15   Most critically, Plaintiffs do not allege that Ms. Hartz sold any stock during the Class Period, which

16   "**detract[s]** from a scienter finding."  *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018)

17   *Metzler*, 540 F.3d at 1067 (lack of stock sales suggests "no insider information from which to benefit").

18               **7.**    **The Statements Themselves Do Not Demonstrate Scienter.**

19   All else failing, Plaintiffs engage in a circular argument, arguing that because "Defendants

20   repeatedly spoke about Eventbrite's platform and the Ticketfly integration" they must have known

21   about the issues alleged in the Complaint.  (Opp. at 27:26–28:6.)  This argument is premised on a

22   misapplication of *Reese v. Malone,* 747 F.3d 557 (9th Cir. 2014).  In *Reese*, plaintiffs alleged that the

23   statement, "corrosion was seen in the 34 inch oil transit line . . . but appeared to be occurring at a 'low

24   manageable corrosion rate'" was misleading because the company's internal documents showed high

25   corrosion rates and indicated a "sharp and rapid spike."  *Id.* at 569.  The court held "the inference that

26   [defendant] did not have access to the corrosion data is directly contradicted by the fact that she

27   specifically addressed it in her statement."  *Id.* at 572.

28   Plaintiffs seek to apply that narrow holding to the broad category of statements encompassing

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

15.

REPLY ISO MOTION TO DISMISS
5:19-CV-02019-EJD

"Eventbrite's platform and the Ticketfly integration." (Opp. at 28:4–5.) Only two statements (Statement Nos. 4 and 6),[10] even remotely contain information that *could* even be addressed by a report. (*See* Appendix 1A.) However, even as to those statements, Plaintiffs do not identify any underlying data or report that actually contradicted—or even encompassed the subject matter—of the challenged statements. In short, the narrow holding in *Reese* is inapplicable here.

**8.     Plaintiffs' Allegations Remain Inadequate Under a Holistic Analysis.**

The Court "must consider ***all*** reasonable inferences to be drawn from the allegations, ***including inferences unfavorable to the plaintiffs***." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007) (to determine "whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences"). Even when viewed collectively, Plaintiffs' allegations fail to raise a strong inference of scienter. The unreliable FE allegations fail to demonstrate that Ms. Hartz or Messrs. Befumo or Dreskin had access to—much less knew or recklessly disregarded—any information that contradicted their public statements. Plaintiffs' allegations about Mr. Dreskin's bonus plan are pure speculation. There are no allegations demonstrating a cognizable motive. Instead, the most compelling inference from the facts alleged is that, while the Ticketfly acquisition may have presented unexpected challenges and even may have taken longer than internal (undisclosed) estimates prior to the IPO, none of the Defendants intended to mislead investors about Eventbrite's capabilities or the progress of the Ticketfly migration.

**C.     Plaintiffs Fail to Plead Loss Causation as to the May 1 Disclosures.**

Plaintiffs admit there is "overlap" between the March 7 and May 1 disclosures, but argue that the May 1 disclosure contained "additional" information "that Eventbrite would be ***lowering*** its Q2 2019 guidance due in substantial part to problems with the Ticketfly migration." (Opp. at 29:20–22 (citing ¶116.)) But Paragraph 116 alleges only that Eventbrite announced Q2 2019 guidance on May 1, 2019. There is no allegation that the Eventbrite had provided Q2 2019 guidance prior to that date, and thus, there is no basis for the argument that Eventbrite "***lower[ed]***" its guidance. Moreover, as to

---

[10] These statements include information about customer loss. (¶¶181, 185.)

1  the timing of the Ticketfly migration, the March 7 and May 1 disclosures were **consistent**—both

2  estimated that Eventbrite would complete migration and sunset the Ticketfly platform in the second

3  half of 2019.  (¶105; Ex. E at 9.)

4  **III.   PLAINTIFFS' SECTION 11 CLAIM SHOULD BE DISMISSED**

5       Plaintiffs challenge a single disclosure in the Registration Statement (Statement No. 1; ¶102)

6  which is also challenged under Section 10(b).  Because the entire complaint sounds in fraud, Plaintiffs'

7  Section 11 claim should be dismissed for the reasons discussed in Sections II.A.1 and II.A.2.

8  However, even if Rule 8 applies, Plaintiffs fail to plead a Section 11 claim.

9       **A.      The Entire Complaint Sounds in Fraud.**

10       Plaintiffs argue that their Securities Act claims do not "sound in fraud" and, thus, are not

11  subject to the heightened pleading standard of Rule 9(b) because the allegations pled in support are

12  physically separated from the Exchange Act allegations.  (Opp. at 10.)  Plaintiffs are wrong.  Where a

13  complaint "alleges a unified course of fraudulent conduct" and "relies entirely on that course of

14  conduct as the basis of a claim," the complaint sounds in fraud and is subject to Rule 9(b)'s heightened

15  pleading standards.  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012).  That is

16  true even where the "section 11 claim does not adopt all of the allegations contained in the rest of the

17  complaint," so long as "it does not allege **different** misrepresentations."  *Id.* at 866.

