UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE EVENTBRITE, INC. SECURITIES LITIGATION | Case No. 5:18-cv-02019-EJD |
| | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND** |
| | Re: Dkt. No. 42 |

This class action arises out of Defendants' alleged violations of Section 11 and 15 of the Securities Act of 1933, Item 303 of SEC Regulation S-K, and Section 10(b) and 20(a) of the Securities Exchange Act of 1934.  Lead Plaintiffs Michael Gomes, Melvin Pastores, Mohit Uppal, and Bruce Bones ("Plaintiffs") purchased Eventbrite securities during Eventbrite's September 2018 Initial Public Offering ("IPO").[1]  Plaintiffs contend that Defendants made misleading statements to and concealed known risks from investors.  The Complaint names multiple defendants: (1) Eventbrite, (2) Individual Defendants Julia Hartz (the Chief Executive Officer "CEO" and a director), Randy Befumo (the Chief Financial Officer "CFO"), Andrew Dreskin (a director), Katherine August-deWilde (a director), Roelof Botha (a director), Kevin Hartz (a director), Sean P. Moriarty (a director), Lorrie M. Norrington (a director), Helen Riley (a director), and Steffan C. Tomlinson (a director), and (3) Underwriter Defendants Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Allen & Company LLC, RBC Capital Markets, LLC, SunTrust

---

[1] Specifically, Plaintiffs allege that they purchased the securities between September 20, 2018 and May 1, 2019 ("the Class Period").

United States District Court
Northern District of California

Robinson Humphrey, Inc., and Stifel, Nicolaus & Co., Inc.

Defendant Eventbrite and Individual Defendants[2] have filed a motion to dismiss the lawsuit arguing that Plaintiffs have not met the heightened pleading requirements applicable in securities fraud cases. Having considered the Parties' papers, the Court agrees and **GRANTS** Defendants' motion to dismiss.[3]

## I.       BACKGROUND

### A.  Factual Background

Eventbrite hosts a platform through which live event creators can plan for, market, and sell tickets to their events. Amended Class Action Complaint ("Compl.") ¶ 1, Dkt. No. 40. Unlike Eventbrite's competitors, whose platforms are focused on a specific industry, Eventbrite serves four core markets—festivals, music, registration events, and endurance events—regardless of their subject-matter. *See id.* ¶¶ 3, 46, 51–52, 54.

*Pre-IPO.* In September 2017, about one year before the IPO, Eventbrite acquired Ticketfly, LLC ("Ticketfly"), a competitor, from Pandora Media, Inc. for $201.1 million. *Id.* ¶ 4. Eventbrite financed the acquisition through a mixture of debt and equity. *Id.* ¶¶ 147–61. The financing was acquired using high interest rates (as high as 12%), stock options, and a $50 million note to Pandora. *See* ¶¶ 151, 153, 161. Plaintiffs allege that this threatened to dilute investors ownership interests. *Id.* ¶¶ 157–61.

Plaintiffs further argue that the Ticketfly acquisition was botched. According to Plaintiffs, there are several important differences between the Ticketfly and Eventbrite platforms. In contrast to Eventbrite, which serves a diverse range of events across a range of countries, Ticketfly limits its services to independent music venues and festivals in North America. *Id.* This was "Eventbrite's largest ever acquisition" and a "substantial purpose" of the acquisition was to acquire Ticketfly's customers and relationships. *Id.* ¶¶ 14, 48–49.

---

[2] Underwriter Defendants join Defendant Eventbrite and Individual Defendants' motion to dismiss and reply. *See* Dkt. Nos. 45, 55.
[3] Pursuant to N.D. Cal. Civ. L.R. 7-1(b), this Court found this motion suitable for consideration without oral argument. *See* Dkt. 58.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs allege that Eventbrite began experiencing problems after the Ticketfly acquisition.  Specifically, because Eventbrite's platform was so different from Ticketfly's, Eventbrite was unable to quickly integrate Ticketfly's customers and relationships into the Eventbrite platform.  Eventbrite's platform operates as follows: a customer can use Eventbrite's platform to sell or offer tickets for various events.  *See id.* ¶ 60.  The tickets are sold or offered directly on Eventbrite's platform.  *Id.* ¶ 56.  This means that whenever an event-attendee RSVPs for an event (or buys tickets for that event), the event-attendee must use Eventbrite's platform, which provides Eventbrite with free advertising.  *Id.* ¶ 56.  Eventbrite customers can plan their event for free, so long as they are not charging an admission fee.  *Id.* ¶ 57–58.  If, however, customers want to charge for admission or if they want more services, they can purchase an essential, professional, or premium package.  *Id.* ¶ 59.  While each package provides different features, customers may not customize the package.  *Id.*  This, Plaintiffs' argue, shows that Eventbrite is not designed to reach professional event organizers.  *Id.* ¶ 58.

In most markets, Eventbrite is the only large-scale online ticketing solution.  *Id.* ¶ 60.  However, the independent music venue market, in which Ticketfly operates, is different—in that market, there are a number of independent music venue online ticketing options.  For instance, TicketWeb, which operates under the Ticketmaster brand, is an online ticketing option for independent music venues.  *Id.* ¶ 61.  Other competitors include tickets.com, StubHub, VividSeats, and ShowClix.  *Id.*  Because the independent music venue market is more competitive and venues have more options to choose from, Ticketfly must work harder to attract and retain customers.  *Id.*  Thus, unlike Eventbrite, Ticketfly provides its customers with individual software solutions and individual assistance, including personalized account management.  *Id.* ¶¶ 63, 65.  Accordingly, Ticketfly's platform operates differently from Eventbrite's.  *Id.* ¶ 65 ("Ticketfly had a different model where their sales reps were also account managers.").

1    Plaintiffs use two confidential, former employees ("FEs")[4] to support their claim that

2  Eventbrite knew, long before the IPO, that migrating Ticketfly customers to Eventbrite's platform

3  would be a "monumental task." *Id.* ¶ 66.  FE 1 was employed by Eventbrite between 2016 and

4  June 2018, as a Marketing Operations/Revenue Operations Analyst, at the San Francisco office.

5  *Id.* ¶ 43.  FE 1's responsibilities were to monitor Eventbrite's sales pipeline and complete analysis

6  on things like site traffic, forecasting, and open deals.  *Id.*  He allegedly interacted with a host of

7  Ticketfly employees.  *Id.*  FE 2 was a Ticketfly Senior Festival Success Specialist from August

8  2011 through November 2018.  *Id.* ¶ 44.  FE 2's job was to sell Ticketfly's services to new and

9  existing clients and retain existing clients.  *Id.*  According to FE 2, Eventbrite began attempting to

10  migrate customers immediately after the Ticketfly acquisition closed.  *Id.* ¶ 67.

11    To support the migration, Eventbrite allegedly attempted to determine which Ticketfly

12  features customers used.  *Id.* ¶ 68.  According to FE 2, all Ticketfly salespersons had to conduct a

13  "gap analysis" for each of their customers who contributed more than $10,000 in gross income.

14  *Id.*  The "gap analysis" aimed to rank Ticketfly functions that customers used and note any "gaps"

15  in the Eventbrite platform.  *Id.*  To aid in this analysis, Eventbrite management supplied Ticketfly

16  salespeople with a form that listed a series of gaps that Eventbrite had already identified.  *Id.*

17  After identifying "gaps," Ticketfly's salespersons were supposed to evaluate on a ranked scale

18  how important the missing service was to customers.  *Id.*  Plaintiffs allege that a lot of effort was

19  put into these gap analyses and that it was a top priority for Eventbrite.  *Id.* ¶¶ 69–70.

