**COTCHETT, PITRE & MCCARTHY LLP**
MARK C. MOLUMPHY (SBN 168009)
TYSON C. REDENBARGER (SBN 294492)
ELLE LEWIS (SBN 238329)
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:    (650) 697-6000
Facsimile:    (650) 697-0577
E-mail:        mmolumphy@cpmlegal.com
              tredenbarger@cpmlegal.com
              elewis@cpmlegal.com

**BOTTINI & BOTTINI, INC.**
FRANCIS A. BOTTINI, JR. (SBN 175783)
YURY A. KOLESNIKOV (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002
E-mail:        fbottini@bottinilaw.com
              ykolesnikov@bottinilaw.com

*Counsel for Proposed Intervenors and*
*California State Court Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| IN RE EVENTBRITE INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br>All Actions | Master File No. 5:19-cv-02019-EJD<br><br><u>Class Action</u><br><br>**DECLARATION OF MARK C. MOLUMPHY IN SUPPORT OF CALIFORNIA STATE COURT PLAINTIFFS' NOTICE OF MOTION AND MOTION TO INTERVENE AND TO CONTINUE HEARING ON MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**<br><br>Date:        October 29, 2020<br>Time:        9:00 a.m.<br>Courtroom:    4, 5th Floor<br>Judge:        Hon. Edward J. Davila |

Declaration of Mark C. Molumphy iso Motion to Intervene and to Continue Hearing
Master File No. 5:19-cv-02019-EJD

I, Mark C. Molumphy, declare as follows:

1.      I am an attorney duly admitted to practice before all courts of the State of California.  I am a partner with Cotchett, Pitre & McCarthy, LLP, ("CPM"), Co-Lead Counsel for Plaintiffs in related state-court action captioned *In re Eventbrite, Inc. Securities Litigation*, Lead Case No. 19CIV02798 (San Mateo County Super. Ct.).  This Declaration is based upon my personal knowledge and if called to testify, I could and would do so competently as to the matters set forth herein.

2.      On May 24, 2019, the first class action was filed in San Mateo County Superior Court against Eventbrite and other defendants, alleging claims for violation of §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 on behalf of all individuals and entities that purchased or acquired Eventbrite shares pursuant to or traceable to Eventbrite's IPO. After other cases were filed, they were all consolidated and assigned for all purposes to Judge Marie Weiner, who heads the complex department in San Mateo County. Discovery was not stayed.

3.      On July 24, 2019, the State Court Plaintiffs filed a Consolidated Complaint. Defendants demurred to all causes of action.

4.      On November 11, 2019, Judge Weiner sustained the demurrer to the Consolidated Complaint with leave amend.

5.      On February 10, 2020, Plaintiffs filed their First Amended Complaint. Again, Defendants demurred to all causes of action.

6.      On June 22, 2020, Judge Weiner issued Case Management Order #7, and overruled the demurrer as to plaintiffs' allegations of standing under § 12(a)(2), plaintiffs' allegations of "seller" liability under § 12(a)(2), and "control person" liability under § 15 against certain defendants.  Judge Weiner sustained the demurrer as to the other claims, but with leave to amend following the resolution of any discovery disputes.  In this regard, Judge Weiner noted the existence of outstanding discovery issues and scheduled an Informal Discovery Conference ("IDC") on July 9, 2020.  Attached hereto as **Exhibit 1**

1

Declaration of Mark C. Molumphy iso Motion to Intervene and to Continue Hearing
Master File No. 5:19-cv-02019-EJD

is a true and correct copy of Case Management Order #7.

7.   On July 9, 2020, the parties participated in an IDC with the Court. Defendants Eventbrite, Sequoia[1] and Tiger[2] each agreed to produce certain discovery. Eventbrite agreed to produce emails from six custodians, and Sequoia and Tiger agreed to produce communications related to specific meetings in which individuals from Sequoia or Tiger met with individuals from Eventbrite.  Judge Weiner actively participated in the discussions, and the parties agreed discuss and agree to specific search terms for the email production.

8.   On July 31, 2020, the State Court parties participated in another IDC. During the IDC, Plaintiffs and Eventbrite agreed on the search terms that Eventbrite would run on emails for the six custodians.

9.   On August 8, 2020, Federal Plaintiffs filed their motion for preliminary approval of settlement in this Court.  Dkt. No. 62.  According to the papers, the Federal Parties reached an agreement in principle on June 17, 2020, and executed the Stipulation on July 29, 2020, i.e., while the parties in the State Action were in the midst of court-supervised discovery negotiations.  Dkt. No. 63, at ¶10.

10.   On August 18, 2020, Judge Weiner conducted a Case Management and Discovery Conference.  Counsel for Defendant Eventbrite indicated that, because of the pending settlement reached with the Federal Plaintiffs, it would no longer agree to produce any the emails previously agreed to produce pursuant to search terms extensively negotiated, with the State Court's supervision, at prior IDCs.  The Sequoia and Tiger Defendants also refused to produce their internal communications.  On behalf

---

[1] "Sequoia" collectively refers to State Defendants Sequoia Capital U.S. Venture 2010 Fund, L.P., Sequoia Capital U.S. Venture 2010 Partners Fund, L.P., Sequoia Capital U.S. Venture 2010 Partners Fund (Q), L.P., and SC US (TTGP), Ltd.

[2] "Tiger" collectively refers to State Defendants Tiger Global Private Investment Partners VI, L.P., Tiger Global Private Investment Partners VII, L.P., and Tiger Global Management, LLC

2

Declaration of Mark C. Molumphy iso Motion to Intervene and to Continue Hearing
Master File No. 5:19-cv-02019-EJD

of State Plaintiffs, I objected to Defendants' change of position and asked the Court to compel immediate production, noting that a motion for preliminary approval had been set in this Court. Judge Weiner indicated she would issue an order.

11. On September 10, 2020, having not yet received an order on discovery, I emailed counsel for the Federal Plaintiffs and Defendants and requested that the federal parties voluntarily defer their hearing on the motion for preliminary approval until after Judge Weiner had ruled on discovery and any demurrer to the second amended complaint. Counsel for the Federal Plaintiffs responded and refused to continue the hearing. Attached hereto as **Exhibit 2**, is a true and correct copy of the email correspondence.

12. On September 23, 2020, Judge Weiner issued Case Management Order #10 compelling Eventbrite, Sequoia and Tiger to produce e-mails and related e-documents by October 16, 2020. Judge Weiner also scheduled a Case Management Conference on November 4, 2020 to discuss and set a schedule for filing an amended complaint. Attached hereto as **Exhibit 3**, is a true and correct copy of Case Management Order #10.

13. My firm retained an expert to assess potential damages in light of assertions made by the Federal Plaintiffs in their Motion. Attached hereto as **Exhibit 4**, is a true and correct copy of an opinion by damages expert Bjorn I. Steinholt, CFA.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that this declaration was executed on this 24th day of September at Burlingame, California.

*/s/ Mark C. Molumphy*
MARK C. MOLUMPHY

3

Declaration of Mark C. Molumphy iso Motion to Intervene and to Continue Hearing
Master File No. 5:19-cv-02019-EJD

# EXHIBIT 1

**FILED**
**SAN MATEO COUNTY**

JUN 2 3 2020

Clerk of the Superior Court
By _____
                 DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

COMPLEX CIVIL LITIGATION

| | |
|---|---|
| In re EVENTBRITE INC. SECURITIES LITIGATION | Master File No. 19CIV02798 CLASS ACTION |
| This Document relates to: | Assigned for All Purposes to Hon. Marie S. Weiner, Dept. 2 |
| ALL ACTIONS / | **CASE MANAGEMENT ORDER #7** |

On June 10, 2020, hearing on Defendants' Demurrers to the First Amended

Consolidated Complaint was held in Department 2 of this Court before the Honorable

Marie S. Weiner.  Francis Bottini and Yury Kolesnikov of Bottini & Bottini Inc. and

Mark Molumphy, Anya Thepot and Tyson Redenbarger of Cotchett Pitre & McCarthy

LLP appeared on behalf of Plaintiffs; Patrick Gibbs, Shannon Eagan and Jeffery

Lombard of Cooley LLP appeared on behalf of Defendants Eventbrite Inc. and the

Individual Defendants; Anna Erickson-White and Robert Webb of Morrison & Foerster

LLP appeared on behalf of the Underwriter Defendants; Sherri Hansen of Folger Levin

LLP and Peter White, Alexander Wharton and Jeffrey Robertson of Schulte Roth &

Zabel LLP appeared on behalf of Tiger Global Management LLC; and Harry Olivar Jr.

1

and Linda Brewer of Quinn Emanuel Urguihart & Sullivan LLP appeared on behalf of the Sequoia Defendants.

Upon due consideration of the briefs and evidence presented and the oral argument of counsel for the parties,

IT IS HEREBY ORDERED as follows:

The Eventbrite Defendants' Demurrer to the First Amended Consolidated complaint is SUSTAINED WITH LEAVE TO AMEND as to the first, second, and third causes of action for failure to adequately allege facts to state a cause of action; but the Demurrer to the second cause of action for Plaintiffs' lack of standing and/or that Defendants are not statutory sellers under Section 12 is OVERRULED. The Underwriter Defendants' Demurrer to the First Amended Consolidated Complaint is SUSTAINED WITH LEAVE TO AMEND as to the first and second causes of action for failure to adequately allege facts to state a cause of action; but the Demurrer to the second cause of action for Plaintiffs' lack of standing and/or that Defendants are not statutory sellers under section 12 is OVERRULED. The Sequoia Defendants' Demurrer to the First Amended Consolidated Complaint is SUSTAINED WITH LEAVE TO AMEND as to the third cause of action. Defendant Tiger Global Management LLC's Demurrer to the First Amended Consolidated Complaint is SUSTAINED WITH LEAVE TO AMEND as to the third cause of action. All joinders are GRANTED. The various requests for judicial notice are DENIED as to Exhibit D by Eventbrite Defendants, and otherwise GRANTED.

2.    Counsel for Plaintiffs indicated that they would be engaging in further meet and confer with Defendants regarding outstanding discovery disputes, and any unresolved disputes will be the subject of e-correspondence by June 19, 2020 requesting

2

an Informal Discovery Conference.  Subsequently, counsel requested an IDC be set for July with substantive IDC letters due June 30, 2020.  Accordingly, an Informal Discovery Conference is set for **Thursday, July 9, 2020 at 9:00 a.m.** in Department 2 of this Court. Counsel shall appear by Phone Conference only, to be scheduled/handled by counsel for Plaintiff.  On or before **June 30, 2020,** the parties shall, jointly or separately, email correspondence to the Court at ComplexCivil@sanmateocourt.org, and contemporaneously to all parties, an electronic letter of no more than five (5) pages, without attachments, summarizing any discovery dispute(s) – or informing the Court that there are no pending discovery disputes.

3.      Plaintiffs requested that the Court **not** set a deadline for the filing of the Second Amended Consolidated Complaint, nor a briefing schedule for responses to the complaint, but rather delegate to counsel for the parties to meet and confer and submit a stipulation and proposed order in that regard, after the Informal Discovery Conference. Accordingly, the deadline for Plaintiffs to file and serve their Second Amended Complaint is DEFERRED until further order of the Court or stipulation of counsel.

THE COURT FINDS as follows:

***Claims in the First Amended Consolidated Complaint***

This is a securities class action brought "on behalf of all persons and entities who purchased or acquired shares of Eventbrite, Inc. ('Eventbrite' or the 'Company') pursuant or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's initial public offering (the 'IPO') on September 20, 2018." (First Am. Cons. Complaint, filed Feb. 10, 2020, ¶ 1 ("FACC").)

3

Plaintiffs Crystal L. Clemons, William Consugar and Cristina Cotte, who "purchased shares of Eventbrite's Class A common stock that were issued in the IPO pursuant and traceable to the Offering Documents" (FACC ¶¶ 15 – 17), bring this action against:

(1) Eventbrite, Inc., "an online ticketing platform that enables event creators to plan, promote, and produce live events" that in September 2017, "acquired Ticketfly, LLC ('Ticketfly') from Pandora Media, Inc. ('Pandora') for approximately $200 million." (¶¶ 2, 18);

(2) Executives CEO Julia Hartz ("J. Hartz") (¶ 19), Chairman of the Board Kevin Hartz ("K. Hartz") (¶ 20), interim CFO and Chief Strategy Officer Randy Befumo (¶ 21), SVP and General Counsel Samantha Harnett (¶ 23);

(3) Directors Roelof Botha (¶ 23), Andrew Dreskin (¶ 24), Katherine Auguste-deWilde (¶ 25), Sean Moriarty (¶ 26), Lorrie M. Norrington (¶ 27), Helen Riley (¶ 28), Steffan C. Tomlinson (¶ 29);[1]

(4) Early investors and large equity stakeholders Sequoia Capital (¶¶ 31 – 33) and Tiger Global Management (¶¶ 34 - 36); and

(5) Underwriters J.P Morgan Securities LLC (¶ 37), Goldman Sachs & Co. (¶ 38), Allen & Company LLC (¶ 39), Stifel, Nicolaus & Company (¶ 40), RBC Capital Markets, LLC (¶ 41), and SunTrust Robinson Humphrey, Inc. (¶ 42) (collectively "Underwriter Defendants" (¶ 43)).

Plaintiffs and the putative class allege that the IPO Registration Statement and Prospectus contained material misrepresentations and omissions, in violation of the Securities Act of 1933. Specifically, Plaintiff asserts three causes of action:

---

[1] The executives and directors are collectively referred to as "Individual Defendants" (¶ 30).

(1) Section 11 violation against Eventbrite, Individual Defendants and Underwriter Defendants (¶¶ 165 - 174);

(2) Section 12(a)(2) violation against Eventbrite, J. Hartz, K. Hartz, Befumo, Harnett, and Underwriter Defendants (¶¶ 175 - 184); and

(3) Section 15 violation against Individual Defendants, Sequoia Capital and Tiger Global Management (¶¶ 185 - 190.)

The focus of the alleged material omissions and misrepresentations in the FACC pertain to the Ticketfly acquisition and integration, especially summarized in Paragraphs 5, 112, and 116.

---

### *First Cause of Action for Violation of Section 11*

To states a claim under Section 11 of the Securities Act of 1933, the plaintiff must allege (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have mislead a reasonable investor about the nature of his or her investment. 15 USCA §77k(a); Rubke v. Capital Bancorp. Ltd. (9th Cir. 2009) 551 F.3d 1156, 1161.

A statement is material when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. In re Ubiquiti Networks Inc. Securities Litigation (ND Cal. 2014) 33 F.Supp.3d 1107, 1127. Materiality is a fact-specific determination and is rarely appropriate to decide at the demurrer stage. Ubiquiti, at p. 11126 fn. 6; In re Stac Electronics Securities Litigation (9th Cir. 1996) 89 F.3d 1399, 1405.

Although factual allegations contained in the complaint are accepted as true, for purposes of determining pleading motions, the Court is not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint, including the Registration Statement itself. Steckman v. Hart Brewing Inc. (9th Cir. 1998) 143 F.3d 1293, 1295-1296, cited by Defendants.

As the First Appellate District stated in City of Warren Police & Fire Retirement System v. Natera Inc. (2020) 46 Cal.App.5th 946, 955, in considering a motion for judgment on the pleadings as to Section 11 claim:

> To determine whether statements are misleading, we must read them "in the context of the whole document. [Citation.] And they should be judged based on 'the facts as they existed when the applicable registration statement became effective.' [Citation.] '{t}he central issue . . . is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor about the nature of the [investment].'" [Citations.]

As the Third Circuit discussed in In re Adams Golf Inc. Securities Litigation (3rd Cir. 2004) 381 F.3d 267, cited by Plaintiffs:

> The 1933 Act creates federal duties, particularly involving registration and disclosure, in connection with the public offering of securities. Sections 11 and 12(a)(2) impose civil liability for the making of materially false or misleading statements in registration statements and prospectuses. See 15 U.S.C. §§ 77k, 77l (a)(2). In particular, section 11 involves material misstatements or omissions in registration statements, while section 12(a)(2) involves prospectuses and other solicitation materials.
>
> To state a claim under section 11, plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement. Herman & MacLean v. Huddleston, 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case."); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 286 (3d Cir.1992). To state a claim under section 12(a)(2), plaintiffs must allege that they purchased securities pursuant to a materially false or misleading "prospectus or oral communication."

6

Adams Golf, at p. 273.

