# Exhibit 2

FILED
By Superior Court of California, County of San Mateo
ON    2/10/2020
By    /s/ Jennifer Tannous
Deputy Clerk

**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
fbottini@bottinilaw.com
Albert Y. Chang (SBN 296065)
achang@bottinilaw.com
Yury A. Kolesnikov (SBN 271173)
ykolesnikov@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002

**COTCHETT, PITRE & McCARTHY, LLP**
Mark C. Molumphy (SBN 168009)
mmolumphy@cpmlegal.com
Tyson Redenbarger (SBN 294492)
tredenbarger@cpmlegal.com
Anya Thepot (SBN 318430)
athepot@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:    (650) 697-6000
Facsimile:    (650) 697-0577

*Lead Counsel for Plaintiffs*
[Additional counsel appear on signature page.]

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SAN MATEO**

| | |
|---|---|
| IN RE EVENTBRITE, INC. SECURITIES LITIGATION<br><br>This Document Relates To:<br>ALL ACTIONS | Lead Case No. 19CIV02798<br>(consolidated with No. 19CIV02911 & No. 19CIV04924)<br><br>Class Action<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Assigned for all purposes to the Honorable Marie S. Weiner in Department 2<br><br>Date action filed:  May 21, 2019 |

**CONDITIONALLY LODGED UNDER SEAL**

**Pursuant to the Stipulation and Protective Order Regarding Confidential Information dated September 17, 2019, Plaintiffs hereby lodge the enclosed document under seal. Plaintiffs have informed Defendants that the enclosed document has been conditionally lodged under seal and will be placed in the public court file upon expiration of ten (10) business days, absent the filing of a motion to seal pursuant to Rule 2.551(b) or Court order.**

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**Table of Contents**

NATURE OF THE ACTION ........................................................................................................3

JURISDICTION AND VENUE ..................................................................................................6

THE PARTIES.............................................................................................................................6

      A.     Plaintiffs................................................................................................................6

      B.     Eventbrite and the Individual Defendants...........................................................7

      C.     Sequoia Capital and Tiger Global Management....................................................9

      D.     The Underwriter Defendants...............................................................................11

      E.     Doe Defendants...................................................................................................14

SUBSTANTIVE ALLEGATIONS ............................................................................................15

      A.     Background of the Company and Its Business .....................................................15

      B.     Background of Eventbrite's Corporate and Board Structure...............................16

      C.     Acquisition of Ticketfly.......................................................................................17

      D.     Eventbrite Plans and Conducts the IPO ..............................................................22

      E.     The Offering Documents Contained False and Misleading Statements and Omitted Material Information.........................................................................24

      F.     Eventbrite Reported Disappointing Financial Results and Reveals Integration Issues With Ticketfly Will Continue to Negatively Impact the Company's Growth Rate............................................................................43

CLASS ACTION ALLEGATIONS ...........................................................................................45

FIRST CAUSE OF ACTION

Violation of § 11 of the Securities Act .....................................................................................47

SECOND CAUSE OF ACTION

Violation of § 12(a)(2) of the Securities Act ............................................................................48

THIRD CAUSE OF ACTION

Violation of § 15 of the Securities Act .....................................................................................50

PRAYER FOR RELIEF .............................................................................................................51

DEMAND FOR JURY TRIAL ..................................................................................................52

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Crystal L. Clemons, William Consugar, and Cristina Cotte ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following upon personal knowledge as to those allegations concerning themselves, and upon information and belief as to all other matters, based on the investigation conducted by counsel, which included, among other things, a review and analysis of filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, and other public statements, securities analyst and media reports, and other publicly-available information. Plaintiffs' investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, Defendants (defined below). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a further opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons and entities who purchased or acquired shares of Eventbrite, Inc. ("Eventbrite" or the "Company") pursuant or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's initial public offering ("IPO") on September 20, 2018.  Plaintiffs bring this action under §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act") against: (1) Eventbrite; (2) certain of the Company's officers and directors; (3) Sequoia Capital and Tiger Global Management, who were early and significant investors in Eventbrite and parties to an investor rights agreement that gives them significant rights as shareholders, enabled them to control certain aspects of the IPO, and allowed them to exercise a certain amount of control over Eventbrite; and (4) the investment banks that acted as underwriters for the IPO.

2.      Eventbrite provides an online ticketing platform that enables event "creators" to plan, promote, and produce live events.  In September 2017, Eventbrite acquired Ticketfly, LLC ("Ticketfly") from Pandora Media, Inc. for approximately $200 million, reportedly to expand the Company's solutions for music-related events.  After purchasing Ticketfly, Eventbrite began the process of integrating the Ticketfly platform into the Eventbrite platform because Eventbrite wanted to vertically integrate the services, which was essential to Eventbrite's growth.

3

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

3.      On September 20, 2018, Eventbrite conducted its IPO.  In the IPO, Eventbrite sold 11.5 million shares of Class A common stock to the public at a price of $23.00 per share, for total proceeds of over $246 million, net of underwriting discounts and commissions.  The underwriters were paid commissions of $18,515,000 for their services performed in connection with the IPO.

4.      Following the IPO, Eventbrite's stock price reached as high as $37.96 on September 28, 2018 and settled at around $31 for much of the following six months.  Since that time, however, the Company's stock price has fallen sharply due to the Company's disappointing financial results and the revelation that the integration of Ticketfly is taking longer than expected and will continue negatively impacting the Company's revenues for the foreseeable near future.

5.      On September 20, 2018, Eventbrite filed its Prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement.  The Registration Statement and the Prospectus (together, the "Offering Documents") contained materially false and misleading statements and omitted material information about the Company's business, operations, and prospects.  For example, the Offering Documents failed to disclose that the Company's migration of the Ticketfly platform and customers was progressing slower than expected. The Company was already experiencing fundamental problems integrating the Ticketfly platform in its own platform, given the starkly different approaches taken by each company with regard to ticketing and customer support.  The Offering Documents also failed to disclose that the delayed integration of the two platforms was likely to, and did, negatively affect the Company's revenue and growth. The Offering Documents also failed to disclose that Eventbrite's core business was already slowing because Eventbrite redirected its resources toward completing the "all hands on deck" project of integrating Ticketfly and diverted its resources away from other projects.  In doing so, Eventbrite diverted necessary money and resources from other profitable aspects of the company and focused those resources instead on the Ticketfly integration, all of which was likely to, and did, negatively affect the Company's revenues.

6.      Additionally, the Offering Documents included misleading projections about future growth, specifically, that the Company would continue to beat prior revenues and continue its growth.  Internally, however, executives knew that beating prior revenues and continued growth

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

was highly unlikely, due to a hacking incident, the failed Ticketfly integration, and the growth strategy based primarily on acquisitions. In fact, in July of 2018, just months before the IPO, Randy Befumo, the CFO and chief strategy officer at Eventbrite, identified numerous concerns regarding the Company's present and future revenue. Instead of disclosing the likely and inevitable reductions in revenue and slowed growth in the Offering Documents, insiders manipulated the Company's accounting and projections in order to promote the Company as profitable and growing. One misleading statement involved Eventbrite promoting "organic growth" in order to claim the Company was experiencing positive growth. However, this statement was very misleading because "organic" growth at Eventbrite traditionally resulted in little to no revenue. In addition, the Offering Documents misrepresented the widespread integration and migration problems. This omission was material because Eventbrite knew that its financial success depended, at least in part, on the successful completion of these processes. Numerous internal documents prove that Eventbrite knew that they could not beat prior earnings and that growth would slow or stop, in part due to the Ticketfly issues. Yet, Eventbrite failed to report those known facts in the Offering Documents.

7. On March 7, 2019, Eventbrite announced its disappointing financial results for the fourth quarter of 2018. The Company reported increased losses for the year, despite increased revenues, and reduced its guidance for the first quarter of 2019, forecasting revenues between $80 million and $84 million, well below the analyst consensus target of $91 million. On this news, the Company's stock price fell $7.96 per share, or over 24%, closing at $24.46 per share on March 8, 2019.

8. On May 1, 2019, Eventbrite released its earnings results for the first quarter of 2019. The Company reported a loss of $10 million, or 13 cents per share, compared with the net income of $9 million a year before. Revenue totaled $81.3 million, missing expectations that forecasted a loss of 8 cents a share on revenue of $83.1 million. The Company also issued revenue guidance of $74 million to $78 million, well below analysts' expected revenue of $82.4 million, for the second quarter of 2019. In addition, the Company announced that it would search for a new chief financial officer ("CFO") to replace defendant Randy Befumo, who became chief strategy officer

5

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

and continued in his role as Eventbrite's interim CFO until his replacement was appointed. Following these revelations, Eventbrite's stock price tumbled nearly 30% to close at $16.93 on May 2, 2019, when this action commenced.

9.     By this action, Plaintiffs, individually on behalf of themselves and on behalf of the other members of the Class (defined below) that also acquired shares of Eventbrite pursuant or traceable to the Registration Statement for the IPO, seek to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

10.     Defendants are each strictly liable for such misstatements and omissions therefrom in their capacities as control persons of Eventbrite, signers of the Registration Statement, and/or as an issuer, statutory seller, offeror, and/or underwriter of the shares sold pursuant to the Offering Documents.  Plaintiffs expressly disclaim any allegation that could be construed as alleging fraud or intentional conduct.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to Article VI of the California Constitution and Sections 10 and 22 of the Securities Act, 15 U.S.C. § 77v.

12.     Removal is barred under Section 22 of the Securities Act, 15 U.S.C. § 77v.

13.     This Court has personal jurisdiction over each defendant named herein because each defendant resided in, was a citizen of, and/or conducted business in California at the time of the conduct that is alleged in this complaint, and each defendant has sufficient minimum contacts with California to render the exercise of jurisdiction by the California courts permissible under the traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court because many of the Defendants reside in this County, including defendants Botha, Norrington, and Tomlinson, and defendant Sequoia Capital's principal place of business is located in this County.

## THE PARTIES

A.     **Plaintiffs**

15.     Plaintiff Crystal L. Clemons purchased shares of Eventbrite's Class A common stock that were issued in the IPO and pursuant and traceable to the Offering Documents and was

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

damaged thereby.