18       Here, the **only** statement challenged under Section 11 is also challenged under Section 10(b).

19  (¶¶102, 175; *see also* ¶190 (containing substantially similar language as Statement No. 1).)  And,

20  despite physically separating the Securities Act and Exchange Act allegations in their Complaint (Opp.

21  at 10:7–9, 10:19–20), Plaintiffs' Opposition establishes that they are alleging a unified course of

22  fraudulent conduct:

23       •   "Defendants were highly motivated to **conceal the truth about the IPO** from investors in

24           order for their company to survive."  (*Id.* at 27:11–15.)

25       •   "Eventbrite **needed an IPO** to avoid a looming death spiral."  (*Id.* at 27:21–22.)

26       •   "Defendants did not to disclose the known risks . . . for the Ticketfly integration **in the IPO**

27           [and] **continued to conceal** those problems from investors for six months."  (*Id.* at 2:6–8.)

28       •   "While these misstatements differed in their precise wording, they **continued to conceal**

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

17.

REPLY ISO MOTION TO DISMISS
5:19-CV-02019-EJD

1    the known migration delays and customer attrition." (*Id.* at 19:8–10.)

2        "Plaintiffs cannot allege fraud based on a series of events occurring before the offering and on

3    essentially identical events continuing after the offering, and then scissor out a non-fraud claim from

4    the center of that unified course of conduct in order to evade the Rule 9(b) requirement." *In re*

5    *Metricom Sec. Litig.*, 2004 WL 966291, at *24 (N.D. Cal. Apr. 29, 2004); *see also Wong v. Arlo*

6    *Techs., Inc.*, 2019 WL 7834762, at *6 (N.D. Cal. Dec. 19, 2019) (holding that "Plaintiff[s] must plead

7    [their] Section 11 claim with particularity" where "[the] section 11 claim is so substantively similar to

8    the conduct pled in connection with [the] section 10(b) claim").

9        **B.      Plaintiffs Fail to Identify any Misleading Statement.**

10        Plaintiffs argue Statement No. 1 gave "investors the impression that Eventbrite could

11    incorporate the features Ticketfly customers needed into the Eventbrite platform." (Opp. at 13:2–4.)

12    But, on its face, the challenged statement does not make any promise that Eventbrite would, or even

13    could, incorporate any specific Ticketfly features. (¶102.) Plaintiffs now concede that point (Opp. at

14    15:25–28), and that it was ***not impossible*** for Eventbrite to implement those features (*id.* at 16:1–2).

15    Because Plaintiffs allege no other basis for falsity, their core Section 11 claim fails. *See Weller*, 230

16    F. Supp. 3d at 1094.  Also, as discussed in Section II.A.2, Statement No. 1 consists largely of

17    inactionable puffery, and Plaintiffs' arguments to contrary are meritless. (Opp. at 13:13–15:9.)

18        **C.      Plaintiffs Fail to Plead any Material Omissions Under Item 303.**

19        Plaintiffs also argue that Eventbrite's Registration Statement failed to disclose "that the

20    troubled Ticketfly migration was a 'known trend' reasonably likely to materially impact Eventbrite's

21    sales and revenue at the time of the IPO." (*Id.* at 12:7–8.) This argument fails for myriad reasons.

22    First, the argument that this alleged trend was "known" as of the IPO belies Plaintiffs' contention that

23    the Securities Act claims do not sound in fraud. (*Id.* at 10:18–20.) The only allegations of Defendants'

24    purported knowledge are contained exclusively within the Exchange Act allegations section of the

25    Complaint (¶¶162–74), so either Plaintiffs' Securities Act claims are subject to Rule 9(b), or they have

26    not alleged ***knowledge*** of any trend or uncertainty. *Restoration Robotics*, 2019 WL 5295059, at *16

27    ("Plaintiff must establish knowledge on the part of Defendants regarding any alleged trend.").

28        Second, the only allegations Plaintiffs identify to support their argument of a known trend or

uncertainty regarding the Ticketfly customer migration as of September 2018 (the date of the IPO) are: (i) the allegation of single employee that by November 2018, "very few of [*his*] Ticketfly customers had migrated to Eventbrite[]" (Opp. at 11:25-27); and (ii) statements by Eventbrite and analysts *in March 2019 and May 2019* (*id.* at 12:2–6).  As to the former, even if it were appropriate to extrapolate the migration statistics of a single employee (it is not), Plaintiffs do not allege the total number of customers FE 2 was responsible for, their overall revenue contribution, or the number that had not yet migrated as of the IPO.  Without these specifics, "it [is] difficult to understand the severity of the problem or whether that actually had an impact on revenue[.]"[11]  *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1056 (N.D. Cal. 2019).  As to the latter, post-hoc statements are inadequate to show what was known "at the time the registration statement became effective."  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009).