20    FE 2 contends that the gap analyses identified glaring deficiencies in Eventbrite's services.

21  *Id.* ¶ 71.  Specifically, the gap analyses identified three principal shortcomings with Eventbrite's

22  platform: (1) Ticketfly provided 24/7 telephone support for ticket purchasers, while Eventbrite did

23  not, and the costs of providing such support would be "astronomical;" (2) Ticketfly provided free

24  custom integrated email that automated marketing emails, while Eventbrite only offered email

25

---

26  [4] The Court notes Defendants' objections to the use of these FEs.  *See* Dkt 42 at 8–10.  Because, however, the Court does not find it necessary to determine the reliability of the FEs for this

27  motion, the Court does not address the substance of Defendants' objections.  The Parties should not construe this as the Court accepting or rejecting Defendants' arguments regarding the FEs.

28  Case No.: 5:19-cv-02019-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

4

1   through a third-party that could cost each customer over $10,000 per year; and (3) Ticketfly

2   provided customizable fee schedules that separated fees and taxes incorporated into a ticket price,

3   while Eventbrite did not.  *Id.* ¶¶ 71–72, 77–79.

4        Ticketfly customers allegedly noted even more problems with Eventbrite's platform.  As

5   noted above, in order for an event-attendee to RSVP or buy tickets for an event, they must visit

6   Eventbrite's platform, which gives Eventbrite free advertising.  When the event-attendee visits

7   Eventbrite's platform, however, Eventbrite also advertises events hosted by the creator's

8   competitors.  This is a problem for music venues, who are at risk of losing attendees to other

9   music venues.  *Id.* ¶ 80.  Plaintiffs also allege that Eventbrite alienated its customers and their

10  ticket-purchasers by under investing in information security, as demonstrated by the May 31, 2018

11  hack.  *Id.* ¶ 94.  For these reasons, after the acquisition, Ticketfly salespeople allegedly made little

12  progress in persuading their clients to migrate to the Eventbrite platform.  *Id.* ¶¶ 81–82.

13       Plaintiffs further argue that Eventbrite compounded the integration-problems by alienating

14  key Ticketfly personnel.  Eventbrite allegedly limited the responsibilities of Ticketfly salespeople

15  and required them to make sales pitches that destroyed their credibility with clients.  *Id.* ¶ 87.

16  Eventbrite also allegedly discontinued Ticketfly traditions and failed to deliver promised

17  amenities.  *Id.* ¶¶ 89–91.  This caused Ticketfly employees to believe that Eventbrite intended to

18  fire them after they migrated customers to the Eventbrite platform.  *Id.* ¶ 87.  As a result, many

19  Ticketfly salespeople left Eventbrite by early 2018.  *Id.* ¶ 92.

20       Plaintiffs allege that by September 2018, these events resulted in a "floundering" Ticketfly

21  integration, which created material uncertainty for Eventbrite's business prospects.  And, as of late

22  November 2018, after the IPO, FE 2 alleges that very few of his Ticketfly customers had migrated

23  to Eventbrite.  *Id.* ¶ 82.

24       **The IPO.**  In September 2018, Eventbrite filed a prospectus and registration statement

25  (collectively, the "Registration Statement") and sold 11,500,000 shares of its Class A common

26  stock in an IPO.  *Id.* ¶¶ 1, 7.  Plaintiffs allege that the Registration Statement was negligently

27  prepared and, as a result, included untrue statements of material facts and/or material omissions.

28  Case No.: 5:19-cv-02019-EJD
    ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
Northern District of California

*Id.* ¶ 98.  Specifically, Plaintiffs argue that Defendants omitted material facts about the Ticketfly integration and failed to disclose (as required by securities law) the substantial problems with the Ticketfly acquisition.  *Id.* ¶¶ 99–101.

**Post-IPO.**  Following the IPO, on November 12, 2018, Defendants published a letter and held a conference call to provide investors with Eventbrite's third quarter 2018 financial results. *Id.* ¶¶ 176, 183.  The Q3 2018 Shareholder Letter touted Eventbrite Music, a new initiative, which purportedly would make Eventbrite more attractive to independent music venues.  *Id.* ¶ 178. Plaintiffs allege that the letter contained misstatements because, contrary to the letter's assurances that Eventbrite was technologically competitive for independent music customers, Eventbrite was not competitive, as shown by the gaps between its platform and Ticketfly's.  *Id.* ¶¶ 179–80. Likewise, on the Q3 2018 Shareholder Call, Defendant Befumo mislead investors by stating that Ticketfly customers were satisfied with Eventbrite's platform.  *Id.* ¶ 186.

On March 7, 2019, Eventbrite reported its fourth quarter 2018 earnings and filed its 2018 annual report with the U.S. Securities and Exchange Commission ("SEC") ("2018 10-K").  *Id.* ¶¶ 187–88, 190.  During this call, Defendants also provided Q1 2019 revenue guidance that fell short of certain analysts' expectations.  *Id.* ¶ 111.  This guidance revealed that the Ticketfly sales team was still focused on migrating Ticketfly customers over to Eventbrite's platform and that they did not anticipate finishing the integration work until "the second quarter of 2019."  *Id.* ¶ 105. Defendants further revealed that the migration was taking longer than planned.  *Id.* ¶ 107.  As a result of these revelations, Eventbrite's stock price fell $7.96 per share (over 24%).  *Id.* ¶ 109.  The next day, the stock fell an additional $1.57, which analysts attributed to the revelation about the Ticketfly integration problems.  *Id.* ¶ 110.

On May 1, 2019, Eventbrite reported its first quarter 2019 earnings, which met its own revenue guidance.  *Id.* ¶ 116.  During its Q1 2019 report, Eventbrite provided Q2 revenue guidance that again fell short of analysts' expectations.  *Id.* ¶¶ 115–16.  In response, Eventbrite's stock price fell $6.55 per share (over 27%) to close at $17.60.  *Id.* ¶ 117.  Analysts again attributed the stock drop to the Ticketfly integration.  *Id.* ¶ 118.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.  Alleged Material Misstatements/Omissions

Plaintiffs allege that Defendants made 7 materially false, misleading, and/or incomplete statements concerning the Ticketfly acquisition.  *See id.* ¶¶ 102, 179, 181, 183, 185, 188, 190.  For clarity, the Court has numbered the alleged actionable statements.  Bold and italics are copied from Plaintiffs' Complaint and indicate the part of the statement alleged to be materially false and misleading.

***The Registration Statement***

**Statement 1**

***Selectively Acquire Businesses Focused on Serving Creators.  We have been successful leveraging our platform to make selective acquisitions that have contributed to creator and revenue growth. We accelerated our momentum through the acquisitions of ticketscript and Ticketfly.  By finding like-minded teams who share a common ethos around serving creators, we can continue to expand and offer new capabilities to existing creators. The modularity and extensibility of our platform enables us to quickly integrate and migrate creators to the Eventbrite platform, allowing us to quickly deprecate the acquired technology and associated costs.***

Compl. ¶ 102.