Plaintiffs correctly point out that any dispute as to the "materiality" of a misrepresentation or omission may be an issue of fact, not appropriate for adjudication at the pleading stage:

> Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal.[8] *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir.1997) ("[T]he emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings."). "Only if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Shapiro,* 964 F.2d at 281 n. 11 (citing *TSC Indus.,* 426 U.S. at 450, 96 S.Ct. 2126) (emphasis added).

Adams Golf, at pp. 274-275.

Although liability under Section 11 and Section 12 does not require scienter, there is a distinction in pleading false representatives versus material omissions. If there is an omission, there must be a duty to have divulged the information in the first place.

In regards to Regulation S-K, Item 303, any omission of facts required to be stated in the registration statement under Item 303 will demonstrate liability under Section 11. Steckman, 143 F.3d at p. 1296; City of Warren Police, 46 Cal.App.5th at p. 960. Under Regulation S-K, Item 303, a registrant is required to "describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." According to the SEC, a "disclosure duty exists where a trend, demand, commitment, event or uncertainty is *both* (1) presently known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation." Steckman, at p. 1296. "Only when future impacts are 'reasonably

7

likely to occur' do they cease to be optional forecasts and instead become present knowledge subject to the duty of disclosure." Steckman, at p. 1297. "The actual knowledge element of Item 303 'requires that a plaintiff plead, with specificity, facts establishing that the defendant had actual knowledge of the purported trend.' [Citations.]" City of Warren Police, at p. 960.

In opposition to the Demurrers by Defendants as to the Section 11 claim, Plaintiffs narrow the issues on Demurrer by pointing to three allegedly material misrepresentations or omissions from the Registration Statement as sufficient to plead their Section 11 claim:

> The FAC identifies numerous adverse material facts that were omitted from the Offering Documents, including that: **(1)** the Company's migration of the Ticketfly platform and customers was progressing much slower than expected and the Company was already losing key talent and customers as a result of the fundamental problems integrating the Ticketfly platform (see, e.g., ¶¶ 5, 79, 101, 104, 111 - 113, 115, 124, 136); **(2)** Eventbrite's core business was already slowing because Eventbrite diverted money and resources from other profitable projects toward completing the Ticketfly integration (see, e.g., ¶¶ 5, 75, 79, 116(a), 124, 125, 136); and **(3)** the value-creating effects of the Ticketfly acquisition would not continue and then-existing events were reasonably likely to adversely impact financial results in the fourth quarter of 2018 (see, e.g., ¶¶ 6, 76, 102, 105 - 109, 112,114 - 115, 116(a), 118 - 123, 127, 137).

Opposition at page 7.)

**Delayed Ticketfly Migration and Integration Problems:** Plaintiffs fail to adequately allege that this was a material misrepresentation, as the Ticketfly integration did occur within 12 to 24 months disclosed in the Registration Statement. "Our acquisition strategy to date, and going forward, often results in the winding down of the acquired platforms over a period of 12 to 24 months while the existing creators migrate to our platform." (Eagan Declaration, Ex. A, p. 22 ("Reg. Stmt.").) In opposition, Plaintiffs argue:

8

> Plaintiffs are *not* attempting to hold Defendants liable for missing an internal deadline. Rather, even though the Offering Documents did not set forth any specific timeline for the migration of the Ticketfly platform, the failure to disclose the significant delays made misleading other statements regarding the Company's "comprehensive platform" and the typically "quick" and "seamless" migration.

However, Plaintiffs do not allege that the Eventbrite Defendants: (1) missed the 12 to 24 month target disclosed in the Registration Statement; or (2) that Eventbrite failed to ever integrate Ticketfly.

Furthermore, as Eventbrite Defendants argue in reply, the phrases "powerful and comprehensive platform"[2] and "seamless"[3] do not actually pertain to the Ticketfly integration. See FACC, ¶ 102 ("Defendants told investors that the acquisition of Ticketfly would create significant value for the Company and that integrating Ticketfly and other acquired companies could be accomplished by virtue of Eventbrite's 'powerful and comprehensive platform' that supposedly would enable the successful migration of customers of its acquired companies (including Ticketfly)").)

---

[2] The phrase **"powerful and comprehensive"** is used to describe the existing Eventbrite platform, not Ticketfly integration. "To enable creators to more easily plan, promote and produce successful events independent of size, category or geographic location, we have designed a powerful and comprehensive platform. Our platform's cloud-based architecture supports a modular and extensible design that facilitates rapid product development and innovation by our internal development teams, our external partners and a broad developer ecosystem." (Reg. Stmt., p. 118.)

[3] The term **"seamless"** is used to describe: (1) "allowing creators to reduce friction and costs, increase reach and drive ticket sales" and "developers to seamlessly integrate services from third-party partners such as Salesforce, Facebook and Hubspot" (Reg. Stmt., p. 1; see also p. 65, 113); (2) its "support [of] the entire lifecycle of an event" (p. 3, 116); (3) "payment options for creators and attendees" (p. 17, 66); (4) "allowing creators to include multiple hosts on a single event (p. 27); (5) "striving to provide a platform for creators . . . both to sign up and publish live events (p. 68); (6) how to "plan promote, and produce live events" (p. 113, F-10); (7) "enabling creators . . . access to best-in-class partners" and "customize their experience by choosing different functionalities for each event" (p. 118); (8) the checkout experience (p. 122); and (9) its reputation and brand (p. 124).

9

In addition, the Registration Statement specifically warned of issues with integration.

Financial and operational risks related to acquisitions, investments and significant commercial arrangements that may have an impact on our business include:

. . .

- **difficulties and expenses in assimilating the operations**, products, data, technology, privacy, data protection systems and information security systems, information systems or personnel of the acquired company

. . .

- **failure to properly and timely integrate** acquired companies and their operations, reducing our ability to achieve, among other things, anticipated returns on our acquisitions through cost savings and other synergies;

. . .

When we acquire companies other businesses, we face the risk that creators of the acquired companies or businesses may not migrate to our platform or may choose to decrease their level of usage of our platform post migration; **we have previously experienced customer loss in the process of integrating and migrating acquired companies for a variety of reasons.** The pace and success rate of migration may be influenced by many factors, including the pace and quality of product development, our ability to operationally support the migrating creators and our adoption of business practices outside of our platform that matter to the creator.

(Reg. Stmt., p. 16 (emphasis added).)

**Diversion of Resources:** Plaintiffs cite to FACC ¶¶ 123 and 125 in support of their argument pertaining diversion of resources. [The text of those provisions is not discussed in detail herein, as they are subject to Confidentiality and a motion to seal.] The allegation is that Eventbrite internally shifted personnel to work on integration of Ticketfly and retention of its customers. Plaintiffs have the burden of demonstrating that a detailed disclosure was required under Regulation S-K, Item 105 (formerly Item 503), because this was a "significant factor" making the IPO offering "speculative or risky"; and/or that a detailed disclosure was required under Regulation S-K, Item 303, because it was a known material "trend". Although these assertions are generally made in FACC

Paragraphs 123 through 136, they are all jumbled together with other allegations as to other alleged misrepresentations and omissions.

It seems consistent with common sense that personnel may be shifted from one task to another after a major corporate acquisition. Plaintiffs have not succeeded in clearly and specifically explaining how a shifting (itself) of personnel from other tasks constituted a significant investment risk factor, or constituted a "trend" of anything. How is this a "trend" in the conventional sense? A "trend" of what? If the answer is the *financial* impact, that has been presented by Plaintiffs as a separate source of misrepresentations and omissions.

Further, Plaintiffs fail to adequately allege facts supporting the assertion that each and all of the Eventbrite Defendants knew at and/or prior to the issuance of the IPO Registration Statement the facts regarding the shifting of personnel and its negative operation impacts such that they constituted a significant investment risk and/or a "trend" required to be disclosed in detail in the Registration Statement.

**False and Misleading Financial Statements and Undisclosed Expected Negative Financial Results:** Plaintiffs fail to adequately facts supporting the proposition that Eventbrite's financial information in the Registration Statement was false and/or materially misleading. As pointed out by Defendants, the FACC fails to allege that the historical data provided in the Registration Statement was false. The FACC fails to adequately allege that the financial data presented was misleading. The FACC also fails to set forth facts to support the allegations that each of the Eventbrite Defendants knew or had reason to know that financial results in the next quarter (and thereafter) would be significantly negative.

11

For example, applying Item 303, "a slowdown after a period of growth might be a trend. [Citation.]" Steckman, 143 F.3d at p. 1297. Yet, Plaintiffs must make sufficient allegations of fact to support the assertion that Defendants "knew of or could have reasonably expected" the slowdown or other negative financial results in the near future *at the time that the statements were made* in the Registration Statement. Id. But under Item 303, the Plaintiffs must also allege facts showing that corporate management knew or could have reasonably expected that the anticipated negative image "would have a material impact on new sales, revenues or income." Steckman, at p. 1298.

Further, in the Registration Statement, Eventbrite specifically warned investors that past performance was not indicative of future performance:

> We expect that our revenue growth rate will decline or fluctuate in the future as a result of a variety of factors, including a reduction in revenue contributed from acquisitions in a particular period. *You should not rely on the revenue growth of any prior quarterly or annual period as an indication of our future performance.* We also expect our costs to increase in future periods as we continue to expend substantial financial resources on technology infrastructure, product and services development and enhancement, international expansion and localization efforts, business development and acquisitions, sales and marketing and general administration, including legal and accounting expenses. These investments may not result in increased revenue or growth in our business. If we are unable to maintain adequate revenue growth and to manage our expenses effectively, we may incur significant losses in the future and may not be able to achieve and maintain profitability. As a result, we may continue to generate losses and we cannot assure you that we will achieve profitability in the future or that, if we do become profitable, we will be able to maintain profitability.

(Reg. Stmt., p. 14 – 15 (emphasis added).) See, City of Warren Police & Fire Retirement System v. Natera Inc. (2020) 46 Cal.App.5th 946, 955-956.

Accordingly, Plaintiffs need to do a better job of specifically identifying the stated financial information which was false or misleading and/or what financial information

was known or reasonably expected by each of the Defendants at the time of issuance of the Registration Statement.

### *Second Cause of Action for Violation of Section 12*

For the reasons set forth above, given that a Section 11 claim has not been adequately pleaded, and specifically insufficient facts that the Registration Statement (read as a whole) contained false and misleading statement and material omissions, so too this Court must find that the allegations of material misrepresentations and omissions in the Prospectus and other Offering Documents are not sufficient for a Section 12 claim. Accordingly, the Demurrers are SUSTAINED WITH LEAVE TO AMEND as to the second cause of action.

In addition, Defendants argue that the FACC does not sufficiently allege Plaintiffs have standing to sue, i.e., that they purchased on the IPO, and not sufficiently alleged that Defendants are "statutory sellers" under Section 12. The Section 12 claim is alleged against Defendants Eventbrite, the Underwriter Defendants, and a few of the Individual Defendants, namely J. Hartz, K. Hartz, Befumo, and Harnett. Given the liberal pleading standards, even if applying federal pleading standards, the Demurrer on this/these ground(s) is OVERRULED.

First, each of the named Plaintiffs alleged in the FACC that they "purchased shares of Eventbrite's Class A common stock that were issued in the IPO and pursuant and traceable to the Offering Documents and was damages thereby." That is sufficient to withstand attack at the pleading stage. See In re Worlds of Wonder Securities Litigation (ND Cal. 1989) 721 F.Supp. 1140, 1148 ("Although facts must later be produced by plaintiffs showing which plaintiffs were purchasers of the stock which [the Underwriter

13

Defendants] sold, the Court finds that plaintiffs' complaint is sufficient at this initial pleading stage to assert §12(2) liability over these defendants.")

Second, the FACC sufficiently alleges that the Underwriter Defendants were "sellers" under Section 12(2), as set forth in Paragraphs 37-53 and 180. The IPO was structured as "firm commitment" whereby the Underwriter Defendants committed to purchase from Eventbrite all of the IPO Class A Common Stock, and then sell that stock to the public (including Plaintiffs). Paragraph 180 of FACC alleges: "The Underwriter Defendants are statutory sellers for purposes of §12(a)(2) because they conducted the roadshows and passed title to the Eventbrite securities in the IPO to Plaintiffs and other members of the Class."

As for the Individual Defendants J. Hartz, K. Hartz, Befumo, and Harnett, they are alleged to be sellers, offerors and/or solicitors of purchasers of the IPO securities of Eventbrite. (FACC ¶177.) The FACC alleges that Julia Hartz is a founder of Eventbrite, its Chief Executive Officer, and a Director. (FACC ¶19.) Kevin Hartz is also a founder of Eventbrite, and Chairman of the Board of Directors. (¶20) Randy Befumo was Chief Financial Officer of Eventbrite at the time of the IPO and its Chief Strategy Officer. (¶21.) In addition. Befumo beneficially owned over 48,000 shares of Series G preferred stock, which automatically converted into common stock immediately prior to the closing of the IPO, on an approximate 1:1.0685 basis. Samantha Harnett is the Senior Vice President and General Counsel of Eventbrite. (¶22.) The FACC gives details regarding the very large stock ownership and stock options of each of these Individual Defendants, convertible to Class A common stock, and that they engaged in solicitation of Plaintiffs and the class for their own financial interests.

14

The FACC provides some details as to the activities of these particular Individual Defendants in drafting the Registration Statement and Prospectus, signing the Registration Statement, and making representations to potential investors at roadshows and other public statements. This is then summarized in Paragraph 178:

> Eventbrite and Defendants J. Hartz, K. Hartz, Befumo, and Harnett were statutory sellers under §12(a)(2) because they either issued, caused to be issued, and/or signed the Registration Statement in connection with the IPO and thereby solicited the purchases of Eventbrite securities motivated at least in part by their own financial interests and/or the financial interest of the Company. Specifically, Defendants J. Hartz, K. Hartz, Befumo, and Harnett solicited the purchases of Eventbrite securities by drafting, reviewing, and/or approving the Offering Documents in connection with the marketing of Eventbrite securities, motivated at least in part by their own financial interests and/or the financial interests of the Company. The Registration Statement was used to induce investors, such as Plaintiffs and the other member of the class, to purchase the Company's shares. In addition, Defendants J. Hartz and Befumo attended roadshows where they sought to induce investors to purchase the Company's shares and, thus, marketed and solicited the purchases of Eventbrite shares, motivated at least in part by their own financial interests and/or the financial interests of the Company.

The acts of these senior officers of Eventbrite are easily attributed to Eventbrite itself, at least for purposes of overcoming a demurrer.

In opposition, these Defendants rely upon Jensen v. iShares Trust (2020) 44 Cal.App.5th 618. The Jensen case involved ETFs (exchange traded funds), which are investment companies registered under the Investment Company Act of 1940 as open-end funds or unit investment trusts. Jensen, at p. 625. Evidence was presented that ETFs are not sold directly to investors, but rather are only sold to investors through the after-market.[4] Jensen, at p. 626. On the other hand, evidence was presented that "iShares

---

[4]    "Creation units are sold to 'authorized participants,' such as broker-dealers or large institutional investors, which may then sell some or all of the shares to investors in the secondary market; creation units are not sold directly to retail investors." Jensen, at p. 626.

15

continuously issues and redeems ETF shares, issuing and selling new shares of each series in primary market transactions pursuant to registration statement or amended registration statement filed with the SEC. Accordingly, iShares registration statement are amended at least annually." Jensen, at p. 627.

*After a court trial*, the trial court found that plaintiffs were unable to prove that their ETF purchases were directly traceable to any particular registration statement or prospectus that they claimed was false. Jensen, at p. 628. Apparently this was undisputed by plaintiffs, especially given that there was a continuous cycle of amended registration statements on the ETFs and the nature of ETFs themselves. Indeed, the plaintiffs conceded that it was "impossible to trace" ETFs because they are not like individual common stock shares issued and owned by investors. Rather they are "creation units" held in "fungible bulks" by depository trust company, and sold in fractional interest ownership. Jensen, at p. 638. On top of that, the registration statements are constantly being amended or new ones issued.

Instead, the Jensen plaintiffs argued that they should not be required to meet the standing requirements of the Securities Act of 1933 on their claims for violation of Sections 11 and 12 – that they should not be required to trace their purchase to a particular primary market registration statement or prospectus. Plaintiffs asserted that if they could demonstrate standing under the Investment Company Act of 1940, that should be sufficient.