16.   Plaintiff William Consugar purchased shares of Eventbrite's Class A common stock that were issued in the IPO and pursuant and traceable to the Offering Documents and was damaged thereby.

17.   Plaintiff Cristina Cotte purchased shares of Eventbrite's Class A common stock that were issued in the IPO and pursuant and traceable to the Offering Documents and was damaged thereby.

**B.   Eventbrite and the Individual Defendants**

18.   Defendant Eventbrite, Inc. is a Delaware corporation with its principal place of business located at 155 5th Street, 7th Floor, San Francisco, California 94103.  Eventbrite's Class A common stock trades on the New York Stock Exchange under the symbol "EB."

19.   Defendant Julia Hartz ("J. Hartz") is Eventbrite's co-founder, Chief Executive Officer ("CEO"), and a director and has held these positions at all relevant times.  J. Hartz signed Eventbrite's Registration Statement and authorized or approved the Offering Documents that Eventbrite filed with the SEC in connection with the IPO.  J. Hartz was involved in drafting, reviewing, and/or approving the Offering Documents and thereby solicited Plaintiffs and other Class members to purchase Eventbrite shares motivated at least in part by her own financial interest and/or the financial interest of the Company.  As of the IPO, J. Hartz beneficially owned over 11.6 million shares of the Company's Class B stock, which was convertible at any time into shares of Class A common stock on a share-for-share basis.

20.   Defendant Kevin Hartz ("K. Hartz") is Eventbrite's co-founder and Chairman of the Board and has held these positions at all relevant times.  K. Hartz signed Eventbrite's Registration Statement and authorized or approved the Offering Documents that Eventbrite filed with the SEC in connection with the IPO.  K. Hartz was involved in drafting, reviewing, and/or approving the Offering Documents and thereby solicited Plaintiffs and other Class members to purchase Eventbrite shares motivated at least in part by his own financial interest and/or the financial interest of the Company.  As of the IPO, K. Hartz beneficially owned over 11.6 million shares of the Company's Class B stock, which was convertible at any time into shares of Class A

7

common stock on a share-for-share basis.

21.   Defendant Randy Befumo is Eventbrite's interim CFO and chief strategy officer and was Eventbrite's CFO at all relevant times.  Befumo signed or authorized the signing of Eventbrite's Registration Statement and authorized or approved the Offering Documents that Eventbrite filed with the SEC in connection with the IPO.  Befumo was involved in drafting, reviewing, and/or approving the Offering Documents and thereby solicited Plaintiffs and other Class members to purchase Eventbrite shares motivated at least in part by his own financial interest and/or the financial interest of the Company.  Befumo beneficially owned over 48,000 shares of Series G preferred stock, which automatically converted into common stock immediately prior to the closing of the IPO, on an approximate 1:1.0685 basis.  He also beneficially owned over 679,000 shares of Class B common stock (convertible to Class A common stock) pursuant to stock options issued in 2014-2017 with exercise prices between $5.04 and $7.69 per share.  As of the IPO, those stock options immediately became "in the money" with an intrinsic value of over $11.3 million.

22.   Defendant Samantha Harnett was, at all relevant times, Senior Vice President and General Counsel of Eventbrite.  Harnett participated in the preparation of the Registration Statement and Prospectus and was designated as the Attorney-in-Fact for Eventbrite's officers and directors in the Registration Statement.  Harnett was involved in drafting, reviewing, and/or approving the Offering Documents and thereby solicited Plaintiffs and other Class members to purchase Eventbrite shares motivated at least in part by her own financial interest and/or the financial interest of the Company.  Harnett beneficially owned approximately 228,000 shares of Class B common stock (convertible to Class A common stock) pursuant to stock options issued in 2016-2017 with exercise prices between $6.79 and $7.24 per share.  As of the IPO, those stock options immediately became "in the money" with an intrinsic value of over $3.6 million.

23.   Defendant Roelof Botha is a director of Eventbrite and member of the audit committee and has been at all relevant times.  Defendant Botha is also a managing member of Sequoia Capital.  Botha signed Eventbrite's Registration Statement and authorized or approved the Offering Documents that Eventbrite filed with the SEC in connection with the IPO.  Botha is a resident of San Mateo County, California.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

24.   Defendant Andrew Dreskin was, at all relevant times, a director of Eventbrite. Dreskin was Ticketfly's co-founder and CEO from January 2008 to September 2017, when it was acquired by Eventbrite.   Dreskin signed Eventbrite's Registration Statement and authorized or approved the Offering Documents that Eventbrite filed with the SEC in connection with the IPO.

25.   Defendant Katherine August-deWilde is a director of Eventbrite and has been at all relevant times.   August-deWilde signed Eventbrite's Registration Statement and authorized or approved the Offering Documents that Eventbrite filed with the SEC in connection with the IPO.

26.   Defendant Sean Moriarty is a director of Eventbrite and has been at all relevant times.   Moriarty signed Eventbrite's Registration Statement and authorized or approved the Offering Documents that Eventbrite filed with the SEC in connection with the IPO.

27.   Defendant Lorrie M. Norrington is a director of Eventbrite and member of the audit committee at all relevant times.   Norrington signed Eventbrite's Registration Statement and authorized or approved the Offering Documents that Eventbrite filed with the SEC in connection with the IPO.   Norrington is a resident of San Mateo County, California.

28.   Defendant Helen Riley is a director of Eventbrite and has been at all relevant times. Riley signed Eventbrite's Registration Statement and authorized or approved the Offering Documents that Eventbrite filed with the SEC in connection with the IPO.

29.   Defendant Steffan C. Tomlinson is a director of Eventbrite and member of the audit committee at all relevant times.   Tomlinson signed Eventbrite's Registration Statement and authorized or approved the Offering Documents that Eventbrite filed with the SEC in connection with the IPO.   Tomlinson is a resident of San Mateo County, California.

30.   Defendants named in Paragraphs 18 through 29 above are collectively referred to as the "Individual Defendants."

C.   **Sequoia Capital and Tiger Global Management**

31.   Defendants Sequoia Capital U.S. Venture 2010 Fund, L.P. ("SC USV 2010"); Sequoia Capital U.S. Venture 2010 Partners Fund, L.P. ("SC USV 2010 PF"); Sequoia Capital U.S. Venture 2010 Partners Fund (Q), L.P. ("SC USV 2010 PFQ"); and SC US (TTGP), Ltd. (collectively, "Sequoia Capital") are venture capital funds located in San Mateo County, at 2800

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Sand Hill Road, Suite 101, Menlo Park, California 94025.

32. Sequoia Capital was an early investor in Eventbrite and controls Eventbrite due to its large equity stake in the Company and its influence on Eventbrite's Board of Directors ("Board"), including through Sequoia Capital's partner defendant Botha, a director of Eventbrite. Sequoia Capital has special rights as a shareholder of Eventbrite pursuant to the terms of an investor rights agreement to which it is party. Defendant SC US (TTGP), Ltd. is the general partner of the general partner to SC USV 2010, SC USV 2010 PF and SC USV 2010 PFQ, and as such exercises voting and investment discretion over those funds. Prior to Eventbrite's IPO, Sequoia Capital owned 13,410,612 Class B shares of Eventbrite stock, representing 20.5% ownership and voting control. After the IPO, Sequoia Capital continued to have significant control over Eventbrite, and owns 13,452,418 Class B shares, representing 17.7% ownership of all shares and 20.0% voting control. Due to its share ownership and voting control, as well as having a director on the Company's Board, Sequoia Capital had the ability to exercise control over the Company at the time of the IPO, including control over the contents of the Offering Documents.

33. Sequoia exercised control over Eventbrite and the contents of the Offering Documents through, among others, Defendant Botha who served as both a managing member of Sequoia and a director of Eventbrite. At the time of the IPO, Botha served as a board member of the audit committee, a member of the merger and acquisition committee, and a member of the compensation committee. As a member of the audit committee, Botha had significant oversight and control over the Company's financial and reporting requirements. Botha had control over the Company's accounting practices, including the ability to appoint accounting firms, approve audit services, develop procedures for employees to submit concerns anonymously about questionable accounting or audit matter, and shape the Company's policies on risk assessment and risk management.

34. Defendants Tiger Global Private Investment Partners VI, L.P. and Tiger Global Private Investment Partners VII, L.P. are affiliates of defendant Tiger Global Management, LLC are related entities that are part of a New York-based hedge fund (collectively, "Tiger Global Management" or "Tiger Global").

10

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

35.    Tiger Global Management was an early investor in Eventbrite and controls Eventbrite by virtue of its large equity stake in Eventbrite and its special rights as a shareholder of Eventbrite pursuant to the terms of an investor rights agreement to which it is party.  Prior to Eventbrite's IPO, Tiger Global Management owned Class B shares of Eventbrite stock representing 21.4% ownership and voting control.  After the IPO, Tiger Global Management continued to have significant control over Eventbrite, including voting control, and owns Class B shares, representing 18.5% ownership of all Eventbrite shares.  Due to its share ownership and voting control, Tiger Global Management had the ability to exercise control over the Company at the time of the IPO, including control over the contents of the Offering Documents.

36.    Tiger Global Management was Eventbrite's largest shareholder prior to the IPO. Tiger Global Management exercised control over Eventbrite and the contents of the Offering Documents through, among others, Lee Fixel, a former partner at Tiger Global Management. Fixel served as a member of the Eventbrite Board and as a member of the merger and acquisition committee during the Ticketfly acquisition and leading up to the IPO.

## D.    The Underwriter Defendants

37.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter for Eventbrite's IPO.  J.P. Morgan was a financial advisor and solicited investment in Eventbrite in connection with the IPO and assisted in the preparation and dissemination of the Offering Documents.  Defendant J.P. Morgan conducts business in California.

38.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter for Eventbrite's IPO.  Goldman Sachs was a financial advisor and solicited investment in Eventbrite in connection with the IPO and assisted in the preparation and dissemination of the Offering Documents.   Defendant Goldman Sachs conducts business in California and maintains an office in San Mateo County that is located at 2765 Sand Hill Road, Menlo Park, California 94025.

11
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

39.    Defendant Allen & Company LLC ("Allen & Co.") was an underwriter for Eventbrite's IPO. Allen & Co. was a financial advisor and solicited investment in Eventbrite in connection with the IPO and assisted in the preparation and dissemination of the Offering Documents. Defendant Allen & Co. conducts business in the state of California.