> <u>Third</u>, Plaintiffs' theory that the migration was "delayed" is nonsensical.  Plaintiffs do not dispute that, as of the IPO, Eventbrite had not publicly disclosed any expected timeframe specific to the Ticketfly migration.  (*See* Op. Br. at 5:13–15.)  Nor do they dispute that the **only** timeframe disclosed in the Registration Statement was based on Eventbrite's historical experience, which typically took "**a period of 12 to 24 months**."  (*Id.* at 5:17; Ex. A at 22.)  Accordingly, as of the IPO, the **only** reasonable expectation investors could have had for completion of the Ticketfly migration was between September 2018 and September 2019.  In any event, Plaintiffs allege no contemporaneous facts, as of the IPO, that the Ticketfly migration was "delayed"—much less that any Defendant knew that such a "delay" would have a material unfavorable impact on Eventbrite's

---

[11] *Restoration Robotics* is inapposite.  (*Cf.* Opp. at 11:22–25.)  There, the court found confidential witness allegations that the company's needles were "faulty" and "damaged the hair grafts," sufficient to infer a widespread problem *with the needle*.  2019 WL 5295059, at *12.  Whether a needle is faulty is fundamentally different than inferring that, just because FE 2 had difficulty convincing *his* customers to migrate, all salespeople must have experienced similar issues.  Just as Plaintiffs argue it is inappropriate to speculate FE 2 was bad at his job (Opp. at 23:19–20) it is equally inappropriate to speculate he was good at his job, or that others experienced the same difficulties.

**REPLY ISO MOTION TO DISMISS
5:19-CV-02019-EJD**

financial condition. Regardless, assuming Eventbrite had internal estimates for completing the Ticketfly migration in less than "12 to 24 months" (which is not alleged), Eventbrite had no obligation to disclose those expectations, even if the migration was purportedly "delayed" because "deviations from internal forecasts, without more, do not produce a duty to disclose in the Prospectus." *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir.1996).

<u>Finally</u>, as set forth in the Opening Brief, to the extent there were any known uncertainties regarding migration as of the IPO, they were disclosed. (*See* Op. Br. at 24:24–25:7.) Plaintiffs argue that these disclosures were "meaningless boilerplate," but the cases upon which they rely prove otherwise. (Opp. at 17:7–21.) Unlike in *S. Ferry LP No. 2 v. Killinger*, where the allegedly undisclosed risk concerned the bank's ability to hedge its mortgage business and the court found a risk disclosure about potentially higher administrative costs and loss of customers from difficulties integrating technology platforms was not meaningful, 399 F. Supp. 2d 1121, 1136 (W.D. Wash. 2005), Eventbrite's risk disclosures address the exact risk Plaintiffs argue was not disclosed:

> When we acquire companies or other businesses, ***we face the risk that creators of the acquired companies or businesses may not migrate to our platform*** or may choose to decrease their level of usage of our platform post migration. ***We have previously experienced customer loss in the process of integrating and migrating acquired companies for a variety of reasons***. The pace and success rate of migration may be influenced by many factors, including the ***pace and quality of product development, our ability to operationally support the migrating creators and our adoption of business practices outside of our platform that matter to the creator***. (Ex. A at 16.)

Accordingly, Plaintiffs' Item 303 claim should be dismissed. *See also Vignola v. FAT Brands, Inc.*, 2019 WL 6138473, at *14 (C.D. Cal. June 14, 2019) (rejecting Item 303 claim where the allegedly adverse trend was disclosed in the Registration Statement).[12]

## IV.   CONCLUSION

The Complaint should be dismissed it its entirety, with prejudice.

---

[12] The "control person" claims fail because Plaintiffs have not pled a primary violation. *Rigel*, 697 F.3d at 886.

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

20.

REPLY ISO MOTION TO DISMISS
5:19-CV-02019-EJD

1   Dated: March 3, 2020                        COOLEY LLP
                                                PATRICK E. GIBBS (183174)
2                                               SHANNON M. EAGAN (212830)
                                                JEFFREY D. LOMBARD (285371)
3                                               HEATHER SPEERS (305380)

4                                               */s/ Patrick E. Gibbs*
5                                               Patrick E. Gibbs (183174)

6                                               *Attorneys for Eventbrite Defendants*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
PALO ALTO

21.

REPLY ISO MOTION TO DISMISS
5:19-CV-02019-EJD