***2018 10-K Statement***

**Statement 2**

***Selectively Acquire Businesses Focused on Serving Creators.  We have been successful leveraging our platform to make selective acquisitions that have contributed to creator and revenue growth.  We accelerated our momentum through the acquisitions of ticketscript, Ticketfly, Ticketea and Picatic.  By finding like-minded teams who share a common ethos around serving creators, we can continue to expand and offer new capabilities to existing creators.  The modularity and extensibility of our platform enables us to integrate and migrate creators to the Eventbrite platform, allowing us to quickly deprecate the acquired technology and associated costs.***

Compl. ¶ 190.

***Q3 2018 Earning Results Letter***

**Statement 3**

Eventbrite Music is purpose-built with the unique challenges of the music business in mind.  It's designed to give independent venues and festivals the tools and expertise they need to grow their businesses, sell out their shows, build their brands, amplify their reach and deliver a great fan and artist experience.  ***This solution helps music creators stay one step ahead of the technology curve by streamlining many important marketing and operations tools into a single platform, helping to provide clarity and control of their music.***

Eventbrite Music includes a specialized event creation workflow that supports key elements of the music business, including the input of detailed artist and performance information and the ability to set up automated publishing for hundreds of events to be released on a pre-set schedule.  *We also offer enhanced marketing capabilities, streamlined checkout experience and mobile box office capabilities.*

. . . .

*We believe the people at the heart of the independent music scene partner with Eventbrite because we support them, speak their language and help grow their business.*

Compl. ¶ 179.

**Statement 4**

Our strategy is to operate a single technical platform globally, which means that we work to migrate customers from acquired platforms to the Eventbrite platform.  This migration process has historically taken 12 to 24 months, over which the Eventbrite team engages with customers to support this process.  In general, we strive to retain the majority of net revenue while migrating customers in order to realize the important synergies of operating a single technical platform. *Migration efforts have typically resulted in modest customer losses which tend to cluster around the time we deprecate the acquired platform.*

Compl. ¶ 181.

***Q3 2018 Earning Results Phone Call***

**Statement 5**

<Q >: Okay. Thank you. Two questions, please. First, Eventbrite Music that you said that launched last week, could you talk about kind of—what kind of impact that would have?  And is this something where you think this would be useful in terms of retention or new customer wins? I think you've already had a lot of offerings in this kind of venue; in music, independent music festival space, but just talk about what the implication of this is.  And then secondly, with YouTube, is this already live now and then could you talk at all about the economics or the somewhat similar to some of the other deals you've had?  Anything around that would be useful. Thank you.

<A – Julia Hartz>: Hi, Mark.  Thanks so much for the questions.  So, for Eventbrite Music, we have gone to market as of last week with a product that is tailor-made for independent music venues and promoters as well as festivals and this applies to not only those who are currently using Eventbrite but also, of course, those who are currently using the legacy Ticketfly platform. And so while related, they really are two different tracks of work: migration and then the Eventbrite Music product.  *And so where we see the great value of Eventbrite Music is that we've been able to utilize the extensibility of our platform and the modularity really to bring together an offering, a product offering that's focused on specifically venues so giving them expanded functionality to manage their box office, to manage their checkout experience, their marketing capabilities.*

Compl. ¶ 183.

United States District Court
Northern District of California

**Statement 6**

<Q>: Great. Thanks, Julia and Randy.  Randy, the revenue that you're talking about losing is part of the re-platforming of Ticketfly.  Are those customers that are going somewhere else?  Is it a change in pricing?  Can you just give us a sense of sort of what that means?  Maybe competitively or sort of for the combined business going forward in terms of how we should think about relative growth rates on the other side of this.

<A – Randy Befumo>: Sure, Heath.  Thank you for the question.  When we think about migration loss, it comes in a variety of shapes and so the first thing to understand is unlike a SaaS contract that has a visible and stable revenue stream, our creators grow or shrink, depending on their businesses.  And so when we're looking at migration and migration loss, you have to think about not just our part of it but also the creators' growing and shrinking as well.  Within that, though, there are really a few reasons that a creator will not migrate after an acquisition.  The first, as you correctly inferred, is competitive activity.  However, that's not the sum total.  Some customers will choose to in-source, some customers actually, in the period between acquisition and migration, may unfortunately go out of business.  Others may be acquired by companies that have competitive ticketing platforms or that already have preexisting ticketing relationships and those may actually drive the decisions, not anything about the Eventbrite platform.  ***So far, in our migration, we've seen a mix of them.  There's no one overwhelming factor.  We try to take them all into account when giving you and TheStreet guidance in order to give you the best sense of where we believe we'll land at the end of the quarter in terms of revenue.***

Compl. ¶ 185.

**Statement 7**

In 2018, we saw significant progress against our strategy. In the self-sign-on acquisition channel, we took steps in the second half to drive volume growth through country launches and product capability expansion.  Our two international acquisitions strengthen our focus on building global development teams and accelerate our ability to deliver product and platform solutions.  Additionally, we have integrated more than 50 distribution partners that are enabled by our APIs, underscoring our focus on platform extensibility.  And in music, we are migrating our global business onto one single platform.  To this end, we made measurable progress on the Ticketfly integration and sunset the ticketscript platform.  We also launched Eventbrite Music, a solution specifically tailored for independent music venues and promoters.

Each of these deliberate choices is about doing the hard work to grow the business in the right way.  For example, our strategy is to have affordable pricing that encourages creator adoption and consumer satisfaction rather than use price to drive near-term revenue growth.  Our focus remains on building a business that will serve millions of creators a decade from now.  And our decisions are focused on this goalpost.  Nowhere is this more evident than our Ticketfly acquisition.  This was the largest acquisition we've completed to date, adding a significant amount to our revenue base.  ***Rather than deciding to operate the Ticketfly platform on its own, we made the decision to integrate Ticketfly onto the Eventbrite platform, thus delivering the full power of both to independent music venues and promoters.***  This strategy also requires an intensive process where our team focuses on migrating existing customers as well as building platform enhancements.

Compl. ¶ 188.

United States District Court
Northern District of California

### C.  Procedural History

Following the continued stock decline, multiple lawsuits were filed against Defendants. One of these—*Gomes v. Eventbrite et al.*—was randomly assigned to this Court.  *See* Class Action Complaint for Violations of the Federal Securities Laws, Dkt. No. 1.  This Court consolidated *Gomes* with other related ones.  *See* Dkt. No. 9.  On November 11, 2019, Plaintiffs filed their amended consolidated complaint, which is the subject of Defendants' current motion to dismiss pursuant to Rule 12(b)(6).  Eventbrite Defendants' Notice of Motion and Motion to Dismiss Plaintiffs' Amended Complaint ("Mot."), Dkt. No. 42.  On January 31, 2020, Plaintiffs filed their opposition to Defendants' motion to dismiss.  Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss ("Opp."), Dkt. No. 50.  Defendants filed their reply on March 3, 2020.  Reply in Support of Eventbrite Defendants' Motion to Dismiss ("Reply"), Dkt. No. 53.

Defendants also request judicial notice regarding facts pertaining to their motion to dismiss.  *See* Eventbrite Defendants' Request for Judicial Notice ("RJN"), Dkt. No. 43.  On January 31, 2020, Plaintiffs filed a response to Defendants' request for judicial notice.  *See* Plaintiffs' Opposition to Request for Judicial Notice ("RJN Opp."), Dkt. No. 51.  Defendants subsequently filed a reply to Plaintiffs' opposition to judicial notice.  Eventbrite Defendants' Reply to Plaintiffs' Opposition to Request for Judicial Notice ("RJN Reply"), Dkt. No. 54.