The Court of Appeal in Jensen held that investors suing for claims under the Securities Act of 1933, including Section 11 and 12, must meet the standing requirements of the Securities Act of 1933. Jensen, at pp. 629-646. Relying upon Hertzberg v. Dignity Partners Inc. (9th Cir. 1999) 191 F.3d 1076, the Jensen court acknowledged that investors

16

who purchased securities on the after-market may have standing to sue under Section **11**, if they can trace their investments back to the false registration statement regarding the initial public offering of that security. Hertzberg, at pp. 1081-1082. As the plaintiffs could not "trace" their ETF purchases to a particular allegedly false registration statement, and the evidence was undisputed that they purchased their ETFs on the *secondary market,* they had no claim under the Securities Act of 1933.

Defendants in Jensen were the Investment Company which managed the ETF funds, and its subsidiaries and affiliates that served as investment advisor or as distributor, as well as a few unidentified individuals (whom this Court assumes were some type of officers or managers of the ETF entities). Jensen, at p. 625. As an alternate ground for upholding the trial court's decision, the Court of Appeal also discussed that the defendants could not be deemed "sellers" of securities under Section 12, because the evidence at trial showed that *none* of the ETF investors had purchased their investment through an initial public offering, i.e., all purchases were on the secondary market. Jensen, at pp. 642-644. Although after-market purchases might be actionable under Section 11 (if traceable), only primary market purchasers can sue under Section 12(2).

Despite its holding that evidence was presented at trial that plaintiffs only purchased on the secondary market, and thus could have no claim under the Securities Act of 1933, the Jensen court decided to go further and discuss whether or not the defendants were actually "sellers" under Section 12. Defendants here quote from the portions of Jensen regarding the Court of Appeal's discussion of the standards for demonstrating a "seller" under Section 12, and whether or not an issuing company can be a "seller" in a "firm commitment underwriting" – which determination was unnecessary given its holding.

17

Indeed, the Court of Appeal acknowledged that the question of whether or not an issuer in a primary offering of securities, i.e., an IPO, is a "seller" under the Securities Act of 1933 in the circumstances of a firm commitment underwriting,[5] under SEC Rule 159A, was irrelevant to that Court's decision, as "[t]he present case involves only secondary market purchasers of securities." Jensen, at p. 650, fn. 21.

Although the Section 12 claim in Jensen was adjudicated on a motion for judgment on the pleadings (which is like a demurrer), the Court of Appeal had 20/20 hindsight of the facts, given that there had already been a court trial of the Section 11 claims, with the presentation of substantive evidence.

The adequacy at the pleading stage *is* the focus of the Demurrers in our case. As the portions of Jensen cited by Defendants here are potentially instructive to the trial courts, this Court looks at the federal *reported appellate* decisions identified therein regarding determination of Section 12 pleading sufficiency.[6] In particular, there are three

---

[5]    Indeed, in reported decisions, federal district courts in the Ninth Circuit have acknowledged that under Pinter, Section 12 liability for a firm commitment underwriting is not simply limited to those underwriters, but rather the issuing company and its officers and directors might also have Section 12 liability as "sellers" or "solicitors." E.g., In re Stratosphere Corp. Securities Litigation (D.Nevada 1998) 1 F.Supp.2d 1096, 1121; In re Bare Escentuals Inc. Securities Litigation (ND Cal. 2010) 745 F.Supp.2d 1052, 1073.

[6]    Although the Court of Appeal also references Hertzberg v. Dignity Partners Inc. (9th Cir. 1999) 191 F.3d 1076 in its discussion of Section 12, there was no Section 12 claim in Hertzberg, only a Section 11 claim. The language taken from Hertzberg pertains to its rejection of the argument that Section 11 standing is the same as Section 12 standing, finding that they are different as Section 12 does not allow a claim on aftermarket purchases, while Section 11 does (as long as it is traceable). Hertzberg, at pp. 1080-1082. There was no issue on appeal as to whether or not a defendant was a "seller" under Section 12.

Similarly, in the case of Joseph v. Wiles (10th Cir. 2000) 223 F.3d 115, cited by the Court of Appeal, there was no Section 12 claim, only a Section 11 claim under the Securities Act of 1933. As in Hertzberg, the Tenth Circuit considered and *rejected* the proposition that standing under Section 11 and 12 is the same. There was no actual issue of whether or not a defendant was a "seller" under Section 12.

18

cases upon which the Court of Appeal predominantly relied in that section of its <u>Jensen</u> opinion; namely <u>Pinter</u>, <u>Shaw</u>, and <u>Lone Star</u>.[7]

In <u>Pinter v. Dahl</u> (1988) 486 U.S. 622, the Supreme Court resolved the inconsistent rulings by the various Circuits as to whom may be liable for violation of Section 12 of the Securities Act of 1933. Although the Supreme Court only addressed the question of who is a statutory "seller" under Section 12**(1)** – regarding the sale of unregistered securities – and explicitly declined to adjudicate that issue as to Section 12**(2)**[8] – for false representations and material omissions in a prospectus or other offering documents – subsequent Circuits have held that <u>Pinter</u> applies to all Section 12 claims.

In <u>Pinter</u>, investors in unregistered fractional undivided interests in oil and gas leases sued Pinter for violation of Section 12(1) of the Securities Act of 1933 for the unlawful sale of unregistered securities. [Accordingly the <u>Pinter</u> case did *not* involve any issue of whether or not a Registration Statement contained misrepresentations or omissions, did not involve the sale of common stock, and did not involve multiple corporate officers and directors or any underwriters.]

Pinter, an oil and gas producer and registered securities dealer, sold fractional undivided interests in oil and gas leases to Dahl, who was a real estate broker and experienced investor in (unsuccessful) oil and gas ventures. <u>Id.</u>, at p. 627. Initially, Dahl

---

[7]   Although the Court of Appeal also quoted from <u>In re Morgan Stanley Information Fund Securities Litigation</u> (2nd Cir. 2010) 592 F.3d 347, the analysis and decision in <u>Morgan Stanley</u> only addressed the issue of whether the plaintiffs had adequately pleaded a material omission in the offering documents. Despite a general discussion of the different claims available under the Securities Act of 1933 and the Securities Exchange Act of 1934, the Second Circuit did not adjudicate the issue of whether or not the defendants were "statutory sellers" under Section 12.

[8]   "Nevertheless, this case does not present, nor do we take a position on, the scope of a statutory seller for purposes of §12(2). <u>Pinter</u>, at fn. 20.

19

advanced $20,000 to Pinter to acquire oil and gas leases, with the understanding that Dahl would be given a right of first refusal to drill certain wells on the leasehold properties. Id. Dahl himself "toured the properties, often without Pinter, in order to talk to others and 'get a feel for the properties.'" Id. "Upon examining the geology, drilling logs, and production history assembled by Pinter," Dahl invested $310,000 in the leasehold properties. Id. Dahl then touted the venture to his friends and relatives, got them to invest $7500 each, and helped them fill out subscription agreement forms drafted by Pinter. Id., at p. 626. The investment checks were made payable to Pinter's company, Black Gold Oil Company. Id. None (but one) of the investors every met Pinter or spoke to Pinter or toured the properties. Id. They all invested "[b]ecause of Dahl's involvement in the venture." Id. Dahl was not paid any commission by Pinter for these investments by others. Id. The venture failed, and all of the investors (including Dahl) sued Pinter. Id., at pp. 627-628.

*After a court trial*, the federal district court held Pinter liable to all investors for unlawful sales of unregistered securities in violation of Section 12(1), which entitled the investors to rescission, i.e. return of their investment. Id., at p. 628. On appeal, the issue was whether Dahl could be held responsible as well. A divided Fifth Circuit held that Pinter had no "in pari delicto" affirmative defense against Dahl, as a matter of law, and that Pinter was not entitled to any contribution from Dahl as a co-seller of the unregistered securities to the other investors, because Dahl received no commission on those sales. The Supreme Court reversed, holding that an in pari delicto defense is available in a Section 12(1) private rescission action, and that a 'seller' under Section 12(1) is *not* limited to one who passes title/ownership, but also may include solicitors who are motivated, at least in part, by a desire to serve their own financial interests or

20

those of the securities owner. The Supreme Court rejected other methods used by Circuit Courts such as the "substantial factor" test or "participation" test.

In determining whether Dahl was a "seller" subject to liability to the other investors under Section 12(1), the Supreme Court held that there was a spectrum for being a statutory seller under Section 12(1), with a direct seller who passes ownership title on one end, and one who solicits an offer or sale with a motivation of personal financial interest on the other end.

> [T]he Securities Act nowhere delineates who may be regarded as a statutory seller, and the sparse legislative history sheds no light on the issue. The courts, on their part, have not defined the term uniformly.
>
> At the very least, however, the language of §12(1) contemplates a buyer-seller relationship not unlike traditional contractual privity. Thus, it is settled that §12(1) imposes liability on the owner who passed title, or other interest in the security, to the buyer for value. [Citation.] Dahl, of course, was not a seller in this conventional sense, and therefore may be held liable only if §12(1) liability extends to persons other than the person who passes title.
>
> . . . [T]he Securities Act defines the operative terms of §12(1) [in] Section 2(3) . . . Under these definitions, the range of persons potentially liable under §12(1) is not limited to persons who pass title. The inclusive of the phrase "solicitation of an offer to buy" within the definition of "offer" brings an individual who engages in solicitation, an activity not inherently confined to the actual owner, within the scope of §12. [Citations.] . . .
>
> * * *
>
> . . . A natural reading of the statutory language would include in the statutory seller status at least some persons who urged the buyer to purchase. For example, a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those "from" whom the buyer "purchased," even though the agent himself did not pass title. [Citation.]

Pinter, at pp. 642-644.

> . . . [W]e share the Court of Appeals' conclusion that congress did not intend to impose rescission based on strict liability on a person who urges the purchase but whose motivation is solely to benefit the buyer. . . .

21

> The language and purpose of §12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in par by a desire to serve his own financial interest or those of the securities owner. If he had such a motivation, it is fair to say that the buyer "purchased" the security from him and to align him with the owner in a rescission action.

Id., at p. 647.

The Supreme Court then remanded the case to the district court for further evidence and/or findings as to Dahl's motivation, in order to determine whether he may be liable as a statutory seller under Section 12. Pinter, at pp. 654-655. "Typically, a person who solicits the purchase will have sought or received a personal financial benefit from the sale, such as where he "anticipates a share of the profits," [citation], or receives a brokerage commission, [citation]. But, a person who solicits the buyer's purchase in order to serve the financial interests of the owner may properly be liable under §12(1) without showing that he expects to participate in the benefits the owner enjoys." Id.

Under Pinter, Section 12 liability is not limited to those in strict privity with the investment purchasers, but rather, persons who did not direct;y pass title to the securities may still be subject to liability under Section 12(2) "if they solicited the purchases and were motivated, at least in part, by financial gain." Moore v. Kayport Package Express Inc. (9th Cir. 1989) 885 F.2d 531, 537. "The language in *Pinter v. Dahl*, coupled with prevailing federal case law in other circuits, seems to undermine the continuing viability of the strict privity concept under section 12(2). [Citations.]" Schlifke v. Seafirst Corp. (7th Cir. 1989) 866 F.2d 935, 940. Indeed, the Supreme Court stated that the common law elements of a claim for rescission (such as privity) are not required for Section 12. Pinter, at fn. 23.

In Shaw v. Digital Equipment Corp. (1st Cir. 1996) 82 F.3d 1194, an investor class action was filed, by those who purchased preferred stock in an IPO, for violations of

22

the Securities Act of 1933 against the corporation, its CEO, its CFO, and its underwriters and investment bankers. After finding that the complaint adequately alleged that the IPO prospectus contained misrepresentations and omissions, for purposes of Section 11 and Section 12(2), the First Circuit then addressed the alternative argument that defendants were not "sellers" under Section 12, because it was a firm commitment underwriting.

After quoting from <u>Pinter</u>, the First Circuit held in <u>Shaw</u> that the plaintiffs *had* adequately alleged a Section 12 claim against the underwriters, but not against the company and its officers and directors. <u>Shaw</u>, at pp. 1215-1216. Acknowledging that those defendants could be held as "sellers" if "they actively 'solicited' the plaintiffs' purchase of securities to further their own financial motives, in the manner of a broker or vendor's agent", the Court of Appeals found that the complaint allegations as to such were too "sparse". It held that mere allegations that the company and its directors and officers were involved in "preparing" (not signing) the registration statement and prospectus and "other activities necessary to effect the sale of the securities to the investing public", did not meet the <u>Pinter</u> standard. <u>Shaw</u>, at p. 1216.

Importantly, the First Circuit in <u>Shaw</u> specifically acknowledged that an issuing company and its officers and directors *could possibly be held liable under Section 12,* even if it was a firm commitment underwriting – or be sufficiently alleged for purposes of the pleading stage:

> While, on a different set of allegations, an issuer involved in a firmly underwritten public offering could be a "seller" for purposes of Section 12(2), we hold that the *Wilensky* complaint does not contain sufficient non-conclusory factual allegations, which, if true, would establish that DEC or the individual defendants qualify as such. However, the complaint does adequately allege that the underwriter defendants directly sold securities to the plaintiffs . . . .

<u>Shaw</u>, at p. 1216.

23

In our case, the FACC contains more specific factual allegations, and is not simply "sparse" or "conclusory" as to the solicitation involvement of Eventbrite and some of its senior officers.

The Court of Appeal in Jensen also relies upon and quotes from Lone Star Ladies Investment Club v. Schlotzsky's Inc. (5th Cir. 2001) 238 F.3d 363, for the proposition that the issuing company is not "ordinarily" liable under Section 12 as a "seller" in the circumstance of a "firm commitment underwriting" of an IPO. Jensen at p. 648. Yet the Jensen court failed to acknowledge the *actual holding* of the Fifth Circuit in Lone Star: That the plaintiffs in that "firm commitment underwriting" case *had* sufficiently pleaded that the issuing company and its officers and directors were "statutory sellers" under Section 12 of the Securities Act of 1933.

Discussion in the Lone Star opinion (occurring in the text *prior* to the portion quoted in Jensen) states:

> As we see it, the pivot point here is not whether defendants were "sellers", because "Congress expressly intended to define broadly" the concept of seller to "encompass the entire selling process, including the seller/agent transaction." Rather, our issue is controlled by section 12's provision that a seller is only liable "to the person purchasing such security from him." The argument is that in a firm commitment underwriting, the public purchases from the underwriter, not from the issuer.
>
> *Pinter* held that the purchase clause of section 12 does not "exclude solicitation from the category of activities that may render a person liable when a sale has taken place." For example, "a securities vendor's agent who solicited the purchase would commonly be said, and would be thought by the buyer, to be among those 'from' whom the buyer 'purchased,' even though the agent himself did not pass title," for example a broker acting for an issuer. *Shaw* found that under some circumstances, "an issuer involved in a firmly underwritten public offering could be a 'seller' for purposes of Section 12(2)" where the issuer solicited the sale of the stock. This much is clear under *Pinter*.

24

It is also true under *Pinter* that under some circumstances, the
issuer is immune from section 12 liability in a firm commitment
underwriting. . . .

Lone Star, at p. 370, footnote citations omitted. The holding in Lone Star (which comes

after the text quoted in Jensen) was that the plaintiffs *had* adequately alleged that the

defendant company issuer and its officers and directors were statutory sellers (which

would include solicitors) under Section 12, and that the motion to dismiss must be

denied:

On remand, plaintiffs will bear the burden of demonstrating that
these issuers did solicit in a manner sufficient to satisfy *Pinter*, if they
wish to preserve their section 12 claims. We say only that this claim
cannot be decided in this case and on these facts upon a Rule 12(b)(6)
motion, although the parties may bring the question again upon a properly
developed record under Rule 56 of the Federal Rules of Civil Procedure[9].
We decline to step further onto this terrain by applying these principles to
possible facts that plaintiffs might adduce. The able district court is better
equipped to first address these issues, with facts in hand.

Lone Star, at pp. 370-371, footnote citations omitted, footnote added.

The Jensen court also cited to reported appellate decisions from the Third Circuit

of In re Westinghouse Securities Litigation (3rd 1996) 90 F.3d 696 and In re Craftmatic

Securities Litigation (3rd Cir. 1989) 890 F.2d 628, which involved a firm commitment

underwriting. Once again, those Court of Appeals' decisions held that the plaintiffs *had*

adequately pleaded a claim for violation of Section 12:

Plaintiffs argue that because the facts alleged in their complaint are so
similar to the factual allegations of the complaint sustained in *Craftmatic*,
they stated a section 12(2) claim. [Citation.] We are constrained to agree.