40.    Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel Nicolaus") was an underwriter for Eventbrite's IPO. Stifel Nicolaus was a financial advisor and solicited investment in Eventbrite in connection with the IPO and assisted in the preparation and dissemination of the Offering Documents. Defendant Stifel Nicolaus conducts business in the state of California.

41.    Defendant RBC Capital Markets, LLC ("RBC") was an underwriter for Eventbrite's IPO. RBC was a financial advisor and solicited investment in Eventbrite in connection with the IPO and assisted in the preparation and dissemination of the Offering Documents. Defendant RBC conducts business in the state of California.

42.    Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") was an underwriter for Eventbrite's IPO. SunTrust was a financial advisor and solicited investment in Eventbrite in connection with the IPO and assisted in the preparation and dissemination of the Offering Documents. Defendant SunTrust conducts business in the state of California.

43.    Defendants named in Paragraphs 37 through 42 above are collectively referred to as the "Underwriter Defendants."

44.    The Underwriter Defendants each participated in the IPO, including through their extensive involvement in conducting and participating in roadshows and by soliciting investment in Eventbrite from the public. ████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

████████████████████████

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

█████████.

45.    The Underwriter Defendants each assisted in preparing and disseminating the Offering Documents.

46.    The Underwriter Defendants each agreed to purchase shares of Eventbrite Class A common stock as set forth in the following table:

| Underwriters | Number of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 3,400,000 |
| J.P. Morgan Securities LLC | 2,900,000 |
| Allen & Company LLC | 1,850,000 |
| RBC Capital Markets, LLC | 1,000,000 |
| SunTrust Robinson Humphrey, Inc. | 600,000 |
| Stifel, Nicolaus & Company, Incorporated | 250,000 |
| **Total** | 10,000,000 |

47.    In addition, each of the Underwriter Defendants had an over-allotment, or "greenshoe" option, to purchase an additional 1,500,000 shares.  Upon information and belief, the Underwriter Defendants exercised that option, bringing the total number of shares that were sold to the public in the IPO to 11,500,000.

48.    The Underwriter Defendants are liable under the Securities Act for the misleading statements and omissions in Eventbrite's Offering Documents.  Each of the Underwriter Defendants failed to conduct adequate due diligence, which was a substantial factor leading to the harm alleged herein.

49.    The Underwriter Defendants are primarily investment banking firms that specialize in underwriting public offerings of securities.  Each of the Underwriter Defendants was paid for their services performed in connection with the IPO and received lucrative fees as a result of their participation in the conduct alleged herein.

50.    The Underwriter Defendants met with potential investors and presented highly favorable information about the Company and its business, including regarding Eventbrite's products, financial condition, and integration of Ticketfly, which was materially misleading and/or omitted material information that was required to be disclosed under applicable federal laws and regulations.

13
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

51.     J.P. Morgan, Goldman Sachs, and Allen & Company were the representatives of the Underwriter Defendants and assisted Eventbrite and the Individual Defendants in planning the IPO.  In connection with their "due diligence" investigation, the Underwriter Defendants and their representatives, agents, and counsel were granted access to confidential information concerning Eventbrite's business, financial condition, products, plans, and prospects.

52.     In addition, the Underwriter Defendants and their representatives, agents, and counsel had access to and worked together with Eventbrite's lawyers, directors, and/or executives, including the Individual Defendants, to determine, among other things:  (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's common stock would be sold; (iii) the information about the Company that would be disclosed publicly in connection with the IPO; (iv) the language used in the Registration Statement; and (v) the Company's response to the SEC regarding its review of the Registration Statement.  As a result of the continued contacts and communications by, between, and among the Underwriter Defendants, their representatives, agents, and counsel, and Eventbrite's lawyers, directors, and/or executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed then-existing problems and plans relating to the integration of Ticketfly and other risks that had already materialized and rendered the statements and omissions in the Registration Statement materially misleading, as detailed herein.

53.     The Underwriter Defendants caused and allowed the Registration Statement to be filed with the SEC and declared effective in connection with the sale of shares of Eventbrite Class A common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Plaintiffs and the Class.

E.     **Doe Defendants**

54.     Various other individuals and entities participated in the violations of law alleged herein and performed acts and made statements in furtherance thereof.  The true names and capacities of these individuals and entities, Does 1 through 20, inclusive, whether corporate, associate, or otherwise, are unknown to Plaintiffs at this time.  Plaintiffs, therefore, sue these defendants, Does 1 through 20, by such fictitious names.  Plaintiffs further allege that each of these

14

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

defendants, Does 1–20, is responsible for the acts and occurrences set forth herein. Plaintiffs are informed and believe that discovery will reveal additional information concerning the identities of these defendants, Does 1–20, and each of their acts and statements made in furtherance of the violations of law alleged herein. Plaintiffs will seek to amend the complaint to show their true names and capacities, and the manner in which each of these defendants, Does 1–20, is responsible for the damages sustained by Plaintiffs and the Class, when such information is ascertained.

**SUBSTANTIVE ALLEGATIONS**

**A.     Background of the Company and Its Business**

55.     Eventbrite is an online marketplace for hosting, discovering, and joining live experiences and events. In the IPO Prospectus, the Company described its business as follows:

> We built a powerful, broad technology platform to enable creators to solve the challenges associated with creating live experiences. Our platform integrates components needed to seamlessly plan, promote and produce live events, thereby allowing creators to reduce friction and costs, increase reach and drive ticket sales. By reducing risk and complexity, we allow creators to focus their energy on producing compelling and successful events.

> We charge creators on a per-ticket basis when an attendee purchases a paid ticket for an event. We grow with creators as their attendance grows and as they plan, promote and produce more events. In 2017, we helped more than 700,000 creators issue approximately 203 million tickets across three million events in over 170 countries.

> We derive substantially all of our revenue from fees associated with the sale of tickets on our platform, inclusive of payment processing. Our fee structure typically consists of a fixed fee and a percentage of the price of each ticket sold by a creator. Fees associated with the sale of tickets on our platform are gross ticket fees, which we define as the total fees generated from paid ticket sales, before adjustments for refunds, credits and amortization of non-recoupable signing fees.

56.     Eventbrite earns revenues by charging event promoters ("creators," as Eventbrite calls them) for each ticket sold on its platform. In 2017, over 700,000 creators issued 203 million tickets on Eventbrite.

57.     Despite having a large number of creators, the vast majority of Eventbrite's creators do not account for the Company's revenue. Eventbrite's platform processes paid tickets, from which it generates revenue, and free tickets, from which it drives creator additions and brand

15

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

awareness. The majority of Eventbrite creators host small events, many of which are free and do not result in the Company making any revenue. Eventbrite's existing creators also fail to increase revenue over time. For example, in 2017, the revenue from existing creators declined by 3% year over year. The creators who do create revenue for Eventbrite are acquired through sales and recruitment efforts, which are costs for Eventbrite.

58. When new creators join the Eventbrite platform on their own, without incentives or sales initiatives, Eventbrite refers to that as "organic growth." An example of organic growth would include a user who had been invited to a friend's birthday party through Eventbrite and then joined Eventbrite to RSVP to the party. Like the majority of Eventbrite's creators, "organic growth" creators do not generate meaningful revenue for Eventbrite.

59. In advance of the IPO, to give the impression that Eventbrite's revenues were growing, Eventbrite spent $239 million acquiring other companies. In total, Eventbrite acquired nine businesses since 2013. Eventbrite's growth strategy, which relies on acquiring other companies, has been described ██████████████████████████████████████████ ████████████████████████████████████████████████████████████

**B.    Background of Eventbrite's Corporate and Board Structure**

60. Eventbrite adopted a dual class share structure. ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████

61. Eventbrite adopted a Board of Directors consisting of several classes listed in the table below. Eventbrite's Second Amended Form S-1 filed with the SEC on August 27, 2018 states: "This classification of our board of directors may have the effect of delaying or preventing changes in control of our company."

| Class I | ████████████████████████████████ |
| | ████████████████████████████████ |
| | ████████ |
| Class II | ████████████████████████ |
| | ████████████████████ |

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

| | |
|---|---|
| Class III | ███████████████████████ |
| | ██████████████ |

62.     The Board's Mergers and Acquisitions Committee was comprised of Lee Fixel (former partner of Tiger Global), Defendant Roelof Botha (managing member of Sequoia), and Defendant Steffan Tomlinson.  Tiger and Sequoia exercised significant control through Fixel and Botha's participating in the Board's Mergers and Acquisitions Committee.  Defendant Befumo told investors that Fixel, Botha, and Tomlinson were███████████████████████

████████████████████████████████████████████

███████[1]

### C.      Acquisition of Ticketfly

63.     In September 2017, Eventbrite acquired Ticketfly, with the aim of expanding the Company's offerings with respect to music-related events.  According to the IPO Prospectus, Ticketfly "is a progressive ticketing company that makes it easy to discover events, buy tickets, and share events with friends" which "works with various venues and promoters throughout the United States and Canada."  The IPO Prospectus stated that the fair value of the consideration transferred to purchase Ticketfly was **$201.1 million**.

64.     Acquiring Ticketfly was consistent with Eventbrite's growth strategy. ██████████

████████████████████████████████████████████

██████████████████████████████████

65.     According to the Offering Documents, Eventbrite's acquisition of Ticketfly for $200 million was the Company's largest acquisition by far.  By contrast, the IPO Prospectus stated that Eventbrite had made other similar acquisitions, including the acquisition of ticketscript for $33.4 million, Ticketea S.L., a leading Spanish ticket provider, for $11.2 million, and Ticatic E-Ticket, Inc., a Vancouver-based ticketing and event registration platform, for CAD $1.8 million in cash and 0.1 million shares of Eventbrite common stock, less adjustments and holdbacks.

66.     However, the Ticketfly acquisition was not a positive event for the Company.

---

[1] Unless otherwise noted, all emphasis is added.