## II.        JUDICIAL NOTICE

Defendants ask this Court to take judicial notice of Exhibits A–J, which are attached to the declaration of Heather Speers (the "Speers Decl.").  Exhibit A is a copy of Eventbrite's Prospectus Form, which is referred to as the "Registration Statement" throughout Plaintiffs' Complaint.  *See e.g.*, Compl. ¶ 102.  It is publicly available on the SEC's website.  Speers Decl. ¶ 2.  Exhibit B is a copy of the JPM Securities March 2019 report entitled "Eventbrite Solid 4Q, But Ticketfly Migration Pushed into '19 to Weigh on 1Q &N-T Growth; Remain Neutral & PT to $27."  *Id.* ¶ 3; *see also* Compl. ¶¶ 110, 118.  Exhibit C is a copy of the March 2019 RBC Capital Markets report entitled "Eventbrite, Inc. More Ticket Troubles."  Speers Decl. ¶ 4; *see also* Compl. ¶¶ 110, 118. Exhibit D is a copy of the publicly-available transcript of Eventbrite's Q1 2019 Earnings Call.

Case No.: 5:19-cv-02019-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND
10

Speers Decl. ¶ 5; *see also* Compl. ¶¶ 115–16.  Exhibit E is a copy of Eventbrite's Q1 2019

Shareholder Letter, which was publicly filed with the SEC on May 1, 2019 as an exhibit to

Eventbrite's Form 8-K.  Speers Decl. ¶ 6; *see also* Compl. ¶ 114.  Exhibit F is a copy of

Eventbrite's Form 10-K for the fiscal year of 2018, which was publicly filed with the SEC on

March 7, 2019.  Speers Decl. ¶ 7; *see also* Compl. ¶¶ 190.  Exhibit G is a copy of the publicly-

available transcript of Eventbrite's Q4 2018 Earnings Call.  Speers Decl. ¶ 8; *see also* Compl.

¶¶ 106–08.  Exhibit H is a copy of Eventbrite's Q4 2018 Shareholder Letter, which was publicly

filed with the SEC on November 13, 2018 as an exhibit to Eventbrite's Form 8-K.  Speers Decl.

¶ 9; *see also* Compl. ¶ 104.  Exhibit I is a copy of the publicly-available transcript of Eventbrite's

Q3 2018 Earnings Call.  Speers Decl. ¶ 10; *see also* Compl. ¶¶ 183–88.  Exhibit J is a copy of

Eventbrite Q3 2018 Shareholder Letter, which was publicly filed with the SEC on November 13,

2018.  Speers Decl. ¶ 11; *see also* Compl. ¶¶ 179, 181.

Generally, district courts may not consider material outside the pleadings when assessing

the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *Lee v.*

*City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d

988, 998 (9th Cir. 2018); *see also* Fed. R. Civ. P. 12(d).  This rule does not apply to the

incorporation by reference doctrine or judicial notice under Federal Rule of Evidence 201.  *Khoja*,

899 F.3d at 998.

In the Ninth Circuit, incorporation by reference is a doctrine that "treats certain documents

as though they are part of the complaint itself."  *Id.* at 1002.  A document may be incorporated by

reference into a complaint "if the plaintiff refers extensively to the document or the document

forms the basis of the plaintiff's claim."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.

2003).  "Once a document is deemed incorporated by reference, the entire document is assumed to

be true for purposes of a motion to dismiss, and both parties—and the Court—are free to refer to

any of its contents."  *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014)

(citation and quotation marks omitted).

United States District Court
Northern District of California

1  Here, Plaintiffs Complaint incorporates by reference Exhibits A–J because Plaintiffs

2  explicitly and repeatedly refer to excerpts of these exhibits to support their claims.  Moreover,

3  Exhibits A–J are all publicly available documents and thus are subject to judicial notice.  *See In re*

4  *Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1253 (N.D. Cal. 2019).  Plaintiffs do

5  not argue that the Court cannot take judicial notice of Exhibits A–J.  *See* RJN Opp. at 3

6  ("Plaintiff[s] will not consume this Court's time by contesting whether those documents may be

7  incorporated or noticed.")  Rather, Plaintiffs argue that pursuant to *Khoja*, Defendants cannot use

8  judicial notice or incorporation by reference on a motion to dismiss to create factual disputes with

9  Plaintiffs' allegations.  *Id.* at 3.  Plaintiffs further contend that the Court should be wary of

10  Defendants' highlighting of the Exhibits.  *Id.* at 4.

11  Plaintiffs oversimplify *Khoja*.  *Khoja* does not prevent a defendant from using the

12  doctrines of judicial notice or incorporation by reference to create factual disputes with a

13  plaintiff's *conclusory* allegations.  Indeed, *Khoja* holds that an incorporated or noticed document's

14  truth may not be assumed if the only purpose is to dispute or create a defense to a <u>well-pled</u> fact in

15  a complaint.  *Khoja*, 899 F.3d at 1014–15.  Moreover, nothing in *Khoja* prevents this Court from

16  analyzing an alleged false statement in context.  *See id.* at 1002 ("[T]he policy concern underlying

17  [incorporation by reference]" is to "[p]revent[] plaintiffs from surviving a Rule 12(b)(6) motion by

18  deliberately omitting references to documents upon which their claims are based" (citation and

19  quotation marks omitted)).  *Khoja* thus did not eradicate the rule that alleged false statements

20  "must be analyzed in context."  *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1408 (9th Cir.

21  1996); *accord Khoja*, 899 F.3d at 1002 ("[Incorporation by reference] prevents plaintiffs from

22  selecting only portions of documents that support their claims, while omitting portions of those

23  very documents that weaken—or doom—their claims.").  Accordingly, the Court takes notice of

24  Exhibits A–J subject to *Khoja*'s restrictions and Plaintiffs' highlighting concerns.

25  **III.    MOTION TO DISMISS**

26  Plaintiffs allege that Defendants violated: (1) Section 10(b) and 20(a) of the Securities

27  Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, (2) Section 11 and 15 of the

28  Case No.: 5:19-cv-02019-EJD

United States District Court
Northern District of California

1  Securities Act of 1933, and (3) Item 303 of Regulation S-K.  *See* Compl. ¶¶ 125–217.  The Court

2  addresses these allegations in turn.

3      To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual

4  matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

5  (2009); Fed. R. Civ. Pro. 8(a).  A claim has facial plausibility when the plaintiff pleads factual

6  content that allows the court to draw the reasonable inference that the defendant is liable for the

7  misconduct alleged. *Ashcroft*, 556 U.S. at 678.  Courts must consider the complaint in its entirety,

8  "accept all factual allegations . . . as true" and construe them in the light most favorable to the

9  plaintiff. *See, e.g.*, *In re Restoration Robotics*, 417 F. Supp. 3d at 1253.  Threadbare recitals of the

10  elements of a cause of action supported by mere conclusory statements "do not suffice." *Ashcroft*,

11  556 U.S. at 678.  Hence, the requirement that the court "accept as true" all allegations in the

12  compliant is "inapplicable to legal conclusions." *Id.*

13      Securities fraud cases must meet Rule 8's plausibility standard, Rule 9(b)'s higher pleading

14  standard, *and* the standards established in the Private Securities Litigation Reform Act

15  ("PSLRA").  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–22 (2007);

16  *Zucco Partners, LLC v. Digimarc, Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  Rule 9 requires a

17  plaintiff pleading securities fraud to state, with particularity, the circumstances constituting fraud

18  or mistake.  Fed. R. Civ. Pro 9(b).