It is certainly true that plaintiffs' section 12(2) alegations are not
clearly drafted. Plaintiffs do not, for example, make clear which
defendants are alleged to be direct sellers as opposed to solicitor sellers.
[Citation.] Nor do plaintiffs allege how the Westinghouse defendants,
assuming they are alleged to be solicitor sellers, directly and actively

---

[9]    This is the federal court equivalent of a motion for summary judgment or
summary adjudication under Code of Civil Procedure Section 437c.

participated in the solicitation of the immediate sales. Further, plaintiffs' allegation that defendants "promoted the sale of" securities would not, standing alone, give rise to any section 12(2) liability. The district court could certainly require that plaintiffs clear up these ambiguities on remand.

Taken in the light most favorable to plaintiffs, however, the complaint does allege that the Westinghouse defendants "solicited plaintiffs' to purchase Westinghouse securities and that in so doing they were motivated by a desire to serve their own financial interests. Contrary to the district court's statement, these are factual allegations – allegations plaintiffs will have to prove – and not bare legal conclusions. Under *Craftmatic,* plaintiffs' allegations are sufficient to survive a motion to dismiss under Rule 12(b)(6). "It cannot be said at this juncture that plaintiffs can prove no set of facts that would entitle them to relief." [Citations.] For these reasons, we reverse the district court's order dismissing the Section 12(2) claims against the Westinghouse defendants.

Westinghouse, at p. 717. The Third Circuit in Westinghouse also held that the plaintiffs

had adequately pleaded that the underwriter defendants were statutory sellers. Id., at pp.

718-719.[10]

Applying the holdings of Pinter (which did not involve determination of pleading

sufficiently) and of these multiple Court of Appeals' decisions regarding the sufficiently

of Section 12 pleadings, and finding that the factual allegations of the Plaintiffs in our

case are more specific and expansive than those found adequate in the above-stated

reported federal decisions, this Court finds that Plaintiffs have adequately pleaded a

Section 12 claim. The factual *evidence* required to actually prove that each Defendant is

a statutory seller under Section 12 and Pinter is properly left to a motion on the merits.

---

[10]     "But *Pinter* does not address what allegations are necessary to plead that a defendant is a seller within the meaning of the statute. Absent a particularity requirement, plaintiffs must provide a short and plain statement showing that the underwriter defendants are statutory sellers and that plaintiffs purchased securities from them. We find that plaintiff satisfied this requirement and stated a section 12(2) claim against the underwriter defendants." Westinghouse, at p. 718, footnote citations omitted.

Although the Ninth Circuit has yet to opine on the subject, California district courts have held that whether or not the factual allegations of the IPO activities of corporate directors and officers reach the level of being a seller or solicitor under Section 12 and under Pinter should not be decided on the pleadings, but rather on the merits. For example,

> The Ninth Circuit has not addressed whether simply alleging that a defendant signed a registration statement – possibly combined with other generalized allegations of solicitation activity – will suffice to state a Section 12 claim. Other courts faced with such claims have reached varying results. . . . In *Pinter*, the Supreme Court left little doubt that mere *participation* in a solicitation or sale will not suffice.
>
> * * *
>
> This order finds that plaintiffs adequately pled solicitation. Plaintiffs alleged more than mere participation. As many court have found, the registration statement is itself a solicitation document. Although the act of signing a registration statement, alone, may not always suffice, it is at least suggestive of solicitation activity. As stated, the complaint also alleges that defendants "actively solicited the sale of the fund's shares" and that certain defendants were involved in marketing the fund. Whether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury; at this stage plaintiffs need only satisfy rule 8(a)'s lenient pleading standards. [Citation.] For these reasons, the complaint adequately pleads that defendants were statutory "sellers" under section 12(a)(2).

In re Charles Schwab Corp. Securities Litigation (ND Cal. 2009) 257 F.R.D. 534, 549.

> The Court concludes that plaintiff has alleged enough facts to support an active solicitation theory against the Individual Defendants. Plaintiff alleges that all of the Individual Defendants signed the Offering Materials, that certain defendants solicited sales at the Investor Day, and that all of the Individual Defendants were financially motivated to solicit sales. The court finds *Charles Schwab* involved similar allegations and that court agrees that the solicitation question is a "factual question which should generally be left to the jury."
>
> According, the court DENIES defendants' motion to dismiss for failing to state a claim under section 12.

27

Pirani v. Slack Technologies Inc. (ND Cal. April 2020) __ F.Supp.3d __; 2020 Westlaw 1929241.

Accordingly, the Demurrers on the basis that Plaintiffs have not adequately pleaded that certain Defendants are statutory sellers under Section 12 is OVERRULED.

### *Third Cause of Action for Violation of Section 15*

Sections 15 and 20(a) impose liability on control persons for a primary violation of the securities laws. . . . Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. "To establish 'controlling person' liability, the plaintiff must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.1996). "[W]hether a person is a 'controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* at 1162. Traditional indicia of control include "having a prior lending relationship, owning stock in the target company, or having a seat on the board." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir.2003).

Takiguchi v. MRI International Inc. (D. Nevada 2014) 47 F.Supp.3d 1100, 1117-1118.

Given the Court's finding that the FACC does not sufficiently allege material misrepresentations and omission in the Registration Statement and Prospectus, the Section 15 "control person" claim also fails. But for the failure to adequately plead the primary violation, the allegations of the FACC would be sufficient as to the Individual Defendants. Those Individual Defendants are alleged to be corporate officers and/or directors of Eventbrite. All but the General Counsel are alleged to have signed the subject Registration Statement, and the General Counsel is alleged to have been personally involved in the drafting of the Registration Statement itself. (FACC at ¶19-¶29.)

28

"'[A]lthough a person's being an officer or director does not create any *presumption* of control, it is a sort of red light.' *Arthur Children's Trust,* 994 F.2d at 1396 (quoting 4 Loss & Seligman, *Securities Regulation* 1724 (1990)) (emphasis in Loss & Seligman)." <u>Paracor Finance Inc. v. General Electric Capital Corp.</u> (9th Cir. 1996) 96 F.3d 1151, 1163.

In pleading a Section 15 claim, "it is a plausible inference' that individuals who are officers of the issuing company and who signed the Registration Statements "were in a position to exercise power and control" over the primary violators at the issuing company. <u>In re Charles Schwab Corp. Securities Litigation</u>, 257 F.R.D. at pp. 550-551.

> Section 15(a) imposes joint and several liability upon every person who controls any person liable under §§ 11 or 12. *In re Daou,* 411 F.3d at 1029. The SEC has defined "control" to mean: "[T]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. As alleged by plaintiffs, defendants are either executive officers and directors of Levi or directors of Levi during the relevant period. In addition, all defendants signed at least one of the registration statements at issue. CAC ¶¶ 19–34. Thus, the court concludes that these individuals are properly alleged to be control persons within the meaning of § 15 by virtue of their positions and role in the registration statements. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568 n. 4, 1575 (9th Cir.1990) ("The standards for liability as a controlling person under § 15 are not materially different from the standards for determining controlling person liability under § 20(a).... [W]e make clear that in an action based on § 20(a), the defendant who is a controlling person, and not the plaintiff, bears the burden of proof as to defendant's good faith. Thus, a plaintiff need not make a showing as to defendant's culpable participation; rather, a defendant has the burden of pleading and proving his good faith.").

<u>In re Levi Strauss & Co. Securities Litigation</u> (ND Cal. 2007) 527 F.Supp.2d 965, 984.

> The SEC defines control as, "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person." 17 C.F.R. § 230.405. A person exercises control over an issuing corporation when he or she oversees day-to-day company operations. *Howard,* 228 F.3d at 1065. While an individual's status as an officer or director of the issuing corporation is insufficient, standing alone, to demonstrate the exercise of control, *Id.,* an officer or director who has

29

signed an SEC filing does exercise control. *In re Alstom,* 406 F.Supp.2d at 487–88;*Sprint,* 314 F.Supp.2d at 1144–45.

> Whether an individual may be considered a "controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *In re Metawave Communs. Corp. Secs. Litig.,* 298 F.Supp.2d 1056, 1087 (W.D.Wash.2003)(quoting *Howard,* 228 F.3d at 1065.) It is sufficient, at the pleading stage, to identify the defendants' positions and allege that they " 'had the **\*1297** power to control and influence [the defendant], which they exercised.' " *In re Cylink Secs. Litig.,* 178 F.Supp.2d 1077, 1089 (N.D.Cal.2001). In addition, persuasive authority indicates that audit committee members, including outside directors, who sign SEC filings qualify as control persons. *See In re Enron Corp. Sec. Litig.,* 258 F.Supp.2d 576, 598 (S.D.Tex.2003)(citing cases); *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 437 (S.D.N.Y.2001)(holding that an outside director can be presumed to exercise control over management and policies related to "company reports and SEC registrations that they actually sign").

In re Metropolitan Securities Litigation (ED Wash. 2007) 532 F.Supp.2d 1260, 1296-

1297.

Accordingly, the FACC sufficiently alleges that the Individual Defendants are

"control persons" under Section 15. Plaintiffs must still allege a viable claim for primary

liability under Section 11 or Section 12 in order to assert a Section 15 claim against

anyone.

In addition, Defendant Tiger Global – as to whom Section 15 is the only claim –

asserts that the Section 15 allegations against it are insufficient regardless. So too the

Sequoia Defendants.

Plaintiffs allege that the Sequoia Defendants are control persons under Section 15,

and that Eventbrite Director Roelof Botha has primary liability for violation of Section

11. The FACC alleges in pertinent part:

> Sequoia Capital was an early investor in Eventbrite and controls Eventbrite due to its large equity stake in the Company and its influence on Eventbrite's Board of Directors "Board"), including through Sequoia

Capital's partner defendant Botha, a director of Eventbrite. Sequoia Capital has special rights as a shareholder of Eventbrite pursuant to the terms of an investor rights agreement to which it is a party. . . . Prior to Eventbrite's IPO, Sequoia Capital owned 13,452,418 Class B shares of Eventbrite stock representing 20.5% ownership and voting control. After the IPO, Sequoia Capital continued to have significant control over Eventbrite, and owns 13,452,418 Class B shares, representing 17.7% ownership of all shares and 20.0% voting control. Due to its ownership and voting control, as well as having a director on the Company's Board, Sequoia Cap8ital had the ability to exercise control over the Company at the time of the IPO, including control over the contents of the Offering Documents.

Sequoia exercised control over Eventbrite and the contents of the Offering Documents through, among others, Defendant Botha who served as both a managing member of Sequoia and a director of Eventbrite. At the time of the IPO, Botha served as a board member of the audit committee, a member of the merger and acquisition committee, and a member of the compensation committee. As a member of the audit committee, Botha had significant oversight and control over the Company's financial and reporting requirements. Botha had control over the Company's accounting practices, including the ability to appoint accounting firms, approve audit services, develop procedures for employees to submit concerns anonymously about questionable accounting or audit matter, and shape the Company's policies on risk assessment and risk management.

The Board's Mergers and Acquisitions Committee was comprised of Lee Fixel (former partner of Tiger Global), Defendant Roelof Botha (managing member of Sequoia), and Defendant Steffan Tomlinson. Tiger and Sequoia exercised significant control through Fixel and Botha's participating in the Board's Mergers and Acquisitions Committee. . . .

(FAC at ¶32, ¶33, and ¶62.) Indeed, Eventbrite's Chief Financial Officer allegedly made public statements regarding the influence that Botha and Fixel had upon decision-making. (¶62.)

"Section 15 extends liability created under §§ 11 and 12(a)(2) to "[e]very person who, by or through stock ownership, agency, or otherwise ... controls any person liable under sections [11 or 12.]" 15 U.S.C. § 77o. The section creates joint and several liability for control persons after a primary securities violation is found. *In re Daou*, 411 F.3d at 1029–30. Whether a defendant is a control person is a fact question rarely appropriate for motion practice. *In re Worlds of Wonder Sec. Litig.*, 694 F.Supp. 1427, 1435 (N.D.Cal.1988)."

31

In re Countrywide Financial Corp. Securities Litigation (CD Cal. 2008) 588 F.Supp.2d 1132, 1183.

> To establish "controlling person" liability, the plaintiff must show that a primary violation was committed and that the defendant "directly or indirectly" controlled the violator. *See Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1575 (9th Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991). "In general, the determination of who is a controlling person ... is an intensely factual question." *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396 (9th Cir.1993). The plaintiff need not show the controlling person's scienter or that they "culpably participated" in the alleged wrongdoing.[12] *Id.* at 1398.
>
> *      *      *
>
> [I]n *Kaplan v. Rose,* 49 F.3d 1363 (9th Cir.1994), *cert. denied,* 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995), we [the Ninth Circuit] stated that whether a person is a "controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* at 1382 (internal quotation marks omitted). We did not inquire into the defendant's involvement in an isolated corporate action. *See id.; see also Arthur Children's Trust,* 994 F.2d at 1397. Similarly, in *Hollinger,* 914 F.2d at 1572 n. 16, we cited the SEC's definition of "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

Paracor, at pp.1161-1162; see also Howard v. Everex Systems Inc. (9th Cir. 2000) 228 F.3d 1057, 1065-1066. "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." Howard at p. 1065; In re Charles Schwab Corp. Securities Litigation, 257 F.R.D. at p. 550.

Should Plaintiffs succeed in adequately alleging a violation of Section 11 or Section 12 against Eventbrite and/or Botha, the allegations in the FACC against the

Sequoia Defendants regarding Section 15 liability as a "control person" would be sufficient at this pleading stage.

Plaintiffs allege that Defendant Tiger Global is a control person under Section 15, based upon the following factual allegations:

> (1) its 21.4% ownership and voting control of Eventbrite prior to Eventbrite's IPO (¶¶35, 190); (2) its 18.5% ownership of all Eventbrite shares both after the IPO and its continued voting control (id.); (3) its attendance at several pre-IPO roadshows where Eventbrite told investors that Ticketfly's existing clients would be able to sell tickets through Eventbrite by the end of 2018 (¶110); (4) its significant special rights as shareholders of Eventbrite pursuant to the terms of an investor rights agreement which, among other things, enabled them to influence facets and terms of the IPO (¶188); and (5) its continued influence over Eventbrite and its co-founders, executives, and major shareholders due to the shareholder investor agreement (¶190).

(Am. Opp. to Tiger Demurrer, filed Apr. 10, 2020, p. 9:16-23.)

Although having some similarities, the factual allegations against Tiger Global are not as lush as those made against Sequoia. Tiger Global was and is a significant shareholder of Eventbrite. Its *former* partner, Lee Fixel, *previously* served on Eventbrite's Board of Directors, and was a member of the Mergers and Acquisitions Committee during the time of negotiation of the Ticketfly acquisition. Yet, Fixel is *not* an Individual Defendant in this case. Fixel is not alleged to have served on any committee other than M&A, and was not a member of the Audit Committee. Fixel left the Board prior to the IPO. Fixel is not alleged to have signed the Registration Statement. None of the Individual Defendants, including members of the Board of Directors of Eventbrite, are alleged to have direct ties to Tiger Global – in other words, there is no allegation that Tiger Global controls any Board "seat".

Accordingly, although there are some factual allegations as to the participation of Tiger Global in the subject IPO, there are not sufficient factual allegations reflecting that

Tiger Global had/has control of or did direct corporate actions, policies and management of Eventbrite or any of the Individual Defendants.

DATED:        June 22, 2020

HON. MARIE S. WEINER
JUDGE OF THE SUPERIOR COURT

# EXHIBIT 2

| | |
|---|---|
| **From:** | Kara Wolke <KWolke@glancylaw.com> |
| **Sent:** | Wednesday, September 16, 2020 9:11 AM |
| **To:** | Tyson Redenbarger; lrosen@rosenlegal.com; Gibbs, Patrick; awhite@mofo.com |
| **Cc:** | Mark Molumphy; Frank Bottini; Yury Kolesnikov; Joseph Cohen; Jonathan Horne |
| **Subject:** | RE: Eventbrite |

Dear Counsel:

Thank you for your email. We are surprised at your statement that you only recently learned of the settlement. It was publicly filed along with the preliminary approval motion on August 7, 2020, and it was reported in Law360. Per local rules, I believe oppositions were due on August 21, 2020. In any event, we do not think it is necessary or appropriate to continue the hearing. The status of the state court action as it relates to the strengths and weaknesses of the underlying facts and the ability to state a claim, as well as the entirety of risks considered, is reflected in the settlement that is pending preliminary approval.