17

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

"Problems with the Ticketfly acquisition cropped up almost immediately." [2]

67.   One problem involved the stark operational differences between Eventbrite and Ticketfly:

> Eventbrite devotes few resources to marketing and sales.  Instead, it invests in improving its web platform, a product-focused approach it believes will attract new users and retain existing customers.  Ticketfly, on the other hand, was built with a traditional sales team that focused on closing deals for large, high-profile concerts.  Its website features an array of must-have options for concert organizers — advanced analytics, general assignment and reserved seating options and tools to manage event entry.[3]

68.   According to former employees, combining the different companies onto one platform proved very difficult.  Shortly before the IPO, the Company circulated an internal memorandum noting that █████████████████████████████████████████████████████████████████████████████████

69.   In addition, integrating different software systems requires significant time and investment, which can create uncertainty and push customers away.

70.   Nonetheless, Eventbrite emphasized that the integration of Ticketfly was critical for the Company's success.  █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

71.   Eventbrite also touted its plans to quickly migrate ticketscript and Ticketfly clients and revenue.  ████████████████████████████████████████████████████████████████████████████████████████

---

[2] THE INFORMATION.  *Inside 'Briteland': Stalled Growth and Slumping Morale at Eventbrite* (Aug. 5, 2019),  https://www.theinformation.com/articles/inside-briteland-stalled-growth-and-slumping-morale-at-eventbrite.

[3] *Id.*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

72. ████████████████████████████████████████████████ ████████████████████████████████ ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████

73. ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████

74.     Prior to the IPO, Eventbrite knew that the Ticketfly integration was not progressing according to its ambitious, yet unrealistic, schedule. ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████

75.     Eventbrite's efforts to focus resources on completing the Ticketfly integration drew the Company's resources away from other parts of the Company, which caused those parts to lose money and caused Eventbrite's business to suffer as a whole.  As later reported by *The Information* on August 5, 2019:

> ***Resources for international expansion have been redirected to complete the integration of Ticketfly*** ... .  Insiders say many of the company's current struggles can be traced back to the acquisition, which shifted the company's focus from the core business that made Eventbrite a success ... .
>
> [***R]ather than investing in a sales team, over the past two years Mr. Befumo slashed the marketing budget in half***, people with direct knowledge said. ***Resources have since been redirected to engineering and product headcount, much of which has been tied up resolving the messy Ticketfly integration.***[4]

---

[4] *Id.*

19

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

76. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████.

77.   Prior to the IPO, Eventbrite knew that it would not meet its initially planned sunset of the Ticketfly platform by the end of 2018.

78.   ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████.

79.   Despite knowing about all of these problems related to the Ticketfly integration, the Offering documents omitted the fact that the integration was delayed and draining resources from other core, profitable aspects of the business. At a minimum, Eventbrite knew it had to complete the integration of Ticketfly to create revenue from that business, but the Offering Documents are void of any reference to the integration or when that integration might be complete.

80.   ████████████████████████████████████████
██████████████████   ████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████.

81.   In April of 2019, Eventbrite projected that it would complete the Ticketfly integration by the second half of 2019. During that time, analysts stated that the Ticketfly issues would continue to weigh heavily on the Company and its growth and revenue.

82.   To add-on, just a few months before the IPO, on May 30, 2018, Ticketfly's website was hacked and defaced by an unknown person or persons calling themselves "isHaKdz." The hackers stole the personal information of 27 million registered Ticketfly users (*i.e.*, customers) and

20

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

replaced the front page of Ticketfly's website with an image from "V for Vendetta" and the statement "Your Security Down im [sic] Not Sorry."

83. On May 31, 2018, someone claiming to be the Ticketfly hacker contacted Vice Motherboard and reported that Ticketfly's entire customer database had been stolen and posted on a server. A link to the server was provided, and Motherboard confirmed that at least some of the personal data that was posted was legitimate. On June 7, 2018, Ticketfly announced that that its website had been hacked and the personal information of Ticketfly's registered users had been stolen.

84. ███████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████

85. The Ticketfly hack also provoked some of its creators to leave the platform and temporarily diverted Eventbrite's product team away from the migration process. This resulted in Eventbrite missing a critical window during the June/July 2018 timeframe, which is typically the low point for music creators and the time they start the initial planning process for their event schedule for the year ahead.

86. The only disclosures in the Offering Documents about the hacking incident concerned the number of Ticketfly accounts that were affected and the amount of costs that Eventbrite had booked and recorded as expenses for accounting purposes. The Offering Documents did not disclose that the hacking incident impacted Ticketfly migration or financial plans. For example, the Offering Documents stated:

> For example, in June 2018, we publicly announced that a criminal was able to penetrate the Ticketfly website and steal certain consumer data, including names, email addresses, shipping addresses, billing addresses and phone numbers. For a short time, we disabled the Ticketfly platform to contain the risk of the cyber incident, which disabled ticket sales through Ticketfly during that period. Because of this incident, we have incurred costs related to responding to and remediating

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

this incident and have suffered a loss of revenue for the period during which the Ticketfly platform was disabled. In the six months ended June 30, 2018, we recorded a liability of $6.6 million for potential costs associated with this incident, of which $6.3 million was recorded as a reduction to net revenue and $0.3 million was recorded as an operating expense. We may experience reputational harm and have suffered customer loss related to this incident. In the future, our financial performance may be impacted further if we face additional costs and expenses from customer compensation and retention incentives, creator loss, regulatory inquiries, litigation and further remediation and upgrades to our security infrastructure.

87.     The costly Ticketfly acquisition and failed integration were serious problems for Eventbrite. Yet, despite knowing that, Eventbrite decided to go public and publicly claim that the Ticketfly acquisition was a positive event and central to Eventbrite's growth strategy, despite knowing that Ticketfly would not provide any increase in revenue or growth until it was fully integrated.

### D.     Eventbrite Plans and Conducts the IPO

88.     On June 15, 2018, Eventbrite filed a draft Registration Statement on Form DRS with the SEC.

89.     ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

90.     ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

91.     The sentiment was clear that the IPO needed to project the idea that Eventbrite would be profitable, without any inquiry into what the numbers were actually showing. █████

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

92. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ ███████████████████████████████████

██████ █████████████████████████████████████████

████████

93.    On August 23, 2018, Eventbrite filed a Registration Statement on Form F-1 with the SEC.  After receiving comments from the SEC, Eventbrite subsequently filed amendments to the Registration Statement.  On September 18, 2018, Eventbrite filed its final amendment to the Registration Statement with the SEC on Form S-1/A, which forms part of the Registration Statement.  The Registration Statement was declared effective on September 19, 2018.  The Registration Statement was subsequently utilized in connection with Eventbrite's IPO.

94.    Each of the Individual Defendant signed and/or approved the Registration Statement.

95.    On September 19, 2018, the Company announced the pricing of its initial public offering of 10,000,000 shares of Eventbrite Class A common stock at $23 per share.  The Company also announced that its shares had been approved for listing on the NYSE.

96.    On September 20, 2018, Eventbrite filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement.  Eventbrite's shares were subsequently listed and began trading on the NYSE.

97.    In the IPO, the Company sold 11.5 million shares of Eventbrite Class A common stock at a price of $23.00 per share, for total proceeds of approximately $246 million, net of underwriting discounts and commissions.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

98.    The Offering Documents represented that the IPO proceeds would be used by Eventbrite to repay certain debts, including $30 million of indebtedness that Eventbrite had incurred to finance the Company's acquisition of Ticketfly, and for working capital and other general corporate purposes.  In particular, the Prospectus stated: "We currently intend to use the net proceeds of this offering (i) to repay our outstanding indebtedness under our term loan facilities (which includes $30.0 million of indebtedness we incurred in September 2017 to finance our acquisition of Ticketfly, LLC) ... ."

**E.    The Offering Documents Contained False and Misleading Statements and Omitted Material Information**

99.    The Offering Documents used to effectuate the Company's IPO were negligently prepared and, as a result, contained untrue and misleading statements of material facts or omitted to state other facts necessary to make the statements made not misleading and that were required to be disclosed.

100.    According to the Prospectus, part of the Company's "Growth Strategy" depended upon its ability to leverage its existing platform through "selective" acquisitions like Ticketfly:

> ***Selectively Acquire Businesses Focused on Serving Creators.*** We have been successful leveraging our platform to make selective acquisitions that have contributed to creator and revenue growth. We accelerated our momentum through the acquisitions of ticketscript and Ticketfly. By finding like-minded teams who share a common ethos around serving creators, we can continue to expand and offer new capabilities to existing creators. The modularity and extensibility of our platform enables us to quickly integrate and migrate creators to the Eventbrite platform, allowing us to quickly deprecate the acquired technology and associated costs.

101.    The statements above in Paragraph 100, were false and misleading and omitted material information.  The inability of Eventbrite's platform to serve Ticketfly customers was hampering migration as of the IPO and draining the Company's resources such that there was virtually no positive financial impact.  As later admitted by the Company, migrating Ticketfly customers and building platform capabilities those customers needed, but Eventbrite did not have, caused the Company's resources to be "primarily focused on integrating existing revenues as opposed to delivering net new growth."  Furthermore, Eventbrite's platform was not extensible

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

because significant numbers of Ticketfly creators, including its largest customers, did not have the functionality they needed on Eventbrite's platform. In the year since Eventbrite had completed its acquisition of Ticketfly prior to the IPO, significant numbers of Ticketfly customers had lodged complaints and refused to migrate to Eventbrite as a result. Thus, this migration – which had been unsuccessfully attempted for more than a year – was far from quick and Eventbrite was bogged down in attempting to expand the functionality of its platform to provide critical or desired capabilities for the Ticketfly creators that Eventbrite was trying to migrate to its platform. In addition, as of the IPO, the Company's salesforce had been bogged down in attempting to migrate Ticketfly customers, which required new tasks not previously required, such as account management. Over 60% of Eventbrite's sales representatives in North America were focused on migration from Ticketfly. Indeed, the Company admitted that, in its maiden quarter following the IPO, its "growth rate" had been slowed by the time it was taking to migrate creators from the Ticketfly acquisition. Eventbrite's stock price plummeted over 25% in part as a result of these complications. And when, just two months later, the Company admitted the migration was "complex and consuming" due to the need to develop new product capabilities to serve Ticketfly customers, diverting resources to simply maintain "existing revenues as opposed to delivering net new growth," the Company's stock price dove over 33%. As of August of 2019 – nearly a year after the IPO – Eventbrite admitted that it was still "work[ing] to ship critical product capabilities and provide support to both migrated and yet-to-be-migrated clients" from the Ticketfly acquisition, including for the "larger" creators.