19      The PSLRA mandates that "securities fraud complaints 'specify' each misleading

20  statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was

21  'formed'; and that they 'state with particularity facts giving rise to a strong inference that the

22  defendant acted with the required state of mind.'"  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336,

23  345 (2005) (alterations in original) (quoting 15 U.S.C. §§ 78u–4(b)(1)–(2)); *see also Metzler Inv.*

24  *GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th. Cir. 2008) ("The PSLRA has

25  exacting requirements for pleading 'falsity.'").  Plaintiffs bear the burden of proving that the

26  defendant's misrepresentations "'caused the loss for which the plaintiff seeks to recover.'" *Dura*

27  *Pharm.*, 544 U.S. at 345–46 (quoting § 78u-4(b)(4)).  In determining whether a "strong inference"

28  Case No.: 5:19-cv-02019-EJD

1    of scienter has been sufficiently alleged, this Court must not only draw "inferences urged by the

2    plaintiff," but also engage in a "comparative evaluation," thus examining and considering

3    "competing inferences [in defendants' favor] drawn from the facts alleged."  *Tellabs*, 551 U.S. at

4    314.  Hence, scienter must not only be "plausible or reasonable," it must also be "cogent and at

5    least as compelling as any opposing inference of nonfraudulent intent."  *Id.* at 324.

        **A.  Section 10(b)/Rule 10b-5 Claim**

6

7            **1.  Legal Standard**

8            To show securities fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange

9    Act, plaintiffs must allege facts sufficient to establish (1) a material misrepresentation or omission;

10   (2) made with scienter, *i.e.*, a wrongful state of mind; (3) a connection between the

11   misrepresentation and the purchase or sale of a security; (4) reliance upon the misrepresentation;

12   (5) economic loss; and (6) loss causation.  *Loos v. Immersion Corp.*, 762 F.3d 880 (9th. Cir.

13   2014), *amended* (Sept. 11, 2014).  "To determine whether a private securities fraud complaint can

14   survive a motion to dismiss for failure to state a claim, the court must determine whether particular

15   facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or

16   with deliberate recklessness made false or misleading statements to investors."  *In re LeapFrog*

17   *Enter., Inc. Sec. Litig.*, 527 F. Supp. 2d. 1033, 1039–40 (N.D. Cal. 2007).

18           For a misstatement to be actionable, the statement must be both false and material.

19   *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) ("It is not enough that a statement is false or

20   incomplete, if the misrepresented fact is otherwise insignificant.").  To survive a motion to

21   dismiss, a complaint must "specify each statement alleged to have been misleading, [and] the

22   reason or reasons why the statement is misleading."  *Metzler Inv. GmbH*, 540 F. 3d at 1070

23   (quoting 15 U.S.C. § 78u–4(b)(1)).  Statements are misleading only if they "affirmatively create

24   an impression of a state of affairs that differs in a material way from the one that actually exists."

25   *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Rule 10b-5 prohibits

26   "*only* misleading and untrue statements, not statements that are incomplete."  *Id.*  Silence, absent a

27   duty to disclose, "is not misleading under Rule 10b-5."  *Basic*, 485 U.S. at 239 n.17, 108 S.Ct.

28   Case No.: 5:19-cv-02019-EJD

United States District Court
Northern District of California

978.  "Often a statement will not mislead even if it is incomplete or does not include all relevant facts."  *Brody*, 280 F.3d at 1006.  Not all material adverse events must be disclosed to investors.  *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012).

An actionable statement must also "be capable of objective verification."  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017).  For example, business puffery or opinion statements are not actionable because they do not "induce the reliance of a reasonable investor."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).

In their motion to dismiss, Defendants challenge the sufficiency of Plaintiffs' Section 10(b) and Rule 10b-5 claim by first arguing that Plaintiffs' allegations do not demonstrate that any challenged statement was false or misleading when made.  *See* Mot. at 11–14 (arguing that Plaintiffs fail to allege particularized, contemporaneous facts inconsistent with Defendants' allegedly false statements).  Defendants next contend that some of the challenged statements are inactionable because they are either accurate statements of historical fact, corporate puffery, and/or statements of opinion.  *Id.* at 15–17.

### a.   Failure to Sufficiently Allege Falsity

To assert a claim under the PSLRA, the plaintiff must particularly plead the element of falsity.  *Zucco Partners*, 552 F.3d at 990–91; *see also Metzler*, 540 F.3d at 1070 (noting the PSLRA' exacting pleading requirements).  To satisfy the PSLRA's "exacting requirements," a plaintiff must plead "specific facts indicating why" the statements at issue were false.  *See Metzler*, 540 F.3d at 1070; *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001).  A plaintiff may rely on contemporaneous statements or conditions to demonstrate why statements were false when made, but such circumstantial evidence must be plead with particularity.  *In re Stratosphere Corp. Sec. Litig.*, 1997 WL 581032, at *13 (D. Nev. May 20, 1997).  Thus, to be actionable, a statement must be false "at [the] time by the people who made them."  *Larkin*, 253 F.3d at 430.

**Statements 1 and 2** pertain to statements Eventbrite made about its acquisition of Ticketfly.  Defendants stated that because of acquisitions like Ticketfly, Eventbrite has been able

Case No.: 5:19-cv-02019-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND
15

United States District Court
Northern District of California

United States District Court
Northern District of California

to continue "to expand and offer new capabilities to existing creators." *See* Compl. ¶¶ 102, 190. Defendants also noted that because of the "modularity and extensibility" of the Eventbrite platform, Eventbrite has been able to integrate and migrate creators to the Eventbrite platform," which lets Eventbrite "quickly deprecate the acquired technology and associated costs." *Id.*

Plaintiffs argue that Statements 1 and 2 misstatements are actionable because Defendants created the impression that the Ticketfly integration was going smoothly when, in fact, it was not. *See* Opp. at 19. Throughout the Complaint, Plaintiffs' theory is that these statements were false because Eventbrite did not, and could not, offer the same customer support, email marketing capabilities, and fee breakdowns offered by Ticketfly. *See* Compl. ¶¶ 103, 180, 182, 184, 186, 189, 191. For example, in Paragraph 103, Plaintiffs argue that Statement 1 is a false statement because "Eventbrite's platform's modularity and extensibility did not enable . . . quick integration and migration because Eventbrite's platform did not include, and could not be extended to include, sufficient features to attract Ticketfly Customers, such as *24-7 Ticket Purchaser support, email integration, and fee expensing.*" *Id.* ¶ 103 (emphasis added); *see id.* ¶ 191 (same). However, neither Statement 1 nor Statement 2 guarantee that such features would be incorporated into the Eventbrite platform.

Recognizing this problem, Plaintiffs argue that Statements 1 and 2 are misleading "not because Eventbrite promised to implement [] specific features, but because the failure or inability to incorporate Ticketfly's key features, whatever they were, caused undisclosed serious problems with the Ticketfly integration." Opp. at 15.[5] In Plaintiffs' view, even if Defendants could have incorporated Ticketfly's key features, the cost and time associated with adding the features would have material adverse effects on the Ticketfly integration and Eventbrite's business. *Id.* at 15–16.