Sincerely,

Kara Wolke

---

**From:** Tyson Redenbarger <TRedenbarger@cpmlegal.com>
**Sent:** Thursday, September 10, 2020 12:29 PM
**To:** Kara Wolke <KWolke@glancylaw.com>; lrosen@rosenlegal.com; Gibbs, Patrick <pgibbs@cooley.com>; awhite@mofo.com
**Cc:** Mark Molumphy <MMolumphy@cpmlegal.com>; Frank Bottini <fbottini@bottinilaw.com>; Yury Kolesnikov <YKolesnikov@bottinilaw.com>; Tyson Redenbarger <TRedenbarger@cpmlegal.com>
**Subject:** Eventbrite

Counsel,

We are lead counsel in the California state action against Eventbrite, San Mateo Superior Court Case No. 19CIV02798, assigned to Judge Wiener. We recently learned that the parties in the federal action, represented by your firms, negotiated a settlement that may impact our case. We had no knowledge of the settlement, nor did we participate in its negotiation.

In the preliminary approval papers filed with Judge Davila, the federal plaintiffs state that one of the relevant considerations in negotiating a settlement is the status of the pleadings and discovery in our State Action. However, the pleadings in the State Case are not resolved. On the contrary, Judge Weiner upheld Section 12(a)(2) seller allegations, as well as control-person allegations under Section 15, and granted Plaintiffs leave to amend the remaining claims. Additionally, Plaintiffs in the State Case are still obtaining discovery from Eventbrite and other defendants, including email correspondence. Once we receive that information, we intend to file an amended complaint. While we anticipate that defendants may demurrer, the viability of our complaint should be determined prior to any preliminary or final evaluation of the proposed settlement.

Accordingly, we request that the federal parties agree to defer any hearing on a motion for preliminary approval, currently set on October 29, 2020, until after Judge Weiner rules on any demurrer to the amended complaint. Please advise us no later than 5:00 p.m. Tuesday, September 15, 2020, if you will agree to defer the motion. Absent such confirmation, we will likely have no choice but to move to intervene in the federal court.

1

Regards,
Mark Molumphy
Frank Bottini
Lead Counsel for State Plaintiffs

# EXHIBIT 3

FILED
SAN MATEO COUNTY

SEP 24 2020

Clerk of the Superior Court
By _____
DEPUTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

COMPLEX CIVIL LITIGATION

| | |
|---|---|
| In re EVENTBRITE INC. SECURITIES LITIGATION | Master File No. 19CIV02798 |
| _____/ | CLASS ACTION |
| This Document relates to: | Assigned for All Purposes to Hon. Marie S. Weiner, Dept. 2 |
| ALL ACTIONS | **CASE MANAGEMENT ORDER #10** |

IT IS HEREBY ORDERED as follows:

1.      All stays are LIFTED.

2.      Defendant Eventbrite shall serve verified written response and production of all responsive documents to Plaintiffs as to Requests for Production (other than No. 8, which they have already answered) on or before **October 6, 2020.**

3.      Plaintiffs served Requests for Production of Documents upon the Tiger Global Defendants, to which they served written responses and objections. As part of the discovery conference process, the Tiger Global Defendants have produced external communications with Eventbrite and any of the other Defendants, and have conducted a targeted electronic search of emails for internal communications with Eventbrite and the

1

Individual Defendants and/or regarding the Initial Public Offering. Tiger Global Defendants are now withholding the e-documents as "internal communications", because they simply do not want to produce any e-discovery before other Defendants do, or incur the costs related thereto. This is not good cause for withholding of discovery regarding Eventbrite and its Initial Public Offering, particularly as Plaintiffs need the discovery to prepare and file a Second Amended Consolidated Complaint. Accordingly, the Tiger Global Defendants shall produce these "internal communications" documents to Plaintiff on or before **October 6, 2020.**

4. Plaintiffs served Requests for Production of Documents upon the Sequoia Defendants, to which they served written responses and objections. As part of the discovery conference process, the Sequoia Defendants have produced external communications with Eventbrite and any of the other Defendants. Plaintiffs have specifically narrowed and targeted the electronic search of emails for internal communications with Eventbrite and the Individual Defendants and/or regarding the Initial Public Offering, as identified in Exhibit A hereto. Sequoia Defendants are now withholding the e-documents as "internal communications", because they simply do not want to produce any e-discovery before other Defendants do, or incur the costs related thereto. This is not good cause for withholding of discovery regarding Eventbrite and its Initial Public Offering, particularly as Plaintiffs need the discovery to prepare and file a Second Amended Consolidated Complaint. Accordingly, the Sequoia Defendants shall produce these "internal communications" documents to Plaintiff on or before **October 6, 2020.**

5. On or before **October 16, 2020,** Defendant Eventbrite shall produce all emails and related e-documents found from the electronic word search of the email

2

documents of the five or six "custodians" identified in the Stipulated ESI Protocol Order (for the stipulated time period stated herein), other than documents withheld on the basis of attorney-client privilege, as identified on the e-search summary attached hereto as Exhibit B, *except for* Search ID #9 with over 30,000 "hits" and *except for the* Search #15 in order with over 40,000 "hits". As to those two excluded responses, the parties are ordered to further meet and confer to see whether the search can be narrowed to yield a more reason number of targeted emails. Any documents withheld on the basis of attorney-client privilege shall be set forth in a Privilege Log to be produced on or before **October 16, 2020**.

6.    A Case Management Conference is set for **Wednesday, November 4, 2020 at 9:00 a.m.** in Department 2 of this Court, located at Courtroom 2E, 400 County Center, Redwood City, California. **Appearances shall be remote only, via CourtCall.** Counsel shall be prepared to brief the Court on the status of this litigation, including potential date for filing of the Second Amended Complaint, and including the status of the related federal district court action.

THE COURT FINDS as follows:

After extensive time spent by counsel and by this Court regarding discovery, and specifically the production of documents in a narrow and targeted fashion, Defendants have refused to proceed with the production of electronic documents. In that regard, Defendant Eventbrite asserts that a formal motion to compel must first be filed and ruled upon before any further discovery can be ordered produced.

Defendant's position is *incorrect*, in that Defendant has forgotten the procedural foundation upon which discovery has been ordered and has been proceeding to date,

3

namely Defendant's own motion(s) to stay discovery and Defendants' request that this Court order that Defendants be protected from broad discovery requests.

California law is explicit in allowing discovery at the beginning of a lawsuit, and regardless of pendency or ruling on any demurrer or other motion regarding the pleadings. E.g., C.C.P. §2030.020 (interrogatories may be propounded by plaintiff 10 days after defendant is served with process; and may be immediately propounded by defendant); C.C.P. §2031.020 (requests for production of documents may be propounded by plaintiff 10 days after defendant is served with process; and may be immediately propounded by defendant); Mattco Forge v. Arthur Young & Co. (1990) 223 Cal.App.3d 1429; Budget Finance Plan v. Superior Court (1973) 34 Cal.App.3d 794, 798 (after defendant's demurrer was sustained with leave to amend, "plaintiff is entitled to reasonable discovery, even to disclose facts essential to his stating a cause of action."); Union Mutual Life Ins. Co. v. Superior Court (1978) 80 Cal.App.3d 1, 11-12.

"[Defendant's] prematurity argument was properly rejected by the trial court. Pleading deficiencies generally do not affect either party's right to conduct discovery [citation], and this right (and corresponding obligation to respond) is particularly important to a plaintiff in need of discovery to amend its complaint. [Citation.]" Mattco Forge, at p. 1436 fn. 3.

Yet, a party may seek and the Court may issue orders limiting document production discovery to avoid undue burden and expense, pursuant to C.C.P. Sections 2017.020 or 2031.060; and the Court has authority over the sequencing of discovery pursuant to C.C.P. Section 2019.020.

On June 3, 2019, this Court issued its CMC Order #1, which included that "discovery is not stayed." On July 10, 2019, Plaintiffs propounded requests for

4

production of documents, and Defendants quickly filed Motions to Stay Proceedings, and alternatively to stay discovery. In Defendants' briefs, they emphasized that this Court had *broad authority over discovery*, and the control thereof.[1]

On August 8, 2019, hearing was held on Defendants' Motion to Stay this consolidated class action in deference to a pending related federal class action. Defendants alternatively requested during oral argument that this Court regulate the document production requests already propounded by Plaintiffs.

Court Order was issued on August 20, 2019, denying the motion to stay the proceedings, and denying Defendants' alternative motion to stay all discovery "until any motions to dismiss in the Federal Action are resolved". Yet, the Court granted the Defendants a short temporary stay of discovery until ruling on the initial demurrer, and then, although they had not filed a formal motion for protective order, the Court granted protection to Defendants against full-blow discovery and instead limited Plaintiffs to specific and targeted discovery pertaining to defects in Plaintiffs' Complaint and factual discovery needed towards potential cure of those pleading defects.

The Order denying stay, issued August 20, 2019, states in pertinent part:

On the other hand, Defendants have properly raised concerns about avoiding completing or inconsistent discovery requests between the state court parties and the federal court parties, and that they want to avoid the

---

[1]    For example, Defendants' Reply Brief stated at page ten:
"Plaintiffs seek to avoid this result by arguing that this Court does not have authority to temporarily stay discovery in this action. [cite] Plaintiffs are wrong. This Court is vested with statutory discretion to manage discovery, including the power to stay discovery. [Citation.] In addition, this court may, for good cause shown, grant a protective order to protect a party from unwarranted annoyance, embarrassment, oppression, or undue burden and expense. [Citations.] This authority includes power to change or extend 'the time specified' to respond to discovery, or to declare that the discovery 'need not be produced,' or 'made available at all.' [Citations.]"

5

time and expense of full-blown e-discovery, where the parties may have differing search terms and scope. Obviously it is best if discovery can be coordinated between the two fora.

Plaintiffs have shown no prejudice from a short stay of discovery. Plaintiffs indicated they are ready to proceed with Defendants' anticipated demurrers to the Consolidated Class Action Complaint, without the need for discovery first. The discovery requests propounded by Plaintiffs are broad (and appropriately so), which are difficult to narrow at this point, given that Plaintiffs would be entitled to take discovery in response to any decision sustaining a demurrer with leave to amend, yet any such deficiencies are presently unknown.

Defendants are also concerned that the state court Plaintiffs might "share" discovery with the federal plaintiffs before they are entitled to proceed with discovery in the federal action. This can be accomplished by confidentiality orders foreclosing such sharing prematurely; while allowing initial discovery efforts to proceed.

Accordingly, although not actually "staying" discovery, and specifically denying the motion for stay of discovery until the federal motions to dismiss are completely resolved, this Court is granting a slowing and staging of discovery at this point – set forth in detail in the parallel CMC Order being issued herewith.

The Court issued Amended CMC Order #2 on August 26, 2019, effectively protecting Defendants from full-blown discovery, and proceeding instead with limited,

6

targeted discovery – subject to meet and confer efforts by the parties, and involvement of the Court.  Amended CMC Order #2 states in pertinent part:

3.      Counsel for the parties shall meet and confer and submit directly to Department 2 a stipulated Confidentiality Order, on or before the Discovery Conference, including or as a separate stipulated order an agreement not to share discovery with any parties to the related federal action until the federal discovery stay is lifted.

* * *

5.      Defendant Eventbrite shall serve verified written response and production of all responsive documents to Plaintiffs as to Request for Production No. 8 regarding insurance, on or before September 11, 2019.

6.      Defendant Eventbrite is otherwise GRANTED an open extension of time to serve its responses to Plaintiffs' first set of requests for production of documents, in order to facilitate discovery in a phased procedure.  **Counsel for the parties shall meet and confer regarding the requests for production, and proposal for phased production, with emphasis upon initial production of standard IPO documents, documents regarding or reflecting "roadshows" or other IPO presentations and solicitations, activities of Tiger Global Management in California, and identification of initial "custodians" at Eventbrite for email searches and other e-documents regarding the IPO. Counsel for the parties shall also meet and confer and submit a stipulated electronic discovery protocol and procedures order.**  (Bold added.)

7

After denial of the stay, Defendants promptly filed their Demurrers to the Consolidated Complaint.

Consistent with CMC Order #2, the parties submitted a Confidentiality Order in September 2019. On September 11, 2019, Eventbrite served amended responses and objections to Plaintiffs' requests for production of documents, and produced a small number of documents. On October 1, 2019, Defendants propounded special interrogatories to Plaintiffs. This Court pre-set several Discovery Conferences during 2019, which Plaintiffs thereafter indicated were not needed – particularly given the limitations on discovery until initial ruling on demurrers. During that time period until the end of 2019, Defendant Eventbrite represented that it "produced standard IPO documents and documents regarding or reflecting 'roadshows' or other IPO presentations and solicitations, and documents regarding the Ticketfly acquisition and migration/integration."

On November 1, 2019, hearing was held on Defendants' Demurrers, which were sustained with leave to amend, by CMC Order #3 issued November 12, 2019. The Court ordered that Plaintiffs file a First Amended Consolidated Complaint by January 10, 2020. On January 10, 2020, the parties presented a Stipulation requesting that the due date for the First Amended Consolidated Complaint be extended to February 10, 2020, and reset the briefing schedule on any demurrer thereto (with hearing set for May 1, 2020) – which was granted by CMC Order #4.

At the very same time that the Covid Pandemic hit and all Court operations in civil actions were shut down, in mid-March 2020 Plaintiffs requested a Discovery Conference regarding Defendants failure to provide discovery consistent with the Court's prior orders. The Court notified counsel that no conference or other hearing in civil

actions could be set pursuant to order of the Presiding Judge, and given that all civil operations had shutdown, i.e., no staff and no court reporters.

On April 28, 2020, the federal district court granted those defendants' motion to dismiss with leave to amend as to the consolidated class action complaint in the related federal class action. The federal plaintiffs did not file any subsequent amended complaint.

Later in May 2020, the Presiding Judge granted permission for the Complex Civil Department to reset previously cancelled hearings. Hearing on the Demurrers to the First Amended Consolidated Complaint was continued to June 10, 2020 in this Court. Pursuant to CMC Order #7 issued June 22, 2020, the demurrers based upon lack of standing were overruled, but the demurrers on failure to adequately state facts constituting a cause of action were sustained with leave to amend.

At the hearing, Plaintiffs requested that the Court schedule a discovery conference. Given the existing limitations on staffing and on civil proceedings, the Court agreed to conduct it as an informal discovery conference – which would not require a courtroom clerk or a court reporter.

One week after the demurrer hearing, and the Court's oral ruling, Eventbrite, its Officers and Directors, and the Underwriters reached a settlement in principle with the federal plaintiffs on June 17, 2020. This was not disclosed at the time.

The parties agreed and the Court ordered an open extension of time for Plaintiffs to file their Second Amended Consolidated Complaint, as they wanted to obtain and review Defendants' productions of documents prior to amending the complaint.

At the suggestion of the parties, an informal discovery conference was set for

9

July 9, 2020. Defendants objected to the collection and production of any electronic communications, i.e., emails, prior to finality of the pleadings; and upon any such production Defendant Eventbrite sought to limit the email search to three persons as "custodians". Basically, Defendants were, once again, taking the position that further discovery should be stayed until after conclusion of the pleadings – a position which this Court had already rejected multiple times. *These discovery disputes regarding email searches and custodians were issues identified by the Court, and arose from the discovery rulings made by this Court, in Amended CMC Order #2 from August 2019 –* based upon Defendants' original requests for protection against full discovery and requesting limitations on production of documents. Plaintiffs responded that (i) email discovery needed to proceed with the pleadings and more custodians needed to be included for the Eventbrite production; and (ii) Sequoia and Tiger Global had or were willing to produce external communications, but not internal communications.

An unreported discovery conference was held on July 9, 2020; follow-up unreported discovery conferences were held on July 20, 2020, and on July 31, 2020. At the July 9th conference, the Court again rejected Defendants' position that all further discovery be stayed, and the Court discussed with counsel and determined *six* custodians for the initial electronic search of emails. The Court also addressed disputes as to the time period to be covered by the e-search. The parties indicated that had presented proposed Search Terms, which were being discussed by the parties. As there was no agreement on the breadth of search terms, the Court requested the proposed list, to then be discussed at the July 20th conference. The parties indicated that further meet and confer might be fruitful, and sent a revised Search Term list to the Court in preparation for the July 31st discovery conference as to those which were agreeable and requesting

10

the Court's guidance or ruling on the disputed ones. At that July 31st conference, the Court painstakingly went through word by word, term by term, several of the Search Terms in dispute. Counsel for the parties then agreed that they understood the impact as to all other Search Terms in dispute, and would be able to finalize the Search Terms to do an initial "run" to see how many responsive documents would arise – and thus determine whether further refinement was needed for any particular Search Term. *Again, this limited and targeted e-discovery stemmed from this Court's initial Amended CMC Order #2 arising from the request of Defendants to limit discovery.* It was agreed to have a further discovery conference in that regard, as well as regarding Sequoia and Tiger Global – as the Court had run out of time for that conference.