102.    Accordingly, in the Offering Documents, Defendants told investors that the acquisition of Ticketfly would create significant value for the Company and that integrating Ticketfly and other acquired companies could be accomplished by virtue of Eventbrite's "powerful and comprehensive platform" that supposedly would enable the successful migration of customers of its acquired companies (including Ticketfly):

> ***Our Technology Platform***
>
> To enable creators to more easily plan, promote and produce successful events independent of size, category or geographic location, we have designed a powerful

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

and comprehensive platform.  Our platform's cloud-based architecture supports a modular and extensible design that facilitates rapid product development and innovation by our internal development teams, our external partners and a broad developer ecosystem.

The five core tenets guiding our platform design are:

• *Accessibility*.  We build intuitive mobile and Web applications that connect to a single platform.  Creators can choose how they interface with our platform.  Their access is not limited by the channels they prefer.

• *Modularity*.  Our core capabilities are built as independent components and solutions so that they can be efficiently modified without redeploying the entire codebase.  Similarly, new capabilities can be easily added without disturbing the functionality of the existing platform.  This approach fuels rapid product development.

• *Extensibility*.  We can extend our platform to integrate third parties, enabling creators' seamless access to best-in-class partners.  We also extend their reach by building Eventbrite into social and media properties with large audiences.

• *Flexibility*.  Our proprietary and third-party components exist on our common platform, allowing creators to seamlessly customize their experience by choosing different functionalities for each event.

• *Reliability*.  We can centrally manage the performance of our platform, providing oversight and monitoring of that performance to support high-demand on-sales while continually monitoring for fraudulent or malicious activity.

103.    The Registration Statement also described as a "competitive strength[]" the purported fact that Eventbrite's "Comprehensive Platform Serves Any Creator," asserting: "Our platform combines deep functionality designed to serve sophisticated creators yet is intuitive and easy to use for creators of all types. This platform is modular and extensible, allowing us to build new capabilities quickly and to integrate with best-in-class third-party services."

104.    The statements above in Paragraphs 102-103, were false and misleading and omitted material information.  In truth, Eventbrite's platform was limited in functionality and its ability to scale.  For example, it did not have advanced ticketing or the reporting functions Ticketfly customers used.  Creators – customers or potential customers – were leaving or not adopting the platform because of the platform's inability to serve their differing interests, needs, issues, or challenges.  Because the platform was not nearly as robust as suggested by the Registration Statement, Eventbrite was acquiring other ticketing platforms in part to adopt or develop the

26

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

functionality of those platforms onto the Company's own platform. Ticketfly was in fact Eventbrite's direct competitor in North America, and the Company acquired Ticketfly in part because Ticketfly's platform offered products and functionality Eventbrite did not have. Indeed, as of the IPO, Ticketfly customers (including a significant number of Ticketfly's largest customers) were refusing to migrate to (and leaving) Eventbrite specifically because Eventbrite's platform did not provide critical capabilities the customers needed and that were provided by Ticketfly or other companies. As later admitted by the Company, the migration was a "substantial challenge" because Eventbrite did not offer the "product" Ticketfly creators "demand[ed]," and it was a "complex and consuming integration process," in part because the Company was "building product capabilities" it did not have but that were required by Ticketfly customers. These facts that existed at the time of the IPO would have been significant to investors, and when they were partially revealed just months after the IPO, investors headed for the exits and Eventbrite's stock price fell over 33% from the IPO price.

105.    Defendants also represented in the Operating Documents that the Ticketfly acquisition had already begun to have a "positive impact" on the Company's revenues. The Registration Statement stated, in relevant part:

> Our quarterly revenue increased for all periods presented, except the second quarter of 2018, primarily due to increases in paid ticket volume, both organically and through our acquisitions. Historically, we have experienced a higher increase in sequential organic net revenue growth in the first quarter of a year compared to the sequential organic net revenue growth in other quarters of that year. We acquired ticketscript in the first quarter of 2017 and Ticketfly in the third quarter of 2017, *which had a positive impact on our net revenue growth in each of those quarters.* The decrease in quarterly net revenue in the second quarter of 2018 was a result of the contra revenue amount of $6.3 million which we recognized related to the Ticketfly incident [*i.e.,* when the Ticketfly platform was disabled following a data breach].

106.    The Registration Statement also indicated that the Ticketfly acquisition had already contributed to the Company's significantly increased revenues in 2017, as compared to the prior year, as shown by the following chart:

*Comparison of years ended December 31, 2016 and 2017*
*Net Revenue*

27

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

| | Year | Ended | | |
|---|---|---|---|---|
| | December 31, | | Change | |
| | 2016 | 2017 | $ | % |
| | (in thousands, except percentages) | | | |
| Net revenue | $133,499 | $201,597 | $68,098 | 51.0% |

The increase in net revenue during 2017 compared to 2016 was driven primarily by growth in paid ticket volume, which increased by 59.4% during 2017, from 44.6 million to 71.0 million in part due to ticket volume from acquired companies. Net revenue from organic paid ticket growth increased by $40.6 million, or 30.4%, in 2017. *Net revenue increased an additional $27.5 million as a result of the Ticketfly and ticketscript acquisitions, both of which were completed in 2017.*

107.    The Offering Documents attributed the Company's revenue growth primarily to an increase in paid ticket sales. For example, the Prospectus stated:

*The gross ticket fees we have generated for the first year of each creator cohort has more than doubled from 2013 to 2017.* Gross ticket fees of each creator cohort in year one are set forth below:



108.    Defendants represented that the increase in ticket sales, which in turn, led to the increased revenue growth, was "fueled in part" by the Ticketfly acquisition:

*In 2017, our net revenue was $201.6 million, up from $133.5 million in 2016, representing year-over-year net revenue growth of 51.0%.* Our net revenue for the six months ended June 30, 2018 was $142.1 million, up from $88.2 million for the six months ended June 30, 2017, representing period-over-period net revenue

28

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

growth of 61.2%.  ***The growth over these periods was primarily the result of paid ticket growth, fueled in part by recent acquisitions.***

109.    The Offering Documents also highlighted a significant increase in customer relationships as one of the benefits of the Ticketfly acquisition, as demonstrated by the following chart, which shows the components of identifiable intangible assets acquired (in thousands) and their estimated useful lives as of the date of acquisition (years):

| | Ticketfly | ticketscript | Useful Lives |
|---|---|---|---|
| Customer relationships | $  60,500 | $    10,600 | 8.0 |
| Developed technology | 14,500 | 1,100 | 1.3 |
| Trademark | 1,300 | 100 | 1.3 |
| Total acquired intangible assets | $  76,300 | $    11,800 | |

110.    In addition, prior to the IPO, Eventbrite conducted several roadshows, which were attended by several of the Defendants, ███████████████████████████ where Eventbrite told investors that Ticketfly's existing clients would be able to sell tickets through Eventbrite by the end of 2018.[5]

111.    The statements in Paragraphs 105 through 110 were false and misleading and included omitted material information.  In reality, at the time of the IPO, the Company was struggling to migrate and integrate the Ticketfly program because the two platforms contained very different features.  For example, the Ticketfly website featured a myriad of essential options for concert organizers, such as advanced analytics, general assignment, and reserved seating options, and tools to manage entry at the event, which have been difficult for Eventbrite to integrate into its own platform.

112.    The Offering Documents' representations that the Ticketfly acquisition had already contributed to substantial increases in the Company's revenues and growth suggested that the value-creating effects of the acquisition would continue, which was misleading because, at the time of the IPO, Eventbrite was experiencing significant problems with the Ticketfly website, and the issues with Ticketfly's website were continuing to prevent the Company from successfully

---

[5] THE INFORMATION. *Inside 'Briteland': Stalled Growth and Slumping Morale at Eventbrite* (Aug. 5, 2019), https://www.theinformation.com/articles/inside-briteland-stalled-growth-and-slumping-morale-at-eventbrite.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

completing the migration and integration of Ticketfly successfully and within the expected timeframe, which the Offering Documents failed to disclose.

113. Additionally, the Offering Documents failed to disclose when the Ticketfly integration would be complete. Instead, misleading statements suggested that the Ticketfly migration was already impacting growth at Eventbrite and proceeding quickly and without delay. For example, the Prospectus stated:

> We accelerated our momentum through the acquisitions of ticketscript and Ticketfly. By finding like-minded teams who share a common ethos around serving creators, we can continue to expand and offer new capabilities to existing creators. The modularity and extensibility of our platform enables us to quickly integrate and migrate creators to the Eventbrite platform, allowing us to quickly depreciate the acquired technology and associated costs.

These statements were false and misleading and omitted material information because the Eventbrite and Ticketfly teams were not like-minded, the platforms were not integrated, nor was the integration process proceeding quickly.

114. The representations regarding the value and benefits to the Company from the Ticketfly acquisition that appeared in the Offering Documents were also misleading and/or incomplete because they omitted material information about the existing problems with Ticketfly's website that were preventing the timely and successful integration of Ticketfly.

115. The representations regarding the value and benefits to the Company from the Ticketfly acquisition were misleading where the Company failed to properly disclose the number of customers that were leaving the service and that new "organic" growth was not providing meaningful revenue.

116. The statements in the Offering Documents identified above were materially false and misleading when made because, in addition to the omitted material information described above, they also failed to disclose that, at the time of the IPO:

a. the Company was experiencing higher expenses than reported, which would lead to larger losses because it was spending significantly greater amounts than anticipated in connection with the integration of Ticketfly customers onto Eventbrite's platform, which was requiring the Company to divert significant resources away from the Company's core

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

sources of revenue, thereby ensuring that future growth and profits in the Company's core non-Ticketfly areas of business would be negatively affected;

b.      the Company was experiencing slower than expected integration of the Ticketfly and Ticketscript platforms and was unable to maintain the ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

c.      ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

d.      the Company's clients, third party business partners, and vendors terminated their contractual relationships with Ticketfly and Eventbrite due to the Ticketfly hacking incident. ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Additionally, vendor Chain Reaction, an all-ages music festival in Southern California cut ties with Eventbrite. "We had a massive loss of sales [after the hack]," said Garrett Carroll, who runs the festival and has used Eventbrite's platform for numerous other events. "They work well for very simple applications. But the dynamics of general admission and standard concert ticketing, it's not a very good platform for that;"[6]

e.      the Company and Ticketfly lost customers (both platform users and event creators) as a result of the Ticketscript migration and the delays in migrating Ticketfly;

f.      ████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[6] *Id.*

31

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

██████████████████████████████████████████████

██████████████████████████████

g.   ██ ██ █ ████ ██████ █████ ██████ █████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████ and

h.   that, as a result of the foregoing internal problems and adverse sales and earnings trends, the Company's business prospects and ability to achieve growth had been materially impaired by the time of the IPO.