---

[5] As Defendants note, for falsity, the Court must do a statement-by-statement analysis. *See Metzler*, 540 F.3d at 1061 ("The PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" (quoting 15 U.S.C. § 78u–4(b)(1)). Despite this, Plaintiffs' Opposition spends only three paragraphs explaining why the 7 alleged statements are false. *See* Opp. at 19–21. This inhibits the Court's need to analyze the statements individually.

Case No.: 5:19-cv-02019-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND
16

1    Hence, Plaintiffs argue that Defendants mislead investors by giving the impression that the

2    Ticketfly migration was successful, "though it was not."  Compl. ¶ 191.

3        There are several problems with Plaintiffs' theory of falsity.  First, Plaintiffs fail to identify

4    which "key" features Eventbrite had trouble integrating.  *See* Opp. at 15–16 (alleging that the

5    Complaint takes issue with Defendants' failure to disclose serious problems with the Ticketfly

6    acquisition "whatever they were").  But, the PSLRA requires a plaintiff to plead "specific facts

7    indicating why" the statements at issue were false.  *See Ronconi*, 253 F.3d at 434.  Accepting

8    Plaintiffs' theory of falsity would eradicate this requirement.

9        Second, the Complaint fails to allege specific facts demonstrating how the purported cost

10   and time translated into "material adverse effects."  *See id.*  The Complaint contains only *one*

11   allegation about the costs associated with implementing 24-7 customer support.  FE 1 alleged that

12   the cost would be "astronomical."  *See* Compl. ¶¶ 43, 72.  Plaintiffs, however, fail to allege facts

13   to explain how or why FE 1, a marketing analyst whose responsibilities included monitoring

14   Eventbrite's pending deals, would be privy to information about the costs of implementing

15   Ticketfly features.  *See Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *16

16   (N.D. Cal. Apr. 27, 2017).  Moreover, Plaintiffs fail to quantify the term "astronomical."  *Cf.*

17   *Ronconi*, 253 F.3d at 434.

18       As to time, Plaintiffs characterize the integration and migration as "delayed."  Yet,

19   nowhere in their Complaint do Plaintiffs allege a contemporaneous public statement setting an

20   estimated completion date against which the term "delayed" could be measured.  *See* Reply at 4.

21   In fact, the only contemporaneous time frame that could provide any basis for an estimated

22   timeframe appears in the same filings as the alleged misstatements.  *See* Speers Decl., Ex. A at 22

23   ("Our acquisition strategy to date, and going forward, often results in the winding down of the

24   acquired platforms *over a period of 12 to 24* months while the existing creators migrate to our

25   platform." (emphasis added)).  Plaintiffs argue that this disclosure is irrelevant because it relates to

26   compliance with "privacy laws touching on data stored in the legacy platforms."  Opp. at 17.

27   Plaintiffs, however, provide no precedent to support this argument.  In fact, contrary to Plaintiffs'

28

*United States District Court*
*Northern District of California*

1   argument, it is established that an alleged misstatement must be read "in light of its surrounding

2   text, including hedges, disclaimers, and apparently conflicting information." *Omnicare, Inc. v.*

3   *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).  This 12 to 24-

4   month benchmark is the only timeframe that was publicly discussed prior to March 2019.  Thus, it

5   is the only timeframe that can be used to measure the alleged delay.  Plaintiffs provide no facts

6   that suggest the Ticketfly integration and migration process was "delayed" when measured against

7   this timeline.

8        Considering the above analysis, the Court finds that Plaintiffs have not alleged that

9   Statements 1 or 2 are false.  Statements are only misleading if they "affirmatively create an

10  impression of a state of affairs that differs in a material way from the one that actually exists."

11  *Brody*, 280 F.3d at 1006.  Plaintiffs' vague allegations that the Ticketfly acquisition was

12  "delayed," "costly," and that the integration missed "key features" are insufficient to show that

13  Defendants "affirmatively" created an impression of a state of affairs that differs in a material way

14  from reality.  In fact, a closer inspection of Eventbrite's SEC filings appears to belie Plaintiffs'

15  claims that the Company projected that the Ticketfly integration was going "smoothly."  *See*

16  Speers Decl., Ex. A at 16 (discussing the Ticketfly acquisition and noting the risks associated with

17  acquisitions like the "difficulties and expenses in assimilating the operations, products, data,

18  technology, privacy, data protection systems and information security systems" and the risk of

19  failing to "properly and timely integrate acquired companies and their operations"); *see also id.*

20  ("When we acquire companies or other businesses, we face the risk that creators of the acquired

21  companies or businesses may not migrate to our platform or may choose to decrease their level of

22  usage of our platform post migration.  We have previously experienced customer loss in the

23  process of integrating and migrating acquired companies for a variety of reasons.  The pace and

24  success rate of migration may be influenced by many factors, including the pace and quality of

25  product development, our ability to operationally support the migrating creators and our adoption

26  of business practices outside of our platform that matter to the creator.").

27

28  Case No.: 5:19-cv-02019-EJD
    ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Moreover, the Complaint indicates that Defendants did not mislead investors.  Indeed,

2  despite the alleged difficulties with the Ticketfly integration, Plaintiffs admit in their Complaint

3  that "new Eventbrite features were rolled out" and that in 2019 (within the 12 to 24-month

4  timeline discussed above), Eventbrite was able to extend its platform to include the fee-break

5  down feature.  *See* Compl. ¶¶ 11, 69.  Hence, there is no showing that Defendants were not able to

6  "quickly"[6] integrate and migrate creators to the Eventbrite platform or that they were unable to

7  offer "new capabilities to existing creators."  *Id.* ¶¶ 102, 190 (Nos. 1–2).  Accordingly, Plaintiffs

8  have not plead particular facts showing why Statements 1 and 2 are actionable.

9    **Statements 3 and 5** pertain to Eventbrite Music and Eventbrite's ability to offer enhanced

10  marketing capabilities, streamlined checkout experiences, and mobile box office capabilities via

11  Eventbrite Music.  *See id.* ¶¶ 179, 183.  In these statements, Defendants also state that they believe

12  people in the independent music scene partner with Eventbrite because Eventbrite "support[s]

13  them, speak[s] their language, and help[s] grow their business."  *Id.* ¶ 179.  Plaintiffs argue these

14  statements are misleading because (1) Eventbrite Music was inferior to Ticketfly, (2) Eventbrite

15  Music did not provide and could not be extended to provide Ticketfly customers with features like

16  24-7 customer support, email marketing capabilities, and fee breakdowns, and (3) music venues

17  only partnered with Eventbrite because it was required under their pre-existing Ticketfly contract.

18

19  [6] The Court is dubious that the term "quickly" can even form the basis of a securities fraud claim.
    *See In re Restoration Robotics*, 417 F. Supp. 3d at 1254 (noting that an actionable statement must

20  be capable of objective verification).  Courts have held that positive statements about a recent
    acquisition are inactionable because "[w]hen one company acquires another, it is to be expected

21  that the acquiring company will characterize the acquisition in a positive light."  *Kane v. Madge*
    *Networks N.V.*, 2000 WL 33208116, at \*3 (N.D. Cal. May 26, 2000).  Merging companies always

22  predict that they will be able to integrate their teams and that this integration will bring a positive
    result.  *Id.*  For this reason, reasonable investors know better than to rely on these statements.  *See*

23  *id.* (noting that courts have also found that forecasts of "strong demand" for a product to be
    inactionable); *see also Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121 (10th Cir. 1997) (declining

24  to find statements like "rapidly" moving to a fully integrated sales force actionable).  Much like
    the statements at issue in *Kane* and *Grossman*, Statements 1 and 2 relate to Eventbrite's

25  predictions about the success of its mergers (with *many* companies beyond Ticketfly).