On July 29, 2020, the parties in the federal action executed a Stipulation of Settlement.

At the conclusion of the Discovery Conference held on July 31, 2020, Defendants orally disclosed to the Plaintiffs and this Court in general that a settlement had been reached in the federal class action.

On August 7, 2020, Plaintiffs in the federal class action filed a Motion for Preliminary Approval of Settlement, with hearing set for October 29, 2020. As noted by Plaintiffs in this state court action, the moving papers by the federal plaintiffs *misleadingly* tell the federal district judge that this Court has "dismissed" the claims asserted in this state court action, and implies that Plaintiffs had full opportunity for discovery – and that this is one of the reasons why the settlement amount is so low compared to potential damages:

- "In addition, a California state court dismissed the first and second amended complaints brought by Eventbrite Inc. [] investors asserting similar claims, the

11

latter of which followed significant discovery. . . . With claims against Eventbrite dismissed in state and federal court and the Company's future uncertain, the prospect that Settlement Class Members would recover anything looked dim. Yet, lead Counsel nonetheless were able to negotiate the $1.9 million Settlement." (federal motion at page one.)

- "Certain Eventbrite investors had filed a securities class action in the San Mateo Superior Court. The plaintiffs in that action . . . were not precluded from obtaining discovery as Plaintiffs here were. They used the discovery to plead their second amended complaint, but on June 10, 2020, the court dismissed it in open court, as reflected in a later June 23, 2020 order." (federal motion at page two.)

- "During negotiations, Settlement Class Members' chances of recovering anything diminished further when the state court dismissed the state plaintiffs' second amended complaint, which had relied on discovery." (federal motion at page six.)

- "Other Eventbrite investors sued in state court and alleged similar theories. Not subject to the PSLRA, the state court plaintiffs were allowed to take discovery. Though those plaintiffs based their second amended complaint on the discovery they obtained, the court nonetheless dismissed it. [Order] Those investors' inability to even state a claim with the benefit of discovery suggests that even if Plaintiffs survived Defendants' motions to dismiss, they might not survive Defendants' motions for summary judgment or win at trial." (federal motion at page eight.)

The Sequoia Defendants and the Tiger Global Defendants are not parties to the federal action.

12

Despite this Court's order in August **2019**, the parties did not submit an ESI protocol order under August **2020**, which this Court entered on August 18, 2020.

A formal Case Management Conference and Discovery Conference were held on August 18, 2020. Defendant Eventbrite now refused to produce any of the e-discovery, specifically the emails from the Search extensively discussed at the multiple discovery conferences – on the basis that a settlement had been reached in the federal class action. The Sequoia and Tiger Global Defendants now refused to produce their e-discovery of internal communications.

Subsequent to the CMC and Discovery Conference, Eventbrite took the position, in an email, that it need not respond to any discovery at all until a formal motion to compel was filed. As set forth herein, this Court does not agree, and finds the assertion to be without substantial justification.

DATED:    September 23, 2020

HON. MARIE S. WEINER
JUDGE OF THE SUPERIOR COURT

13

*In Re Eventbrite, Inc. Securities Litigation*

Lead Case No. 19CIV02798 (consolidated with No. 19CIV02911)

Plaintiffs' Request for Sequoia Capital's Internal Documents

1. All documents concerning a meeting between Roelof Botha and Julia Hartz on or about January 5, 2017. (See SEQ-EVBRT_0000807)

2. All documents concerning a meeting between Roelof Botha and Julia Hartz on or about February 14, 2017. (See SEQ-EVBRT_0000796)

3. All documents concerning a meeting between Roelof Botha and Julia Hartz on or about March 1, 2017. (See SEQ-EVBRT_0000808)

4. All documents concerning a meeting between Roelof Botha and Julia Hartz on or about March 2, 2017. (See SEQ-EVBRT_0000355, SEQ-EVBT_0000799))

5. All documents concerning a meeting between Roelof Botha and Julia Hartz on or about May 9, 2017. (See SEQ-EVBRT_0000833)

6. All documents concerning a meeting Roelof Botha and Julia Hartz on or about July 6, 2017. (See SEQ-EVBRT_0000866)

7. All documents concerning Sequoia partner Stephanie Zhan's participation at Eventbrite's Board of Directors Meeting December 1, 2017. (See EVBRT_011822)

8. All documents concerning Sequoia partner Stephanie Zhan's participation at Eventbrite's Board of Directors Meeting February 15, 2018. (See EVBRT_013879)

9. All documents Julia Hartz sent to Roelof Botha pertaining to the updated investor deck and draft S-1 letter March 7, 2018. (See SEQ-EVBRT_0000269)

10. All documents concerning Sequoia partner Stephanie Zhan's participation at Eventbrite's Board of Directors Meeting May 15, 2018. (See SEQ-EVBRT_015276)

11. All documents regarding approval of S-1 filings for Sequoia review on or about June 14, 2018. (SEQ-EVBRT_0000004)

12. All documents regarding accounting and S-1 filings discussed between Roelof Botha, Julia Hartz, and Randy Befumo on or about June 14, 2018. (SEQ-EVBRT_0010547)

13. All documents concerning a meeting between Roelof Botha and Tamara Mendelsohn on or about July 30, 2018. (See SEQ-EVBRT_0000561)

14. All documents concerning Sequoia partner Stephanie Zhan's participation at Eventbrite Board of Directors meeting on July 31, 2018. (See EVBRT_011822)

Page 1
July 13, 2020

EXHIBIT A

## *In Re Eventbrite, Inc. Securities Litigation*

Lead Case No. 19CIV02798 (consolidated with No. 19CIV02911)

### Plaintiffs' Request for Sequoia Capital's Internal Documents

15. All documents concerning a meeting between Roelof Botha and Tamara Mendelsohn on or about November 7, 2018. (See SEQ-EVBRT_0011365)

16. All documents concerning the meeting between Roelof Botha and Julia Hartz pertaining to Q1 `19 Board meeting debrief on or about March 6, 2019. (See SEQ-EVBRT_0014138)

17. All documents concerning the meeting between Roelof Botha and Julia Hartz pertaining to Q2 `19 Board meeting debrief on or about June 11, 2019. (See SEQ-EVBRT_0009250)

18. All documents concerning the meeting between Roelof Botha and Julia Hartz pertaining to Q3 `19 Board meeting debrief on or about September 5, 2019. (See SEQ-EVBRT_0014140)

**Total**

| ID | Clause | Doc Count | DeDuped Docs |
|----|--------|-----------|--------------|
| 1 | (("rs" OR "road show" OR roadshow) w/25 (rehears* OR meet* OR plan* OR note* OR present* OR slide* OR deck)) AND (delay* OR integra* OR migrat* OR resource* OR staff* OR divert* OR financ* OR revenue* OR quarter* OR beat* OR income* OR negative*) | 1,417 | 1,108 |
| 2 | ((anxiety OR distrust* OR doubt* OR suspicion* OR apprehen* OR concern* OR refus* OR worry OR afraid OR struggl*) w/25 (tf OR ticketfly)) | 2,225 | 1,797 |
| 3 | ((earn* w/1 result*) w/25 (buy* OR interest* OR purchas* OR revenue OR project* OR cash OR "cash flow" OR drop*)) AND (tf OR ticketfly) | 17 | 13 |
| 4 | ((hack* OR attack* OR harm* OR cyber* OR breach* OR "cyber incident") w/25 (tf OR ticketfly)) | 3,709 | 2,921 |
| 5 | ((ipo OR "initial public offering" OR narwhal OR registration OR "rs" OR "drs") w/25 (tf OR ticketfly)) | 1,822 | 1,317 |
| 6 | ((ipo OR meet* OR board OR recommend* OR suggest* OR acquir* OR trend* OR risk* OR miss* OR diligence OR "s-1" OR "SEC") w/25 (tf OR ticketfly)) | 16,906 | 13,524 |
| 7 | tiger AND ("due diligence" OR checklist OR draft OR presentation OR deck OR slide OR roadshow OR "road show" OR invitee OR report* OR memo* OR analy*) | 2,507 | 2,062 |
| 8 | tiger AND (tf OR ticketfly) AND (delay* OR integra* OR migrat* OR resource* OR staff* OR divert* OR financ* OR revenue* OR quarter* OR beat* OR income* OR negative*) | 1,044 | 786 |
| 9 | (mbu OR "music business unit" OR "music team" OR migrat* OR integrat* OR churn* OR retain* OR retent* OR gap* OR feature*) AND (tf OR ticketfly) | 42,004 | 31,780 |
| ## | ((relationship OR migrat* OR integrat* OR competit* OR strategy*) w/25 (tf OR ticketfly)) | 15,900 | 11,874 |
| ## | (roelof OR "roelof botha" OR sequoia) AND ("due diligence" OR checklist OR draft OR presentation OR deck OR slide OR roadshow OR "road show" OR invitee OR report* OR memo* OR analy*) | 6,034 | 4,720 |
| ## | (roelof OR "roelof botha" OR sequoia) AND (tf OR ticketfly) AND (delay* OR integra* OR migrat* OR resource* OR staff* OR divert* OR financ* OR revenue* OR quarter* OR beat* OR income* OR negative*) | 1,935 | 1,291 |
| ## | ((strateg* OR integrat* OR migrat* OR "music integration") w/25 (tf OR ticketfly)) | 14,985 | 11,185 |
| ## | (((strateg* OR roadmap) w/25 (plan* OR effort* OR schedule)) w/25 (tf OR ticketfly)) | 1,040 | 721 |
| ## | ((tf OR ticketfly) w/25 (ticket* OR generat*)) AND (income OR sales OR grow* OR revenue OR stall* OR level*) | 53,267 | 40,372 |
| ## | ("ebitda" w/25 (loss* OR high* OR impact* OR concern* OR strateg* OR trend* OR miss* OR direction)) AND (tf OR ticketfly) | 2,255 | 1,594 |

*EXHIBIT B*

| ## | Query | | |
|---|---|---|---|
| ## | ("necessary feature" w/20 migrat*) AND (tf OR ticketfly) | 0 | 0 |
| ## | ("non-operating expense" w/25 (loss* OR actual* OR impact* OR high OR concern* OR strateg* OR trend* OR miss* OR direction)) AND (delay* OR integra* OR migrat* OR resource* OR staff* OR divert* OR financ* OR revenue* OR quarter* OR beat* OR income* OR negative*) | 58 | 56 |
| ## | ("operating expenses" w/25 (loss* OR impact* OR actual* OR high* OR concern* OR strateg* OR trend* OR miss* OR direction)) AND (delay* OR integra* OR migrat* OR resource* OR staff* OR divert* OR financ* OR revenue* OR quarter* OR beat* OR income* OR negative*) | 1,740 | 1,300 |
| ## | ("Q&A" w/25 (shareholder* OR investor* OR analys* OR fund*)) AND (delay* OR integra* OR migrat* OR resource* OR staff* OR divert* OR financ* OR revenue* OR quarter* OR beat* OR income* OR negative*) | 491 | 406 |
| ## | ("SEC" w/25 "S-1") AND (draft OR comment* OR amend* OR letter OR correspond*) | 853 | 586 |
| ## | ((churn* OR leave) w/25 (account OR promoter* OR client* OR owner* OR customers OR revenue OR impact)) AND (tf OR ticketfly) | 1,836 | 1,300 |
| ## | (decreas* w/25 (customer* OR "customer base" OR user*)) AND (tf OR ticketfly) | 342 | 227 |
| ## | (earn* w/25 (sale* OR budget* OR memorand* OR slid* OR presentation* OR deck* OR forecast* OR project* OR report* OR expect* OR unexpect*)) AND (ipo OR public OR "initial public offering" OR narwhal OR registration OR "rs" OR "drs" OR narwhal) | 4,587 | 3,812 |
| ## | (((earn* OR expense*) w/25 (slow* OR grow* OR forecast* OR reduc* OR decreas* OR diminish* OR declin* OR fall* OR trend* OR stall* OR level* OR drop* OR "long term")) w/25 (tf OR ticketfly)) | 870 | 601 |
| ## | (few* w/25 (customer* OR client* OR user*)) AND (tf OR ticketfly) | 3,443 | 2,499 |
| ## | (integra* w/25 (mbu OR "music business unit" OR "music team" OR creators OR customers OR client OR owners OR promoters OR tier OR impact OR competit* OR churn* OR strategy* OR retain* OR retent* OR gap*)) AND (tf OR ticketfly) | 4,850 | 3,256 |
| ## | (integrat* w/20 (gap* OR feature* OR tier)) AND (tf OR ticketfly) | 1,572 | 994 |
| ## | ((integrat* w/25 (plan* OR "resource*" OR schedule OR delay OR target* OR business)) w/25 (tf OR ticketfly)) | 2,081 | 1,540 |
| ## | ((integrat* w/25 (platform OR engineering OR product OR marketing OR operations OR trbu OR ("ticketing" w/1 "registration") OR sales)) w/25 (tf OR ticketfly)) | 2,908 | 1,968 |
| ## | ((integrat* w/25 ("timeline" OR "time line" OR schedule)) w/25 (tf OR ticketfly)) | 508 | 419 |
| ## | ((integrat* w/25 (business OR "music team" OR mbu OR "music business unit")) w/25 (tf OR ticketfly)) | 853 | 562 |

| | | | |
|---|---|---|---|
| ## | ((invest* w/25 offer*) w/25 (ipo OR public OR "initial public offering" OR narwhal OR registration OR "rs" OR "drs" OR narwhal OR registration)) AND (delay* OR integra* OR migrat* OR resource* OR staff* OR divert* OR financ* OR revenue* OR quarter* OR beat* OR income* OR negative*) | 2,427 | 2,008 |
| ## | (investor* w/25 (presentation* OR pitch OR "pitch book" OR target* OR report* OR notes* OR (concern*OR risk*) OR files OR meet*)) | 16,039 | 14,060 |
| ## | ((los* w/25 (larg* OR customer* OR user*)) w/25 (tf OR ticketfly)) | 579 | 414 |
| ## | ((margin* w/25 (risk* OR high OR low* OR reduc* OR diminish* OR fall* OR expect* OR unexpect* OR trend* OR miss*)) w/25 (tf OR ticketfly)) | 376 | 256 |
| ## | migrat* AND (anxiety OR distrust* OR doubt* OR suspicion* OR apprehen* OR concern* OR refus* OR worry OR afraid OR resource*) | 9,812 | 7,284 |
| ## | (migrat* w/25 (mbu OR "music business unit" OR "music team" OR creators OR customers OR client OR owners OR promoters OR tier OR strateg* OR phase OR impact OR competit* OR churn*)) AND (tf OR ticketfly) | 7,730 | 5,515 |
| ## | (((migrat* w/25 ("timeline" OR "time line")) OR delay) w/25 (tf OR ticketfly)) | 1,363 | 1,041 |
| ## | ((migrat* w/25 (gap* OR tier OR feature* OR custom*)) w/25 (tf OR ticketfly)) | 3,057 | 2,056 |
| ## | ((migrat* w/25 (assess* OR retain* OR retent*)) w/25 (tf OR ticketfly)) | 285 | 218 |
| ## | (migrat* w/25 (plan* OR "resource*" OR schedule OR process OR propos* OR target*)) AND (mbu OR "music business unit" OR "music team") | 3,160 | 2,136 |
| ## | ((migrat* w/25 (platform OR engineering OR product OR marketing OR operations OR trbu OR ("ticketing" w/1 "registration") OR sales)) w/25 (tf OR ticketfly)) | 4,282 | 2,902 |
| ## | ((platform w/25 (migrat* OR differ* OR plan* OR incorporate* OR propos* OR process* OR delivery OR change* OR resource*)) w/25 (tf OR ticketfly)) | 4,294 | 3,097 |
| ## | ((revenue w/25 (project* OR decreas* OR drop* OR less OR margin* OR stall OR flat OR result)) w/25 (tf OR ticketfly)) | 2,047 | 1,404 |
| ## | (risk* w/25 (investor* OR analys* OR fund* OR view* OR concern* OR miss*)) AND (delay* OR integra* OR migrat* OR resource* OR staff* OR divert* OR financ* OR revenue* OR quarter* OR beat* OR income* OR negative*) | 11,484 | 9,825 |
| | TOTAL | 109,940 | 87,791 |

SERVICE LIST
*Eventbrite,* Class Action Master File No. 19CIV02798
As of May 2020