117.   Under Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), the Offering Documents were also required to disclose any known trends, events, and uncertainties that were having, and that were reasonably likely to have, an impact on the Company's continuing operations.  The Offering Documents violated Item 303 by failing to disclose that at the time of the IPO, the migration of Ticketfly's platform and customers was already proceeding much slower than expected and that Eventbrite was already experiencing fundamental problems with integrating the Ticketfly platform in its own platform, given the starkly different approaches taken by each company with regard to ticketing and customer support.  The Offering Documents were required to disclose these fundamental issues with Ticketfly migration and integration because these were known events and uncertainties that existed at the time of the IPO and were likely to, and did, negatively affect the Company's revenue and growth.

118.   Eventbrite and its Board of Directors were aware of the misleading statements concerning Eventbrite's growth trends, and yet the Offering Documents nonetheless failed to adequately disclose them.

119.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

120. ████████████████████████████████████████

[Id.]

121. ████████████████████████████████████████

122.    Eventbrite's financial models were manipulated to create a set of numbers that showed an unrealistic picture of the Company. The numbers presented were "created" in an effort to make Eventbrite appear profitable for the two quarters following the IPO. Yet, in reality, the Company was experiencing a decrease in revenues and internal problems that would likely cause and did cause, reduced revenues after the IPO.

123. ████████████████████████████████████████

---

[7] "Churn" refers to the loss of customers.

33

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT



124. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

125.    The Offering Documents were misleading because they did not disclose that Eventbrite's business, including its other acquired businesses, was negatively affected by its decision to divert many of its resources to integrating Ticketfly. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

126.    The Offering Documents were misleading because they did not disclose that Eventbrite had lost and would continue to lose event creators (*i.e.,* paying customers). Prior to the IPO, RBC reported its predicted "downside scenario that Eventbrite's market traction weakens as its value proposition doesn't resonate with creators and attendees and paid ticket growth decelerates substantially." Eventbrite lost event creators as a result of the delays of migrating Ticketfly. This loss was exacerbated by Ticketfly's May 30, 2018 hacking incident. Eventbrite also lost creators due to the Ticketscript migration and the introduction of lapping product packages. These omissions were material and misleading because "[t]he company's success is

34

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

tied to the success of its creators … Eventbrite gets paid only on paid live events." Defendants were aware of this dynamic because prior to the IPO, RBC reported that "[f]ailure to meaningfully grow creator base and paid tickets" was one of the top risks to RBC's investment in Eventbrite.

127.   The Offering Documents were misleading because they claimed that customers gained by "organic" growth would result in a significant profit. This was misleading because Eventbrite's organic growth consists of customers who use Eventbrite's free services and does not result in an increase in revenue. Eventbrite failed to explain that only 5% of its creators accounted for 46% of its revenue and that Eventbrite had to acquire those profitable customers through direct sales efforts. The Offering Documents misleadingly touted the low-cost acquisition of unprofitable "organic" growth and failed to explain that such growth was not positive for business. Forbes described the vast majority of Eventbrite's unprofitable customers as a "long-term problem."[8]

128.   The Offering Documents were misleading in their presentation of sources of revenue growth. For example, Eventbrite's IPO Prospectus lists the Adjusted EBITDA figures identical to the numbers listed in the chart below but does not include any further breakdown or analysis. Prospectus p. 12.

---

[8] FORBES, *What You Need to Know About Eventbrite's IPO* (Sept. 20, 2018), https://www.forbes.com/sites/greatspeculations/2018/09/20/ipo-coverage-eventbrite-eb/#2158ab8e2bf1.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT



129.    The financial statements in the Registration Statement were misleading because the Registration Statement failed to disclose the fact that the extinguished loan was a significant source of the Company's supposed revenue growth.  In reality, Eventbrite had not increased its earnings, but had rather simply eliminated the loan as an expense and liability and therefore, significantly increased EBITDA, a key financial metric relied upon by investors.

130.    On August 29, 2018, less than a month before the IPO, Defendant K. Hartz, Eventbrite's Co-Founder and Chairman of the Board, ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████

131.    ████████████████████████████████████████████████ ████████████████████████████            both  misleading  statements  went unaddressed and were included in the IPO prospectus.

132.    The  Offering  Documents  portrayed  the  Company's  financial  condition  and

36

business prospects, including Ticketfly integration, in a far more positive light than the true facts that existed at the time, if disclosed, would allow. The Offering Documents were highly misleading in omitting these known facts and trends that had *already* begun to negatively impact the Company's business at the time of the IPO and would continue to cause the Company to experience significant losses. Defendants thus violated Item 303 by failing to disclose in the Offering Documents that the Company was already experiencing the adverse growth and earnings trends described above, because these undisclosed facts were already having and would continue to have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.

133. The Offering Documents misleadingly portrayed the Company's financial condition and business prospects, including Ticketfly integration, in a far more positive light than existed at the time, in part, to justify and explain the Ticketfly acquisition price of **$201.1 million**, which constituted a vastly greater purchase price compared to other acquisitions presented in Eventbrite's IPO Prospectus.

134. Under Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 (formally, Item 503), Defendants were also required to include, in the "Risk Factor" section of the Registration Statement and Prospectus, "a discussion of the most significant factors that make the offering speculative or risky" and to ensure that each factor "adequately describes the risk."

135. Here, the Registration Statement merely disclosed various generic "Risk Factors" and stated that "[i]n case" they did actually occur, then Eventbrite's financial condition and results of operation "*could* be materially and adversely affected." These purported "Risk Factors" violated Item 105 by failing to disclose that the warned-of risks were *already* known or predicted, *already* occurring, and were *already* negatively impacting the Company's revenues. Defendant also failed to adequately disclose the specific risks identified above even though they were highly significant factors that rendered any investment in Eventbrite stock speculative and/or risky.

136. For example, Eventbrite's IPO Prospectus states that "Any significant system interruption or delays *could* damage our reputation, result in potential loss of creators and adversely impact our business." This "risk factor" was insufficient and was misleading at the time

37
FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

the statement was made because Eventbrite was *already* experiencing delays in the Ticketfly migration and integration and was *already* losing creators. Nonetheless, despite the numerous communications evidencing Eventbrite's understanding of the need to finalize integration of the Ticketfly platform ███████████████████████████████████████████████████████ ██████████████████████████ and Defendants' knowledge that Eventbrite was behind schedule in doing so, the Offering Documents never disclosed that Eventbrite was currently experiencing delays and difficulties integrating the Ticketfly platform. The Offering Documents did not adequately disclose these risk factors because they failed to state that Eventbrite's reputation was *already* damaged. After all, creators were already lost, key employees had already quit, and its business had already been adversely impacted. Furthermore, Eventbrite did not disclose that its ██████████████████████████ to integrate Ticketfly negatively affected Eventbrite's business because it was fueled by diverting resources away from Eventbrite's other projects. ███████████████ ███████████████████████████████████████████████████████████████████████████ ███████████ Eventbrite also did not disclose that these trends were likely to persist as a result of problems encountered integrating the Ticketfly platform.

137. The Offering Documents were also misleading because they failed to disclose ███ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████ This omission was misleading because, as early as July of 2018, Eventbrite was aware of the likelihood of poor performance in the fourth quarter of 2018 and the effect it would have on Eventbrite's stock. ███████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████

138. ███████████████████████████████████████████████████████████████ ███████████ Although Eventbrite understood the risks of missing deadlines and not beating financial estimates in the quarter before and during its IPO, it did not disclose the risks.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

139. In addition, Eventbrite insufficiently and misleadingly described the "risk factors" concerning the delays in integrating Ticketfly and the consequences of not meeting integration deadlines. Eventbrite's IPO prospectus stated that, "System interruptions, slow-downs and a lack of integration and redundancy in our information systems and infrastructure *may* adversely affect our ability to operate our technology, handle sales for high-demand events, process and fulfill transactions, respond to creator and attendee inquiries and generally maintain cost-efficient operations. These "risk factors" are misleading at the time the statement was made because Eventbrite not only knew of the multitude of problems in integrating the Ticketfly platform, but also was aware of the crucial importance of completing the integration on time in order to protect and justify its most expensive acquisition.

140. The Registration Statement stated "continued growth depends on our ability to attract new creators and retain existing creators," "[a]cquisitions … could result in operating and financial difficulties," and "[i]f we do not continue to maintain and improve our platform … our business will suffer." But those statements were false and misleading and omitted material information, as creators were then rejecting the Company's platform because the platform did not have Ticketfly's capabilities (including but not limited to advanced ticketing and internal reporting functions). In addition, attempts to migrate the Ticketfly acquisition had already bogged down the Company's resources, with over 60% of the Company's North American salesforce focused on migrating thousands of Ticketfly creators and account management while the Company attempted to build capabilities onto its platform those customers needed, thereby decimating new revenue growth. And Eventbrite's business was already suffering because its platform lacked the capabilities of Ticketfly's platform, which, internally, was a significant reason Eventbrite had acquired Ticketfly.