26  Even if a term like "quickly" is actionable, reading it in context indicates that at maximum, it
    means "24 months."  Hence, even if "quickly" can form the basis of fraud, due to the context of

27  the statement and absence of particular pleading showing how Defendants mislead investors, it
    remains unclear whether the Ticketfly integration was done "slowly."

28  Case No.: 5:19-cv-02019-EJD
    ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

1    *See id.* ¶¶ 180, 184.

2         As Defendants note in their reply, Plaintiffs' "theory of falsity cannot be squared with the

3    statement itself."  Reply at 6.  Indeed, neither Statement 3 nor Statement 5 make any comparison

4    between Eventbrite Music and Ticketfly.  In fact, neither statement mentions Ticketfly nor

5    purports to tout Eventbrite Music's superiority.  Despite this gap between the statements and

6    Ticketfly, Plaintiffs fail to connect Ticketfly to Statements 3 and 5 and thus fail to specifically

7    allege *why* a reasonable investor would be misled by these statements.  *See Vess v. Ciba-Geigy*

8    *Corp., USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by

9    the who, what, when, where, and how of the misconduct charged." (quotation marks and citation

10   omitted)).

11        *Weller v. Scout Analytics, Inc.* is instructive.  There, the plaintiff challenged the statement:

12   "With more than $3.5 billion of recurring revenue under management, Scout Analytics extends

13   ServiceSource's reach into new markets while increasing its footprint to now $14.5 billion under

14   management across more than 200 customer engagements."  230 F. Supp. 3d 1085, 1093 (N.D.

15   Cal. 2017).  The plaintiff alleged that this statement was misleading because the defendants "have

16   never held more than $5 million in gross revenues."  *Id.*  But, as the court noted, the defendants'

17   "gross revenues" have no relation to the defendants' "recurring revenue management services."

18   *Id.* 1094.  Hence, the court held that the plaintiff had not adequately alleged falsity because "the

19   reasons [p]laintiff offers as to why the statement is false or misleading bear no connection to the

20   substance of the statement itself."  *Id.* (quotation marks omitted); *see also Brody*, 280 F.3d at 1006

21   (holding that the company did not have a duty to disclose information regarding an imminent

22   merger in a press release because it was not referred to or supported by the text of the actual press

23   release).

24        Here, similar to *Weller*, the reasons Plaintiffs offer to show falsity as to Statements 3 and 5

25   bear no connection to the substance of the statements.  Indeed, both statements discuss Eventbrite

26   Music; neither makes any mention of Ticketfly.  Hence, the suggestion that Defendants intended

27   to mislead investors into believing that Eventbrite Music was superior (or even comparable) to

28   Case No.: 5:19-cv-02019-EJD

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

United States District Court
Northern District of California

Ticketfly is simply not a plausible interpretation of the statements.

**Statement 4** relates to costs Defendants typically experience when migrating new acquisitions to the Eventbrite platform.  As alleged in Statement 4, Eventbrite "typically" experiences "moderate customer losses" that "tend to cluster around the time [they] deprecate the acquired platform."  Compl. ¶ 181.  Plaintiffs allege that this statement is misleading because Defendants "knew that [Eventbrite] was suffering, and was likely to suffer further, serious customer losses in connection with the Ticketfly migration."  Opp. at 7.

There is a problem with Plaintiffs' theory.  The statement, by its terms, addresses customer loss at a single point in time—that is, "around the time [Eventbrite] deprecate[s] the acquired platform."  Compl. ¶ 181.  Plaintiffs provide no facts that *at the deprecation point*, Eventbrite was suffering atypical customer losses.  Likewise, Plaintiffs do not provide facts about customer losses.  To the contrary, Plaintiffs only allege that FE 2 had trouble migrating *his* customers to Eventbrite.  *Id.* ¶¶ 80, 82.  Without context or other quantifiable metrics this Court cannot determine how many customers FE 2 was responsible for migrating, whether they migrated after FE 2 left in November 2018, or whether FE 2's customers are even a representative sample.[7]  *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019).  Beyond FE 2's allegation that customers were unhappy and did not want to migrate to the Eventbrite platform, there is no support for Plaintiffs' allegation that Eventbrite was experiencing "material customer losses" at the time of this statement.  Compl. ¶ 182.  Accordingly, there are insufficient, particularized facts to support falsity as to Statement 4.

**Statement 6** pertains to Defendant Befumo's statements about migration loss during acquisitions.  *See* Compl. ¶ 185.  Specifically, after being questioned about losing Ticketfly revenue, Defendant Befumo stated that during migration of an acquisition, there are a few reasons that an event-planner might not migrate to Eventbrite's platform after an acquisition.  Such

---

[7] The Court notes a point of confusion.  FE 2 is alleged to have left Eventbrite in November 2018.  Statement 4 was released in November 2018.  The Court is unclear whether or not FE 2 was even with the company when the statement was released.

United States District Court
Northern District of California

reasons include customer loss due to competitive activity or competitive ticketing platforms. *Id.* Defendant Befumo stated that the Ticketfly acquisition had faced a "mix" of these problems. *Id.* Plaintiffs contend that this statement was misleading because it implied that Ticketfly customers chose not to migrate to Eventbrite because of pricing, in-sourcing, and/or other acquisition/revenue problems, when "in truth the overwhelming factor in losses is that Ticketfly's customers were dissatisfied with Eventbrite's platform." *Id.* ¶ 186.

There are two problems with Plaintiffs' theory of falsity.  First, the Court is not persuaded that Defendant Befumo mislead investors by failing to state that Ticketfly customers were dissatisfied with Eventbrite's platform.  If anything, Defendant Befumo admitted that the Ticketfly acquisition was facing a multitude of problems by stating that, "There's no one overwhelming factor [to explain why not all Ticketfly customers migrated to Eventbrite's platform]." *Id.* ¶ 185; *see also Oracle Corp.*, 2019 WL 6877195, at *17 (finding that the defendant did not make a misleading statement when he stated that the "story is a lot bigger than the realities" because he did not outright deny material facts).  Second, and relatedly, to the extent this statement could be actionable, Plaintiffs have failed to allege sufficient facts to show *why* or *how* Ticketfly's customers were dissatisfied with Eventbrite's platform.  *See supra* (discussing failure to plead sufficient facts to support FE 1 and 2's allegations).  Accordingly, there are insufficient, particularized facts to support falsity as to this statement.

**b.  General Statements of Corporate Optimism/Puffery**

In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws" because no reasonable investor would rely on such statements. *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *14 (N.D. Cal. Feb. 12, 2015) (collecting cases).  When valuing corporations, investors do not "rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

Statements like "[w]e are very pleased with" and "so far we're getting really great feedback" are inactionable puffery. *Wozniak v. Align Tech., Inc.*, 850 F.Supp.2d 1029, 1036 (N.D.

1    Cal. 2012).  Likewise, "statements projecting 'excellent results,' a 'blowout winner' product,

2    'significant sales gains,' and '10% to 30% growth rate over the next several years'" have been

3    held not actionable as mere puffery.  *In re Fusion-io*, 2015 WL 661869, at *14 (citing *In re*

4    *Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F.Supp.2d 1069, 1087 (N.D. Cal. 2005)).