Co-Lead Counsel for Plaintiffs and the putative class:

FRANCIS BOTTINI
ALBERT CHANG
YURY KOLESNIKOV
BOTTININ & BOTTINI INC.
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
(858) 914-2001
fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

MARK MOLUMPHY
ANYA THEPOT
TYSON REDENBARGER
COTCHETT PITRE & McCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
(650) 697-6000
mmolumphy@cpmlegal.com
tredenbarger@cpmlegal.com
athepot@cpmlegal.com

Attorneys for Defendants:

PATRICK GIBBS                          Eventbrite and Individual Defendants
SHANNON EAGAN
JEFFREY LOMBARD
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5000
pgibbs@cooley.com
seagan@cooley.vom
jlombard@cooley.com

HEATHER SPEERS
COOLEY LLP
4401 Eastgate Mall
San Diego, CA 92121
(858) 550-6000
hspeers@cooley.vom

14

ANNA ERICKSON WHITE                    Underwriter Defendants
ROBERT CORTEZ WEBB
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
(415) 268-7000
AWhite@mofo.com
RWebb@mofo.com

HARRY OLIVAR JR.                       Sequoia Defendants
QUINN EMANUEL URQUHART
      & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, CA  90017
(213) 443-3000
harryolivar@quinnemanuel.com

LINDA BREWER
SHUANG ZHANG
QUINN EMANUEL URQUHART & SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, CA  94111-4788
(415) 875-6600
lindabrewer@quinnemanuel.com
shuangzhang@quinnemanuel.com

ROGER MEAD                             Defendant Tiger Global
FOLGER LEVIN LLP
199 Fremont Street, 20th Floor
San Francisco, CA  94105
(415) 625-1050
rmead@folgerlevin.com

JEFFREY ROBERTSON
PETER WHITE
ALEX WHARTON
SCHULTE ROTH & ZABEL LLP
901  15th Street NW, Suite 800
Washington DC  20005
(202) 729-7476
pete.white@srz.com
jeffrey.robertson@srz.com
alex.wharton@srz.com

15

# EXHIBIT 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IN RE EVENTBRITE, INC. SECURITIES LITIGATION | ) ) ) ) | Master File No. 5:19-cv-02019-EJD |

**DECLARATION OF BJORN I. STEINHOLT, CFA**

**September 23, 2020**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION AND QUALIFICATIONS ................................................................1

II.     OVERVIEW OF ASSIGNMENT ...............................................................................3

III.    POTENTIAL §11 DAMAGES....................................................................................3

IV.     POTENTIAL §10(b) DAMAGES ..............................................................................8

## I.    INTRODUCTION AND QUALIFICATIONS

1.    I am a Managing Director at Caliber Advisors, Inc. ("Caliber"), a full-service valuation and economic consulting firm with offices in San Diego, California and Chicago, Illinois.  Prior to Caliber, I was a founding Principal of Financial Markets Analysis ("FMA"), an economic consulting, valuation and litigation support firm focusing on securities litigation consulting.  Prior to FMA, I was a Vice President and then Principal at Business Valuation Services ("BVS"), a national full-service financial valuation firm that was part of publicly traded CBIZ, Inc. (NYSE: CBZ).  Prior to BVS, I was a Financial Analyst, Vice President and Senior Vice President in the San Diego office of Princeton Venture Research, Inc. ("PVR"), a national investment banking, venture capital and litigation support firm.  Prior to PVR, I was a Graduate Fellow performing investment research at the University of San Diego.

2.    I have approximately 30 years of experience providing capital markets consulting, including analyzing and valuing investments.  Over the past 15 years, I have been retained on numerous occasions to provide expert opinions relating to market efficiency, materiality, loss causation and damages in large and complex securities class actions similar to this litigation.  In *China Intelligent Lighting and Electronics, Inc.*, No. 2:11-cv-02768 (C.D. Cal.), the court entered its judgment based on my aggregate damages estimate.  In *Jaffe v. Household Int'l Inc., et al.*, No. 1:02-cv-05893 (N.D. Ill.), the court adopted my guidance in calculating pre-judgment interest.  In *Novatel Wireless Sec. Litig.*, No. 3:08-cv-01689 (S.D. Cal.), the court undertook a rigorous *Daubert* analysis of every element of my loss causation analysis and damages methodology and found that "Steinholt's testimony on loss causation and damages, based on his event study analysis, is reasonable and reliable."  In *Alan Willis, et al. v. Big Lots, Inc.*, No. 2:12-cv-00604 (S.D. Ohio), the court concluded that "Steinholt has set forth a methodology for later calculating damages on a class-wide basis. . . . and explained how it is both workable and consistent with Plaintiffs' theory

of liability in this particular case," and that my class-wide damages opinion was "both relevant and reliable."

3.    Other courts have similarly found my testimony admissible, including in *New England Health, et al. v. Qwest Comm. Int'l Inc., et al.*, No. 1:01-cv-01451 (D. Colo.); *Employer-Teamsters Joint Council Pension Trust Fund v. America West Holding, et al.*, No. 2:99-CV-399 (D. Ariz.); *Nursing Home Pension Fund et al. v. Oracle Corporation et al.*, No. 3:01-cv-00988 (N.D. Cal.) and *Carson, et al. v. Neopharm Inc, et al.*, No. 1:02-cv-02976 (N.D. Ill.).  Furthermore, several other courts have cited my testimony in support of their decisions, including in *Healthsouth Corp. Sec. Litig.*, No. 2:03-CV-01501 (N.D. Ala.); *Luman v. Anderson, et al.*, No. 4:08-CV-00514 (W.D. Mo.); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, No. 1:08-CV-7508 (S.D.N.Y.); *Smilovits, et al. v. First Solar Inc., et al.*, No. 2:12-cv-00555 (D. Ariz.); *Marcus, et al. v. J.C. Penney Co. Inc., et al.*, No. 6:13-CV-00736 (E.D. Tex.) and *Villella, et al. v. Chemical & Mining Co. of Chile, Inc., et al.* No. 1:15-CV-02106 (S.D.N.Y.).

4.    I received a Master of International Business degree from the University of San Diego and a Bachelor of Science degree in Computer Science and Engineering from California State University, Long Beach.  In addition to my graduate business degree and my engineering degree, I have earned the professional designation of Chartered Financial Analyst ("CFA") awarded by the CFA Institute, and I participate in its continuing education program.  The CFA designation is a qualification for finance and investment professionals focusing on investment management and securities analysis of common stock, fixed income and other investments.  A summary of my background and qualifications is attached as Exhibit A to this report.

5.    The compensation for the work performed in this matter is based on the number of hours worked times each analyst's billable rate.  My billable rate is currently $525 per hour.  My compensation is not contingent on the outcome of this case.

- 2 -

## II.    OVERVIEW OF ASSIGNMENT

6.      I have been retained by Bottini & Bottini, Inc. and Cotchett, Pitre & McCarthy, LLP to analyze and discuss:

- Potential §11 damages for investors who purchased Eventbrite, Inc. ("Eventbrite" or the "Company") Class A common stock traceable to the Company's September 2018 initial public offering ("IPO"), pursuant to the Securities Act of 1933 ("1933 Act").

- Potential §10(b) damages for investors who purchased Eventbrite Class A common stock from September 20, 2018 through May 1, 2019, inclusive (the "Class Period"), pursuant to the Securities Exchange Act of 1934.

7.      For the purpose of my §10(b) damages analysis, I have assumed that the Federal Plaintiffs will be able to prove their factual allegations at trial, as outlined in their October 11, 2019 Amended Class Action Complaint.[1]

## III.    POTENTIAL §11 DAMAGES

8.      Section 11(e) of the 1933 Act provides specific guidance on how to calculate the losses that Plaintiff may seek to recover.  It states:

> The suit authorized under subsection (a) may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.

9.      In this case, the price of Eventbrite's Class A common stock in the IPO was $23.00 per share, and the closing price on the day the first Federal §11 suit was brought (April 15, 2019)

---

[1]      This is consistent with the traditional role of a damages expert.  *Reference Manual on Scientific Evidence: Reference Guide on Estimation of Economic Damages*, 3rd. ed. at 432. ("In almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that it was unlawful.").

- 3 -

was $20.93 per share, a difference of $2.07 per Class A share.[2]  Consequently, the above formula

for the Statutory §11 damages that may be recoverable in the Federal action translates into the

difference between the purchase price (not exceeding the IPO price of $23.00 per Class A share),

minus:

(a)    $20.93 per Class A share, the closing price at the time the first Federal §11 suit was brought, for Eventbrite Class A shares not yet sold (as current Eventbrite trading prices are below $20.93 per Class A share);

(b)    the sale price per Class A share if sold on or prior to April 15, 2019, when the first Federal §11 suit was brought; or

(c)    the greater of: (i) the sale price per Class A share, or (ii) $20.93 per Class A share, if sold after April 15, 2019.[3]

10.    The above statutory formula can be used to calculate the Federal Statutory §11

damages for each individual Class member who can trace their shares to the IPO.  In this case, I

assumed that only Eventbrite IPO shares were eligible to trade and traded from the IPO through

March 18, 2019 (the last day of the lock-up of the Eventbrite non-IPO shares).  Consequently, all

Eventbrite Class A shares purchased in the IPO or on the open market through March 18, 2019

were assumed to be traceable to the IPO.

11.    At this stage, aggregate damages are typically estimated using trading models.

Since trading models can be very sensitive to the assumed share turnover rate, I employed two-

different models with very different share turnover assumptions: (a) the single trader model

---

[2]    As is common in these cases, I will assume that the value of Eventbrite's Class A common stock on April 15, 2019 was equal to its closing price on that day.

[3]    This measure of damages appears to be largely based on the loss causation rationale that, had investors been informed about the alleged misrepresentations, they would not have purchased Eventbrite Class A shares in the Offering, and, thus, not suffered any losses as a result of the decline in the Company's stock price.

("STM")[4] assuming high combined share turnover, and (b) the two-trader model ("TTM")[5] assuming low combined share turnover. According to my analysis, the aggregate Statutory §11 damages in the Federal action are $31.1 million and $32.0 million using the STM and TTM, respectively.[6]

12.    It is my understanding that the Federal plaintiffs have estimated that the statutory §11 damages in their case are a "maximum" of $33.5 million.[7] However, their estimate assumes that all of the Eventbrite Class A shares purchased on the open market through May 1, 2019 were traceable to the IPO (and thereby eligible for §11 damages).[8] I believe that this is an unreasonable assumption. In my opinion, following the expiration of the 180-day lockup, the IPO shares and non-IPO shares would be virtually indistinguishable, making it virtually impossible to trace any shares back to the IPO. That said, had I used the same assumption as the Federal plaintiffs and included all the shares purchased through May 1, 2019 in my damages models, I would have estimated Statutory §11 damages for the Federal action of $43.4 million and $44.2 million using the STM and TTM, respectively.

_____

[4]    The STM assumes that each share has an equal likelihood of being traded.

[5]    The TTM assumes that 20% of the IPO shares (and non-IPO shares after lockup) were owned by high-activity traders and made up 80% of the net volume; while the remaining 80% of the IPO shares (and non-IPO shares after lockup) were owned by low-activity traders and made up the remaining 20% of the net volume.

[6]    All of these potential §11 damages relate to Eventbrite's $2.07 per Class A share price decline from March 8, 2019 through April 15, 2019, mitigated by subsequent rebounds. It is my understanding that the State Court plaintiffs also will argue that all shares purchased during the 25 calendar days following the IPO are eligible for §12(2) damages, *i.e.*, effectively rescission, pursuant to the 1933 Act. If so, my estimate of these damages as of September 18, 2020 are $96.5 million and $109.2 million using the STM and TTM, respectively.

[7]    [Federal] Plaintiffs' Notice of Unopposed Motion for Preliminary Approval of Settlement, dated August 7, 2020, at 11.

[8]    *Id.*

- 5 -

13.     The §11 damages analysis for the State Court action is different than the analysis for the Federal action (discussed above) because the State Court plaintiffs did not file their initial §11 suit until May 24, 2019, when the closing price was much lower (or $16.14 per Class A share when the first State Court suit was filed as opposed to $20.93 per Class A share at the time of the initial Federal suit).  As a result, the difference between the IPO price and price when the first suit was filed is $6.86 per Class A share in the State Court action (compared to only $2.07 per share in the Federal action).  Consequently, the Statutory §11 damages that may be recoverable in the State Court action translates into the difference between the purchase price (not exceeding the IPO price of $23.00 per Class A share), and:

(a)     $16.14 per Class A share, the closing price at the time the first State Court §11 suit was brought, for Eventbrite Class A shares not yet sold (as current Eventbrite trading prices are below $16.14 per Class A share);

(b)     the sale price per Class A share if sold on or prior to May 24, 2019, when the first Federal §11 suit was brought; or

(c)     the greater of: (i) the sale price per Class A share, or (ii) $16.14 per Class A share, if sold after May 24, 2019.

14.     Using the same trading models as above, the aggregate Statutory §11 damages in the State Court action are $67.2 million and $73.4 million using STM and TTM, respectively.  This is more than twice that of the Statutory §11 damages in the Federal action and is solely the result of the lower value at the time the first State Court suit was filed.[9]

15.     It should be noted that Section 11(e) of the 1933 Act specifically provides Defendants with an opportunity to reduce (or eliminate) the losses calculated above by proving that a portion (or all) of the decline in Eventbrite's stock price was caused by factors other than

---

[9]     Attached as Exhibit B is a graph showing Eventbrite's daily closing prices versus the §11 limitations (Purchase price limit: $23 IPO price; and sales price limit: $20.93 per Class A share for the Federal plaintiffs and $16.14 per Class A share for the State Court plaintiffs).

the alleged misrepresentations and/or omissions.[10]  This concept is also commonly referred to as

negative causation.[11]  Section 11(e) states:

> Provided, That if the defendant proves that any portion or all of such damages
> represents other than the depreciation in value of such security resulting from such
> part of the registration statement, with respect to which his liability is asserted, not
> being true or omitting to state a material fact required to be stated therein or
> necessary to make the statements therein not misleading, such portion of or all such
> damages shall not be recoverable.

16.     Based on my preliminary review of Eventbrite's stock price performance, it does

not appear that any, or at least not a material portion, of the decline in the Company's stock price

following March 8, 2019 through May 24, 2019, was caused by "other" factors.  During this time

period, Eventbrite's stock price declined approximately 34% from a closing price of $24.46 per

Class A share on March 8, 2019 to a closing price of $16.14 per Class A share on May 24, 2019,

or a decline of $8.32 per Class A share (greater than the $6.86 per share difference between the

IPO price and May 24, 2019 closing price).  In contrast, the S&P 500 index and the S&P North

American Technology Sector index both increased more than 3%.[12]  Furthermore, according to the

Federal plaintiffs' Plan of Allocation, $6.47 per Class A share of the price decline on May 2, 2019

---

[10]     Reducing recoverable damages by the portion of Eventbrite's price decline attributable to factors other than the alleged misrepresentations, or negative causation, appears to be based on the rationale that investors assumed the risks of such other factors (for example, market and industry factors), and that even if the representations in Eventbrite's Registration Statement had been true, the investors would have suffered these losses related to these other unrelated factors.

[11]     Negative causation is in many respects the flip side of the legal concept of loss causation, or proof that a misrepresentation caused an economic loss.  Generally, to establish loss causation, the disclosed information "must reflect part of the 'relevant truth' – the truth obscured by the fraudulent statements." *Flowserve*, 572 F.3d at 230.

[12]     In its 2018 Form 10-K, Eventbrite selected the S&P 500 index and the S&P North American Technology Sector index as its market and industry index for purposes of measuring its common stock price performance.  For my purposes, I will use the same indices.

- 7 -

allegedly caused by the alleged misrepresentations was by itself almost as large as the $6.86 per share difference between the IPO price and May 24, 2019 closing price.[13]

## IV.   POTENTIAL §10(b) DAMAGES

17.   In contrast to the above framework, §10(b) damages are generally based on the fraud-related price declines that plaintiffs can prove was caused by some disclosure of the alleged fraud.  The Federal plaintiffs' Plan of Allocation is a reasonable approximation of how §10(b) damages would have been calculated had this case gone to trial, assuming the Federal plaintiffs were only able to establish loss causation for the March 8, 2019 and May 2, 2019 price declines. For my purposes, I will accept the Federal plaintiffs' per share analysis of the potential §10(b) damages reflected in their proposed Plan of Allocation.  In other words, I will assume that the inflation from the IPO through March 7, 2019 was $14.42 per Class A share, and from March 8, 2019 through May 1, 2019 was $6.47 per Class A share, limited by the 90-day lookback.[14] Attached as Exhibit C is a chart showing Eventbrite's stock price, its implied value and the average 90-day closing prices following the Class Period.