141. The Registration Statement compiled a long list of generalized possible "risks" from "[a]cquisitions," which it said "could result in operating and financial difficulties," including "failure of the acquired company to achieve anticipated benefits," "failure to properly and timely integrate acquired companies and their operations, reducing [its] ability to achieve … anticipated returns," and "other expected and unexpected risks with pursuing acquisitions, including …

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

diversion of management's attention or other resources from [its] existing business." But those statements were false and misleading and omitted material facts because they misrepresented and/or omitted material facts concerning the Ticketfly acquisition that were then already materially adversely affecting the Company's operations as of the IPO. Indeed, the acquisition had already created an operational nightmare, as over 60% of the Company's salesforce in North America was attempting to migrate thousands of Ticketfly creators, a great proportion of which had declined to use Eventbrite's platform because it lacked Ticketfly's product capabilities. Eventbrite's salesforce was also struggling to adopt new account management, a change in function from Eventbrite's model. Consequently, as of the IPO, the Company lacked Ticketfly's product resources to develop net new revenues. What was described as something that "could result" in the future, namely operating difficulties, was then already happening as of the IPO. With the Company struggling to integrate Ticketfly since September 2017, it had already failed to timely integrate Ticketfly, given that, as of the IPO, Eventbrite's platform lacked critical capabilities that were causing hundreds of Ticketfly creators to shy from the Company's platform.

142. The Registration Statement also presented generalized possible "risks" related to migration of creators from its past "seven" acquisitions since 2015 or future acquired companies, stating "[o]ur failure to address these risks or other problems encountered in connection with past or future acquisitions … could … harm our business, results of operations and financial condition." According to the Registration Statement: "[w]hen we acquire companies … we face the risk that creators of the acquired companies … may not migrate to our platform"; Eventbrite had "previously experienced customer loss in the process of integrating and migrating acquired companies"; and "[t]he pace and success rate of migration may be influenced by many factors, including the pace and quality of product development [and] our ability to operationally support the migrating creators." Those statements were false and misleading and omitted material information, because, as of the IPO, Eventbrite was suffering from a near-catastrophic operational failure brought on by one specific acquisition – the Company's largest acquisition – Ticketfly. That was not a matter of something that "could" harm the Company – it already was materially adversely affecting operations. And customer loss was not a matter of the past, *i.e.*, something

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

"previously" experienced – it was then occurring as of the IPO due to the significant capabilities that Eventbrite's platform lacked that Ticketfly creators demanded and had been accustomed to using prior to the migration. The specific loss of creators from the Ticketfly platform that Eventbrite was then experiencing needed to be disclosed in the Registration Statement, but was not.

143. In addition, the Registration Statement stated that Eventbrite's "industry is characterized by rapidly changing technology, new service and product introductions and changing demands of creators," that "[b]uilding new solutions is costly and complex," and that "[i]f we do not continue to maintain and improve our platform or develop successful new solutions … our business will suffer." Those statements were false and misleading and omitted material facts because Eventbrite was then already suffering from a failure to introduce new products and meet creator demands – this was not a matter of keeping up with the pace of technology and demands in the future. The capabilities and functions that needed development on Eventbrite's platform already existed on Ticketfly's platform as of the IPO and the Company was suffering from the demand on its resources as a result of its previous choice to integrate those existing functions from Ticketfly onto the Company's platform.

144. The Registration Statement generally described a list of "risks" related to its employees, stating "[o]ur success depends upon the continued service of our founders and senior management team and key technical employees, as well as our ability to continue to attract and retain additional highly qualified personnel," and "future success depends on our continuing ability to identify, hire, develop, motivate, retain and integrate highly skilled personnel for all areas of our organization." Those statements were false and misleading and omitted material facts because Eventbrite was then already suffering from a lack of personnel devoted to growing the business as a result of the Ticketfly migration swallowing existing personnel resources, which was caused by the Company's attempt to integrate a tremendous number of functional capabilities that Eventbrite's platform lacked in comparison to Ticketfly's platform.

145. In addition, statements in the Registration Statement regarding the Company's current financial condition, operations, and prospects, including the purported risk warnings, were

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

similarly materially false and misleading at the time of the IPO because defendants failed to disclose that: (i) the acquisition of Ticketfly had materially impaired the Company's business and prospects, and Eventbrite had been unsuccessfully struggling to integrate Ticketfly since September 2017; (ii) significant numbers of Ticketfly creators were not migrating onto the Eventbrite platform as represented because Eventbrite products lacked the capabilities offered by Ticketfly that these creators relied on and expected; (iii) Eventbrite's attempts to build necessary new product capabilities, such as advanced ticketing and internal reporting functions, had fallen behind schedule and were draining Company resources; (iv) Eventbrite was forced to dedicate a debilitating 60% of its North American sales force to migrating Ticketfly customers, and these sales representatives were struggling to execute expanded responsibilities, such as new account management; and (v) as a result of the foregoing, Eventbrite's operational capabilities had been materially impaired, its customer and revenue growth trends had significantly deteriorated, it was experiencing rising losses, and it had suffered diminished capabilities to generate new net revenues and earnings growth.

146.    Furthermore, the fact that the Offering Documents stated that Eventbrite "***may*** experience reputational harm and have suffered customer loss related to this [Ticketfly hacking] incident" was an insufficient "risk factor," because this statement was also misleading when it was made.  By the time of the IPO, the Company had already begun losing customers, business partners, vendors, and key employees as a direct result of the reputational harm that followed the announcement of the hack, and the reputational harm and resulting loss of customers would continue to adversely affect the Company's revenue and revenue growth that was expected from the Ticketfly acquisition as the Company was unable to successfully integrate Ticketfly's website and could not achieve the migration of its customers to Eventbrite's platform within the expected timeframe as represented.

147.    On September 20, 2018, *Forbes* published an article entitled *"What You Need To Know About Eventbrite's IPO."*  The article explained that Eventbrite's claims regarding its growth were misleading because "growth through acquisitions destroys value."  The article described the misleading claims regarding growth:

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Acquisitions have been a key component of Eventbrite's growth strategy. Over the past two years, the company has spent $239 million (121% of invested capital) on acquisitions. …

***These acquisitions disguise the real customer acquisition costs that Eventbrite faces by shifting those costs from the income statement to the balance sheet.*** Through the first six months of 2018, revenue grew faster than sales and marketing costs, at 61% vs. 54% year-over-year respectively. However, much of that revenue growth came from acquisitions, ***organic revenue growth was only 39%. Eventbrite's customer acquisition strategy is not more efficient than others as it claims. When investors consider the money Eventbrite pays to acquire smaller competitors as part of its customer acquisition cost, this business looks much weaker***.[9]

**F.      Eventbrite Reported Disappointing Financial Results and Reveals Integration Issues With Ticketfly Will Continue to Negatively Impact the Company's Growth Rate**

148.     As early as November 12, 2018, several months prior to Eventbrite's first quarterly report as a public company, the Underwriter Defendants were reporting that the losses caused by the Ticketfly integration were negatively affecting Eventbrite's performance. In SunTrust Robinson Humphrey's Earnings Recap containing, among other things, "4Q18 Guidance out of the (IPO) gate," SunTrust reported:

**Migration Loss Impacting Next Quarter**: One of the key factors that will impact 4Q18's performance is the customer migration loss from moving customers onto the EB platform from Ticketfly. The company called out several drivers influencing migration loss, including competitive activity, decision to in-source, and in some cases, creators going out of business.

(Emphasis in original).

149.     On March 7, 2019, the Company announced its disappointing financial results for the fourth quarter of 2018. ███████████████████████████████████████ ████████████████████████████████████████████ ████ The Company also provided significantly lower guidance for first-quarter 2019 revenue of between $80 million and $84 million — far below analyst estimates of $91.3 million based on the Company's prior statements.

150.     In a letter to shareholders, the Company explained that the shortfall was related to the integration and migration of Ticketfly into the Eventbrite platform, and indicated that its

---

[9] FORBES, *What You Need to Know About Eventbrite's IPO* (Sept. 20, 2018), https://www.forbes.com/sites/greatspeculations/2018/09/20/ipo-coverage-eventbrite-eb/#2158ab8e2bf1.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

growth rate would continue to be negatively impacted while it integrated Ticketfly:

> Since we last updated you, we have made substantial progress toward integration and migration of Ticketfly creators. We made a deliberate decision when we acquired the company to integrate it into the Eventbrite platform, which made for a more complex and time-consuming integration process. During this process, our team has been focused on migrating existing customers, which creates tremendous value for our business but does not result in near-term revenue growth. We believe in this strategy because it will enable us to build the leading, global independent music platform.

> We anticipate finishing the last integration work to support creator migration in the second quarter of 2019. In the second half of the year we aim to complete creator migration and sunset the Ticketfly platform. ***Therefore, we believe that growth rates of our North American music business will begin to accelerate by early 2020.***

151.    The Company also stated in the letter that migration headwinds were expected to offset "continued growth self sign-on and international for the first quarter of 2019."

152.    On this news, the Company's share price fell $7.96 per share, or over 24%, on March 8, 2019.

153.    In SunTrust's April 29, 2019 Earnings Preview, SunTrust stated that "EB should report 1Q19 results that are in-line with lowered expectations."  SunTrust further stated:

> We believe the focus this quarter [1Q19] will be on the Ticketfly migration, as the progress, or lack there of, will likely determine the growth curve in 2H.  Current expectations (and management's guidance) are for the integration work to be completed mid-year (June/July). …

> As more of the sales force works on migrating Ticketfly creators and less on landing new accounts, growth will be pressured.  **Much of this slowdown is self-inflicted, in our view, not the result of changes to TAM[10] or a dramatic shift in the competitive landscape**.  We do note that competitors have taken advantage of the current dislocation from the integration to try to attract EB clients with generous offers.

154.    On May 1, 2019, after the market closed, the Company reported disappointing earnings for the first quarter of 2019.  Eventbrite reported a loss of $10 million, or 13 cents a share, far greater than analysts' expected loss of 8 cents a share on $83.1 million in revenue.  The Company's operating expenses, which rose 23% to $61 million, significantly offset revenue

---

[10] "TAM" refers to Total Addressable Market.

44

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

growth. Further, the Company's general and administrative costs — which were attributed to higher personnel costs, including stock-based compensation — increased 26%.

155.    Also, on May 1, 2019, Eventbrite announced that it would begin a search for a new CFO to replace defendant Befumo, who would be demoted to chief strategy officer.

156.    *The Wall Street Journal* reported on May 1, 2019 in an article entitled "Eventbrite Shares Plunge After Quarterly Loss, Weak Forecast" that:

> Eventbrite said it expects to bring in between $74 million and $78 million in revenue, below the $82 million analysts were expecting. The company said it faced problems related to platform migration during the quarter.