5        **Statement 7** relates to prepared remarks that Defendant Hartz made during the Q4 2018

6    Earnings Call.  *See* Compl. ¶ 188.  During this call, Defendant Hartz discussed the Ticketfly

7    acquisition and Eventbrite's decision to integrate Ticketfly onto the Eventbrite platform, "thus

8    delivering the full power of both [Eventbrite and Ticketfly] to independent music venues and

9    promoters."  *Id.*  Plaintiffs argue that this statement was misleading because the "Eventbrite

10   platform did not extend to Ticketfly Customers the full power of Ticketfly."  *Id.* ¶ 189.  Hence,

11   Plaintiffs take issue with Defendant Hartz's statement about "delivering the full power."

12       Defendants argue, and this Court agrees, that this statement is too vague to be actionable.

13   Statements that consist of nothing more than "mildly optimistic, subjective assessment[s]," which

14   investors know how to devalue, are not actionable.  *In re Cutera*, 610 F.3d at 1111.  Statement 7 is

15   nothing more than an optimistic statement about Eventbrite's integration of the Ticketfly platform.

16   Indeed, run-of-the-mill statements like "business remained strong" or statements about a product's

17   "technological leadership, "innovative features," and "significant performance advantages" are

18   inactionable puffery.  *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868–69 (N.D.

19   Cal. 2004); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 827 (C.D. Cal. 1998).  A statement about

20   "delivering the full power" of a product is similarly vague.  Accordingly, Statement 7 is not

21   actionable.

22       For these reasons, the Court hold that Plaintiffs have failed to plead falsity as required by

23   the PSLRA for Statements 1–7 and **GRANTS** Defendants' motion to dismiss these statements.[8]

24

25

26

27   ────────────────
     [8] Because it is unnecessary, this Court does not address Defendants' scienter or loss causation
     arguments.

28   Case No.: 5:19-cv-02019-EJD
     ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND
     23

*United States District Court*
*Northern District of California*

### B.  Section 11 Claim

To allege a claim under Section 11, a plaintiff must prove "'(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.'"  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005)).  Liability must be based on false or misleading statements in the Registration Statement.  15 U.S.C. § 77k(a).

Plaintiffs challenge a single disclosure in the Registration Statement—Statement 1—which is also challenged under Section 10(b).  Plaintiffs argue that their Section 11 claim does not "sound in fraud" and thus is not subject to the heightened pleading standard of Rule 9(b).  Opp. at 10.  In their view, the Complaint "clearly delineates" the Securities Act claims from the Exchange Act claims.  *Id.*  Not so.  Plaintiffs' entire Complaint is built around the idea that Defendants knew the Ticketfly migration was failing because of Eventbrite's incompatible platform and fraudulently concealed information about the Ticketfly acquisition.  *See* Opp. at 2, 19, 27.  Plaintiffs cannot allege fraud based on events that occurred before and after the offering, and then "scissor out a non-fraud claim from the center of that unified course of conduct in order to evade the Rule 9(b) requirement."  *In re Metricom Sec. Litig.*, 2004 WL 966291, at *24 (N.D. Cal. Apr. 29, 2004).  Accordingly, because the course of conduct pled in connection with Plaintiffs' Section 11 claim is so substantively similar to the conduct pled in connection with Plaintiffs' Section 10(b) claim, the Court holds that Plaintiffs' Section 11 claim does sound in fraud.  *See Wong v. Arlo Techs., Inc.*, 2019 WL 7834762, at *6 (N.D. Cal. Dec. 19, 2019).  The heightened pleading standard of Rule 9(b) thus applies.  As analyzed above, because Statement 1 was not plead with sufficient particularity, Defendants' motion to dismiss Plaintiffs' Section 11 claim is **GRANTED**.  *See supra* III.A.1.a.

### C.  Item 303 Claim

Item 303 requires that the offering materials disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or

1   unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §§

2   229.303(a)(3)(ii). A "disclosure duty exists where a trend, demand, commitment, event or

3   uncertainty is *both* [1] presently known to management and [2] reasonably likely to have material

4   effects on the registrant's financial condition or results of operation." *Steckman v. Hart Brewing,*

5   *Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998).

6          Plaintiffs argue that Defendants had an obligation to disclose the problems with the

7   Ticketfly migration because this was a known trend that was reasonably likely to materially

8   impact Eventbrite's sales and revenue at the time of the IPO. Opp. at 12; *see also* Compl. ¶ 99.

9   However, Eventbrite did disclose the exact risks that Plaintiffs argue were not disclosed:

> When we acquire companies or other businesses, ***we face the risk
> that creators of the acquired companies or businesses may not
> migrate to our platform*** or may choose to decrease their level of
> usage of our platform post migration. ***We have previously
> experienced customer loss in the process of integrating and
> migrating acquired companies for a variety of reasons.*** The pace
> and success rate of migration may be influenced by many factors,
> including ***the pace and quality of product development, our ability
> to operationally support the migrating creators and our adoption
> of business practices outside of our platform that matter to the
> creator.***

16   Speers Decl., Ex. A at 18 (emphasis added).

17          Plaintiffs argue that these are meaningless boilerplate disclosures. The Court disagrees.

18   On the same page as the risk disclosure, Eventbrite specifically named Ticketfly as a recent

19   acquisition and noted potential impacts that the Ticketfly acquisition could have on business. *See*

20   *Vignola v. FAT Brands, Inc.*, 2019 WL 6138473, at *14 (C.D. Cal. June 14, 2019) (finding that

21   risk disclosure identified the adverse trend). Hence, unlike cases like *South Ferry LP No. 2 v.*

22   *Killinger*, 399 F. Supp. 2d 1121, 1136 (C.D. Cal. June 14, 2019), where the risk disclosures did

23   not address the risks at-issue but rather addressed only a related risk, Eventbrite's risk disclosure

24   adequately identified the risks facing the Ticketfly acquisition. Accordingly, Plaintiffs have not

25   pled sufficient facts to show an Item 303 violation and thus Defendants' motion to dismiss is

26   **GRANTED** as to Item 303.

27

1

## IV.  CONCLUSION[9]

Defendants' motion to dismiss Plaintiffs' Complaint in its entirety is **GRANTED**.  When dismissing a complaint for failure to state a claim, a court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  Although the Court has determined that Plaintiffs fail to state a claim, it is possible Plaintiffs can cure their allegations by alleging more particular facts to support their theory of falsity.  Should Plaintiffs choose to file an amended complaint, they must do so by **June 24, 2020**.  Failure to do so, or failure to cure the deficiencies addressed in this Order, will result in dismissal of Plaintiffs' claims with prejudice.  Plaintiffs may not add new claims or parties without leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15.

**IT IS SO ORDERED.**

Dated: April 28, 2020

_____
EDWARD J. DAVILA
United States District Judge

---

[9] Plaintiffs also bring claims for violations of Section 20(a) of the Exchange Act and Section 15 of the Securities Act.  These claims, however, depend on a primary violation of the securities laws. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("[T]o prevail on their claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of § 10(b) or Rule 10b 5."); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012) ("Section 20(a) and section 15 both require underlying primary violations of the securities laws.").  Because the Court determines Plaintiffs' claims securities law claims fail, it follows that Plaintiffs' Section 15 and Section 20(a) claims also fail.

Case No.: 5:19-cv-02019-EJD
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND
26

United States District Court
Northern District of California