18.   Using the same trading models as discussed above, I calculated potential aggregate §10(b) damages to be $163 million and $206.2 million using the TTM and STM, respectively.  The difference between these two damages estimates is primarily that the low turnover TTM results in only 20.2 million unique damaged Class A shares, while the high turnover STM results in 23.9 million unique damaged shares.  Given that we know that: (a) 11.5 million Class A shares were

---

[13]    [Federal Plaintiffs'] Notice of Pendency and Proposed Settlement of Class Action, dated August 7, 2010, at 6-7.

[14]    The 90-day lookback rule simply limits the recoverable damages to (a) the purchase price per share less the average closing price from May 2, 2019 through the day of the sale, if sold prior to July 31, 2019, or (b) the purchase price less $16.81 per share (90-day average closing price after the Class Period) if still retained at the end of July 30, 2019.  1995 Act, Sec. 21D(e).

issued in the IPO, (b) almost 3 million Class A shares were sold short at the end of the Class Period, (c) at least 21 million shares were converted from Class B to Class A shares (presumably to be sold on the open market following the expiration of the lockup), for a total of at least 35.5 million Class A shares, there is a distinct possibility that both of the models I use above significantly underestimate §10(b) damages in this particular case. Consequently, if I was a consultant to the Federal plaintiffs, I would have recommended obtaining additional information from the Company on the shareholders who converted their shares, prior to agreeing on a settlement.

19.     According to the Federal plaintiffs, their "maximum" §10(b) damages are $121.9 million.[15] This is significantly lower than any reasonable range I can replicate, and may be a result of the Federal plaintiffs ignoring the millions of known shares purchased by Class members from short sellers[16] and the tens of millions of additional Eventbrite Class A shares known to have become freely tradeable following the 180-day lockup.

Respectfully submitted,

Bjorn I. Steinholt, CFA

---

[15]    [Federal] Plaintiffs' Notice of Unopposed Motion for Preliminary Approval of Settlement, dated August 7, 2020, at 11.

[16]    It should be noted that zero damages were calculated for the short sellers themselves as they are not part of the Class. However, Class members who purchased Eventbrite Class A shares on the open market that were sold by the short sellers are included.

# EXHIBIT A

# Bjorn I. Steinholt, CFA

**Caliber Advisors, Inc.**
10620 Treena Street, Suite 230, San Diego, CA 92131
Telephone: (858) 549-4900   •   Facsimile: (858) 549-9317
Bjorn@CaliberAdvisors.com

## Employment History

**Caliber Advisors, Inc.**
*Managing Director* (2014 to present)

Caliber Advisors is a full-service valuation and economic consulting firm.  Mr. Steinholt provides a broad range of capital markets consulting, including financial and economic analyses relating to mergers and acquisitions, initial public offerings, fairness opinions, structured finance, portfolio risk management, market structure, securities analysis and financial valuations, including litigation consulting and expert testimony relating to the economic issues that arise in large complex securities fraud cases.

**Financial Markets Analysis, LLC**
*Principal* (2000 to 2014)

Financial Markets Analysis was a financial valuation and economic consulting firm that primarily focused on providing economic analyses and expert testimony relating to securities analysis and financial economics.  Mr. Steinholt provided capital markets consulting, financial valuation services, and various litigation consulting and expert testimony in large complex securities fraud cases.

**Business Valuation Services, Inc. (subsidiary of CBIZ, Inc.)**
*Principal* (1999 -2000)
*Vice President* (1998-1999)

Business Valuation Services was a national full-service financial valuation firm.  Mr. Steinholt provided valuations of businesses and financial securities, including common stock, warrants, options, preferred stock, debt instruments and partnership interests, as well as intangible assets such as patents, trademarks, software, customer lists, work-force and licensing agreements.  Mr. Steinholt also provided litigation support in shareholder disputes.

**Princeton Venture Research, Inc.**
*Senior Vice President* (1996-1998)
*Vice President* (1993-1996)
*Financial Analyst* (1990-1993)

Princeton Venture Research was a venture capital, investment banking and economic consulting firm. Mr. Steinholt provided various financial and economic analyses for venture capital, investment banking and consulting assignments, including shareholder disputes. Among other things, he helped identify and evaluate prospective emerging technology companies in need of venture capital funding.

**University of San Diego**
*Research Assistant, Graduate Fellow* (1988-1989)

Mr. Steinholt assisted with research regarding the performance of international equity markets following the 1987 stock market crash. He also developed computer programs related to the portfolio theory, including risk minimization and portfolio optimization based on quadratic programming techniques.

### Educational Background

- **Chartered Financial Analyst**
  CFA Institute, 1997

- **Master of International Business**
  University of San Diego, 1989

- **Sivilingeniør** - (Norwegian graduate level engineering designation)
  University of Trondheim, Norway, 1987

- **Bachelor of Science in Computer Science,
  Computer Science and Engineering**
  California State University, Long Beach, 1987

### Professional Affiliations

- **Member, CFA Institute**

- **Member, Financial Analysts Society of San Diego**

*Bjorn Steinholt, CFA*                                                Page   2

## Publications

"Price Impact Analysis – Where The Halliburton Court Erred," Expert Analysis Section, *Law360* (August 25, 2015).

## Testimony

*In re: New England Health, et al v. Qwest Comm Intl Inc, et al.,* Case No. 1:01-cv-01451 (United States District Court for the District of Colorado).  QwestDex Hearing Testimony relating to Section 11 damages: January 28, 2003.  Mr. Steinholt was retained to opine on potential Section 11 damages.

*In re: King, et al v. CBT Group PLC, et al.,* Case No. 98-CV-21014 (United States District Court, Northern District of California, San Jose Division).   Deposition Testimony: November 5, 2003.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Employer-Teamsters Joint Council Pension Trust Fund v. America West Holding, et al.,* Case No. 99-CV-399 (United States District Court, District of Arizona).  Deposition Testimony: October 28, 2004.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Howard Yue vs. New Focus,* Case No. CV808031 (Superior Court of the State of California, County of Santa Clara).  Deposition Testimony: July 28, 2005.  Mr. Steinholt was retained to opine on the potential damages and other economic issues relating to the defendants' acquisition of Globe Y.Technology, Inc.

*In re: Howard Yue vs. New Focus,* Case No. CV808031 (Superior Court of the State of California, County of Santa Clara).  Deposition Testimony: August 9, 2005.  Mr. Steinholt was retained to opine on the potential damages and other economic issues relating to the defendants' acquisition of Globe Y.Technology, Inc.

*In re: AB Liquidating Corp., fka Adaptive Broadband Corporation v. Ernst & Young, LLP* (American Arbitration Association).  Arbitration, March 23, 2006.  Mr. Steinholt was retained to analyze the share turnover in Adaptive Broadband Corporation in connection with the liquidation of the company's assets.

*In re: AOL Time Warner, Inc. Securities and "ERISA" Litigation, Consolidated Opt-Out Action*, Case No. 1:06-cv-00695 (United States District Court, Southern District of New York).  Deposition Testimony: September 28, 2006.  Mr. Steinholt was retained to opine on materiality and loss causation in a Section 11 context.

*Bjorn Steinholt, CFA*                                                                              Page    3

*In re: Ohio Public Employees Retirement System vs. Richard Parsons, et al.,* Case No. 03-CVH07-7932 (Court of Common Pleas of Franklin County, Ohio). Deposition Testimony: March 22, 2007. Mr. Steinholt was retained to quantify Section 11 damages for various institutional investors.

*In re: Ryan v. Flowserve Corporation et al.,* Case No. 3:03-cv-01769 (United States District Court, Northern District of Texas, Dallas Division). Deposition Testimony: June 15, 2007. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Nursing Home Pension Fund et al v. Oracle Corporation et al.,* Case No. 3:01-cv-00988 (United States District Court, Northern District of California). Deposition Testimony: July 2, 2007. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: Carson, et al v. Neopharm Inc, et al.,* Case No. 1:02-cv-02976 (United States District Court, Northern District of Illinois, Eastern Division). Deposition Testimony: January 22, 2008. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*In re: HealthSouth Corporation Securities Litigation*, Case No. 2:03-cv-01501-S (United States District Court, Northern District of Alabama, Southern Division). Deposition Testimony: February 1, 2008. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality and loss causation.

*In re: Robert Kelleher, et al. v. ADVO, Inc., et al.*, Case No. 3:06-cv-01422 (United States District Court, District of Connecticut). Deposition Testimony: September 16, 2008. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality and loss causation in a class certification context.

*In re: HealthSouth Corporation Securities Litigation*, Case No. 2:03-cv-01501-S (United States District Court, Northern District of Alabama, Southern Division). Deposition Testimony: January 30, 2009. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality and loss causation.

*In re: Huffy Corporation Securities Litigation*, Case No. 3:05-cv-00028 (United States District Court, Southern District of Ohio, Western Division (at Dayton)). Deposition Testimony: November 12, 2009. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and potential damages for lead plaintiff.

*Lori Weinrib v. The PMI Group, Inc. et al.*, Case No. 3:08-cv-01405, (United States District Court for the Northern District of California).  Deposition Testimony: June 14, 2010.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*Kenneth McGuire, et al. v. Dendreon Corporation, et al.*, Case No. 2:07-cv-00800 (United States District Court, Western District of Washington at Seattle).  Deposition Testimony: June 18, 2010.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*City of Livonia Employees' Retirement System v. The Boeing Company et al.*, Case No. 1:09-cv-07143, (United States District Court, Northern District of Illinois, Eastern Division).  Deposition Testimony: November 5, 2010.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*Maureen Backe, et al. v. Novatel Wireless, Inc., et al.*, Case No.08-cv-1689 (United States District Court, Southern District of California).  Deposition Testimony: February 1, 2011.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Paul Luman, et al. v. Paul G. Anderson, et al.* (*FCStone Group Securities Litigation*), Case No. 4:08-cv-00514 (United States District Court, Western District of Missouri, Western Division).  Deposition Testimony: January 5, 2012.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*T Grocery & Food Employees Welfare Fund v. Regions Financial Corporation et al.*, Case No. 2:10-cv-02847 (United States District Court, Northern District of Alabama).  Deposition Testimony: May 8, 2012.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*City of Pontiac General Employee's Retirement System v. Lockheed Martin Corporation et al.*, Case No. 1:11-cv-05026, (United States District Court, Southern District of New York).  Deposition Testimony: May 18, 2012.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*United Food and Commercial Workers Union et al v. Chesapeake Energy Corporation et al.*, Case No. 5:09-cv-01114 (United States District Court, Western District of Oklahoma).  Deposition Testimony: August 14, 2012.  Mr. Steinholt was retained to opine on loss causation in a Section 11 context.

*City of Pontiac General Employee's Retirement System v. Lockheed Martin Corporation et al.*, Case No. 1:11-cv-05026, (United States District Court, Southern District of New York). Deposition Testimony: October 4, 2012. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Western Pennsylvania Electrical Employees Pension Fund, et al. v. Dennis Alter, et al.*, (*Advanta International Inc. Securities Litigation*) Case No. 2:09-cv-04730 (United States District Court, Eastern District of Pennsylvania). Deposition Testimony: May 1, 2013. Mr. Steinholt was retained to opine on economic issues relating to market efficiency in a class certification context.

*Southern Avenue Partners LP v. The Perot Family Trust et al.*, (*Parkcentral Global Litigation*) Case No. 3:09-cv-00765 (United States District Court, Northern District of Texas, Dallas Division). Deposition Testimony: May 6, 2013. Mr. Steinholt was retained to opine on the calculation of potential damages.

*Maureen Backe, et al. v. Novatel Wireless, Inc., et al.*, Case No. 08-cv-1689 (United States District Court, Southern District of California). Deposition Testimony: June 25, 2013. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Garden City Employees' Retirement System v. Psychiatric Solutions, Inc. et al.*, Civil Action No. 3:09-cv-00882 (United States District Court, Middle District of Tennessee, Nashville Division). Deposition Testimony: June 6, 2014. Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc. et al.*, Case No. 12-cv-05162 (United States District Court, Western District of Arkansas (Fayetteville)). Deposition Testimony: November 9, 2015. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Alan B. Marcus, et al. v. J.C. Penney Company, Inc., et al.*, Case No. 13-CV-00736 (United States District Court, Eastern District of Texas (Tyler Division)). Deposition Testimony: March 4, 2016. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Basis Yield Alpha Fund (Master) v. Goldman Sachs Group, Inc., et al.*, Index No: 652996/2011 (Supreme Court of the State of New York, County of New York). Deposition Testimony: April 1, 2016. Mr. Steinholt was retained to analyze loss causation related to two CDO-squared securities purchased by Basis Yield Alpha Fund (Master) from Goldman Sachs.

*Bjorn Steinholt, CFA*                                                      Page   6

*John Sender v. Franklin Resources, Inc.*, Case No. 11-cv-03828 (United States District Court, Northern District of California). Deposition Testimony: June 17, 2016. Mr. Steinholt was retained to analyze ERISA damages related to plaintiff's participation in defendant's Employee Stock Ownership Plan.

*Alan Willis, et al. v. Big Lots, Inc., et al.*, Case No. 12-CV-00604 (United States District Court, Southern District of Ohio (Columbus)). Deposition Testimony: July 21, 2016. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*In re: Beaver County Employees Retirement Fund vs. Cyan, Inc., et al.,* Lead Case No. CGC-14-538355 (Superior Court of the State of California, County of San Francisco). Deposition Testimony: October 14, 2016. Mr. Steinholt was retained to opine on potential damages pursuant to §§11 and 12 of the Securities Act of 1933.

*In Re Willbros Group, Inc. Securities Litigation*, Case No. 14-CV-3084 (United States District Court, Southern District of Texas, Houston Division). Deposition Testimony: April 14, 2017. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Shankar v. Imperva, Inc. et al.*, Case No. 14-cv-01680 (United States District Court, Northern District of California (Oakland)). Deposition Testimony: May 5, 2017. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Glitz et al. v. Sandridge Energy Inc et al.*, Case No. 12-cv-01341 (United States District Court, Western District of Oklahoma). Deposition Testimony: May 3, 2018. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Gary Curran, et al. v. Freshpet, Inc., et al.*. Case No. 16-cv-02263 (United States District Court, District of New Jersey). Deposition Testimony: July 25, 2018. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Megan Villella , et al. v. Chemical & Mining Co. of Chile, Inc., et al.*, Case No. 15-cv-02106 (United States District Court, Southern District of New York). Deposition Testimony: November 9, 2018. Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Glitz et al. v. Sandridge Energy Inc et al.*, Case No. 12-cv-01341 (United States District Court, Western District of Oklahoma).  Deposition Testimony: June 12, 2019.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

*Gary Curran, et al. v. Freshpet, Inc., et al..* Case No. 16-cv-02263 (United States District Court, District of New Jersey).  Deposition Testimony: June 27, 2019.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency, materiality, loss causation and Section 10(b) and Section 11 damages.

*Scheufele et al v. Tableau Software, Inc. et al.*, Case No. 17-cv-05753 (United States District Court, Southern District of New York).  Deposition Testimony: September 24, 2019.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Douglas S. Chabot, et al. v. Walgreens Boots Alliance, Inc., et al.*, Case No. 18-cv-02118 (United States District Court, Middle District of Pennsylvania).  Deposition Testimony: October 11, 2019.  Mr. Steinholt was retained to opine on economic issues relating to market efficiency and the calculation of class-wide damages in a class certification context.

*Jon D. Gruber, et al. v. Dakota Plains Holdings, Inc., et al.*, Case No. 16-CV-09727 (United States District Court, Southern District of New York).  Deposition Testimony: July 2, 2020.  Mr. Steinholt was retained to opine on economic issues relating to materiality, loss causation and Section 10(b) damages.

 *Scheufele et al v. Tableau Software, Inc. et al.*, Case No. 17-cv-05753 (United States District Court, Southern District of New York).  Deposition Testimony: July 28, 2020.  Mr. Steinholt was retained to opine on opine economic issues relating to market efficiency, materiality, loss causation and Section 10(b) damages.

# EXHIBIT B

**Exhibit B**
Eventbrite Closing Prices and the §11 Limitations
From IPO through May 18, 2020



# EXHIBIT C



**Exhibit C**
Eventbrite §10(b) Analysis
Class Period: IPO through May 1, 2019