> Eventbrite bought Ticketfly, a ticketing platform used mainly for concerts, from Pandora Media in 2017 for $200 million. Eventbrite plans to bring the two platforms together by the summer, but executives have said the integration has taken longer-than expected and weighed on the company's bottom line.

> "We took on a substantial challenge when we acquired Ticketfly and spent time and resources to address the product demand and competitive landscape," said Julia Hartz, Eventbrite's co-founder and chief executive, on a conference call with analysts. ***"Resources dedicated to Ticketfly have been primarily focused on integrating existing revenues as opposed to delivering net new growth."***

157.    On this news, Eventbrite's stock price fell 29% in after-hours trading.

158.    On May 2, 2019, when this action was commenced, Eventbrite's stock was trading at under $16 per share — well below its IPO price.

## CLASS ACTION ALLEGATIONS

159.    Plaintiffs bring this action under California Code of Civil Procedure § 382 as a class action on behalf of a class consisting of all purchasers of Eventbrite Class A common stock in and/or traceable to the Company's IPO and the Offering Documents who were damaged thereby ("Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

160.    The members of the Class are so numerous such that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs are informed and believe that

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

there are hundreds or thousands of members of the proposed Class. The members of the proposed Class may be identified from records maintained by Eventbrite or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

161. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' violations of law, as alleged herein.

162. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

163. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the federal securities laws by virtue of their acts and omissions alleged herein;

b. whether the Registration Statement and Prospectus contained materially false and misleading statements and omissions; and

c. to what extent Plaintiffs and members of the Class have sustained damages as a result of the foregoing, the manner in which each Defendant is responsible for damages sustained by Plaintiffs and the Class, and the proper measure of such damages.

164. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable, and because the damages suffered by individual Class members may be relatively small, such that the expense and burden of individual litigation make it financially unfeasible and unreasonable and/or impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**FIRST CAUSE OF ACTION**
**Violation of § 11 of the Securities Act**
**(Against Eventbrite, the Individual Defendants, and the Underwriter Defendants)**

165.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

166.    This claim is brought pursuant to § 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Eventbrite, the Individual Defendants, and the Underwriter Defendants.

167.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and/or omitted to state material facts required to be stated therein.

168.    Eventbrite is the issuer of the securities purchased by Plaintiffs and the Class.  As such, Eventbrite is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

169.    The Individual Defendants each signed and/or authorized the Registration Statement.  As such, each is strictly liable for the materially misleading, inaccurate, and/or incomplete statements and omissions in the Registration Statement, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, to ensure that they were true and accurate, that there were no omissions of material facts that would make the Registration Statement misleading, and that the Offering Documents contained all facts required to be disclosed.  Each of the Individual Defendants should have known, had they exercised reasonable care, of the material misstatements and omissions contained in the Registration Statement, and they also should have known of the omissions of material fact necessary to make the statements made therein not misleading.  Accordingly, each of the Individual Defendants is liable to Plaintiffs and the Class.

170.    The Underwriter Defendants each served as underwriters in connection with the IPO.  As such, each is strictly liable for the materially misleading, inaccurate, and/or incomplete statements and omissions in the Registration Statement, unless they are able to carry their burden

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

of establishing an affirmative "due diligence" defense. The Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement, to ensure that such statements were true and accurate, and that there were no omissions of material facts that would make the Registration Statement misleading, and to ensure that the Offering Documents contained all facts required to be disclosed. The Underwriter Defendants should have known, had they exercised reasonable care, of the material misstatements and omissions contained in the Registration Statement, and they also should have known of the omissions of material facts necessary to make the statements made therein not misleading. Accordingly, each of the Underwriter Defendants is liable to Plaintiffs and the Class.

171. By reason of the conduct herein alleged, Eventbrite, each of the Individual Defendants, and each of the Underwriter Defendants violated § 11 of the Securities Act.

172. Plaintiffs acquired shares of Eventbrite Class A common stock pursuant or traceable to the Registration Statement and without knowledge of the untruths and/or omissions alleged herein. Plaintiffs sustained damages, and the price of the Company's common stock declined substantially due to material misstatements in the Registration Statement.

173. This claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the IPO.

174. By reason of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under § 11, as measured by the provisions of § 11(e), from Eventbrite, the Individual Defendants, and the Underwriter Defendants, and each of them, jointly and severally.

**SECOND CAUSE OF ACTION**
**Violation of § 12(a)(2) of the Securities Act**
**(Against Eventbrite, J. Hartz, K. Hartz, Befumo, Harnett, and the Underwriter Defendants)**

175. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

176. This claim is brought pursuant to § 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of the Class, against Eventbrite, J. Hartz, K. Hartz, Befumo, Harnett, and the

48

Underwriter Defendants.

177.   Under § 12(a)(2), Eventbrite, J. Hartz, K. Hartz, Befumo, Harnett, and the Underwriter Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's securities offered pursuant to the IPO.

178.   Eventbrite and Defendants J. Hartz, K. Hartz, Befumo, and Harnett were statutory sellers under § 12(a)(2) because they either issued, caused to be issued, and/or signed the Registration Statement in connection with the IPO and thereby solicited the purchases of Eventbrite securities motivated at least in part by their own financial interests and/or the financial interest of the Company.  Specifically, Defendants J. Hartz, K. Hartz, Befumo, and Harnett solicited the purchases of Eventbrite securities by drafting, reviewing, and/or approving the Offering Documents in connection with the marketing of Eventbrite securities, motivated at least in part by their own financial interests and/or the financial interests of the Company.  The Registration Statement was used to induce investors, such as Plaintiffs and the other members of the Class, to purchase the Company's shares.  In addition, Defendants J. Hartz and Befumo attended roadshows where they sought to induce investors to purchase the Company's shares and, thus, marketed and solicited the purchases of Eventbrite shares, motivated at least in part by their own financial interests and/or the financial interests of the Company.

179.   Eventbrite is also a statutory seller for purposes of § 12(a)(2) pursuant to the S.E.C. Rule 159A, 17 C.F.R. § 223.159A.

180.   The Underwriter Defendants are statutory sellers for purposes of § 12(a)(2) because they conducted the roadshows and passed title to the Eventbrite securities in the IPO to Plaintiffs and other members of the Class.

181.   The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.  Defendants' acts of solicitation included participating in the preparation of the false and misleading Registration Statement.

182.   Plaintiffs and the other Class members did not know, nor could they have known, of the untruths and omissions contained in the Registration Statement.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

183. Eventbrite, J. Hartz, K. Hartz, Befumo, Harnett, and the Underwriter Defendants were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of these Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were accurate and complete in all material respects. Had they done so, they could have known of the material misstatements and omissions alleged herein.

184. This claim is brought within one year after discovery of the untrue statements and omissions in the Registration Statement and within three years after shares of Eventbrite Class A common stock were sold to Plaintiffs and members of the Class in connection with the IPO.

### THIRD CAUSE OF ACTION
### Violation of § 15 of the Securities Act
### (Against the Individual Defendants, Sequoia Capital, and Tiger Global Management)

185. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

186. This claim is brought pursuant to § 15 of the Securities Act, 15 U.S.C. § 77*o*, on behalf of the Class, against each of the Individual Defendants, Sequoia Capital, and Tiger Global Management.

187. The Individual Defendants were controlling persons of the Company within the meaning of § 15 of the Securities Act. By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, had the power to influence, and exercised control over the Company to cause it to engage in the conduct complained of herein.

188. Defendants Sequoia Capital and Tiger Global Management were early and significant investors in Eventbrite and are control persons of Eventbrite due to their large equity stakes in Eventbrite, and due to Sequoia Capital's influence on the Board, including representation through Sequoia partner Defendant Botha. Sequoia and Tiger Global Management have significant special rights as shareholders of Eventbrite pursuant to the terms of an investor rights

50

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

agreement which, among other things, enabled them to influence facets and terms of the IPO.

189.    Prior to Eventbrite's IPO, Sequoia owned 13,410,612 shares of Eventbrite Class B stock, representing 20.5% ownership and voting control.  After the IPO, Sequoia owned (and continues to own) 13,452,418 shares of Eventbrite Class B stock, representing 17.7% ownership of all shares and 20.0% voting control.  Sequoia had (and continues to have) significant control over Eventbrite, including voting control, and influence over Eventbrite and its co-founders, executives and major shareholders, pursuant to the terms of an investor rights agreement to which it is party, among other things.

190.    Prior to Eventbrite's IPO, Tiger Global Management owned shares of Eventbrite Class B stock representing 21.4% ownership and voting control.  After the IPO, Tiger Global Management owned (and continues to own) shares of Eventbrite Class B stock, representing 18.5% ownership of all shares.  Tiger Global Management had (and continues to have) significant control over Eventbrite, including voting control, and influence over Eventbrite and its co-founders, executives and major shareholders, pursuant to the terms of an investor rights agreement to which it is party, among other things.

191.    By virtue of the foregoing, each of the Individual Defendants, Sequoia Capital, and Tiger Global Management are liable pursuant to § 15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Plaintiffs and the Class members suffered damages in connection with their purchases of the Company's shares.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment as follows:

A.    Declaring this action to be a proper class action and that Plaintiffs are adequate representatives of the Class;

B.    Awarding Plaintiffs and the other members of the Class compensatory damages;

C.    Awarding Plaintiffs and the other members of the Class equitable and injunctive relief, including restitution and rescission;

D.    Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

disbursements; and

E.    Awarding Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  February 10, 2020                    Respectfully submitted,

COTCHETT PITRE & MCCARTHY, LLP
Mark C. Molumphy
Tyson Redenbarger
Anya Thepot

 _/s/ Mark C. Molumphy_____
Mark C. Molumphy
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, California 94010
Telephone:   (650) 697-6000
Facsimile:    (650) 697-0577

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.
Albert Y. Chang
Yury A. Kolesnikov
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002

*Co-Lead Counsel for Plaintiffs*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

ROBBINS GELLER RUDMAN & DOWD LLP
James I. Jaconette
Brian E. Cochran
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone:   (619) 231-1058
Facsimile:    (619) 231-7423

ROBBINS LLP
Brian J. Robbins
Stephen J. Oddo
Jonathan D. Bobak
5040 Shoreham Place
San Diego, California 92122
Telephone:   (619) 525-3990
Facsimile:    (619) 525-3991

*Counsel for Plaintiff Cristina Cotte*

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT